IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| MELVIN GENE HODGES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:14-CV-374-RAH |
| | ) | [WO] |
| JOHN Q. HAMM, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Melvin Gene Hodges, a death-sentenced inmate in the custody of the Alabama Department of Corrections, has filed a habeas corpus petition, pursuant to 28 U.S.C. § 2254, challenging his conviction for the capital murder of Elizabeth "Beth" Seaton and the resulting death sentence he received in July 1999. Hodges claims that his conviction and sentence were obtained in violation of his rights under the United States Constitution. For the reasons stated below, the petition will be denied.

# TABLE OF CONTENTS

**BACKGROUND** ...........................................................................................7

   **I.**   **The Murder of Beth Seaton** ......................................................7

   **II.**   **Trial** .........................................................................................8

   **III.**   **Direct Appeal** .......................................................................13

   **IV.**   **State Post-conviction** ............................................................14

**PETITIONER'S CLAIMS** ....................................................................20

**STANDARDS OF REVIEW** ................................................................21

   **I.**   **Procedural Defenses** ...........................................................22

   **II.**   **Review Pursuant to 28 U.S.C. § 2254(d)** ...........................28

**DISCUSSION** ......................................................................................33

   **I.**   **Claim One – Ineffective Assistance of Counsel** .................33

     A.  Structural Problems in Alabama's Capital Defense System Contributed to the Ineffective Assistance of Counsel ..................36

     B.  Trial Counsel Failed to Adequately Conduct a Mitigation Investigation and Failed to Adequately Present Mitigating Evidence at the Penalty Phase of Trial ........................................41

     C.  Trial Counsel Failed to Adequately Cross-Examine Several Key Witnesses for the State ...............................................94

     D.  Trial Counsel Failed to Adequately Conduct an Investigation into Petitioner's Culpability ...............................................118

     E.  Trial Counsel Failed to Object to Erroneous Rulings and Improper Rulings by the Trial Court ................................................137

     F.  Trial Counsel Were Ineffective for Failing to Object to Numerous Instances of Prosecutorial Misconduct at Trial .........................163

     G.  Trial Counsel Failed to Conduct an Adequate Voir Dire .........................184

H.  Trial Counsel Failed to Object to the Introduction of Victim-Impact Evidence in the Guilt Phase ...................................................................207

I.  Trial Counsel Failed to Present and Effectively Argue a Motion for Acquittal .................................................................................................211

J.  Counsel Failed to Move for a Change of Venue, Despite the Lack of Jurisdiction in Lee County and Highly Prejudicial Media Coverage .......215

K.  Trial Counsel Performed Ineffectively During Closing Argument ..........220

L.  Trial Counsel Failed to Request an Inquiry into the Fact that Assistant District Attorney Thomas Rountree had Previously Represented Petitioner...............................................................................226

M.  Trial Counsel Failed in Other Ways to Present a Constitutionally Sufficient Defense .....................................................................................228

N.  Trial Counsel's Representation was Cumulatively Inadequate ...............230

O.  Appellate Counsel was Constitutionally Inadequate................................235

II.    **Claim Two – Deprived of the Right to Present His Defense** ..............239

III.   **Claim Three – Alabama's Death Penalty Scheme is Unconstitutional**......................................................................................275

A.  Alabama's Judicial Override is Unconstitutional ....................................275

B.  Alabama Affords Insufficient Weight to a Jury's Life Recommendation...................................................................................284

C.  In Light of the Judicial Override Process, Jury Instructions  are Either Unconstitutional or they Make a Mockery of the Jury's Sentencing Role in Capital Trials.............................................................287

D.  Judicial Override is Unconstitutional Because it Provides for Standardless Imposition of a Death Sentence ..........................................291

E.  The Trial Court Improperly Discounted Mitigating Evidence.................300

F.  Petitioner Should Not Have Been Sentenced to Death .............................327

G.  The HAC Aggravator is Vague and Overbroad........................................332

3

H.  The HAC Aggravator Requires Specific, Written Findings
Demonstrating the Factfinder's Comparison to Other Capital Cases ....... 332

I.  The Trial Court Improperly Relied Upon the HAC Aggravator .............. 332

**IV.  Claim Four - Alabama's Use of the Death Penalty, and the
Sentence of Death in this Case, is Unconstitutional** ........................... 346

A.  Evolving Standards of Decency Render the Death Penalty
Unconstitutional ........................................................................... 346

B.  Alabama's Death Penalty is and will be Unconstitutional Until the
State Adopts a Moratorium Permitting Review of its Process and
Procedures ..................................................................................... 348

C.  Lethal Injection is Unconstitutional ............................................ 349

D.  The Process Used by Alabama for Imposing Death by Lethal
Injection is Unconstitutional ........................................................ 352

E.  The Death Penalty, as Applied in Alabama, is Racially Biased .............. 353

**V.  Claim Five - Petitioner's Right to a Fair Trial by an Impartial
Jury was Denied by Juror Misconduct in Violation of the Sixth
and Fourteenth Amendments to the Constitution of the United
States** ................................................................................................ 358

A.  Jurors Engaged in Premature Deliberations ................................ 358

B.  Alternate Juror Improperly Participated in Deliberations ......................... 367

C.  Jurors Improperly Relied Upon Outside Knowledge and Beliefs ........... 374

D.  Alternate Juror Failed to Disclose Material Information During
Voir Dire ....................................................................................... 380

**VI.  Claim Six – Petitioner's Constitutional Right to an Impartial
Jury was Violated** ........................................................................... 390

A.  The Selection of the Grand Jury Foreperson was Based Upon
Improper Racial Characteristics ................................................... 390

4

B. The Trial Court Impermissibly Denied Counsel the Ability to Inquire into the Jury Venire .......................................................405

C. The Trial Court Impermissibly Refused to Make Personal Service on Those Summoned to Participate in the Jury Venire ..................................407

D. The Trial Court Impermissibly Excluded a Juror from the Venire Based on Unconstitutional Biases Regarding Her Religion ....................411

E. The Trial Court Impermissibly Refused to Instruct the Jury That "Life Without Parole" Means "Life Without Parole" ..............................416

VII.  **Claim Seven – Petitioner was Denied Due Process and a Fair Trial by the Prosecution's Misconduct** .................................................420

A. The Prosecutor Failed to Disclose a Deal with Kitty Porter and that She was Pressured to Testify in a Manner that Implicated Petitioner .......................................................................................420

B. The Prosecutor Permitted Perjured Testimony Regarding Police and Prosecutorial Pressure on Witnesses for the State..............................426

C. The Prosecutor Misstated Facts, Law, and Evidence...............................431

D. The Prosecutor Impermissibly Offered the Jury his Own Personal Opinions of the Evidence and Assessed the Credibility of Petitioner in Closing Arguments.......................................................................443

E. The Prosecutor Permitted a Prosecution Witness's False Testimony to Go Uncorrected ...................................................................448

F. The Prosecutor Intimidated a Witness During Trial Counsel's Cross-Examination of Her.......................................................................451

G. The State Failed to Provide Petitioner's Trial Counsel with Complete Copies of All Reports, Photographs, and Other Evidence and Information Generated that Was Relevant to this Case ....................453

H. The Prosecution Failed to Reveal Significant Inconsistencies in the Collection of Physical Evidence .............................................................456

**VIII. Claim Eight – Petitioner's Due Process Rights Under the Sixth and Fourteenth Amendments were Violated by the Trial Court's Bias** ............................................................................459

**IX.   Claim Nine – The Errors Alleged in the Petition So Infected Petitioner's Trial That, Taken as a Whole, the Trial Amounted to a Miscarriage of Justice that Cannot be Constitutionally Supported** ................................................................478

**X.    Claim Ten – State and Federal Claims Reserved; Procedurally Defaulted Claims Amount to Ineffective Assistance of Counsel; Direct Claims Preserved** .......................................................483

**CERTIFICATE OF APPEALABILITY** ...........................................484

**CONCLUSION**................................................................486

# BACKGROUND

## I.     The Murder of Beth Seaton

Hodges and Seaton were co-workers at the Golden Corral restaurant in Opelika, Alabama. *Hodges v. State*, 856 So. 2d 875, 894 (Ala. Crim. App. 2001). "Seaton was a supervisor, and one of her duties was to close the restaurant." *Id*. Seaton closed the restaurant on January 4, 1998, a Sunday.  In the early morning hours of January 5, two hunters discovered Seaton's nude body alongside County Road 26 in Macon County. *Id*.  Later that same morning, Hodges and his girlfriend, Trina Eady, also a co-worker at the Golden Corral, arrived for their opening shift at the restaurant. *Id*.  They found that "the alarm system was deactivated and the safe was open." *Id*.  They contacted police. *Id*.

Seaton "died as a result of a combination of blunt-force injuries to her head, neck, chest, and abdomen, the most significant being the crushing injuries to her chest and abdomen, which resulted from having been run over by a vehicle." 856 So. 2d at 894.  Indeed, forensic evidence showed that it was Seaton's own vehicle, a van, that crushed her.  Investigators found Hodges's Golden Corral nametag—"Mr. Hodges"—at the scene of Seaton's murder in Macon County. *Id*.  Investigators matched Hodges's DNA to that contained in a saliva sample taken from a cigarette butt recovered from the driver's side floorboard of Seaton's van.

7

*Id*. at 895; Tr. 909–10 (testimony of forensic scientist who obtained DNA profile from cigarette butt and compared profile with that of Hodges).[1]   Hodges was in possession of a "large quantity of money" immediately after Seaton's murder.  856 So. 2d at 895.[2]   Investigators recovered clothes linked to Hodges that were soaked with blood matching Seaton's DNA.   *Id*.   Investigators also found blood on the watch and ring Hodges was wearing at the time of his arrest.   *Id*.[3]

## II.   Trial

Hodges was tried on a charge of capital murder pursuant to Ala. Code § 13A-5-40(a)(2), murder during the course of a robbery.   Apart from testimony establishing the forensic and circumstantial evidence described above, the

---

[1] Citations to the court reporter's transcript of Petitioner's trial will be formatted in this opinion as "Tr. x" and will utilize the pagination original to the reporter's transcript.  The court reporter's transcript can be found in Volumes 6–12 of the state court record, accessible at docket number twenty-one in the ECF system.  Likewise, citations to the transcript of Petitioner's Rule 32 evidentiary hearing will be formatted as "Rule 32 Tr. x."  The transcript of Petitioner's Rule 32 evidentiary hearing can be found in Volume 50 of the state court record.  By contrast, citations to the clerk's record, the state court record on appeal, and the record of petitioner's Rule 32 proceedings, excluding his evidentiary hearing, as well as the pleadings and documents filed in federal court, will utilize the docket number and PDF page number generated in the ECF system and appearing at the top of the document.

[2] Trial testimony established that over $7,900 in cash and checks, as recorded in the "manifest" prepared by Seaton on January 4, 1998, plus the restaurant's "safe fund" of $5,000, was missing from the restaurant's safe.  Tr. 605–06.

[3] Investigators were unable to conclude that the blood on the watch and ring was Seaton's blood, as "the amount of stain present was just insufficient to do anything further" than identify the components of blood.  Tr. 857.

prosecution's case at the guilt phase of Hodges's trial hinged largely on the testimonies of two witnesses: Hodges's aunt, Kitty Porter, and Hodges's co-defendant, Marlo Murph.  Porter "testified that, on January 5, 1998, she drove Hodges to Tuskegee.  She said that he told her that police had discovered his Golden Corral name tag at the murder scene." *Id*. at 895.  She further testified that "Hodges admitted to her that he had robbed and killed Seaton." *Id*.  Specifically, she testified as follows:

> He told me that he had—him and this person [Murph] had killed this woman.  He told me that one of them held her while the other one beat her.  And then told me they throwed her out of the car at Smith's Station.  And the same thing with the robbery.  They stopped her.  They pulled her over.  And they made her go back to the store at gunpoint, and that at that point in time, they robbed the store, and took all – took whatever and they left with her.
> . . .
> She was begging them—she was asking Melvin not to let this person—this other person kill her.  She was actually begging him not to let this person hurt her.

Tr. 981–82.  Porter's account of the murder, as relayed by Hodges, would be corroborated by Murph's testimony "in almost all respects." 856 So. 2d at 895.

Murph testified pursuant to a plea agreement "that recommended that he receive a sentence of life imprisonment without the possibility of parole" in exchange for his testimony.  856 So. 2d at 895 n.1.  The Alabama Court of Criminal Appeals ("ACCA") summarized his testimony as follows:

Murph testified at trial that Hodges suggested robbing the Golden Corral. He said that Hodges told him that Sunday night was the best time because there would be a lot of money in the safe. Murph said that Hodges got the pistol used to murder Seaton from Greg Holstick.[4] The two planned to get to the restaurant while Seaton was closing up. According to Murph, their plans went awry. When they arrived at the restaurant they saw Seaton driving away in her van. They followed the van and were able to get Seaton to pull over. While Hodges was talking to her, Murph said, he entered the van and pointed a gun at her. The two then forced her to drive back to the Golden Corral and open the safe. Murph and Hodges then forced Seaton to drive her van around the area. Murph testified that Seaton sensed that something was going to happen; he stated that she started taking off her clothes and saying that she would have sex with them if they did not hurt her. They eventually made her pull the vehicle over.[5] Murph testified that Hodges said that Seaton knew too much. Hodges then pulled Seaton out of the van and began hitting and choking her. Murph said that while Hodges was holding her, he hit Seaton with a pistol. Murph testified that when he realized what Hodges was going to do he walked away. He said that Hodges got into the driver's seat in Seaton's van and ran over Seaton about four times, back and forth. The two then left in Seaton's van. Murph said

---

[4] To be clear, as the ACCA acknowledged in its opinion, Seaton's cause of death was the extensive crush injuries she received as a result of being repeatedly run over. She did not suffer any gunshot wounds. The trial evidence did show that Hodges obtained a firearm from Holstick, and that this firearm was used during the robbery and beating of Seaton. Specifically, Murph admitted to holding Seaton at gunpoint and to hitting her with the pistol at least twice. Indeed, a piece of the pistol's plastic grip was recovered at the scene of her murder. Given these facts, however, the pistol was "used to murder" Seaton only in the broadest sense.

[5] Murph testified that, after the robbery at the Golden Corral, while holding her at gunpoint, he rode in Seaton's van with Seaton driving and that they followed a vehicle driven by Hodges to a church "out in the country," where Hodges parked the car he was driving and took over driving Seaton's van. Tr. 1022. It was at that point, according to Murph, that Seaton began pleading for her life, including removing her clothes and offering sex for her life. *Id.* at 1023. In short, Murph testified that Hodges, not Seaton, drove the van to the location where Seaton was murdered.

that they drove around for several minutes and Hodges realized that his Golden Corral name tag was missing. The two tried to return to where they had left the body, but they were lost and running out of gas. Murph said that he threw Seaton's purse out of the window near the rest area in Tuskegee and that they parked Seaton's van at Mount Olive Baptist Church. Hodges's clothes were covered in blood so he gave them to Murph to dispose of. Murph led police to where he had disposed of Hodges's clothes. Murph testified that Hodges gave him $2,500 for his part in the robbery/murder. (Murph had $1,427 in his possession at the time of his arrest.)

*Id.* at 894–95.

Hodges testified in his defense at the guilt phase. He was the defense's only

witness. The ACCA summarized his testimony as follows:

Hodges testified that he orchestrated the robbery and enlisted the help of Craig Hicks,[6] Greg Holstick, and Marlo Murph. Hodges testified that, on the night of the intended robbery, Hicks did not show up and they had to revise their plans. He said that he planned to be at his apartment so that he would not be implicated in the robbery. He said that he wondered what was taking so long and went across the street from the Golden Corral to see what was happening. Hodges further testified that after about one hour Greg Holstick returned and said that they had to get rid of Seaton because she knew them. (Hodges had previously introduced Holstick to Seaton.) Hodges said that Holstick gave him $600.[7] Hodges said that he was not present at the time of the robbery or the murder and that he knew nothing about the murder. He said that the State's witnesses were all lying.

---

[6] Craig Hicks was another Golden Corral employee and, at the time of the murder, was incarcerated in a work release program in Lee County. Tr. 1109.

[7] This is slightly more than the amount that Hodges's "mistress" in Tuskegee testified she found hidden in her bathroom after Hodges visited her apartment on January 5, 1998. Tr. 789 (witness testifying that she found $525 hidden in a bag inside her toilet tank). The "mistress," Armesia Perry, also testified that Hodges gave her $100 that same day to put toward her phone bill. Tr. 787.

11

856 So. 2d at 895–96.   Hodges also attempted to explain away some of the circumstantial evidence amassed against him.   For example, Hodges testified that his Golden Corral work shirt, which was found with blood on it and was recovered with other items of clothing containing Seaton's blood, was worn by Murph during the robbery in an attempt at subterfuge, the idea being that Seaton would let Murph into the restaurant after closing if she believed he was an employee.  Tr. 1067.  He claimed to have been in Seaton's van numerous times as both a passenger and driver, thereby explaining the presence of his DNA on a cigarette butt found in her vehicle.  Tr. 1105–06.  The blood on his ring and watch likely owed to his duties handling raw meats at Golden Corral.  Tr. 1107.

In sum, Hodges testified that he planned the robbery; that he recruited Holstick, Murph, and Hicks to execute his plan; that he did not actively participate in the robbery or murder; that Holstick and Murph, but especially Holstick, were responsible for the murder; that all the witnesses implicating him in the murder, including his aunt, were lying; and that all of the inculpatory circumstantial evidence implicating him in the murder can be explained by innocent coincidence.

The jury convicted Hodges of capital murder.   The State presented no witnesses in the penalty phase.  Hodges called one witness, his mother Cora Cobb. Over thirty-six pages of transcript, Cobb testified about her background, her family

12

history, her struggles with poverty and physical and mental abuse by a series of husbands and boyfriends, and how all these circumstances affected Hodges throughout his life.  The jury returned a verdict recommending, by a vote of eight to four, that Hodges be sentenced to life imprisonment without parole.  Tr. 1263–64.   At the sentencing hearing, the trial court overrode the jury's life recommendation and sentenced Hodges to death.  Tr. 1268.

## III.   Direct Appeal

On direct appeal, the ACCA identified several errors in the trial court's sentencing order and remanded with instructions to correct the identified errors, reweigh the aggravating and mitigating circumstances, and enter a new sentencing order.  *Hodges*, 856 So. 2d at 894.  On remand, the trial court entered an amended sentencing order again imposing a sentence of death.  Doc. 21-55 at 7–14.   On return to remand, the ACCA affirmed.  856 So. 2d at 936.  The Alabama Supreme Court ("ASC") granted certiorari on two sentencing issues raised by Hodges and affirmed his sentence.  *Ex parte Hodges*, 856 So. 2d 936, 948–49 (Ala. 2003).  The United States Supreme Court denied certiorari review.  *Hodges v. Alabama*, 540 U.S. 986 (2003).

## IV.    State Post-conviction

Hodges next sought relief from his conviction and sentence pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  Because the cumulative Rule 32 proceedings in this matter are voluminous and are characterized by multiple remands for further proceedings by Alabama's appellate courts, some care is taken to properly summarize Hodges's lengthy postconviction efforts in Alabama's state courts.

### A.    Initial Rule 32 Proceedings

Hodges filed his initial Rule 32 petition in the Circuit Court of Lee County, Alabama, in early 2004.  Doc. 21-20 at 13–160.  Circuit Judge Robert Harper, who presided over Hodges's trial, was assigned.  A few months later, Hodges filed an amended petition pursuant to Rule 32.  Doc. 21-21 at 34–183.  The State filed a lengthy answer asserting procedural and merits defenses to the Rule 32 petition's claims and, subsequently, moved to dismiss several claims in the amended petition.  Doc. 21-23 at 150–78.  Judge Harper entered an order granting the State's motion and summarily dismissing several claims in the amended petition as procedurally barred or insufficiently pleaded.  Doc. 21-55 at  108–95.  Hodges then filed a corrected amended Rule 32 petition and moved the Circuit Court to reconsider its

order granting the State's partial motion for summary dismissal.  Doc. 21-25 at 40–43.

In early 2005, the State moved to set an evidentiary hearing on the amended Rule 32 petition's remaining claims.  Doc. 21-25 at 110–11.  Petitioner opposed this motion and, instead, urged Judge Harper to set a hearing on his pending motions for reconsideration of the court's orders granting the State's motion to dismiss and its orders denying his motions for discovery and for funds to hire an investigator.  Doc. 21-25 at 119–121.  Judge Harper retired from the bench during these proceedings.  The Circuit Court, Judge John Denson presiding, entered an order setting an evidentiary hearing, as requested by the State.  Doc. 21-25 at 131.  Approximately a week later, Circuit Judge Jacob Walker entered an order re-appointing Retired Circuit Judge Harper to preside over Hodges's Rule 32 proceedings.  Doc. 21-25 at 132.  A little over two weeks later, Judge Harper entered a one-page summary order denying the remainder of the Rule 32 petition.  Doc. 21-55 at 196–197.  In pertinent part, Judge Harper concluded as follows:

> The thrust of the Amended Petition is that trial counsel for the Petitioner was inadequate in several respects.  The Court has an independent recollection of the trial of this case.  The representation provided by trial counsel was adequate in every respect and met the full requirements of the law with respect to adequate representation.

*Id.* at 196.  Judge Harper accordingly canceled the evidentiary hearing and denied Hodges's pending motions to reconsider.  *Id.*

On appeal, the ACCA affirmed the summary dismissal of Hodges's claims except to the extent that the Circuit Court failed to state its reasons for denying Hodges's claims alleging that "trial counsel were ineffective for failing to conduct an adequate mitigation investigation and for not presenting the mitigation evidence they should have discovered[.]"  *Hodges v. State*, 147 So. 3d 916, 962–63 (Ala. Crim. App. 2007).  Finding that those claims were "sufficiently pleaded and unrefuted by the State," the ACCA concluded that "Hodges is entitled to an opportunity to present evidence to prove those claims."  *Id*. at 963.  Accordingly, the ACCA remanded with instructions "to either conduct an evidentiary hearing or accept evidence in the form of affidavits, written interrogatories, or depositions" on the above-described ineffective assistance claims.  *Id*. at 969.  The ACCA further instructed that, "[a]fter receiving and considering the evidence presented," the Circuit Court must "issue specific written findings of fact regarding Hodges's claims[.]"  *Id*.

## B.    First remand to the Circuit Court

On remand, Judge Harper took evidence in the form of depositions from several witnesses, including Hodges's trial attorneys Larry Ray and Floyd Likins,

16

his mother, brother, and sister, a social worker, and psychological experts proffered by both Hodges and the State.   Judge Harper did not conduct an evidentiary hearing.   Following his review, Judge Harper issued a two-page order denying the amended petition on remand.   In that order, Judge Harper recognized "six claims asserted by the Petitioner in which he claims trial counsel failed to adequately investigate and present to the jury and Court during trial."   These claims included that Hodges "was exposed to continual and extreme violence during his youth;" that "alcoholism and drug abuse plagued Petitioner and his family;" that "Petitioner was raised in extreme poverty;" that Petitioner was abandoned as a child and had no male role model;" that "Petitioner constantly moved between homes;" and that Hodges "attempted to lead a positive life."  Doc. 21-56 at 65.  In one paragraph, Judge Harper set forth his findings of fact in support of his order denying these claims:

> During the mitigation phase of the trial the defense called Cora Cobb, the Petitioner's mother to testify.  To a greater or lesser extent, her testimony touched on facts to establish each of the six claims made by Petitioner as set forth above.  This testimony was not disputed by the State.  No cross examination of Mrs. Cobb was conducted by the State.  By virtue of the fact that each of the "claims" of Petitioner was brought before the Court and the Jury, the Court finds that the mitigation investigation conducted by attorneys for the Petitioner met the requirements of the law.  The Court further finds that the presentation of this testimony by attorneys for the Petitioner was adequate and met the requirements of the law.

Doc. 21-56 at PDF 65.

17

On return to remand, the ACCA concluded that Judge Harper's order "fails to satisfy this Court's directions on remand" and the requirements of Rule 32. *Hodges v. State*, 147 So. 3d at 971. In particular, the ACCA chastised Judge Harper's failure to "delineate any of the voluminous testimony presented during the depositions" and failure to include findings of fact "regarding the scope of trial counsel's investigation and preparation for the sentencing phase of Hodges's trial or the evidence trial counsel discovered during the investigation and presented at trial as compared to the information about which Hodges's witnesses testified during their depositions." *Id*. Accordingly, the ACCA again remanded with directions to "enter a new order in which it makes specific, written findings of fact regarding each of the specific claims Hodges raised in his petition about trial counsel's alleged failure to conduct an adequate investigation into mitigation evidence and to adequately present mitigation evidence at the penalty phase of his trial." *Id*. at 972–73. Although the ACCA did not require that the Circuit Court take additional evidence to comply with its directions, it did not preclude the Circuit Court from doing so. *Id*. at 973.

## C.   Second remand to the Circuit Court

On remand once more, Circuit Judge Walker entered a lengthy order addressing the legal standard governing Hodges's ineffective assistance claims,

18

summarizing the deposition evidence submitted by the parties in the prior remand, and making findings of fact respecting each of the claims before the court. Doc. 21-56 at PDF 67–84. Ultimately, Judge Walker denied the penalty phase ineffective assistance of counsel claims subject to the ACCA's remand. *Id.* On return to second remand, the ACCA affirmed. Doc. 21-56 at PDF 85–122.

The ASC granted certiorari on the limited question of whether the summary denial of Hodges's claim alleging juror misconduct conflicted with the ASC's intervening decision in *Ex parte Burgess*, 21 So. 3d 746 (Ala. 2008). *Ex parte Hodges*, 147 So. 3d 973, 974 (Ala. 2011). The ASC concluded that Hodges was entitled to an evidentiary hearing on his claim that a juror failed to respond truthfully to questioning during voir dire and, accordingly, remanded to the ACCA "for that court, in turn, to remand it to the trial court for an evidentiary hearing on the merits" of such claim. *Id.* at 977. The ACCA followed with its order remanding to the Circuit Court. *Hodges v. State*, 147 So. 3d 977 (Ala. Crim. App. 2011).

### D.    Third remand to the Circuit Court

On remand once again to the Circuit Court, Judge Christopher Hughes conducted an evidentiary hearing at which the subject juror and Hodges's lead trial counsel, Larry Ray, testified. Following the hearing, Judge Hughes entered an

order denying Hodges's juror misconduct claim on the merits.  Doc. 21-56 at PDF 130–35.  The ACCA affirmed.  Doc. 21-56 at PDF 137–48.  The ASC denied Hodges's petition for certiorari review, thereby concluding state postconviction proceedings.  Doc. 21-56 at PDF 150.  On May 19, 2014, Hodges filed the instant federal habeas corpus petition.

## PETITIONER'S CLAIMS

Petitioner asserts ten separately numbered grounds for habeas corpus relief, many of which contain multiple subclaims.  These ten claims are summarized as follows:

(1)    Petitioner was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the Constitution;

(2)    Petitioner was deprived of his right to present a defense under the Sixth and Fourteenth Amendments due to the trial court's denial of funds for experts and investigators;

(3)    Alabama's death penalty sentencing scheme is unconstitutional on its face and as applied to Petitioner;

(4)    Alabama's use of the death penalty, and Petitioner's sentence of death, is unconstitutional;

(5)     Juror misconduct denied Petitioner a fair trial by an impartial jury, in violation of his rights under the Sixth and Fourteenth Amendments;

(6)     Petitioner was deprived of an impartial jury of his peers;

(7)     Prosecutorial misconduct deprived Petitioner of a fair trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments;

(8)     The trial court's bias violated Petitioner's due process rights under the Sixth and Fourteenth Amendments;

(9)     The errors described in the preceding claims cumulated to cause a miscarriage of justice that cannot be constitutionally supported; and

(10)    A claim purporting to "reserve" all state and federal claims and categorically assert the ineffective assistance of trial and appellate counsel as cause for the failure to present purportedly procedurally defaulted claims.

## STANDARDS OF REVIEW

Respondent argues that many of the subclaims comprising some of Petitioner's claims are procedurally barred from federal habeas review, while his remaining claims cannot survive the deferential review required by 28 U.S.C. § 2254(d).  The standards and criteria to be applied in evaluating these defenses are set out below.

## I.     Procedural Defenses

"Generally, procedural default can arise in two ways: (1) when the state court correctly applies a procedural default principle of state law and concludes that the petitioner's federal claims are barred; or (2) when the petitioner 'never raised a claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred' in state court." *Carruth v. Comm'r, Ala. Dept. of Corr.*, 93 F.4th 1338, 1354 (11th Cir. 2024) (quoting *Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999) (per curiam)).  Where the asserted procedural default is grounded in the state court's application of state procedural rules to bar a federal claim, the "federal court must determine whether the last state court rendering judgment clearly and expressly stated that its judgment rested on a procedural bar." *Id.* at 1355 (internal quotation omitted).  Where the asserted procedural default is based upon the habeas petitioner's failure to present or exhaust his claim in the state courts, "the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine." *Id.* (citation omitted).

Expanding on the first common procedural default scenario described in *Carruth*, "[a]s a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural

default grounds, that are 'independent and adequate' to support the judgment."

*Boyd v. Comm'r, Alabama Dep't of Corr.*, 697 F.3d 1320, 1335 (11th Cir. 2012)

(citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

> To determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision, [the federal court] consider[s]: (1) whether the last state court rendering a judgment in the case clearly and expressly state[d] that it relied on state procedural rules to resolve the federal claim without reaching its merits; (2) whether the decision rest[s] solidly on state law grounds and is not intertwined with an interpretation of federal law; and (3) the state procedural rule is adequate, *i.e.*, not applied in an arbitrary or unprecedented fashion.

*Thomas v. Attorney General*, 992 F.3d 1162, 1184 (11th Cir. 2021) (internal quotations and citations omitted).   Regarding the third of these factors, "[t]he state court's procedural rule cannot be manifestly unfair in its treatment of the petitioner's federal constitutional claim to be considered adequate for purposes of the procedural default doctrine.  In other words, a state procedural rule cannot bar federal habeas review of a claim unless the rule is firmly established and regularly followed. *Boyd*, 697 F.3d at 1336 (quotations and citations omitted).

The second common procedural default scenario described in *Carruth* stems from a habeas petitioner's failure to exhaust his claim in the state court.  A state prisoner seeking habeas corpus relief must first exhaust the remedies available to him in the state courts before seeking relief in federal court.   28 U.S.C. §

23

2254(b)(1)(A). "The prisoner exhausts his remedies by presenting his constitutional claim to the State courts, to afford them an opportunity to correct any error that may have occurred." *Hardy v. Comm'r, Ala. Dep't of Corr.*, 684 F.3d 1066, 1074 (11th Cir. 2012) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*)). The "opportunity" to resolve federal constitutional claims in the state courts must be "full and fair." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Hence, the state prisoner must alert the state courts to the federal nature of a given claim. *Duncan,* 513 U.S. at 365–66 ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."). To do this, "a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The state prisoner must "invok[e] one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. This requirement obligates the state prisoner to seek even discretionary review in the state's highest court, provided such "review is part of the ordinary appellate review procedure in the State." *Id.* at 847. However, a claim raised for the first and only

time in a procedural posture in which review of claims is discretionary has not been "fairly presented." *Castille v. Peoples*, 489 U.S. 346, 351 (1989). *See also Mauk v. Lanier*, 484 F.3d 1352, 1358 (11th Cir. 2007) (finding that the habeas petitioner failed to fairly present his claims in Georgia's state courts where the claims were first raised in a petition for certiorari review to the Georgia Supreme Court).[8]

Because a federal court ordinarily may not grant habeas corpus relief when the petitioner has not exhausted available state remedies, "[i]f a petitioner fails to exhaust his state remedies, a district court must dismiss the petition without prejudice to allow for such exhaustion." *Gore v. Crews*, 720 F.3d 811, 815 (11th Cir. 2013). If state remedies are no longer available to the state prisoner due to state procedural limitations, the unexhausted claim is generally treated as exhausted but procedurally defaulted from federal habeas review. *Id.* at 816 ("An unexhausted claim is not procedurally defaulted unless it is evident that any future attempts at exhaustion would be futile due to the existence of a state procedural bar."). *See also McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) ("It is well established that when a petitioner has failed to exhaust his claim by failing to

---

[8] This rule has been applied to bar federal review of claims presented, for the first and only time, in discretionary review before the ASC. *See Waldrop v. Comm'r, Ala. Dep't of Corr.*, 711 F. App'x 900, 918–19 (11th Cir. 2017).

fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar.").

"A procedural default can be overcome if the petitioner 'demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Carruth*, 93 F.4th at 1355 (quoting *Coleman*, 501 U.S. at 750)). "As a general matter, 'cause' for procedural default exists if 'the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258 (11th Cir. 2013) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). A petitioner may achieve this threshold by showing, for instance, that "the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Murray*, 477 U.S. at 488 (citations and quotations omitted). "Attorney negligence is generally not good cause to excuse procedural default. Attorney performance is only relevant if the procedural default stems from constitutionally required counsel's deficient performance, or 'when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding,' but the prisoner did not have effective counsel in his first collateral proceeding." *Carruth*,

26

93 F.4th at 1355 (citation omitted) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14 (2012)).   Likewise, the ineffective assistance of counsel may constitute "cause" for a procedural default of a federal claim in the state courts.   *Id.*

In addition to cause, the habeas petitioner must demonstrate actual prejudice to overcome a procedural default. "Actual prejudice means more than just the possibility of prejudice; it requires that the error 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Ward v. Hall*, 592 F.3d 1144, 1178 (11th Cir. 2010) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Finally, a federal court may review a procedurally defaulted habeas claim on the merits, even in the absence of cause or prejudice, if necessary to remedy a "fundamental miscarriage of justice." *Carruth*, 93 F.4th at 1354.  A fundamental miscarriage of justice occurs if a "constitutional violation has probably resulted in the conviction of one who is actually innocent."   *Murray*, 477 U.S. at 496. To show a fundamental miscarriage of justice based on asserted actual innocence, the petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  "To determine if someone was actually innocent,

petitioner must demonstrate 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Carruth*, 93 F.4th at 1355 (quoting *Schlup*, 513 U.S. at 327)).

## II.   Review Pursuant to 28 U.S.C. § 2254(d).

For those claims exhausted and decided on the merits in the state courts, this court is to apply the standard of review set out in § 2254(d)(1) and (2), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996). Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is

"contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412–13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In short, to satisfy § 2254(d)(1)'s "unreasonable application" standard, "a prisoner must show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020).

Likewise, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "In reviewing whether a state court's decision was based on an 'unreasonable determination of the facts' under § 2254(d)(2), [the court]

presume[s] the state court's factual findings are correct, and the petitioner has the burden to rebut those facts by clear and convincing evidence." *Wellons v. Warden, GA Diagnostic & Classification Prison*, 695 F.3d 1202, 1206 (11th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)). "This statutory presumption of correctness applies to the factual determinations of both state trial and appellate courts." *Id.* (citing *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003)).

While "deference [in the habeas context] does not imply abandonment or abdication of judicial review" and does not "preclude relief," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), the deferential standard imposed by § 2254(d), as to both legal conclusions and factual determinations by the state courts, is formidable. As the Supreme Court has explained:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no probability fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quotation and citations omitted). *See also Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied.  However it is phrased, the deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear.").

The force of AEDPA's "daunting" standard of review is demonstrated in other ways.  For example, AEDPA deference is owed when a state court has summarily denied relief on a claim.  That is, where there is no "opinion from the state court explaining the state court's reasoning," the habeas petitioner still must show "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.  Thus, faced with a state court's summary disposition on the merits, "a habeas court must determine what arguments or theories supported, or . . . could have supported, the state court decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court.  *Id*. at 102.

Furthermore, even where the state court has provided a reasoned decision, AEDPA still requires the federal court to "consider any potential justification" for

31

the state court's ultimate disposition, even those not expressly offered by the state court. *Pye v. Warden, Georgia Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc); *id.* at 1037–38 (explaining that, where "a state court rejects a petitioner's claim in a written opinion accompanied by an explanation, the federal habeas court reviews only the state court's 'decision' and is not limited to the particular justifications that the state court supplied"). Put another way, while a federal court in habeas must "evaluate the reasons offered by the [state] court," if the state court's reasons can be justified "on a basis the state court did not explicate, the state-court decision must still stand." *King v. Warden, Georgia Diagnostic Prison*, 69 F.4th 856, 867 (11th Cir. 2023).

If petitioner succeeds in surmounting the formidable obstacles imposed by AEDPA, then this court is "unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1255 (11th Cir. 2013) (citation and internal quotation marks omitted). Even in *de novo* review, however, with limited exceptions, the court may not grant habeas corpus relief if the state court error at issue was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). "In collateral cases, a federal constitutional error is harmless unless it imposed 'actual prejudice.'" *Sears v. Warden, GDCP*, 73 F.4th 1269, 1280 (11th Cir. 2023) (quoting *Brecht*, 507 U.S. at

637–38).   Actual prejudice results when the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

## DISCUSSION

The court will address each claim, including subclaims, as well as Respondent's defenses thereto, in the order in which they are presented in the petition.

## I.   Claim One – Ineffective Assistance of Counsel

Petitioner's lengthiest claim is his claim that he received ineffective assistance from his trial and direct appellate counsel.   There are sixteen separate headings under his umbrella claim of ineffective assistance, with many of these headings containing several distinct subclaims.   Because the same general standard governs all ineffective assistance claims, the court first explains that standard before addressing each of the petition's claims.

The clearly established federal law governing a claim of ineffective assistance of counsel is the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984).   Broadly, *Strickland* requires the petitioner to show both that his counsel performed deficiently and that such deficient performance prejudiced the outcome of the defendant's trial (or appeal).   *Id*. at 687.   To show deficient performance, the petitioner must show that his counsel's performance "fell below

33

an objective standard of reasonableness." *Id*. at 688. "In other words, the petitioner must establish that no competent counsel would have taken the action that his counsel did take." *McNabb v. Comm'r, Ala. Dep't of Corr.*, 727 F.3d 1334, 1339 (11th Cir. 2013) (quotation omitted). In reviewing the actions and omissions of counsel, courts are to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable processional assistance." *Strickland*, 466 U.S. at 689.

*Strickland*'s prejudice prong requires that the petitioner "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome[.]" *Id*. This requires more than a showing that counsel's errors "had some conceivable effect on the outcome of the proceeding[.]" *Id*. at 693. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. In a capital case in which ineffective assistance is alleged to have prejudiced the petitioner's sentence, "the prejudice inquiry asks 'whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Sealey v. Warden, Georgia Diagnostic Prison*, 954 F.3d 1338, 1355 (11th Cir.

2020) (quoting *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 935 (11th Cir. 2011)).

Where review of an ineffective assistance of counsel claim is governed by AEDPA, review is "doubly deferential." *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1323 (11th Cir. 2013).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (quotation and citation omitted). So, while satisfying *Strickland*'s deferential inquiry is "never an easy task[,]" *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105.

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The

> question is whether there is any reasonable argument that counsel
> satisfied *Strickland*'s deferential standard.

*Id.* (citation omitted).  If the answer to this question is "yes," the federal court lacks

the power to grant habeas relief.  *Pye*, 50 F.4th at 1042.

The practical effect of applying the "doubly deferential" standards of *Strickland* and AEDPA in tandem is that "it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding."  *Gissendaner*, 735 F.3d at 1323.

The court now turns to application of these principles to Petitioner's claims of ineffective assistance of counsel.

### A.    Structural Problems in Alabama's Capital Defense System Contributed to the Ineffective Assistance of Counsel (Claim I.A).

Petitioner first identifies several "structural problems" that, he alleges, "contributed" to his counsels' ineffective assistance at his trial and on appeal.  The essential allegations outlining these "structural problems" are as follows: Lee County's system for the appointment of indigent capital defense "was biased to exclude from consideration those counsel who had the most experience representing criminal defendants" because it "specifically excluded from the pool of possible appointed counsel the county 'contract defenders'" who represent most

36

of the indigent criminal defendants in Lee County (Pet. ¶ 43); Alabama's statutory compensation limits for appointed counsel in capital cases "made it impossible for Mr. Ray to adequately represent Mr. Hodges while supporting himself and his dependents" by forcing Mr. Ray to limit his investigation in support of the defense (Pet. ¶ 51); lead counsel, Mr. Ray, had inadequate experience to be appointed lead counsel in a capital case because he had never been involved in a capital case, criminal cases constituted only about five percent of his practice, and he had not tried a criminal case in the fifteen years prior to his appointment (Pet. ¶ 52); Mr. Ray repeatedly expressed his lack of training and expertise in capital defense to the trial court and requested the provision of investigative assistance and expenses, which the trial court denied (Pet. ¶¶ 53–60); Mr. Ray was not qualified to be appointed lead counsel under Alabama law (Pet. ¶ 66); and Mr. Ray's appointed co-counsel, Mr. Likins, "did virtually nothing to prepare the case" for trial (Pet. ¶ 68).

Although the overall framing and organization of Claim One suggests that Claim I.A presents a discrete claim of ineffective assistance, Petitioner's "structural" allegations read more as context or an explanation for the many ineffective assistance claims that are subsequently described in the petition and are predicated on specific acts or omissions of counsel. Indeed, by its own terms, in

which the perceived "structural problems" are said to have "contributed to" the alleged ineffective assistance of counsel, Claim I.A does not appear to invoke a distinct ground of relief from Petitioner's conviction and sentence.   Instead, the petition appears to posit Alabama's "structural problems" as relevant to Claim One because they made the ineffective assistance alleged throughout the remainder of Claim One a *fait accompli*.

Reading beyond the petition, Petitioner's brief on the merits of his claims also does not position Claim I.A as an independent claim for relief.   The brief does not cite any Supreme Court case establishing, for instance, the minimal constitutional standards governing a state's indigent capital defense appointment system, how such system is to be funded, or the minimal level of experience required of an attorney appointed under a state's system.   *See* Doc. 31 at 32–37. Instead, the brief presents a lone citation to *Strickland*'s prejudice standard in reference to Petitioner's lead counsel's lack of experience and co-counsel's alleged "virtual absence" from participating in the defense.   *Id*. at 36.   The brief then proposes that, "but for the structural problems with Alabama's system for capital defense, an experienced capital attorney would have been appointed to Mr. Hodges," and that such attorney would have avoided the many mistakes that the petition attributes to the attorneys who were appointed.   *Id*.

In essence, therefore, it does not appear that Claim I.A presents any sort of independent "claim" to be resolved. As another district court observed when confronted with a similar "claim" challenging perceived structural problems in Alabama's capital appointment system under the auspices of an ineffective assistance claim, "petitioner does not explain how, if the representation he received at trial comported with his Sixth Amendment right to counsel, any of these purported structural infirmities would give rise to an actional habeas claim for him." *Lee v. Thomas*, Civ. Act. No. 10-0587-WS-M, 2012 WL 1965608, at *55 (S.D. Ala. May 30, 2012), *affirmed*, 726 F.3d 1172 (11th Cir. 2013). Indeed, in his reply brief, Petitioner clarifies that he

> does not argue, and never has, that each of the multiple systemic failures in Alabama's system for appointment of counsel for indigent capital defendants is, on its own, a free-standing constitutional violation under *Strickland*. Rather, the totality of Alabama's system of appointment for indigent death penalty defense is fundamentally unjust and ensures that indigent capital defendants will be provided with inexperienced, overburdened, and hopelessly ineffective counsel, which is precisely what happened here. All of the claims that Hodges raises in his Habeas Petition regarding ineffective assistance of trial counsel are at least partially traceable to these structural failures.

Doc. 42 at 13.

Petitioner's clarification is telling. If a court is to consider a claim that, in its totality, Alabama's "system of appointment" is "fundamentally unjust," then it is reasonable to expect a discussion of the constitutional requirements, as elucidated

by the Supreme Court of the United States, governing such a system—*e.g.*, how does the Constitution limit a state's authority to construct a pool of potential appointed attorneys, what level of experience is required of such attorneys, and how must the state compensate the attorney it appoints?  Neither the petition nor Petitioner's merits briefing provide such a discussion.  Occasional references to *Strickland*—a constitutional standard for judging whether counsel's performance was deficient and whether prejudice ensued—do not advance a claim challenging the allegedly "unjust" "system of appointment" that resulted in the appointment of counsel whose performance is being challenged pursuant to *Strickland*.

If Claim I.A does not, by Petitioner's own admission, present a freestanding claim of ineffective assistance, then what is it?  The court construes it as a factual recitation of the circumstances under which Petitioner's allegedly "inexperienced, overburdened, and hopelessly ineffective counsel" were appointed and discharged their representation of Petitioner, *i.e.*, how Alabama's system "contributed" to the ineffective assistance of counsel that he claims to have received by allowing the appointment of allegedly unqualified and underfunded counsel.  In other words, as previously observed, Claim I.A provides context for understanding the myriad allegations of ineffective assistance of counsel presented throughout the remainder of Claim One.  Because it does not present a "claim" for relief under a theory of

ineffective assistance of counsel, the court does not consider whether Petitioner is entitled to relief based on the allegations of Claim I.A standing alone. However, to the extent the allegations comprising Claim I.A inform the *Strickland* analysis and were properly before the state courts, the court will consider them in reviewing the reasonableness of the state court adjudication of Petitioner's ineffective assistance claims.

**B.    Trial Counsel Failed to Adequately Conduct a Mitigation Investigation and Failed to Adequately Present Mitigating Evidence at the Penalty Phase of Trial (Claims I.B–C).**

Petitioner next claims that his trial counsel failed to adequately conduct a mitigation investigation in preparation for the penalty phase of his trial (Pet. ¶¶ 73–147) and failed to adequately present mitigating evidence during the penalty phase at trial (Pet. ¶¶ 148–65). Although the claims are presented under separate headings, one for the failure to investigate and one for the failure to present, the claims are necessarily intertwined. As set forth in the petition, the evidence counsel is faulted for failing to adequately investigate is largely the same evidence that counsel is faulted for failing to adequately present during the penalty phase. Likewise, Petitioner's theory of prejudice flowing from the failure to investigate mitigating evidence encompasses the failure to present that same evidence. *See* Pet. ¶ 75 (describing the prejudice of counsel's failure to adequately investigate as

41

rendering counsel unable to present to the jury and trial court extensive mitigation evidence). Accordingly, the court will merge these separately denominated claims for purposes of this opinion's discussion.

Discussion of this claim will proceed as follows: 1) a summary of the relevant factual allegations of the petition; 2) a summary of the relevant law concerning counsel's duty to investigate and present mitigating evidence in a capital trial; 3) a summary of the mitigating evidence counsel presented at trial; 4) a summary of the relevant state court findings and conclusions regarding the alleged failure to adequately investigate and present mitigation evidence; and 5) analysis of whether Petitioner has satisfied the standard of review governing his claims.

### 1.    The petition's allegations.

The court first summarizes the petition's supporting allegations. With regard to *Strickland*'s deficient performance requirement, Petitioner alleges as follows:

> In the months before trial, counsel had only brief conversations regarding mitigating circumstances with Mr. Hodges's mother and siblings. During the penalty phase he put on a single witness, Mr. Hodges's mother, from whom he elicited approximately 30 minutes of testimony. Trial counsel's direct examination of Mr. Hodges's mother was brief and incoherent and failed entirely to bring out the major mitigating circumstances of physical abuse, extreme poverty and pervasive instability that shaped Mr. Hodges's life.

Pet. ¶ 74.  He faults counsel for conducting only "cursory mitigation discussions" with Petitioner's mother, speaking only once with Petitioner's brother, and failing to interview any of Petitioner's aunts, uncles, or friends and acquaintances who could speak to the many hardships Petitioner and his family faced prior to the murder of Beth Seaton.  *See, e.g.*, Pet. ¶¶ 95, 102, 111 & 128.

Petitioner maintains that "timely investigation of Mr. Hodges's background, development, and functioning would have produced evidence in mitigation that competent counsel would have investigated and presented during the penalty phase of the trial proceedings."  Pet. ¶ 76.  That evidence is meticulously detailed in the petition's allegations and is only broadly outlined here in order to provide context for this order's discussion of Claims I.B & C.  The evidence supporting the petition's allegations was produced in Rule 32 proceedings in the state courts and, cumulatively with the mitigating evidence produced at trial, constitutes the totality of the mitigating evidence that was before the ACCA when it reviewed Petitioner's ineffective assistance of counsel claims.   This opinion will utilize the same broad categories of mitigation evidence that are specified in the petition.

> a.  *Hodges was exposed to continuous and extreme violence.*

Petitioner was born into extreme poverty.  Prior to his birth, his parents lived and worked in a turpentine camp in rural Barwick, Georgia, where they labored for

low wages, struggled to pay debts to their employers, and lived in crude shacks lacking indoor plumbing and heating.  After the birth of Petitioner's older brother, Billy, the family fled the Barwick turpentine camp for a different turpentine camp in Colerain, Georgia.  Still, though, the family occupied a cabin in the woods that lacked indoor plumbing.  Petitioner was born in this cabin in 1970.

Petitioner's early years were characterized by his exposure to violence at home and in his community.  His father, also named Billy, was prone to drinking and was violent with the children and, especially, the children's mother, Cora.  Petitioner regularly witnessed his father attack his mother.  At the age of two, he witnessed a neighbor shoot and kill his uncle.

When Petitioner was around the age of three, Cora and the children left Petitioner's father in Georgia and moved in with Eddie Maddox, a pastor in Loachapoka, Alabama.  Maddox was somewhat older than Cora, and he proved to be controlling and abusive as well.  Cora and the children returned to Billy Hodges in Georgia after a few months.   Billy continued drinking and beating Cora, especially after he learned that Cora was pregnant with Maddox's child.  Cora delivered a stillborn girl in 1974 and fled back to Maddox in Alabama.  Maddox continued with his abuse of Cora—much of which Petitioner witnessed.  Maddox also beat Petitioner with extension cords, belts, switches, and the like.  When Cora

44

resolved to leave Maddox again, she left Petitioner and his siblings with their paternal grandparents in Georgia for a lengthy period while she tried to establish a home in Alabama.  This time in Georgia, occurring around the time that Petitioner was seven to eight years old, proved traumatic for several reasons, including that Petitioner continued to suffer beatings from members of his extended family, including his grandparents and uncles.

Sometime after Cora was able to bring all her children back to Alabama, they lived with Cora's new husband, James Echols, in Auburn, Alabama.  Echols, however, continued the trend of beating Cora and the children, particularly Petitioner.  Echols also introduced Petitioner to drugs and alcohol when Petitioner was around ten or eleven years old.  Echols later was diagnosed with paranoid schizophrenia and, when he failed to take his medications, subjected the family to bizarre behaviors, including waking the children in the middle of the night to accuse them of plotting to murder him.  He once waved a knife over Petitioner's bed while interrogating him about these plots and conspiracies.

   b.   *Alcoholism and drug abuse plagued Hodges and his family.*

Petitioner is an alcoholic, like his father and several of his grandparents and uncles before him.  From his birth, Petitioner was exposed to the effects of alcoholism, including his father's black-out drinking and violent behavior while

45

drunk.  Petitioner began drinking excessively as a teenager and continued into his twenties.  He also began using drugs after Echols exposed him to marijuana.  He began the steady use of drugs in his early twenties.  This behavior led to his arrest for possession of cocaine in 1993, for which he was sentenced to ten years in prison.

*c.*    *Hodges was raised in extreme poverty.*

As noted previously, Petitioner was born into extreme poverty at the turpentine camp where his parents lived and worked.  The owner of the camp treated the workers as his property.  He administered beatings to workers and their wives as discipline and maintained a form of "indentured servitude" by keeping his workers indebted to the company store and commissary, all while providing spartan living quarters and no access to medical care.  Petitioner was born at the camp because his parents had no insurance or ability to pay for a delivery at the hospital.  Petitioner received no pediatric care after his birth or for years afterward.  The family mostly ate "dried beans, peas, neck bones, and rice."

Poverty followed the family when Cora moved in with Maddox in Loachapoka.  As an example, Cora was forced to cook outside because they could not afford propane for the stove.  After Cora left Maddox and returned her children to Alabama from their stay with grandparents in Georgia, the family (Cora and

four children) subsisted on about $150 per week.  Billy Hodges never paid child support despite being ordered to do so.  The arrival of James Echols also did not elevate their financial situation.  Petitioner and Echols sometimes scavenged neighbors' trash for useful items.

> d.  *Hodges was repeatedly abandoned and left with no adult male role model.*

Petitioner's youth and adolescence were characterized by repeated abandonments and the overwhelming lack of positive male role models throughout his life.  The most formative of these abandonments was the time, referenced earlier, that Cora left Petitioner and his siblings in the care of his paternal grandparents in Georgia.  Petitioner was seven years old and living in an over-crowded home with his grandparents, his siblings, and several aunts, uncles and cousins.  The home lacked indoor plumbing.  His step-grandmother, Flossie, was verbally and physically abusive and forced the children to labor around the house, including making Petitioner clean her chamber pot.  Petitioner's relatives teased him, telling him that Cora was not coming back for him.  When Cora did return, she retrieved only Petitioner's sister, Enna, and left Petitioner and his older brother to continue living in Georgia.  This devastated Petitioner; he chased after her car as she was leaving begging her to take him too.  This made the relatives' taunting about Petitioner's abandonment worse and, more importantly, it imbued the

taunting with an air of truth.

Even when he was with his mother, Petitioner sometimes felt unprotected from the various men that she brought into their lives. She failed to shield him from the abuse of Maddox and the bizarre behaviors of Echols. This sense of abandonment was particularly acute because of Petitioner's father's total abandonment of the family. Indeed, all of the men in Petitioner's life—his father, grandfather, Maddox, and Echols—contributed to this abandonment by failing to provide Petitioner with a meaningful relationship or even model appropriate male behavior. Even Petitioner's older brother abandoned him to join the Army when Petitioner was sixteen. Finally, Petitioner watched his best friend drown in a river in his late teens, a traumatizing experience that reinforced the sense of abandonment that he confronted all his life.

e.    *Hodges constantly moved between homes.*

As detailed above, Petitioner did not enjoy a constant, steady home throughout his youth and adolescence. From the turpentine camp in Georgia (with his father), to Alabama (Maddox), back to Georgia (with his father, again), back to Alabama (Maddox, again), back to Georgia (his grandparents), back to Alabama (where he eventually resided with Echols), back to Georgia (attempting to reconnect with his father in his late teens), and finally back to Alabama, including

48

moves to multiple residences within some of these stops, Petitioner plainly did not enjoy a comfortable, stable place to call home.  Indeed, the petition alleges that, following a series of moves upon his return from his grandparents' home in Georgia, Petitioner had lived in thirteen homes in eleven years.  Furthermore, outside of his mother and his siblings—and even his mother was absent some of this time—Petitioner found himself surrounded by a revolving cast of family members and abusive father figures who did little to nurture him during this time.

### f.      Hodges is possibly brain damaged and mentally ill.

Petitioner exhibited signs of mental illness during his youth.  In particular, he attempted suicide as a result of depression around the age of sixteen.  He also exhibited symptoms of anxiety disorder.  These mental illnesses and behaviors may relate to brain injuries Petitioner suffered in his youth.  For example, Petitioner was exposed to environmental toxins from his birth, including constant and intense exposure to turpentine.  He consumed sheetrock in at least one instance as a toddler, including the lead paint that covered the sheetrock.  He also suffered multiple head injuries in his youth.

### g.      Hodges attempted to lead a positive life.

Notwithstanding the many challenges Petitioner faced, he attempted to lead a positive life.  Despite the instability of his home life, he obtained his G.E.D.

49

After serving his drug-related prison sentence, he was hired at Golden Corral and was promoted to the position of crew leader. He started a new relationship with a co-worker, Trina Eady, and planned to further his education. He provided for his daughter and regularly spent time with her.

### 2.    The duty to investigate and presenting mitigating evidence.

"[I]t is well established that counsel's obligation to render competent performance includes 'a duty to make reasonable investigations' of potential mitigating evidence 'or to make a reasonable decision that makes particular investigations unnecessary.'" *Raheem v. GDCP Warden*, 995 F.3d 895, 909 (11th Cir. 2021) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). Where an attorney decides not to investigate certain mitigating evidence, or to curtail such investigation, that decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521–22 (quotation omitted). While the duty to investigate mitigating evidence "'does not necessarily require counsel to investigate every evidentiary lead[,]'" *Raheem*, 995 F.3d at 909 (quoting *Williams v. Allen*, 542 F.3d 1326, 1337 (11th Cir. 2008)), the decision to forego further investigation of mitigating evidence is reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466

U.S. at 690–91.  In other words, a decision to limit the investigation of mitigation evidence must be based on reasonable, informed judgment.  In "assessing the reasonableness of an attorney's investigation," this court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Wiggins*, 539 U.S. at 527.

Where the claim alleges counsel's failure to adequately investigate and present mitigating evidence, the prejudice inquiry under *Strickland* asks "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.  A reviewing court applying *Strickland* to a claim of this type must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation."  *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam) (quotation omitted).

### 3.  Counsel's presentation of mitigation evidence at trial.

The particulars of counsel's pretrial investigation of mitigation evidence, *i.e.*, what counsel did and failed to do in his investigation, were the subject of

considerable litigation in Rule 32 proceedings, including two remands from the ACCA back to the Circuit Court, and the state courts rendered substantial findings of fact on that subject that will be further discussed below.  Because it is germane to assessing the ACCA's application of *Strickland*, for present purposes this opinion recounts only what is observable in the objective trial record: the mitigation evidence that counsel presented in the penalty phase of Petitioner's trial.

As noted previously, the defense presented one witness during the penalty phase of Petitioner's trial, his mother Cora Cobb.  Cobb testified about the conditions the family endured at the turpentine camps in Georgia around the time Petitioner was born, including the dilapidated state of their housing and the lack of indoor plumbing.  Tr. 1191–92.  She testified about being denied medical care at Petitioner's birth because of her lack of insurance.  Tr. 1193.  She also told the jury about Petitioner's significant head injuries as a toddler and again, in the same area of his head, when he was five years old, and referenced his ingestion of sheetrock materials as a toddler.  Tr. 1194–95.

Cobb testified about the abuse she endured at the hands of the various men in her life, and the turbulent and transient effects this had on Petitioner.  She first told the jury about her volatile relationship with Petitioner's father, how they fought constantly, and how he beat her regularly.  Tr. 1195.  She testified about

Maddox's abuse and controlling behavior after she moved to be with him in Alabama, and specifically mentioned that Petitioner observed this abuse. Tr. 1206. She also told the jury about her next spouse, James Echols. Although the relationship started well, Echols's descent into drug abuse and his mental health issues placed enormous strain on the family, including Petitioner. Tr. 1213. Specifically, Cobb told the jury about Echols waking the children up at night to question them about a conspiracy to murder him. Petitioner was targeted during these events because he was more "verbal" than the other children in his response to Echols's behavior. Tr. 1214.

Cobb also told the jury about Petitioner's effort to reconnect with his father in his late teens. She testified that Petitioner returned to Alabama greatly disappointed after spending time with his father in Georgia because he saw there what alcohol addiction had done to his father. Tr. 1216. She also referenced the "devastating" impact on Petitioner of having watched his best friend drown in Georgia. Tr. 1217.

Finally, Cobb testified about some of the positive attributes exhibited by Petitioner in his later years. He was motivated to get his GED after spending time with his father in Georgia and witnessing his friend's death. Tr. 1217. Although he was later incarcerated on drug charges for a few years, Petitioner strove to

improve himself during that time and earned many certificates for completing rehabilitation programs, including a substance abuse treatment course.  Tr. 1219. He established close friendships in his community after his release from prison. Tr. 1221.  He obtained a barber's license.  Tr. 1221.  He was "very close" with his daughter, who lived with Cobb at the time of the trial; he took her shopping and to activities like birthday parties and roller skating.  Tr. 1222.  Finally, she told the jury that Petitioner expressed remorse to her for "his part" in what happened to Beth Seaton.  Tr. 1224.

### 4.    The State court's findings respecting this claim.

Petitioner presented his ineffective assistance claims respecting counsel's investigation and presentation of mitigation evidence in his Rule 32 petition.  After two remands, the Circuit Court rendered findings of fact respecting the claims and denied relief based on those findings.[9]  The ACCA affirmed in a reasoned decision. The ASC did not review the ACCA's disposition of these claims.  Respondent concedes that the claims are exhausted and properly before the court for review pursuant to § 2254(d).  Doc. 37 at 11–20.  Accordingly, as the last reasoned

---

[9] Petitioner's claims about counsel's alleged failure to adequately investigate and present evidence about his possible brain damage and mental illness were addressed by the ACCA in its initial opinion on appeal of the Circuit Court's summary dismissal of his petition.  *See Hodges*, 147 So. 3d at 944–46.  Accordingly, those claims were not part of the remand to the Circuit Court for further proceedings on Petitioner's larger claim about counsel's alleged ineffective assistance.  *See* Doc. 21-56 at 86 n.1.

decision addressing Petitioner's claims, this court reviews the ACCA's decision denying relief subject to the AEDPA standard of review.

The ACCA first noted the evidentiary sources from which the Circuit Court derived its findings of fact: "On remand Hodges conducted depositions of Cora Cobb, Hodges's mother; Enna Hodges, Hodges's sister; Billy Hodges, Hodges's brother; Floyd Likins and Larry Ray, defense counsel at Hodges's trial; Joanne Terrell, a social worker; and Dr. Stanley Brodsky, a psychologist. The State conducted a deposition of Dr. Karl Kirkland, a psychologist." Doc. 21-56 at 87. The ACCA then examined each of the categories of mitigation evidence Petitioner alleged counsel was ineffective for failing to adequately investigate and present.

> a. *Exposure to violence*

Under the heading of Petitioner's first category—his exposure to continuous violence—the ACCA set out its most extensive findings about the overall scope of counsel's investigation and presentation of mitigation evidence:

> The record on remand contains vast evidence that trial counsel thoroughly investigated Hodges's past, including the relationships among various family members and his exposure to violence. Both attorneys interviewed Hodges and his mother, and they inquired about Hodges's upbringing and background, about his family relationships. Likins testified that Hodges "shut down" when Likins asked him about his father or any of the men in his family, however. Likins testified that he spent a lot of time with Hodges, and that he met with Cobb 8 or 10 times. Likins said that almost all of the discussions he had with Cobb were related to background issues. Likins said Cobb is

55

an amazing woman who came from a background that included being raised in a turpentine mill and having abusive husbands and boyfriends. Likins also met with Hodges's neighbors and coworkers about Hodges. Ray testified that he had a lot of contact with both Hodges and Cobb, and Ray testified that he was in regular contact with Cobb about the case. Ray stated he had developed a good rapport with Hodges.

Ray met with Hodges's sisters, Enna and Patricia, and Hodges's brother, Billy. Ray stated that Patricia had nothing additional to offer as to mitigation because she was only 10 years old when Hodges moved out of the family home. Enna told Ray some of the same things about Hodges's upbringing that Cobb had told him, and he chose to present that evidence through the testimony of Cobb, Ray said. Billy was stationed overseas in the military, but Ray spoke to him before trial. Ray remembered asking Billy about their childhood and upbringing, but Ray "did not get anything out of him that was related to mitigation issues."

Ray and Likins testified that they filed motions for funds to hire experts to assist with the investigation of mitigation, but that the judge denied the motions. Likins stated, "And so we had to work through Cora [Cobb] primarily and use our own ability because we couldn't get an expert." During the pretrial interviews, according to Ray's testimony and the exhibits presented on remand, Cobb and Hodges both denied that Hodges or his siblings were physically abused. Cobb told Ray and Likins that she had been abused by Hodges's father and stepfathers and that Hodges had seen some of this abuse. In addition to the statements from Hodges and Cobb denying that Hodges had been physically abused, Cobb and Hodges both told Ray that Hodges had a good relationship with each of his stepfathers. Hodges told Ray that he had had a good relationship with his entire family while he was growing up, and that he continued to have good relationships with his mother and siblings. Cobb told the attorneys that one of her husbands, James Echols, began abusing drugs and was diagnosed with paranoid schizophrenia during their marriage, and that he exhibited bizarre behavior when he was not taking his medication. For example, Echols "interrogated" Cobb and the children at times, because he

56

believed that someone was trying to kill him, she said.

Defense counsel filed motions with the circuit court seeking funds to obtain the services of a mitigation investigator. While the motions were pending, two mitigation investigators, Hector Guevara and Brenda Lewis, and one of Guevara's co-workers, Cynthia Trammel, conducted initial interviews of Hodges and his family members as part of a mitigation investigation. Ray met with Guevara, and together they interviewed Hodges in jail. Trammel conducted lengthy interviews of Hodges's mother and his sister, Enna, and provided to defense counsel the information obtained during those interviews. Guevara met with Ray after the interviews had been conducted, and he exchanged correspondence with Ray about the investigation and the results of the interviews.

Cobb provided to Ray a short biography of Hodges, beginning with her pregnancy and Hodges's birth and including his performance at school, his interactions with his friends, and his feelings about his meeting his father. She provided family photographs, school records, and a history of the moves she and the children made while Hodges was growing up. Hodges, his mother, and his siblings were forthcoming with information regarding the children's upbringing and family dynamics, Hodges's personality and behavior as a child, Hodges's educational history and what his teachers thought of him, his criminal history, and his attempts to do well before the murder occurred. Hodges's mother and one of his sisters even provided their opinions about Hodges's planning of and involvement in the robbery. That defense counsel were seeking all information relevant to Hodges -- his upbringing and the significant events in his life -- and that the family was aware of the importance of the investigation is clear from this record.

Moreover, it is important to note that Hodges was 27 years old when he committed this crime. He had been living independently for many years, was employed at the Golden Corral and was being considered for a management position, maintained relationships with his family members and girlfriends, assisted his mother in caring for his 12-year-old daughter, had already been incarcerated and had

availed himself of self-help programs before and after his incarceration, and had completed his GED. Thus, as the trial court noted, the weight to be accorded instances of alleged childhood abuse was not as great as it might have been when Hodges was younger.

In summary, the record before this Court establishes that trial counsel thoroughly investigated Hodges's childhood and were aware that he had been exposed to violence, and that his mother had suffered physical abuse at the hands of Hodges's father and stepfathers. Trial counsel were in frequent contact with Hodges and Cobb, and counsel asked them about their exposure to physical abuse. The mitigation investigators counsel attempted to retain spent hours interviewing Hodges and his family members, and they shared with counsel the information they obtained from the interviews. Thus, much of the information about Hodges's exposure to violence that Hodges now alleges counsel should have discovered and presented at sentencing was discovered and presented. Counsel undoubtedly were not aware of every instance of violence and abuse to which Hodges was exposed as a child. However, additional instances of the violence to which Hodges was exposed would have been cumulative to the information counsel discovered before and presented at trial.

Doc. 21-56 at 94–96 (citations and footnotes omitted).

Taking note of authority emphasizing that counsel's investigation may reasonably be curtailed based on the information provided by the defendant and his family, the ACCA also rendered findings about the significance of what Petitioner and his family told his attorneys prior to trial regarding Petitioner's exposure to violence:

Likins said that he spoke often with Hodges before trial, but that Hodges refused to speak to him about his father or stepfathers. Likins testified that Hodges "would shut down" when he attempted to speak to Hodges about his father and stepfathers.  Ray inquired

58

specifically of Hodges whether he had suffered any physical harm or pain as a result of whippings or beatings, and Hodges stated that he had not. Cora Cobb spoke to defense counsel and the mitigation investigators about the physical abuse she suffered, but denied that Hodges suffered physical abuse from his father or stepfathers. To the contrary, Cobb and Hodges said that he had had good relationships with his father, with Maddox, and with Echols in the years before he was diagnosed with schizophrenia. Cobb reported to Ray and to the mitigation investigators that Hodges was disciplined by spanking with a belt; she said that Hodges was not physically harmed, and that he was not beaten or whipped.

Records from the Alabama Department of Pensions and Securities ("DPS") related to Echols's display of paranoia and aggression toward Cobb in 1985 -- before he received psychiatric treatment -- are in the record before us, and we note that Cobb reported to DPS that Echols was a loving husband and father, and that he was a gentle person who was supportive of his family. Hodges's brother told DPS in 1985 that he and his siblings were not afraid of Echols and that they continued to maintain their daily routine without problems from Echols, and Cobb confirmed that Echols's frustrations had been directed at her.

Even in her testimony on remand, Cobb stated that she was aware that, before the trial, Ray had been attempting to investigate Hodges's past and his upbringing, and that he had asked her if Hodges had been injured. Ray had also asked her if she could think of anything that Hodges had been affected by, and Cobb told Ray that they had lived in a turpentine camp, about Hodges hitting his head when he was a baby, and that she and Hodges['s] father "was always in fighting mode" and that she tried to keep the children from being injured. Cobb testified that Ray had asked her to complete a summary of Hodges's life, to write "things about Melvin that really stuck out," and she tried to capture pretty much everything when she wrote it. Cobb's summary of Hodges's childhood did not include any mention of physical abuse he suffered.

Patricia Maddox, one of Hodges's sisters, told Ray that she was

a baby when Maddox, her father, left the family; she said that Echols had been a good father. Enna Hodges, Hodges's sister, told Ray that she remembered fights between her mother and Maddox, but that she did not remember Maddox hitting the children. She said that Echols had been a good father to them before he began abusing drugs and was diagnosed with schizophrenia. She said that, after he began abusing drugs, Echols on occasion hit the boys with a broom.

Although Cobb and Hodges's siblings testified in the remand proceedings that Hodges experienced physical abuse from his father, stepfathers, and his paternal grandmother, the information was not provided to counsel during any of the pretrial interviews. Joanne Terrell, a social worker who conducted a psychosocial assessment of Hodges in 2005, testified that from her interviews with Hodges and his siblings she learned that Hodges had experienced years of daily beatings. Terrell agreed, however, that the family's reports to her of physical abuse were different from the information Cobb and Hodges gave to defense counsel before trial. Furthermore, Hodges's siblings did not testify on remand that Hodges suffered daily beatings for years from anyone. Therefore, we cannot hold that trial counsel's performance was deficient when they inquired whether Hodges had been physically abused and they were told that he had not been abused, and the records did not indicate otherwise or provide any reason for counsel to ask Hodges and Cobb the same question repeatedly, particularly when Cobb had been so open about the physical and mental abuse she had suffered. That, for whatever reason, Hodges and his mother denied during pretrial interviews with defense counsel that Hodges had been physically abused cannot be attributed to deficiencies in the performance of trial counsel. Given counsel's frequent contacts with Hodges and his family, their attempts to obtain funds to hire a mitigation investigator and their consultation with mitigation investigators who conducted interviews and drafted reports for counsel while awaiting the trial court's ruling on the request for funds, and the voluminous records and other information they obtained relative to Hodges's background, this clearly is not a case in which counsel failed to adequately investigate potential mitigation evidence. We will not hold that counsel were required to reject the statements from their client and his mother that Hodges had

60

not been physically abused and use their limited resources to initiate additional investigation on that point. Hodges failed to prove that trial counsel's investigation of evidence regarding Hodges's childhood exposure to violence was deficient, and the Rule 32 court correctly denied relief as to that claim.

Doc. 21-56 at 97–100 (citations and footnotes omitted).

Based upon these findings about the particulars of counsel's investigation, and after reviewing Cora Cobb's sentencing phase testimony and concluding that her testimony presented the most salient aspects of Petitioner's exposure to violence, the ACCA concluded that counsel's presentation of evidence about Petitioner's exposure to violence was reasonable and that, accordingly, Petitioner failed to establish deficient performance.  Doc. 21-56 at 101–04.

Turning to the prejudice prong, the ACCA opined that, while counsel indeed had informed the jury about Petitioner's exposure to violence, "additional focus on that abuse might have hurt Hodge's case" because, considering what the evidence also revealed about Petitioner's close relationship with his mother and siblings and his efforts to improve himself even after such exposure to violence, it "might have led the jury to believe that Hodges had a violent nature, that his criminal behavior was becoming more extreme than it had been, and that he was deserving of the death sentence."  Doc. 21-56 at 105–06 (footnote omitted).  The ACCA also remarked that Hodges's age at the time of the murder, 27, and the fact that his

siblings did not similarly commit violent crime despite growing-up in the same circumstances rendered the evidence about his exposure to violence as a child less weighty. With these additional findings, the ACCA concluded that Petitioner failed to demonstrate prejudice:

> Hodges did not prove that, even if counsel had discovered and presented at sentencing additional evidence regarding the violence in his family and, specifically, testimony regarding abuse Hodges allegedly suffered a decade or more before he committed the crime and while he still lived at home, the result of the proceeding would have been different.

Doc. 21-56 at 107.

### b. *Alcoholism and drug abuse*

The ACCA next rendered findings of fact about counsel's investigation into evidence of alcohol and drug abuse in Petitioner's family:

> Counsel were aware before trial that Hodges's father and stepfathers had abused drugs and alcohol and that Hodges, himself, had abused alcohol. Hodges told Ray that, although he had sold illegal drugs, he did not use drugs, himself. Ray's interview notes from an initial meeting with Hodges include notations about Hodges's prior drug convictions and his participation in substance-abuse programs while he was in prison. Hodges's mother told Ray and the mitigation investigators about the family history of alcoholism. She also stated that Hodges was an alcoholic who had been attending meetings of Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") before the murder, and she reported that Hodges had been doing well. Hodges's sister, Enna, told Ray that Hodges smoked marijuana, and that he also drank a lot of alcohol. Thus, as the court determined, defense counsel were aware that Hodges had abused alcohol and had been involved with illegal drugs and had been convicted for his

> involvement, and that there was a history of drug and alcohol abuse among other family members. Thus, further investigation into additional reports of family members's [sic] drug and alcohol abuse would have been cumulative to evidence counsel had already discovered.

Doc. 21-56 at 107–08.   The ACCA again emphasized the significance of Petitioner's self-reporting on this issue, and that of his family, in shaping counsel's investigation:

> Hodges told Ray that he had sold illegal drugs but that he did not use them. Hodges told Ray that he had participated in substance abuse programs in prison and that he had attended AA meetings after he was released from prison. Thus, Hodges denied ever having a drug problem, and by noting his continued participation in AA, indicated that alcohol was no longer a problem for him. Hodges's family members told counsel that Hodges had been doing well since he had been released from prison – he was employed and was to be promoted at the Golden Corral in a job he said was the best job he had ever had; he had been maintaining relationships with his friends and his girlfriend, his mother, his siblings, and his daughter; and he contributed to his daughter's support and care. The statements of Hodges and his family did not indicate to defense counsel that further exploration of the issue of Hodges's drug abuse as a mitigating factor would have yielded useful information beyond that of which counsel were already aware.

Doc. 21-56 at 108–09.  After reviewing the evidence about drug and alcohol abuse that was introduced through Petitioner's mother, as well as guilt phase testimony demonstrating that Petitioner was drinking alcohol and using marijuana around the time of the murder, the ACCA concluded that Petitioner's additional evidence of alcohol and drug abuse would have been cumulative and, accordingly, counsel

could not have been deficient in failing to present cumulative evidence.  Doc. 21-56 at 109.

Turning to prejudice, the ACCA opined that additional evidence about Petitioner's alcohol or drug abuse might have harmed, rather than helped, Petitioner at the penalty phase:

> Detailed evidence about Hodges's own history of drug and alcohol abuse would have seriously undermined defense counsel's efforts to "humanize" Hodges and argue that, in spite of his unstable upbringing and his personal problems, which included alcohol abuse and drug-related crimes, that he had become a productive member of society and that his was a life worth saving.

Doc. 21-56 at 110.  Ultimately, the ACCA concluded, Petitioner could not show prejudice from the failure to investigate and present additional evidence about drug and alcohol abuse in his family:

> There is no reasonable probability that, even if counsel had discovered and presented evidence regarding Hodges's substance abuse and his exposure to substance abuse by other family members, the sentencing authority -- including this Court when it independently reweighed the evidence -- would have concluded that a death sentence was not warranted given the lengthy and torturous nature of this crime and the absence of mitigating circumstances.

Doc. 21-56 at 110.

### c.   *Extreme Poverty*

The ACCA next rendered findings of fact about counsel's investigation into the circumstances of Petitioner's upbringing, including the poverty that he

64

endured:

As discussed in previous portions of this memorandum, defense counsel and the mitigation investigators who worked with them for a time interviewed Hodges and his family members, and they inquired about the circumstances of Hodges's upbringing. Hodges's mother, in particular, described to the attorneys details of their living situation and the extreme poverty they sometimes experienced, including that they sometimes did not have food or electricity. Hodges's sister, Enna, told Ray that the family was poor but that they always had necessities. Cobb told the mitigation investigators that the family's Christmases were like most families' and the children were given items like board games and bicycles. Cobb said that Hodges was like most children and wanted things he could not have, and that the family did not have money to purchase.

Defense counsel presented evidence of the family's poverty in Cobb's penalty-phase testimony. Cobb testified that the family was living in a turpentine camp in the woods when Hodges was born, having been moved there by the camp owner, she explained, "would pay the previous person who we owed money to move – he moved us there." Cobb testified that they survived by buying food from commissary that had been set up by the camp's owner. They lived in a small house provided by the camp's owner; Cobb said that the house was in bad condition, with holes in the sheet rock, no indoor plumbing, wooden windows that were so drafty that they had to be covered with cardboard in the winters. Cobb said that Hodges was born at home; she had been refused treatment at the local hospital because the family lived at the turpentine camp and had no insurance. Cobb said that the birth was attended by a midwife, and that Hodges had no medical care immediately after he was born. When Hodges suffered a head injury when he was approximately two years old, he did not receive medical care because they could not afford it, Cobb testified. Nor did they obtain medical care for Hodges when, as a toddler, he ate some of the exposed sheet rock in the house. Defense counsel argued to the jury that Hodges's early childhood included poverty, malnutrition, and a lack of medical care.

65

Doc. 21-56 at 110–11 (citations omitted).

Given this record, the ACCA held, Petitioner could not show deficient performance.

> The record reflects that defense counsel investigated the conditions of extreme poverty into which Hodges was born and initially raised, that they presented testimony from Hodges's mother about those conditions, and they argued poverty as a mitigating circumstance to the jury. It does not appear that Hodges or any of his family members provided additional detail about the impoverished conditions in which Hodges was raised; and to the contrary, one of his sisters stated before trial that they were poor but had all that they needed. Defense counsel testified that he attempted to present all of the mitigating evidence he had discovered. In fact, it appears from our review of this extensive record that counsel presented the vast majority of the evidence about Hodges's early childhood poverty that Hodges now alleges he failed to present. The fact that counsel might have been able to elicit from Hodges and his family additional examples of the extreme poverty into which Hodges was born and initially raised does not establish ineffective assistance of counsel. Moreover, as the trial court correctly held, additional evidence about the poverty into which Hodges had been born would have been cumulative.

Doc. 21-56 at 112.

The ACCA also concluded that Petitioner failed to show prejudice due to counsel's failure to investigate and present additional evidence "about the impoverished conditions he experienced in his early childhood[:]"

> There is no reasonable probability that, even if counsel had discovered and presented additional evidence regarding the family's poverty, the sentencing authority -- including this Court when it independently reweighed the evidence -- would have concluded that a death sentence

66

was not warranted given the circumstances of this crime and the absence of mitigating circumstances.

Doc. 21-56 at 112.

### d.    *Abandonment and instability*

The ACCA found the following regarding Petitioner's claim that counsel failed to adequately investigate and present evidence about his repeated abandonment and lack of male role models:

> As we have set forth in previous portions of this memorandum, trial counsel conducted numerous interviews of Hodges and his family members, particularly his mother, and the family background and children's upbringing were often discussed. Mitigation investigators participated in additional interviews of Hodges and his family. Hodges's mother was forthright about the number and instability of her marriages, and about the frequent moves that resulted when she married and separated from the men. Hodges's mother prepared at counsel's request a timeline indicating the dates the children were born and the periods of time she lived with each husband or when she lived with only her children. As noted previously, counsel were aware that Hodges did not have a consistent male role model during his childhood, and that Hodges's mother left each of her husbands because they were abusive to her. Hodges and his mother reported to counsel, however, that Hodges had a good relationship with each of the stepfathers. Counsel were also aware that Cobb left the children with Hodges's father's parents, Flossie and Eddie Hodges, for one summer when she left her second husband and had to find a new place for her and her children to live. Counsel discovered before trial that Hodges had not had a relationship with his father until he was approximately 17 years old and he moved to Georgia to find his father; counsel also discovered that when Hodges learned that his father was an alcoholic Hodges was very disappointed. Defense counsel learned from the interviews with Hodges and his family that Hodges experienced the death of his best friend while the two boys

67

were swimming in Georgia. The friend's death devastated Hodges, Cobb said, but she said that the loss also motivated Hodges to complete his GED, get a job, and become more positive.

Evidence of the unstable living situations and absence of a consistent male role model was presented at the penalty phase of Hodges's trial through the testimony of Hodges's mother. She testified frankly about her marriages and her various residences as she moved into and out of each marriage. Cobb also testified that she and the children lived alone for periods of time. Although the trial court stated that it did not believe that Cobb's moves from one place to another was relevant, defense counsel presented legal arguments to support his claim that it was relevant, and continued to present testimony from Cobb about the family's moves through the period of time that Hodges left home to find his father in Georgia. Cobb also testified about the [sic] Hodges's disappointment with his father's alcoholic condition, and she testified about the devastation Hodges suffered as a result of his friend's drowning. Counsel argued at the penalty phase of Hodges's trial that Hodges had been "shuffled around" from place to place, and had spent time with various stepfathers and sometimes had no father figure, and had experienced the death of a friend.

Doc. 21-56 at 113–14 (citation omitted). The ACCA concluded that much of the evidence about abandonment and instability that Petitioner presented was cumulative of evidence that was presented at trial and that, accordingly, counsel was not deficient in failing to investigate and present such evidence. Doc. 21-56 at 115.

Likewise, the ACCA concluded that, considering his age and the circumstances of his life in the years following the repeated abandonment he describes, Petitioner did not show prejudice:

> Hodges did not establish a reasonable probability -- or any probability -- that the presentation of the additional details of abandonment and lack of a male role model gathered in connection with the postconviction proceeding would have changed the balance of the aggravating and mitigating factors or the result of this case. As the trial court noted, presentation of this alleged mitigating evidence might have been counterproductive; despite being raised in the same households and being subjected to many moves and abusive stepfathers, Hodges presented no evidence that any of his three siblings had ever been convicted of a crime. Focusing the jury's attention on the fact that Hodges was somehow more gravely affected by his childhood experiences and that they caused him to act out by committing this violent crime would surely have been more damaging to Hodges.

Doc. 21-56 at 116.

The ACCA also addressed Petitioner's claim that counsel failed to adequately investigate and present evidence about being abandoned by his mother. In particular, this discussion addressed the failure to present evidence about Petitioner's traumatic experience at his grandparents' home in Georgia:

> The vast majority of the evidence in the trial record and in the postconviction record indicates that Hodges always had a close relationship with his mother and his siblings, that Cobb was a consistent, positive role model for the children, and that Hodges and his mother had a special bond. Hodges and Cobb told Ray in their interviews that they had a good relationship. During the remand proceedings Hodges was examined by Karl Kirkland, the State's psychological expert, and Hodges told him that his mother was a good, positive parent who taught him many positive lessons while he was growing up; Hodges holds his mother in very high esteem and has a healthy and positive relationship with her, Dr. Kirkland said. Hodges presented testimony from the social worker and Hodges's siblings that tended to show that the children were abused by Flossie

69

and perhaps other family members during the summer they spent with Flossie and Eddie, and that Flossie told the children that Cobb was not coming back to get them.  Although that testimony provided evidence of abuse by the grandmother and others, the testimony did not demonstrate abandonment of Hodges by his mother. Cobb testified on remand that she agreed to let the children stay with their grandparents for the summer because they asked to see the children, that the conditions in the house were okay, and that Flossie had always been nice to her and was a pretty good person. Cobb testified that she had picked up Enna early because she was the youngest, and that the grandparents convinced her to leave Hodges and his brother, Billy, there for the rest of the summer. Cobb said that after the summer was over, she did not have transportation to pick up the boys, so they started school in Georgia. Even the testimony presented on remand does not demonstrate abandonment by Hodges's mother.

Defense counsel were aware that Cobb had taken the children to stay with their paternal grandparents during the summer when Hodges was approximately seven years old. Ray testified that he knew some of the circumstances of [the] household -- such as the household was crowded and that their grandfather let a pet king snake loose in the house – because Enna had described the circumstances to Ray, and he chose not to call Enna to testify about those circumstances.  [. . .]

It appears from the record, moreover, that Ray was not told by Enna, Hodges, his other siblings, or Hodges's mother that Hodges believed that his mother had abandoned him, or that this was a pivotal event in Hodges's life. To the extent that it is true that Hodges felt abandoned by his mother and that this was a pivotal event in his life, this information was known to Hodges and his family but was withheld.  [. . . .]  Hodges and his family members were aware that Ray, Likins, and the mitigation investigators were trying to help Hodges by learning about significant events in his life. They told Ray about pivotal events such as Hodges leaving home to find his father and being disappointed when he discovered that his father was an alcoholic, and they disclosed the devastation Hodges suffered when he watched his best friend drown. Ray presented this evidence at the penalty phase of the trial. Because Ray testified that they put on all of

the mitigating evidence they had, because the defense counsel's notes and testimony do not reflect any disclosure to Ray of Hodges's feeling of abandonment by his mother as a result of the stay with his paternal grandparents, and because no witness testified in postconviction proceedings that they brought this pivotal event to counsel's attention, we cannot find that counsel were ineffective for failing to discover and present this evidence.

Doc. 21-56 at 116–18 (citations omitted).

The ACCA also concluded that—for the same reasons it gave respecting Petitioner's abandonment by his male role models—Petitioner could not show prejudice regarding counsel's failure to adequately investigate and present evidence about Petitioner's abandonment by his mother. Doc. 21-56 at 119.

> e.    *Possible brain damage and mental illness*

The ACCA concluded, prior to remand, that Petitioner's allegations about counsel's failure to adequately investigate and present evidence about Petitioner's possible brain damage and mental illness were due to be summarily dismissed as insufficiently specific:

Hodges's claims were speculative; he pleaded no facts to support the conclusory allegations of possible brain damage and mental illness, "likely depression," potential brain developmental problems caused by turpentine exposure, or an anxiety disorder. Not only did Hodges fail to provide any specific facts to support the allegations regarding his possible mental deficiencies, he failed to include in his petition any facts tending to indicate what information counsel would have discovered if they had conducted an "adequate" investigation, how that information would have aided counsel in the presentation of his case, and whether the evidence would have been admissible. Finally,

71

> Hodges failed to allege any specific facts regarding prejudice he suffered as a result of trial counsel's actions. . . . The pleading requirements of Rule 32.3 and Rule 32.6(b) required that Hodges allege specific facts indicating that the result of the proceeding probably would have been different if counsel had investigated the possibility that Hodges suffered from brain damage and mental illness. Because Hodges failed to plead these claims with any specific facts, they were properly dismissed by the circuit court.

*Hodges*, 147 So. 3d at 945–46 (citation omitted).

### f.    *Efforts to lead a positive life*

The last category of mitigation evidence the ACCA reviewed corresponded with Petitioner's claim that counsel inadequately investigated and presented evidence about his positive attributes and his attempts to lead a positive life. The ACCA found as follows:

> Counsel conducted interviews with Hodges, his mother, his siblings, coworkers, and neighbors. As a result of these interviews, counsel became aware of the evidence Hodges now says they should have discovered, and additional positive evidence. Counsel then presented much of this evidence at trial through the testimony of Hodges's mother. Cobb testified that Hodges had obtained his GED; that he had participated in several programs while he was incarcerated, including substance abuse programs; that Hodges had been cited for being a good, hard worker on the jobs he had performed in the work-release program; that Hodges had close friends; that he had studied, trained, and obtained his license as a barber; and that he had obtained legal custody of his 13-year-old daughter, and that he had a close relationship with her.

Doc. 21-56 at 120.  Given this conclusion, the ACCA found that, had counsel "called additional witnesses or presented a few more of Hodges's positive

qualities," such evidence would have been cumulative.   Doc. 21-56 at 120. Accordingly, the ACCA concluded that counsel was not deficient as alleged by Petitioner.

The ACCA also addressed Petitioner's claim that counsel should have investigated and presented evidence of his good work record at the Golden Corral and his effort to build a romantic relationship with Trina Eady:

> Counsel can hardly be faulted for failing to present testimony about Hodges's good work performance at the Golden Corral, since he planned an elaborate robbery of his supervisor at the Golden Corral, then carried out the robbery and brutally beat and choked his supervisor as she begged for her life, and then ran over her naked body with her van. Similarly, counsel can not be faulted for not presenting as a mitigating circumstance that Hodges maintained a relationship with coworker Trina Eady, first, because Hodges testified that she also knew about the planned robbery and, second, because Hodges testified that he also had a "little mistress" to whom he gave some of the money he took from the Golden Corral.

Doc. 21-56 at 120 (citation omitted).

Given all these circumstances, the ACCA held, Petitioner's counsel did not render deficient performance in failing to investigate and present evidence about his efforts to lead a positive life.  Doc. 21-56 at 120–21.

g.    *Conclusion*

After examining the record respecting each of the categories of mitigation evidence Petitioner faulted his counsel for failing to investigate and present, the ACCA concluded that Petitioner's claim was without merit:

> Having begun with the strong presumption that counsel were effective, and considering fully the record presented in this case, we hold that Hodges failed to meet the heavy burden of proving that counsel's investigation and presentation of mitigating evidence fell outside the wide range of professionally competent assistance. Nor did Hodges prove that, but for defense counsel's alleged errors, there was a reasonable probability of a different outcome at sentencing.

Doc. 21-56 at 121.

**5.    The ACCA did not unreasonably apply *Strickland* and did not base its decision upon an unreasonable determination of fact.**

As set forth above, the ACCA rendered substantial findings of fact in support of its application of the *Strickland* standard to Petitioner's claims that his counsel were ineffective in failing to adequately investigate and present mitigation evidence.  While the petition recounts, over approximately twenty pages, all the evidence Petitioner faults counsel for failing to investigate and present, the petition notably *does not* appear to articulate, specifically, how the ACCA's decision denying his claims is contrary to, or an unreasonable application of *Strickland*, or

74

how it was based upon an unreasonable finding of fact in light of the record before that court.  This is, of course, the paramount inquiry under AEDPA.

Petitioner's merits brief likewise reiterates the petition's allegations and discusses counsel's obligations to investigate and present mitigating evidence.  The brief goes on to assert that the ACCA's "decision was an unreasonable application of *Strickland* and *Wiggins* to the facts of this case."  Doc. 31 at 42.  In support, Petitioner argues that the evidence admitted in the Rule 32 proceedings, which is set out in the petition and summarized above, "demonstrated that an investigation would have revealed that Mr. Hodges's life was defined by constant violence, instability, extreme poverty, and alcohol and drug abuse."  *Id*.  Petitioner also argues that the ACCA's finding that "trial counsel thoroughly investigated Hodges's past," doc. 21-56 at 94, is "simply inaccurate" because, while counsel did speak with Petitioner's mother and siblings, he "failed to elicit several important pieces of mitigation evidence" in these interviews, doc. 31 at 42–43.

Petitioner's reply brief is more focused on the question of how his claims pass muster under the AEDPA.  The ACCA unreasonably applied *Strickland* and *Wiggins*, he argues, because the ACCA essentially excused counsel's failure to "follow-up on obvious leads that would have provided much more useful and effective mitigation evidence than what was ultimately found and presented to the

jury." Doc. 42 at 16.  Meanwhile, he asserts, the ACCA's finding that counsel "thoroughly" investigated Petitioner's background "is an unreasonable determination of the facts." *Id*. at 17.  On the failure-to-present-mitigation-evidence claim, he contends that the ACCA's finding that much of his Rule 32 evidence was "cumulative" of evidence introduced at trial "is a completely unreasonable determination of the facts in light of the evidence presented in the Rule 32 Proceeding and an unreasonable application of *Strickland*." *Id*. at 19.

In pertinent part, the ACCA found as follows concerning the scope of counsel's investigation and presentation of mitigation evidence: counsel interviewed Petitioner, his mother, and his siblings to learn about Petitioner's background; counsel worked with private investigators, who also interviewed some of Petitioner's family members and produced reports concerning those interviews in which they discuss mitigation evidence; counsel's requests for funds to compensate the investigators for additional investigation were denied by the trial court; counsel asked Petitioner and his mother about whether Petitioner was abused; Petitioner and his mother denied that Petitioner suffered unusual or inappropriate physical abuse growing up;[10] the only institutional records broaching

---

[10] For example, counsel interviewed Cobb using a form provided in the Alabama Capital Defense Trial Manual, which counsel had procured and studied in preparation for his mitigation investigation.  *See* Doc. 21-36 at 185.  The form contained numerous sample questions designed to elicit "Client Background Information."  Counsel recorded Cobb's

the topic of violence in Petitioner's home suggested Petitioner and his siblings were not abused by, or even afraid of, Echols; counsel was not informed by Petitioner or anyone else he spoke to about how uniquely traumatic and formative was the experience Petitioner suffered living with his grandparents including, in particular, the feeling of abandonment this inspired; counsel was informed that, while Petitioner and his family were poor, even exceptionally so in his early years, they "always had the necessities;" that, for the most part, counsel presented through Cobb what mitigation evidence he learned, including, broadly, Petitioner's experience with poverty, instability, exposure to violence, and substance abuse issues; and that much of the evidence Petitioner faults counsel for failing to

---

answers on the form.   The form indicates Cobb advised counsel that Petitioner's relationship with Maddox was "ok," that discipline was administered to Petitioner via "spanking," and  that Cobb denied that Petitioner suffered any "infliction of physical harm or pain (by burning, beating, cutting, whipping, etc.) that was apparently not associated with culture-appropriate discipline[.]"  Doc. 21-36 at 188–89.  Counsel used the same form in an interview with Petitioner who, like his mother, also denied the infliction of culturally-inappropriate discipline through beating and whipping.  Doc. 21-37 at 19.  Counsel confirmed in his Rule 32 deposition that his notes on these forms reflect the answers he was given when inquiring whether Petitioner suffered abuse.  *See* Doc. 21-36 at 116, 118–19.

Counsel prepared a "Summary" of information he gathered from his interviews with Petitioner and his mother which also reflects that both had denied that Petitioner suffered abuse.  Doc. 21-37 at 53.  Petitioner's mother also appears to have told the mitigation investigators working with trial counsel that Petitioner received only "spanking" with a belt for discipline, with no indication of abuse.  Doc. 21-37 at 80.  The social worker Petitioner retained to investigate mitigation evidence in Rule 32 proceedings conceded in her deposition that she based her opinion about Petitioner's abusive childhood on information that was not evidenced in the attorneys' notes and records of interviews with many of the same witnesses.  Doc. 21-39 at 8–9.

discover and present was cumulative of the evidence that counsel actually presented.

Apart from his charge that the ACCA unreasonably determined that counsel "thoroughly" investigated his past, and that much of the Rule 32 evidence was "cumulative" of the evidence introduced at trial, Petitioner does not challenge these core findings, much less demonstrate that they were unreasonable in light of the record before the ACCA. Rather, throughout his merits and reply briefs, Petitioner charges that the ACCA unreasonably applied *Wiggins v. Smith*, which he describes as "arguably the Supreme Court's most famous case regarding ineffective assistance in death penalty mitigation," doc. 42 at 15, in concluding that counsel's investigation was reasonable. *See* Doc. 31 at 37–38, 42–43; Doc. 42 at 15–18.

*Wiggins* reflects the Supreme Court's application of the *Strickland* standard to the facts before it in that case. *Newland v. Hall*, 527 F.3d 1162, 1197 (11th Cir. 2008). It does not present a distinct legal standard to be applied in ineffective assistance cases and does not otherwise modify or expand the *Strickland* standard. Thus, although *Wiggins* may be informative in a *Strickland* analysis, and it may even help to illuminate a state court's unreasonable application of *Strickland*, the

*Strickland* standard remains the ineffectiveness standard the ACCA was charged with applying to Petitioner's claims.

That said, the facts of *Wiggins* are in stark contrast to those described by the ACCA in this case.  To begin with, Wiggins's attorneys admitted that, "well in advance of trial," they decided to focus their penalty phase strategy on retrying the guilt phase case by "disputing Wiggins' direct responsibility for the murder."  539 U.S. at 517.  In pursuit of this "strategy," counsel declined to use available State funds to hire a social worker to prepare a social history, which even the trial judge advised was likely erroneous.  *Id*.  Moreover, counsel adhered to this "strategy" even though available sources of background information—namely, a presentence investigation report and social services records—indicated that a wealth of mitigation information about Wiggins's hellish background was available.  *Id*. at 523.  Foremost among the mitigation evidence that was not revealed in the available records, but could have been discovered had counsel followed its leads, was a history of "severe physical and sexual abuse [Wiggins] suffered at the hands of his mother and while in the care of a series of foster parents."  *Id*. at 516.

Despite not following these leads, counsel indicated their intent to present mitigation evidence by requesting that the trial court bifurcate the sentencing proceeding so that they could "retry" the guilt phase and present mitigating

evidence separately.  539 U.S. at 515.  Then, during the sentencing proceeding, after their request for bifurcation was denied, counsel advised the jury that it would hear about Wiggins's difficult life but then failed to present any evidence on that subject.  *Id*.  In sum, "counsel never actually abandoned the possibility that they would present a mitigation defense" in favor of their primary "strategy" and, therefore, "had every reason to develop the most powerful mitigation case possible."  *Id*. at 526.  Because counsel failed to obtain a social history report, failed to follow-up on the leads in the PSI and social services reports, and failed even to fulfill their promise to the jury to explain the difficult circumstances in Wiggins's life, the Supreme Court concluded that Wiggins's attorneys abandoned their mitigation investigation as a result of "inattention, not reasoned strategic judgment."  *Id*. at 534.

Here, by contrast, it cannot be argued that counsel were inattentive to the need to develop mitigation evidence, or that they subordinated the investigation of mitigation evidence to pursue some other penalty phase strategy while keeping one foot inside the mitigation door.   As the ACCA found, counsel conducted interviews with several witnesses and attempted to gather pertinent information about Petitioner's background, including whether he was subject to abuse. Counsel also plainly did not neglect to utilize available funds to obtain a social

history report.  Quite the opposite: counsel worked with investigators on a *pro bono* basis and requested funds from the trial court to continue such investigations, which was denied.  Likewise, there are no institutional records, as in *Wiggins*, that would have alerted counsel to a wealth of mitigation evidence waiting to be discovered.  Nor did counsel indicate that they would tell the jury about Petitioner's hardships but then wholly fail to follow through on that point.  Instead, counsel elicited testimony about Petitioner's experience of poverty, exposure to violence and instability in his homes, substance abuse, and his positive attributes and efforts to overcome the hardships he faced in his life.

In essence, counsel here is primarily faulted for failing to extract information out of Petitioner and his family members that they subsequently revealed to postconviction investigators and failing to provide the jury and trial court with additional examples and a more compelling presentation of evidence supporting the broad mitigation themes that counsel did present.  Those may be legitimate criticisms of counsel's efforts.  Perhaps counsel could have been more probing or insistent in his questioning of Petitioner and his family members.  And perhaps the penalty phase presentation would have benefitted from a more cohesive theory of mitigation, rather than a scattershot series of anecdotes about the hardscrabble life in turpentine camps, abusive husbands, eating sheetrock, watching a friend drown,

81

*etc*.  But it stretches *Wiggins* beyond reason to analogize counsel's alleged shortcomings here with the gross deficiency of counsel described in that case.

The contrast with *Wiggins* is even more glaring on the issue of prejudice.  In *Wiggins*, the attorneys advised the jury that they would be presenting evidence about Wiggins's difficult life, but then "introduced no evidence of Wiggins' life history."  539 U.S. at 515.  This failure to follow through with their assurances to the jury was especially damaging considering the extensive mitigation evidence that was available.  The Supreme Court summarized this evidence as follows:

> [Wiggins's] mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner-an incident that led to petitioner's hospitalization.  At the age of six, the State placed Wiggins in foster care.  Petitioner's first and second foster mothers abused him physically, . . . [and] the father in his second foster home repeatedly molested and raped him.  At age 16, petitioner ran away from his foster home and began living on the streets.  He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion.  After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id*. at 517 (record citations omitted).  This incongruity, that counsel promised to deliver evidence but then wholly failed to deliver any of the abundant, compelling evidence that was available, explains the Court's conclusion that Wiggins was

prejudiced: "Wiggins' sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id*. at 537.[11]

Here, it simply cannot be said that the jury and trial court were similarly deprived. Counsel presented considerable evidence on the broad themes of violence, poverty, instability, abandonment, and substance abuse that counsel is faulted for failing to investigate and present. Petitioner has capably demonstrated that there was still more to present in support of those themes, but he falls short of demonstrating the uniquely prejudicial effect of attorneys who presented nothing where copious "powerful" evidence was available, as the Supreme Court confronted in *Wiggins*.

More importantly, and not to minimize the evident hardships Petitioner faced in his formative years, the mitigating evidence that was wholly neglected in *Wiggins* is simply more compelling than what Petitioner mustered in his Rule 32

---

[11] Consider, too, that the Supreme Court's prejudice analysis in *Wiggins*, unlike here, was not "circumscribed" by AEDPA. *See* 539 U.S. at 534. As such, *Wiggins* provides "no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking." *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011) (emphasis in original). *See, e.g*., *Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1269 (11th Cir. 2022).

proceedings.  Wiggins experienced shocking physical and sexual abuse at the hands of his own mother and a series of foster parents over a period of years. Petitioner, by contrast, enjoyed a loving relationship with his mother, who, the evidence in the state court showed, did her level best to nurture and provide for him under difficult circumstances.  Even if Petitioner did not experience an idyllic childhood, the abuse, abandonment, and instability he alleged in the state court is not on par with that found sufficiently compelling to establish prejudice in *Wiggins*.

The same can be said for other cases in which the Supreme Court has found that a habeas petitioner received the ineffective assistance of counsel due to counsel's failure to adequately investigate and present mitigating evidence in the penalty phase of a capital trial.  *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 395–96 (2000) (Williams was prejudiced by counsel's failure to discover and present evidence that he was "severely beaten by his father," that his "home was a complete wreck" with feces, urine, and trash, that his parents were incarcerated due to their neglect of Williams, and that he was "'borderline mentally retarded'"); *Rompilla v. Beard*, 545 U.S. 374, 392–93 (2005) (counsel failed to discover and present evidence of extreme parental abuse, including regular beatings, being locked in a "wire mesh dog pen that was filthy and excrement filled," denial of

basic needs like shelter and clothing, the effects on Rompilla of fetal alcohol syndrome, and that "Rompilla's IQ was in the mentally retarded range"); and *Porter v. McCollum*, 558 U.S. 30, 33–42 (2009) (counsel failed to investigate and present evidence about Porter's uniquely mitigating "heroic military service in two of the most critical—and horrific—battles in the Korean War," regular beatings by his father, an incident where his father attempted to shoot Porter, and evidence of organic brain damage and diminished capacity).

Of course, Petitioner's claim is not due to be denied merely because it is not factually analogous to or as compelling as that in *Wiggins* or the other cases surveyed above.  The question before this court is simply whether fairminded jurists can agree with the ACCA's determination that his counsel did not perform deficiently and that it is not reasonably probable that he would have obtained a better outcome at his sentencing had counsel presented the mitigation evidence that was presented in the Rule 32 proceedings.  Applying this heightened, deferential standard of review, the court concludes that, ultimately, the ACCA did not unreasonably apply *Strickland* and it did not base its decision on an unreasonable determination of the facts.

On the deficient performance prong, fairminded jurists can agree with the ACCA's determination that counsel adequately investigated petitioner's

background and presented the mitigating evidence he discovered in his investigation. Specifically, fairminded jurists can agree with the ACCA's conclusion that reasonable, competent counsel may limit the investigation of mitigating evidence as did counsel in this case. On the issue Petitioner positions at the forefront of his mitigation case, his exposure to continuous and extreme violence, the ACCA's finding that neither Petitioner, his mother, nor his sister conveyed to counsel that Petitioner suffered sustained physical abuse at the hands of his father, stepfathers, grandparents, and other family members is salient on this point. "Indeed, 'when a petitioner (or family members petitioner directs his lawyer to talk to) does not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation.'" *Morrow v. Warden*, 886 F.3d 1138, 1148 (11th Cir. 2018) (quoting *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1211 (11th Cir. 2007)).

Likewise, even if information conveyed by Petitioner or his family members suggested there may have been instances of abuse—like Cora's history of abuse by her husbands, or Echols's paranoid schizophrenic interrogations of Petitioner, or Cora's admission that Petitioner was subject to "spanking," for example—counsel "is not automatically deficient for failing to discover other abuse that his client conceals." *Morrow*, 886 F.3d at 1148 (citations omitted). Based on the record

86

before the ACCA, it was reasonable for that court to conclude that counsel inquired specifically about abuse in Petitioner's background, but that Petitioner and his family members failed to reveal the existence and extent of such abuse to trial counsel.  Given this fact, and considering that there were no contemporaneous institutional records—like school, law enforcement, or social services records—to alert counsel to the history of abuse and abandonment alleged in his Rule 32 proceedings, counsel was not deficient in  failing to discover and present such evidence.

But even if Petitioner could show that the ACCA unreasonably adjudicated *Strickland*'s deficient performance prong, he still must show that the ACCA also unreasonably adjudicated *Strickland*'s prejudice prong.  This he cannot do.  To begin with, the ACCA reasonably concluded that much of the mitigation evidence counsel is faulted for failing to investigate and present was cumulative of the evidence that counsel did present in the penalty phase of Petitioner's trial.  In general, "[n]o prejudice can result from the exclusion of cumulative evidence." *Raheem*, 995 F.3d at 925.  "[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more

87

or better examples or amplifies the themes presented to the jury." *Holsey v. Warden*, 694 F.3d 1230, 1260–61 (11th Cir. 2012).

It is undeniable that trial counsel here presented evidence that Petitioner grew up surrounded by and exposed to violence, that he moved around frequently and lacked a stable home, that his family was impoverished, that he suffered head injuries and was exposed to toxic substances in his developmental period, that he suffered substance abuse issues, and that, despite these challenges, he worked toward improving his life by advancing at his job, building relationships with others, and attempting to provide his daughter with the loving father that was absent from his life.  To be sure, as detailed in the petition and summarized previously in this opinion, Petitioner presented the state courts in his Rule 32 proceedings with specific and quantitatively more evidence in support of these general themes.  And his postconviction presentation benefitted from the sort of expertise—namely, a psychosocial investigator and a forensic psychologist—that was denied to trial counsel.

But the ACCA's "cumulative" finding is reasonable because "[m]uch (although not all) of the 'new' testimony introduced [in Rule 32 proceedings] would simply have amplified the themes already raised at trial and incorporated into the sentencing judge's decision to override the jury." *Boyd v. Allen*, 592 F.3d

1274, 1298 (11th Cir. 2010).  In essence, while Petitioner's Rule 32 witnesses "presented more details or different examples of these unfortunate aspects of [his] life, these aspects were nonetheless known to the sentencing jury and judge.  Thus, no significant prejudice can result from the exclusion of cumulative evidence, meaning [Petitioner's] counsel's failure to present cumulative evidence was not prejudicial." *Ferguson v. Comm'r, Ala. Dep't of Corr.*, 69 F.4th 1243, 1261 (11th Cir. 2023).  *See also Guardado v. Sec'y, Fla. Dep't of Corr.*, __ F. 4th __, 2024 WL 3747882, *21 (11th Cir. Aug. 12, 2024) (affirming under AEDPA the state appellate court's conclusion that the habeas petitioner could not establish *Strickland* prejudice because much of his postconviction evidence was cumulative of his penalty phase evidence).

In addition to the foregoing, the ACCA concluded that Petitioner cannot show prejudice because the "lengthy and torturous nature of this crime" outweighs the mitigating evidence he presented in his Rule 32 proceedings.  *See* Doc. 21-56 at 110; *id*. at 112, 115.  This, too, was reasonable.  The trial court found that the murder of Beth Seaton was "especially heinous, atrocious, and cruel compared to other capital offenses."  Doc. 21-55 at 11.  The ACCA affirmed the application of the "heinous, atrocious, and cruel" ("HAC") aggravator:

> The evidence demonstrated that Seaton pleaded for her life for some
> time before she was beaten with fists and a pistol and was ultimately

run over with her own vehicle.  Murph testified that she even took off
her clothes and offered to have sex with Hodges and Murph if they
would not kill her.  The evidence further demonstrated that Seaton had
been physically and psychologically tortured.  . . .  There was
sufficient evidence to show that Seaton's murder was "especially
heinous, atrocious, or cruel" as compared to other capital murders.

*Hodges*, 856 So. 2d at 931 (citations omitted).

The HAC aggravating circumstance in Alabama is "a particularly powerful

aggravator."  *Boyd*, 592 F.3d at 1302 n.7.  So, while Petitioner argues that "the

aggravating factors in Mr. Hodges's case were minimal" because he had no history

of violent crime, *see* Doc. 31 at 41, he fails to reckon with the substantial

aggravating weight owed to the existence of the HAC aggravating circumstance in

the required reweighing of aggravating and mitigating circumstances.  *See Thornell*

*v. Jones*, 602 U.S. __, 144 S. Ct. 1302, 1310 (May 30, 2024) (finding error where

federal court in habeas review "failed adequately to take into account the weighty

aggravating circumstances in this case[,]" including Arizona's analogue to

Alabama's HAC aggravator).  *See also Pye*, 50 F.4th at 1049 ("We've repeatedly

held that even extensive mitigating evidence wouldn't have been reasonably likely

to change the outcome of sentencing in light of a particularly heinous crime and

significant aggravating factors.").  Considering that much of his Rule 32 evidence

was cumulative of evidence introduced at his trial, and that this evidence was

weighted against the "particularly powerful" aggravating evidence, the ACCA

reasonably concluded that Petitioner was not prejudiced by his counsel's alleged failure to investigate and present the Rule 32 evidence.

In addition to his argument that the aggravating circumstances in his case were "minimal," Petitioner appears to argue that the "State's case for the death penalty was 'only weakly supported by the record'" because the jury recommended a life sentence in his case.  Doc. 31 at 40 (quoting *Strickland*, 466 U.S. at 695).  He further cites as "fact" that "'[p]rejudice is more easily shown in jury override cases because of the deference shown to the jury recommendation.'"  *Id.* (quoting *Harich v. Wainwright*, 813 F.2d 1082, 1093 n.8 (11th Cir. 1987)).  Indeed, the Eleventh Circuit has previously stated that the "fact that the jury decisively voted against the death penalty, even without the powerful evidence adduced at postconviction, weighs heavily in favor of a finding of prejudice."  *Williams v. Allen*, 542 F.3d 1326, 1343 (11th Cir. 2008).

More recently, however, the Eleventh Circuit concluded that, where trial counsel presented the testimony of family members about the defendant's "substance abuse, his problems in school, his strange behavior, and that [the defendant] was loved and his life should be spared[,]" "the fact that the jury recommended life imprisonment counsels against a determination that [the petitioner] was prejudiced under *Strickland*."  *Lee v. Comm'r, Ala. Dep't of Corr.*,

726 F.3d 1172, 1196 (11th Cir. 2013).  No doubt, there is some tension in these decisions regarding how to interpret a jury's life sentence recommendation in assessing prejudice.  *Ferguson*, 69 F.4th at 1261.

Until the Eleventh Circuit reconciles these decisions, however, the mere fact that a jury recommended life should not, as Petitioner here argues, be treated as confirmation that the State's case for the death penalty is only "weakly supported." Instead, the better course is to  examine the evidence that precipitated the jury's life sentence recommendation and compare it to the evidence introduced in post-conviction proceedings.  Where, as here, the trial evidence may reasonably be considered a sort of broad thematic distillation of the post-conviction evidence, even if it is was presented in a less impactful or meticulous fashion, it is reasonable to conclude that the jury's life sentence recommendation should not be treated as a conclusive indicator of prejudice.

The ACCA also concluded that Petitioner's mitigation evidence about the effects of his exposure to violence, poverty, and instability was of limited weight because his siblings, "particularly his older brother, were exposed to violence and abuse as they were raised in the same household and none of them committed capital murder or have a criminal history."  Doc. 21-56 at 106.  Moreover, the ACCA opined that additional evidence about the instability Petitioner experienced

"might have been counterproductive" because none of Petitioner's siblings, who largely experienced the same instability, "had ever been convicted of a crime." Doc. 21-56 at 116. The ACCA's conclusion, again, was reasonable. *See Ledford v. Warden, Georgia Diagnostic and Classification Prison*, 818 F.3d 600, 650 (11th Cir. 2016), abrogated on other grounds by *Moore v. Texas*, 581 U.S. 1 (2017), (observing that evidence that "Ledford's sisters grew up in the same dysfunctional and difficult environment and yet turned out not to be murderers, but rather reasonably well-adjusted individuals" could be "more harmful than helpful"); *Kormondy v. Sec'y, Fla. Dep't of Corr.*, 688 F.3d 1244, 1283 (11th Cir. 2012) ("The evidence of Kormondy's impoverished upbringing, lack of parenting, and a father who abandoned him is also problematic. Kormondy's half-siblings . . . were brought up in the same environment of physical abuse, neglect and poverty, their father left their mother to fend for herself and her children, yet they emerged as law abiding citizens. The mitigating evidence now pressed by Kormondy has its obvious limitations."); *Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1247 (11th Cir. 2010) (finding omitted evidence of childhood abuse "damaging" to the extent it revealed that the petitioner's siblings "were affected by the same childhood abuse and neglect, . . . but acknowledged that [petitioner] was the only one of the siblings who had ever been arrested for a violent crime").

The upshot of all of this is that the ACCA had before it all the evidence produced by Petitioner in the Rule 32 proceedings, it compared that evidence to that which was presented at trial, and it reweighed all such mitigating evidence against the aggravating evidence introduced at trial.  As set forth above, the ACCA *reasonably* determined that much of the new mitigating evidence was cumulative of the trial evidence, that it was of limited mitigating impact, and that, given the circumstances of Beth Seaton's murder, the aggravating evidence outweighed the totality of the mitigating evidence.  Fairminded jurists can agree with those assessments.  Thus, in concluding that Petitioner was not prejudiced by  his counsel's investigation and presentation of mitigating evidence at trial, the ACCA did not unreasonably apply *Strickland* and it did not base its decision on an unreasonable determination of the facts.  Accordingly, Petitioner is not entitled to relief on Claims I.B & C and such claims are due to be denied.

### C.   Trial Counsel Failed to Adequately Cross-Examine Several Key Witnesses for the State (Claim I.D).

Petitioner claims that his counsel failed to adequately cross-examine the following prosecution witnesses: his co-defendant, Marlo Murph; his girlfriend, Trina Eady; fingerprint examiner Carol Curlee; Murph's girlfriend, Marlena Maddox; his aunt, Kitty Porter; Annie Ware, who testified about her interactions with Petitioner on the night of the murder; Greg Holstick, who provided Petitioner

with the gun used in the robbery; and Muna Patel, the proprietor of the motel where Petitioner took Murph and Maddox after the murder of Seaton.  Pet. ¶¶ 166–80.  Respondent concedes that this claim was denied on the merits in the state courts and, accordingly, is exhausted and properly before this court for review under AEDPA.  Doc. 37 at 21–22.  For each of these witnesses, this opinion will examine the petition's allegations, the state court disposition of the claim, and whether the state court decision withstands scrutiny under § 2254(d).

### 1.   Marlo Murph

As discussed previously, Murph testified extensively about how he and Petitioner robbed Golden Corral using Seaton's access to the safe, drove Seaton into rural Macon County, beat and murdered her, left her body alongside the road, and disposed of some of the evidence of their actions.

### a.   *Petitioner's allegations*

Petitioner alleges that his counsel failed to elicit "critical impeachment evidence" in his cross-examination of Murph, including the following: a) "counsel never challenged Mr. Murph's identification" of blood-stained pants which Murph testified were worn by Petitioner during the murder; b) counsel did not sufficiently inquire into Murph's previous conviction for "false reporting" and specifically failed to inform the jury that the conviction stemmed from Murph's having "lied to

law enforcement officers[;]" c) counsel "failed to convey to the jury that most of the incriminating evidence linked Mr. Murph to the crime, not Mr. Hodges[,]" to wit, Murph was in possession of more money than was linked to Petitioner following the murder, police found the gun used to rob Seaton in Murph's possession, Murph led police to the blood-stained clothes, and Murph's, but not Petitioner's, fingerprints were found in Seaton's van.  Pet. ¶ 169.  Petitioner also faults counsel for "fail[ing] to note the inconsistency between Mr. Murph's trial testimony regarding which clothes he was wearing on the night of the crime, and a police report indicating that the trial testimony was, in fact, incorrect."  Pet. ¶ 170. Finally, Petitioner alleges counsel "failed to elicit from Mr. Murph testimony regarding Mr. Murph's willingness to lie in order to frame Mr. Hodges."  Pet. ¶ 171.

### b.      *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim as insufficiently pleaded pursuant to Rule 32.6(b), and for failure to "raise a material issue of law or fact that would entitle the petitioner to relief" pursuant to Rule 32.7(d).  Doc. 21-55 at 133–34, 161–62.  The ACCA affirmed.  *Hodges*, 147 So. 3d at 953.  In pertinent part, the ACCA found that Petitioner failed to allege specific facts supporting his claim that he was prejudiced by counsel's alleged inadequate cross-examination of

Murph. *Id.*   Although Petitioner had identified "specific areas of inquiry" that counsel could have probed with Murph, he nevertheless "failed to allege specific facts indicating that there was a reasonable probability that, had trial counsel had [sic] asked the additional questions on cross-examination, Hodges would not have been convicted of capital murder." *Id.*

> c.   *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* in concluding that Petitioner failed to allege specific facts showing how he was prejudiced by counsel's alleged deficient cross-examination of Murph.   To begin with, neither the instant federal petition nor the Rule 32 petition alleges, specifically, how counsel might have "challenged" Murph's identification of the bloody pants as belonging to, and worn by, Petitioner.   With no factual allegations to even suggest that such a challenge could have been fruitful, the ACCA reasonably concluded there were no alleged facts to support a finding of prejudice.[12]

---

[12] Furthermore, counsel *did* object to Murph's identification of the pants "as far as putting any of his own personal identification on them.   It's been a year and half since he has seen those pants . . . .   You can hold up any pair of black pants and he can say yes.   I don't think he had an identification that he can specify these as being the pants."   Tr. 1042.   Considering that this objection was overruled, and with no additional facts in his arsenal to further challenge Murph's identification of the pants, the petition is silent as to what more counsel could have done or how Petitioner was prejudiced due to counsel's failure to do more.

Likewise, the jury was aware of Murph's previous conviction for false reporting and that he lied in his initial statement to police in this case. *See* Tr. 1032. Petitioner alleges nothing showing that jurors failed to understand that the crime of "false reporting" involves false reporting to law enforcement. Thus, the ACCA reasonably concluded that it is not reasonably probable that Petitioner would not have been convicted of murder had counsel forced Murph to admit that his false reporting conviction stemmed from his lying to law enforcement officers.

The petition also faults counsel for failing to "convey to the jury that most of the incriminating evidence linked Mr. Murph to the crime, not Mr. Hodges." Pet. ¶ 169. But all of the points Petitioner cites that should have been conveyed were, in fact, conveyed through trial testimony, and counsel raised most of those points in his argument to the jury. For example, counsel emphasized trial testimony showing that only Murph's fingerprints were found in the van (Tr. 1139); that Murph had the gun at the time of his arrest (Tr. 1140); and that Murph had "nearly $1,500" in his pocket when he was arrested (*Id.*). The ACCA reasonably concluded that Petitioner did not plead specific facts showing he was prejudiced by counsel's failure to "convey" these facts through additional cross-examination of Murph.

The petition next faults counsel for failing to "note the inconsistency" between Murph's testimony about what he was wearing on the night of the murder and "a police report indicating that the trial testimony was, in fact, incorrect." Pet. ¶ 170. The petition does not specifically allege the substance of the "inconsistency" counsel should have explored and it does not allege how the failure to highlight any such "inconsistency" could have prejudiced Petitioner. In any event, counsel spent the majority of his cross-examination of Murph eliciting testimony about Murph's conflicting statements, how he gave multiple versions of his statements to police, and how his trial testimony differed from those statements. Then, in closing, counsel reminded the jury that Murph admitted his statements "were full of lies." Tr. 1134. It cannot be said that counsel did not place Murph's veracity in dispute. Thus, the ACCA reasonably concluded that Petitioner did not plead facts showing how he was prejudiced by counsel's failure to impeach Murph's testimony about the clothes he was wearing based on the undescribed "police report."

Finally, the petition faults counsel for failing to "elicit from Mr. Murph testimony regarding Mr. Murph's willingness to lie in order to frame Mr. Hodges. . . . Trial counsel failed to point-out that Mr. Murph was willing to lie in order to avoid responsibility and point the finger at Mr. Hodges." Pet. ¶ 171. On the

99

contrary, this is exactly what counsel did.  Counsel meticulously reviewed Murph's

police statements on cross-examination to show that Murph lied to the police in his

initial statements.  Then, in closing, counsel emphasized that Murph was willing to

lie to save his own life and frame Petitioner:

> Well, as it turned out, with all the evidence they got, Mr. Murph
> finally came up here and had a completely different version than what
> he told them back in January of l998.  Mr. Murph's testimony.  Let's
> talk about his testimony.  This is a man that's been convicted of
> larceny.  Been convicted of making a false report.  And that's in
> addition to the lies he has told the police, and yet, the state wants you
> to take his version and say that's it.  That's it. That's Murph.  Wants
> you to ignore the problems that Mr. Murph has in telling the truth and
> they want you to ignore the motivation that Mr. Murph had of saving
> his life.  He started off real quick here early on giving a statement and
> agreeing now to testify against Mr. Murph -- Mr. Hodges because he
> saved his life.  And Mr. Hodges may be going to the electric chair, in
> exchange for that testimony.

Tr. 1135.  Of course, it is unlikely that Murph would have testified on cross

examination that he was willing to lie to save his own life.  But counsel

nevertheless made that case the only way he could, by showing that Murph had

been convicted of lying, had lied to the police about this case, and was naturally

motivated to save his own life.  The ACCA reasonably concluded that Petitioner

failed to allege how he was prejudiced by counsel's alleged failure to elicit

testimony from Murph about his willingness to lie.

**2.     Trina Eady**

100

Trina Eady was Hodges's girlfriend and co-worker at Golden Corral.   In pertinent part, she testified about arriving to open the restaurant on January 5, finding the alarm system deactivated and the safe open, and immediately contacting police.   She also testified about what she and Petitioner, Murph, and Maddox did after she left work on the evening of January 4.   In particular, she testified that the four of them played cards in her apartment until around 10:30 p.m., when Petitioner and Murph left to get something to eat.   Tr. 585–86. Petitioner returned later that evening, she was not sure what time, and retrieved Maddox before leaving again, with Petitioner informing her that he was taking Murph and Maddox to a hotel room.  Tr. 586.  Petitioner returned again still later, went to bed, and accompanied Eady to Golden Corral the following morning.   On cross-examination, she testified that she was "very close friends" with Beth Seaton, and that she and Petitioner had socialized often with Seaton, including having Seaton over to her apartment after work.   Tr. 589.   She denied any knowledge of Petitioner ever having been in Seaton's van, however.  Tr. 590.

### a.   *Petitioner's allegations*

Petitioner claims that counsel's cross-examination of Eady was inadequate because counsel failed "to follow-up on Ms. Eady's testimony that Mr. Hodges had never been in Ms. Seaton's van."  Pet. ¶ 172.  He insists that, "in fact, Ms. Eady

knew that Mr. Hodges had been in Ms. Seaton's van on several occasions associated with both his employment as well as his social relationship with Ms. Seaton." *Id.* He also claims that counsel could have elicited testimony from Eady that she "was familiar with Mr. Hodges's clothing, and that she did not recognize the pants on which the victim's blood had been found." Pet. ¶ 174.

### b. *The state court's merits adjudication*

Petitioner presented his claim that counsel failed to adequately cross-examine Eady in his amended Rule 32 petition. Doc. 21-31 at 48–49. The ACCA affirmed the dismissal of the claim pursuant to Rules 32.3 and 32.6(b) as overly vague and conclusory. 147 So. 3d at 936, 939. The ACCA concluded that Petitioner "clearly failed to plead sufficient facts supporting *both* prongs of the *Strickland* test." *Id.* at 942 (emphasis in original). Regarding Petitioner's claim about the failure to follow-up on Eady's testimony about whether Petitioner had been in Seaton's van, the ACCA explained its conclusion as follows:

> First, Hodges's claim does not accurately reflect the facts from the trial. Trial counsel did, in fact, ask Eady if Hodges had previously been in the victim's van and she stated that, to her knowledge, he had not been in the van. Hodges failed to plead any facts to indicate what follow-up questions trial counsel should have asked Eady, and he failed to plead any facts indicating that Eady's answer to those questions would have been different than her original answer to his question.

*Id*. at 952 (citation omitted).  The ACCA thus concluded that dismissal of the claim was appropriate pursuant to Rules 32.3 and 32.6(b), and because "the claim was meritless on its face."  *Id*.

> c.   *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably, and correctly, identified the deficiency of Petitioner's pleading respecting this claim.  Eady was plainly asked if she knew whether Petitioner had been in Seaton's van.  Her answer was equally plain:  that she had no knowledge of that having occurred.  Although Petitioner alleges that Eady "knew" he had been in the van, both socially and for work reasons, he points to nothing establishing such knowledge on her part.  He does not identify any piece of evidence counsel could have relied upon in attempting to impeach Eady's answer.  Nor does he explain why, even if Petitioner or other witnesses might have testified that he had previously been in the van, this would mean that Eady, specifically, must have known that he had been in the van but either lied or forgot about that fact.[13]  Petitioner simply does not allege how counsel could have caused Eady to change her response to this simple question.  Accordingly, the ACCA's

---

[13] For example, Kitty Porter testified that Petitioner and Seaton visited her house on the Friday before the murder, and that they were traveling in a van.  Tr. 989.  She did not testify, however, that Eady was present or that Eady must have known about Petitioner traveling in Seaton's van at that time.

conclusion that he failed to plead sufficient facts to support a finding of deficient performance or prejudice is reasonable.

The ACCA also reasonably concluded that Petitioner did not plead sufficient facts to establish deficient performance or prejudice regarding counsel's failure to cross-examine Eady about her familiarity with his clothing.  Trina Eady was the first witness called at trial.  Tr. 577.  The blood-soaked pants that Murph later attributed to Petitioner were not in evidence at the time of her testimony.  But, even if they had been, Petitioner did not plead any facts showing that Eady would not have identified the blood-soaked pants as belonging to Petitioner, or that she had comprehensive knowledge of all his clothing and, therefore, could positively identify every pair of pants he owned.[14]  The ACCA's findings and application of *Strickland* were reasonable.

### 3. Carol Curlee

Carol Curlee was a certified latent print examiner working for the Alabama Department of Public Safety.  Curlee identified latent prints lifted from the passenger door of Seaton's van as belonging to Murph.  Tr. 727–28.  She testified

---

[14] Indeed, Eady testified that Petitioner lived with her "[o]n and off at that time."  Tr. 579. She clarified that he "stayed there [at her apartment] and then he moved back and then he came back and stayed and then he moved back."  Tr. 591.  Given this testimony, and the subsequent testimony about Petitioner's "little mistress" in Tuskegee, a juror could easily infer that Petitioner might have clothing in various places that Eady had not laundered and could not identify.

that she could not identify Petitioner's prints in any of the latent prints lifted from the van or other items at the scene, including his nametag.  Tr. 735.  On cross-examination, counsel caused Curlee to confirm that "[t]he only prints in or on the van or anything in or on the van came from Ms. Seaton and Mr. Murph[.]"  Tr. 740–41.

### a.    Petitioner's allegations

Petitioner claims that "[a]lthough trial counsel elicited testimony that Mr. Hodges's prints were not found in the van, trial counsel failed to elicit testimony to explain the significance of this fact.  Trial counsel also failed to elicit testimony regarding the absence of any prints on the name tag found at the scene."  Pet. ¶ 175.

### b.    The state court's merits adjudication

The Rule 32 court dismissed this claim as insufficiently pleaded, pursuant to Rules 32.3 and 32.6(b), and for failure to raise a material issue of fact or law, *i.e.*, facially without merit, pursuant to Rule 32.7(d).  Doc. 21-55 at 130–31, 161.  The ACCA affirmed, concluding that Petitioner "failed to plead sufficient facts supporting *both* prongs of the *Strickland* test."  147 So. 3d at 942 (emphasis in original).

>    c.    *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA's decision is a reasonable application of *Strickland* because counsel did elicit testimony about the absence of Petitioner's fingerprints on or inside Seaton's van, while other testimony established that there were no identifiable prints on his nametag.  Had counsel asked Curlee to "explain the significance" of the absence of Petitioner's prints on or in the van or on the nametag, such questions surely would have been objected to as beyond the purview of Curlee's direct testimony and expertise.  In any event, counsel was free to argue about the significance of the absence of prints described by Curlee, which he did in closing argument:

> Whose fingerprints were found in or on the van? Mr. Murph's.  The State would have you believe that everything got wiped off, cleaned up, and that's why Mr. Hodges' fingerprints weren't found.  Well, that's really amazing and interesting that everybody's but Mr. Murph's was covered up.  I think that's a little bit of a stretch.

Tr. 1139.  The ACCA's decision, especially regarding Petitioner's failure to plead facts establishing prejudice, was reasonable.

### 4.    Marlena Maddox

Maddox was Murph's girlfriend at the time of the murder.  In pertinent part, she testified about hanging out with Petitioner, Eady, and Murph at Eady's

apartment on the evening of January 4.  Like Eady, she testified that the quartet played cards until Petitioner and Murph left to get something to eat in the range of 9:00 to 10:30 p.m.  Tr. 1003.  Also like Eady, she napped until they returned, which she testified was about 3:30 a.m.  Tr. 1004.  Maddox testified that Petitioner had left the apartment in his work uniform—gray pants and a white shirt with red stripes and nametag—but when she saw him after his return, he "had on some blue jeans, but he didn't have on no shirt."  Tr. 1004.  She also testified that Murph gave her $1,200, which she used to purchase a car.  Tr. 1006.  On cross-examination, counsel forced Maddox to admit that she lied in her first statement to police regarding the amount of money Murph gave her after the murder.  Tr. 1011.

### a. *Petitioner's allegations*

Petitioner alleges that counsel "failed to adequately question Ms. Maddox about the pants that Mr. Hodges wore on the night of the crime and whether the blood-stained pants were the gray pants which Mr. Hodges wore when he left the apartment."  Pet. ¶ 176.  He also faults counsel for failing to "adequately cross-examine her regarding her biases in the case," and failing "to examine her on inconsistencies between her testimony and other evidence regarding the clothing that Mr. Murph had been wearing on the night of the crime."  *Id.*

### b. *The state court's merits adjudication*

107

The Rule 32 court dismissed this claim as insufficiently pleaded pursuant to Rules 32.3 and 32.6(b).  Doc. 21-55 at 131.  The ACCA affirmed, finding that Petitioner had "clearly failed to plead sufficient facts supporting *both* prongs of the *Strickland* test."  147 So. 3d at 942 (emphasis in original).

> c.   *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner failed to allege facts showing how he was prejudiced by counsel's failure to ask Maddox whether the blood-soaked pants in evidence were the same pants she saw him wearing when he left the apartment.  He points to nothing indicating what Maddox might have said were she presented with such a question.  Accordingly, counsel would have run the risk of having Maddox give an inculpatory answer to whether the pants in evidence were the same pants she saw him wearing.  Petitioner also alleged no facts beyond Maddox's relationship with Murph, which was known to the jury, respecting any "biases" on the part of Maddox that counsel might have explored with her.  Nor did Petitioner allege specific facts about how counsel should have examined Maddox about "inconsistencies between her testimony and other evidence regarding the clothing that Mr. Murph had been wearing on the night of the crime."  Pet. ¶ 176.  Most importantly, considering that counsel did

108

elicit testimony showing that Maddox lied to police, Petitioner failed to plead specific facts showing how he could have been prejudiced by counsel's failure to explore her "biases" or any inconsistencies in her testimony about Murph's clothing.  The ACCA's conclusion that Petitioner's claim was unduly vague and conclusory was reasonable.

### 5.    Kitty Porter

The testimony of Kitty Porter, Petitioner's aunt, was reviewed previously. To reiterate, Porter testified about her time spent with Petitioner on January 5 and his confession to her of his role in the murder of Seaton.  On cross-examination, counsel questioned Porter extensively about the circumstances under which she gave her police statement implicating Petitioner.  He explored the intimidating circumstances of her statement, including that she was "picked up" by law enforcement, transported to the county jail, placed in a room with several officers, and kept there for over seven hours while she worked through her statement.  Tr. 982–84.  Counsel also elicited testimony that, prior to giving her statement, Porter was told she was an accessory and was threatened with going to jail if she did not tell the truth.  Tr. 988–89.  Counsel further elicited Porter's testimony that she had refused to speak with defense counsel before trial because she feared "going to jail for something" she did not do.  Tr. 991.

### a.    Petitioner's allegations

Petitioner alleges counsel "failed to identify Ms. Porter's drug problems, and the number of areas in which she was pressured by the police to testify against Mr. Hodges."  Pet. ¶ 177.  He also faults counsel for failing to cross-examine Porter on "inconsistencies in her prior statements, and substantial internal inconsistencies in her statement to police."  *Id*.  He further faults counsel for several failures having nothing to do with his cross-examination of Porter, including the following: failing to "point out" that Porter gave her statement after Murph, which, it is alleged, allowed law enforcement to "coordinate" the statements of Porter and Murph; failing to "point out the likely effect of the district attorney's effort to intimidate Ms. Porter at trial, as well as the fact that a pretrial interview with her was given in the presence of a police officer;" and failing to object to the State's "impermissible use of [Porter's] written statement" during its examination of her.  *Id*.

### b.    The state court's merits adjudication

The Rule 32 court summarily dismissed this claim as insufficiently pleaded, pursuant to Rules 32.3 and 32.6(b).  Doc. 21-55 at 131–32.  The ACCA affirmed, concluding that Petitioner had "clearly failed to plead sufficient facts supporting *both* prongs of the *Strickland* test."  147 So. 3d at 942 (emphasis in original).

      *c.*     *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA's conclusion that this claim was unduly vague and conclusory was reasonable.  Petitioner did not plead any facts about Porter's purported drug problem or how it was relevant to her testimony.  He did not plead any facts explaining counsel's alleged failure to "identify" the "number of areas in which she was pressured by the police to testify against Mr. Hodges."  Pet. ¶ 177.  As noted above, however, counsel elicited Porter's testimony about the pressure that was placed on her to provide her police statement and about her fear of going to jail if she did not testify truthfully.   Nor did Petitioner allege what "inconsistencies" counsel should have explored with Porter regarding "her prior statements" or "substantial internal inconsistencies in her statement to the police." *Id*.  Petitioner also did not allege how counsel might have "pointed out" in his cross-examination of Porter that Porter gave her statement after Murph or how Porter even could have been aware of such a fact.  In short, Petitioner did not plead any facts showing that he could have been prejudiced by counsel's failure to further cross-examine Porter on these points.   The remainder of Petitioner's arguments—that counsel should have "pointed out" the effect of the prosecutor's purported effort to intimidate Porter during her testimony and should have objected

to the State's "impermissible" use of Porter's prior statement—have nothing to do with the adequacy of counsel's cross-examination of Porter and, accordingly, the ACCA's conclusion that he failed to plead facts showing prejudice was reasonable.

### 6.    Annie Ware

Annie Ware's testimony was used to establish Petitioner's whereabouts and a timeline on the evening of the murder.  She first testified that she ran a "licensed" store out of her home where she sold "pigs feet, pickled eggs, fish sandwiches, sodas, chips, and gum."  Tr. 713 (capitalization and punctuation altered).  She further testified that Petitioner and Murph visited her home after 10:00 p.m. on January 4, and that Petitioner was dressed in his Golden Corral uniform, including his nametag.  Tr. 714.  Petitioner jokingly asked Ware to "run off" with him, to which she replied that he did not have enough money for her to run off with him. Tr. 716.  Ware testified that Petitioner made a joking response along the lines of "I'll surprise you" and "don't be surprised" if he does have money.  Tr. 716. Counsel did not cross-examine Ware.

### a.    *Petitioner's allegations*

Petitioner claims counsel "failed to adequately examine Annie Ware in order to reveal likely biases in association with her testimony," namely, that she was a

"bootlegger" and therefore "would have been under obvious pressure to cooperate with police in order to remain[ in] their good graces." Pet. ¶ 178.

### b.    *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim for lack of sufficient specificity pursuant to Rule 32.3 and 32.6(b). Doc. 21-55 at 132. The ACCA affirmed for the same reasons discussed previously, that Petitioner "clearly failed to plead sufficient facts to establish *both* prongs of the *Strickland* test." 147 So. 3d at 942 (emphasis in original).

### c.    *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

Although Petitioner alleges that Ware was a "bootlegger" and was biased against him because of "obvious pressure to cooperate with police," he provides no specific factual allegations supporting any of these contentions. While Murph referred to Ware as a "bootlegger" in his testimony, *see* Tr. 1019, nothing in the record establishes this fact or suggests that Ware fabricated her testimony because of pressure exerted by law enforcement. Petitioner admitted in his own testimony that he visited Ware's house/store on the evening of January 4, while wearing his Golden Corral uniform and nametag. Tr. 1080–81. The only pertinent difference in their testimonies was that Ware placed the visit after 10:00 p.m., which she

remembered because she had been away visiting her mother until late that evening, and Petitioner testified that he visited Ware earlier in the evening, around 7:00 to 7:15 p.m.  In any event, given the testimony from Eady and Maddox indicating that Petitioner and Murph left Eady's apartment around the time that Ware testified they visited her home, Petitioner failed to plead any factual allegation supporting his claim that he was prejudiced, *i.e.*, that it is reasonably likely that he would not have been convicted of murder had counsel cross-examined Ware about her biases against him due to her alleged bootlegging activities.  The ACCA's decision, therefore, was reasonable.

### 7.   Greg Holstick

As referenced previously, Holstick provided Petitioner with the gun that Murph used to hold Seaton at gunpoint during the robbery and was later used to beat Seaton in Macon County.  He testified that a friend of his had asked him to keep the gun while the friend was out of town, and that Petitioner visited his apartment on a Sunday night right after Christmas and asked to borrow the gun because "he had a problem in Auburn with some fellow." Tr. 755.  Holstick told Petitioner there were no bullets in the magazine and Petitioner responded that he did not need bullets. *Id*.  Petitioner was dressed in his Golden Corral uniform.  Tr. 757.  On cross examination, Holstick admitted that he was a convicted felon.  Tr.

758. He also testified that the friend who asked him to keep the gun never asked for its return. Tr. 759.

### a.   *Petitioner's allegations*

Petitioner alleges that counsel knew of Petitioner's claim that Holstick was involved in Seaton's murder but "failed to investigate, and then failed to pursue, this claim in cross-examination at trial (or, for that matter, in the defense case). This failure to pursue or even raise the issues with Holstick prevented Mr. Hodges's trial testimony from having any grounding in previously-established testimony, undermining and failing to support Mr. Hodges's case." Pet. ¶ 179.

### b.   *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim as insufficiently specific pursuant to Rules 32.3 and 32.6(b). Doc. 21-55 at 132–33. The ACCA affirmed, concluding that Petitioner asserted only "bare conclusions of deficient performance and prejudice" and had "clearly failed to plead sufficient facts supporting *both* prongs of the *Strickland* test." 147 So. 3d at 942 (emphasis in original).

### c.   *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner did not plead specific facts establishing deficient performance or prejudice due to counsel's

failure to cross-examine Holstick about Petitioner's claim that Holstick was involved in Seaton's murder. Despite over twenty years to investigate and substantiate this claim, Petitioner still points to nothing upon which counsel might have relied in accusing Holstick of the murder. Holstick had no known relationship with Seaton which could be exploited to cause her to let her guard down. Holstick's clothes were not found covered in Seaton's blood. Holstick's DNA was not located in her van. Witnesses did not place Holstick and Murph together around the time of the robbery and murder. Murph did not implicate Holstick in the murder in any fashion. With no other witnesses or forensic or other circumstantial evidence to support Petitioner's fanciful claim, a quixotic effort to pin the murder on Holstick during cross-examination likely would have compromised counsel's credibility with the jury at the time that he could least afford to do so. The ACCA's conclusion that Petitioner did not plead sufficient and specific factual allegations establishing deficient performance or prejudice was reasonable.

### 8.   Muna Patel

Muna Patel was the co-owner of the Golden Cherry motel and was working the desk there in the early morning hours of January 5. She identified a room registration card dated January 4 with information that she gathered from the

photographic I.D. produced by the guest at the time of check in.  Tr. 933–34.  The registration card reflected that Petitioner reserved the room.  Doc. 21-5 at 294.

### a.    Petitioner's allegations

Petitioner alleges that, because the registration card was dated January 4, the prosecution was able to imply that Petitioner "had actually procured the motel room on January 4, 1998, and that he had, therefore, carefully planned and executed the crime[.]"  Pet. ¶ 180.  Petitioner faults counsel for failing to elicit testimony from Patel on cross-examination to the effect that "individuals who check in after midnight typically date their registration statements with the date of the preceding day.  Such testimony would have been consistent with Mr. Hodges's account of the events that night, and undermined a significant point alleged by the prosecution in closing."  *Id.*

### b.    The state court's merits adjudication

The ACCA concluded that Petitioner failed to plead a meritorious claim:

> Hodges failed to allege specific facts regarding the context of the date, January 4, 1999 [sic], and indicating why the date and time of Murph's check-in was relevant.  He also failed to allege any specific facts regarding how trial counsel's preparation for Patel's cross-examination was inadequate.  Finally, Hodges pleaded no facts, specific or otherwise, indicating how he was prejudiced by counsel's actions.

147 So. 3d at 953.

       c.    *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner cannot show prejudice from counsel's failure to cross-examine Patel about whether Petitioner might have back-dated his registration card when he checked-in at the motel. Petitioner himself admitted to planning the robbery,[15] so the prosecution's theory that Petitioner carefully planned the robbery was amply supported with or without any inference that Petitioner reserved a motel room before, rather than after, the murder of Seaton.   Petitioner simply cannot show that there is a reasonable probability that he would not have been convicted of murder had counsel cross-examined Patel about the accuracy of the date on the registration card that Petitioner completed.

**D.   Trial Counsel Failed to Adequately Conduct an Investigation into Mr. Hodges's Culpability (Claim I.E).**

Petitioner next claims that counsel failed to adequately investigate the State's case against him.   The product of this failure, he alleges, is that it "prevented trial counsel from offering appropriate objections to misstatements of fact by the prosecution in closing, as well as objections to statements of fact that

---

[15] Specifically, he testified as follows:  "My extent was I was the plan—the one planning it.  I was in on the planning of it.  The planning and—and what—what can be done and what can't be done."  Tr. 1057.

were actually contradicted by the statements of witnesses."  Pet. ¶ 182.  He identifies three areas in which counsel's investigation was deficient: 1) counsel failed to conduct adequate interviews of the State's witnesses; 2) counsel failed to adequately investigate Petitioner's version of events and elicit evidence and testimony that would have supported it; and 3) counsel failed to adequately pursue investigations into physical evidence collected and presented by the State.  This opinion will examine each of these contentions in turn.

### 1.    Failure to adequately interview State's witnesses.

#### a.    *Petitioner's allegations*

Petitioner first claims counsel's failure to adequately interview the State's witnesses rendered counsel "unaware of the likely testimony from the vast majority of the State's fact witnesses."  Pet. ¶ 184.  This resulted in counsel's alleged inadequate cross-examination of the witnesses, as alleged in Claim I.D and discussed previously.  He alleges that, had counsel adequately interviewed these witnesses, he would have been prepared to "point[] out misstatements of fact and internal inconsistencies in the testimony of the State's witnesses," and thus "could have undermined their credibility,  . . . challenged the admissibility and/or weight of the physical evidence in this case, and . . . substantially bolstered the account offered by Mr. Hodges in his own testimony."  Petitioner makes no specific

119

allegations respecting counsel's failure to adequately investigate any witness other than to refer to the witnesses previously discussed in his claim challenging counsel's cross-examination of certain witnesses.

> b.    *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim as insufficiently specific pursuant to Rule 32.3 and 32.6(b).  Doc. 21-55 at 120–21.  The ACCA affirmed the dismissal of the claim as unduly vague and conclusory.  147 So. 3d at 935–36, 942.

> c.    *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* in dismissing this claim.  To begin with, there are no specific allegations in the Rule 32 petition or in the federal petition about the extent of any interviews conducted by counsel.  Petitioner alleges only that counsel "made only limited efforts to interview any of the likely witnesses for the State."  Pet. ¶ 184.  Where counsel plainly did conduct interviews of some State witnesses, or at least tried to conduct such interviews, it is incumbent on Petitioner to allege specific facts surrounding those interviews so that the state

courts and this court can assess the reasonableness of counsel's performance.[16] The petition is devoid of specific allegations about whom counsel interviewed, the substance of any such interviews, or the extent of counsel's efforts to secure interviews with witnesses he was not able to interview.  In any event, for the reasons previously stated regarding the witnesses Petitioner alleged counsel failed to adequately cross-examine, the ACCA reasonably applied *Strickland* because Petitioner did not allege specific facts establishing that he was prejudiced by counsel's failure to adequately interview these same witnesses.

### 2. Failure to adequately investigate Petitioner's version of events.

Petitioner alleges counsel failed to adequately investigate his version of the events surrounding Beth Seaton's murder, despite that this was his "only defense at trial[.]"  Pet. ¶ 186.  This failure consisted of counsel's failure to investigate and failure to "point to any physical evidence or elicit any testimony that would have supported Mr. Hodges's case."  *Id*.

#### a.    Petitioner's allegations

Petitioner alleges that counsel's deficient investigation resulted in the following failures of counsel at trial: a) providing inadequate guidance of

---

[16] For example, trial testimony showed that Kitty Porter refused to speak with counsel despite his efforts to interview her.  Tr. 991.  Yet, counsel is apparently alleged to have inadequately interviewed and cross-examined Porter.

Petitioner's direct testimony so that it was delivered "in a manner that would have made it persuasive to a jury" (Pet. ¶ 187); b) failing to elicit Trina Eady's testimony that Hodges had occupied Seaton's van on previous occasions (Pet. ¶ 188); c) failing to elicit Eady's testimony that "she had never seen him wear the pants stained with blood identified" by Murph as belonging to Petitioner (Pet. ¶ 189); d) failing to "investigate a police report of a man dressed all in black lurking around the scene of the robbery around the time that the victim was allegedly abducted," where such report would have corroborated Petitioner's testimony about Murph's involvement and the clothes he was wearing (Pet. ¶ 190); e) failing to "investigate or elicit testimony regarding the basis for Mr. Hodges's alibi at the time of the murder" (Pet. ¶ 191); f) failing to "investigate or elicit testimony from Greg Holstick (Pet. ¶192); g) failing to investigate whether any "physical evidence" tied Petitioner to the "bloody clothes that Mr. Murph had found for the police" (Pet. ¶ 193); h) failing to "investigate the inventory of the victim's van, and the discovery of evidence in and around it" (Pet. ¶ 194); i) failing to "inquire into contradictions that existed between the trial testimony of several witnesses and statements made by those witnesses on relevant evidentiary points" (Pet. ¶ 195); j) failing to inquire "whether footprints on the driver's side of the van . . . matched shoes identified as belonging to Mr. Murph, which would have contradicted Mr.

Murph's testimony about the events leading to the abandonment of the van" (Pet. ¶ 196); and k) failing to "inquire whether any of the other conspirators identified by Mr. Hodges had vehicles matching the description of vehicles seen near the victim's van on the morning of the crime" (Pet. ¶ 197).

> ### b.    *The state court's merits adjudication.*

The Rule 32 court dismissed most of the allegations supporting this claim as insufficiently specific pursuant to Rules 32.3 and 32.6(b). Doc. 21-55 at 122–26. The ACCA affirmed, concluding that all of the allegations in support of this claim were unduly vague and conclusory, and that Petitioner "clearly failed to plead sufficient facts supporting *both* prongs of the *Strickland* test." 147 So. 3d at 936–37, 942 (emphasis in original).

> ### c.    *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA's application of *Strickland* and its associated fact-finding was reasonable. The petition does not substantiate its claim that counsel failed to adequately communicate with Petitioner and made no effort to investigate his version of events. Nor does the petition identify the physical evidence or omitted testimony counsel should have raised in order to support Petitioner's story. Lacking such allegations, the ACCA reasonably concluded that Petitioner did not

adequately plead deficient performance.  Moreover, counsel did attempt to "point out" to the jury where Petitioner's version was supported by the evidence.  For example, he reminded the jury that only Murph's fingerprints were found in the victim's van.

The petition also does not allege how counsel might have better guided Petitioner's testimony so that it was more persuasive to the jury.  The only specific critique appears to be that counsel let Petitioner "testify for minutes at a stretch in a manner that, while entirely honest, prevented the clear communication of Mr. Hodges's version of events to the jury."  Pet. ¶ 187.  But nothing in the petition or in the record suggests that allowing Petitioner to deliver his narrative account of events—again, this was a direct examination of Petitioner—had the effect of rendering the testimony unpersuasive.  If anything, the weight of the evidence against Petitioner and his resort to accusing almost all the State's fact witnesses of being liars, as well inconsistencies between Petitioner's testimony and the evidence, was more persuasive to the jury than was the fact that Petitioner testified for minutes at a time.[17]

_____

[17] For example, Petitioner insisted that he visited Walmart with Murph to purchase a ski mask around 8:00 p.m.  Tr. 1087 ("I don't go – I didn't go by Wal-Mart at no ten twenty, sir.  I know it was eight o'clock.").  The Walmart receipt, however, which was found in his wallet after his arrest, indicated that the purchase occurred at 10:23 p.m. on January 4, 1998.  Tr. 970.  In addition, Petitioner gave inconsistent accounts of his visit to Greg Holstick's home.  Petitioner first testified that he went to Holstick's home to get the gun

The remainder of the points raised by Petitioner are, as the ACCA concluded, insufficient.  He faults counsel for failing to elicit testimony from Eady about prior instances where Petitioner occupied Seaton's van, but counsel plainly asked Eady about such instances and she testified that did not know of any. Petitioner makes no allegation that Eady has ever admitted to any knowledge of Petitioner's having occupied Seaton's van.  Petitioner also again faults counsel for failing to elicit testimony from Eady about whether she had seen Petitioner wear the gray pants that were admitted at trial.  Petitioner does not allege, however, that Eady has ever declared, or would testify, that she could not identify those pants and, as discussed previously, considering Eady's testimony about Petitioner's transience and other evidence about Petitioner's "little mistress" in Tuskegee, a jury could reasonably infer that Eady might not have seen, or laundered, all of Petitioner's pants.

Petitioner does not allege why the failure to investigate a police report that might have corroborated his description of Murph's involvement in the crime and the clothes Murph was wearing could have been deficient or prejudicial.  There was no doubt about Murph's involvement in the crime and, unless the police report

---

and that, while there, he told Holstick about his robbery plan.  He said Murph "was out in the parking lot" during this visit.  Tr. 1064.  Then, on cross-examination, he insisted Holstick gave the gun to Murph and that he had never touched it.  Tr. 1087.

also described Murph as wearing Petitioner's Golden Corral work shirt and gray pants, it was of limited exculpatory value.

Likewise, the petition is wholly devoid of allegations about what testimony counsel should have elicited "regarding the basis for Mr. Hodges's alibi at the time of the murder." Pet. ¶ 191. Petitioner's "alibi," such as it was, was that he was waiting around Eady's apartment while Holstick and Murph carried out the robbery. Tr. 1066–68. He even testified that Maddox interacted with him in the parking lot of the apartment while he was waiting on Holstick and Murph to finish the robbery. Tr. 1068. But Eady testified that Petitioner and Murph left around 10:30 p.m. and that she did not see Petitioner again until he returned to the apartment to retrieve Maddox and take her to the Golden Cherry motel with Murph. Tr. 586. Maddox, like Eady, testified that Petitioner and Murph left around 10:30 p.m. and that she did not see Petitioner again until around 3:30 a.m., when he returned to the apartment before taking her to the motel. Tr. 1003–05. She did not testify about any interaction with Petitioner in the parking lot while the robbery was in motion. Petitioner does not allege what testimony counsel should have elicited from these or other witnesses' to better support any alibi defense.

Petitioner also does not allege what testimony counsel should have elicited from Holstick in support of Petitioner's version of events. Other than his own self-

serving story, Petitioner does not point to any evidence in the record, or elsewhere, that counsel might have relied upon in essentially trying to elicit Holstick's confession to participating in the robbery and murder of Seaton.    Petitioner similarly fails to specifically allege what counsel should have done to "investigate whether there was any physical evidence tying Mr. Hodges to the bloody clothes that Mr. Murph had found for the police."    Pet. ¶ 193.    This allegation is particularly curious given Petitioner's admission that at least some of the "bloody clothes" to which Murph led the police—namely, Petitioner's bloody Golden Corral uniform shirt—belonged to Petitioner but was worn by Murph at the time of the murder.

Petitioner does not allege or explain the relevance of the alleged failure to "investigate the inventory of the victim's van, and the discovery of evidence in and around it."    Pet. ¶ 194.    Nor does Petitioner allege, specifically, what "contradictions" counsel should have "inquired into" with unnamed witnesses and on what "relevant evidentiary points" such inquiry should have been made.  Pet. ¶ 195.  To be sure though, and as discussed previously, counsel cross-examined the State's key witness, Murph, extensively about the contradictions in Murph's various police statements and the testimony he eventually delivered at trial.

Petitioner does not allege what counsel should have done to "inquire" about "whether footprints on the driver's side of the van . . . matched shoes identified as belonging to Mr. Murph[.]"  Pet. ¶ 196.  There are no allegations that, indeed, the footprints he references matched Murph's shoes.  Petitioner even affirmed at trial that he saw the "rigid" prints left by Murph's shoes on the passenger side of the van.  Tr. 1085.  Finally, Petitioner does not allege how any "inquiry" into whether "other conspirators identified by Hodges had vehicles matching the description of vehicles seen near the victim's van on the morning of the crime" would have been fruitful.  Pet. ¶ 197.  There are no specific allegations about what vehicles Murph, Holstick, or Hicks were driving around that time or whether any of those vehicles were seen in the vicinity of the Golden Corral "on the morning of the crime."

Based upon the foregoing, the ACCA reasonably concluded that Petitioner failed to sufficiently allege deficient performance and prejudice respecting all of the alleged failures of counsel to investigate Petitioner's version of events. Accordingly, the ACCA did not unreasonably apply *Strickland*, and it did not base its conclusion upon any unreasonable determination of fact in light of the record before the ACCA.

> **3.  Failure to adequately pursue investigation into physical evidence collected and presented by the State.**

Petitioner's final contention in challenging counsel's failure to investigate his culpability concerns the alleged failure of counsel to adequately investigate the physical evidence.  He acknowledges that counsel "asked the trial court to permit independent investigations into various pieces of physical evidence[,]" but that the trial court "improperly" and "incorrectly" denied such motion.   Pet. ¶ 199. Nevertheless, he alleges, despite the trial court's denial, counsel "should have made further efforts to investigate the physical evidence presented in this case[,]" and that the failure to do so "prejudiced the presentation of Mr. Hodges's case." Pet. ¶ 200.

### a.    Petitioner's allegations

Petitioner identifies the following errors in counsel's alleged failure to adequately investigate the State's physical evidence: a) counsel failed to "make every effort" to investigate whether the blood-stained pants, shirt, and underwear identified by Murph as belonging to Petitioner could be linked to Petitioner by physical evidence (Pet. ¶¶ 201–02); b) counsel "failed to make every effort to investigate the brands or types of cigarettes smoked by Mr. Hodges and Mr. Murph" to properly determine "the source and provenance of the cigarette butts found in the van" (Pet. ¶ 203); counsel failed to "investigate or elicit testimony regarding the physical state of the name tag found near the victim's body, the

presence of fingerprints on that name tag, or the fundamental implausibility that something so incriminating as a name tag would have been found, resting face up, within several feet of the victim's body" (Pet. ¶ 204); trial counsel failed to "pursue" Petitioner's "analysis" that the name tag must have been wiped clean of prints and was "planted" by someone (Pet. ¶ 205); counsel "failed to examine videotapes of the crime scene as well as security videotapes collected by the prosecution from businesses located at or near locations past which the victim or relevant vehicles or individuals may have passed on January 4–5, 1998" (Pet. ¶ 206); counsel failed to "inquire into the likelihood of an error in the time stamp" on the Walmart receipt that indicated Petitioner and Murph visited the store later in the evening than he stated in his testimony (Pet. ¶ 207); and counsel failed to "articulate a more detailed basis" for his request for independent testing of physical evidence (Pet. ¶ 208).

### b.    *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.3 and 32.6(b).  Doc. 21-55 at 126–27.  The ACCA affirmed.  147 So. 3d at 943–44. Specifically, after reviewing each of Petitioner's allegations respecting counsel's failure to adequately investigate physical evidence, the ACCA concluded as follows:

Although Hodges identified several acts or omissions of counsel that he believed constituted deficient performance, he failed to include in his petition any specific facts indicating how those acts or omissions prejudiced his defense.  *See, e.g., Bracknell v. State*, 883 So. 2d 724, 728 (Ala. Crim. App. 2003).  Hodges was required to plead specific facts indicating that there is a reasonable probability that, but for counsel's acts or omissions, the result of the proceeding would have been different.  The bare allegation that prejudice occurred did not satisfy the pleading requirements.  In his brief to this Court, Hodges has included more factual allegations in an attempt to support his argument that the circuit court erred in summarily dismissing these claims. However, in *Bearden v. State*, 825 So. 2d 868, 872 (Ala. Crim. App. 2001), we stated: "Although Bearden attempts to include more specific facts regarding his claims of ineffective assistance of counsel in his brief to this Court, those allegations are not properly before this Court for review because Bearden did not include them in his original petition before the circuit court."  Therefore, summary dismissal of the foregoing claims was proper.

*Id.*

> c.  *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because its conclusion that Petitioner failed to allege sufficient facts to establish prejudice was reasonable. Petitioner's allegations respecting this claim in his amended Rule 32 petition and the instant federal petition are essentially identical.  *Compare* Doc. 21-31 at 14–17 *with* Pet. ¶¶ 199–209.   The allegations are, indeed, conclusory and lacking in sufficient specificity to support a claim of prejudice.  For instance, regarding the bloody clothes he alleges counsel should have "made every effort"—beyond

requesting independent testing, which was denied—to determine whether they could be forensically linked to Petitioner, he alleges only that testing the clothes for hair or skin cells "*might have* linked individuals other than Mr. Hodges" to the items of clothing.  Pet. ¶ 201 (emphasis supplied).  This is too tenuous a thread to support an allegation of cognizable prejudice.  Petitioner does not allege that such testing *would have* linked the clothes to other individuals.  It is of course equally, if not more, probable that such testing would have linked the clothes to Petitioner and, therefore, conclusively established his guilt.

Even by Petitioner's account, the bloody shirt he alleged Murph wore during the murder belonged to Petitioner.  Counsel might have fully expected that the shirt would have hair, skin, sweat, or other excretions traceable to Petitioner.  If, by chance, it did not have any similar trace of Murph, whether because Murph never wore the shirt or he just happened not to leave any discoverable trace behind, then Petitioner's defense would be doomed.  As it was, counsel had the necessary wiggle room to argue why the fact that Petitioner's work shirt had blood on it and was recovered with other items of clothing soaked in Seaton's blood did not necessarily implicate Petitioner, which is exactly what he did in closing argument: "He [Murph] took that red shirt right there and put it on because he was trying to get in the building because his plan didn't work out like they had planned. . . .

Murph threw Hodges' clothes out and put his back on." Tr. 1132–33. The testing Petitioner faults counsel for failing to obtain or elicit testimony about its absence very well could have foreclosed that line of defense. At bottom, with no specific allegation that any benefit would have been derived from the investigation Petitioner faults counsel for failing to make, he did not adequately plead prejudice to support his claim.

Similarly, Petitioner does not allege why the failure to investigate the cigarettes commonly smoked by Petitioner and Murph, or the "source and provenance of the cigarette butts found in the van," prejudiced his defense. Regardless of Petitioner's preferred "brand or type" of cigarette, or the "source and provenance" of any cigarettes found in the van, the forensic evidence established the presence of Petitioner's DNA on a cigarette butt found in the van. Even if counsel could have shown that this cigarette was not of a brand or type normally smoked by Petitioner, the petition does not allege how counsel might have negated the impact of the State's evidence by proving this fact. A jury reasonably could have concluded that, whatever was Petitioner's preferred type or brand of cigarette, he smoked the one with his saliva on it. The inference that Petitioner found or "bummed" a cigarette he would not ordinarily smoke is more plausible than the unsupported, and frankly conspiratorial, notion that his saliva was planted on some

impostor cigarette.  Petitioner simply failed to plead any fact establishing the requisite prejudice.

Petitioner also failed to plead any specific fact establishing the requisite prejudice concerning counsel's failure to elicit testimony about the physical state of his name tag when it was found at the scene of Seaton's murder.  As best the court can tell, counsel is faulted here for failing to argue that, given the "fundamental implausibility" of its recovery "resting face up" at the scene, and the fact that it bore no fingerprints, the State (or Murph? or Holstick?) must have wiped the name tag clean and planted it at the scene to implicate Petitioner.  But Petitioner does not allege why it was "fundamentally implausible" that his name tag would be located and positioned as it was at the scene.  There is no doubt that his work shirt was there, and that the wearer of the shirt was engaged in a brutal physical struggle with Beth Seaton.  That the name tag might get pulled off or become dislodged under such circumstances is hardly implausible.  Nor is it implausible that the name tag would come to rest "face up" rather than "face down."  There are only two options as far as that goes, after all.

As for the inferences that can be drawn from the lack of fingerprints on the name tag, and whether counsel should have argued that the lack of fingerprints showed that it was wiped clean and "planted," trial testimony showed that there

134

were no recoverable prints on the name tag.  Petitioner presented his story of how his bloody work shirt, and by extension his nametag, came to be at the scene of Seaton's murder and counsel argued in support of that testimony in closing.  There is no reasonable probability that Petitioner would not have been convicted had counsel argued, without evidence, that someone wiped clean and planted Petitioner's name tag at the scene.  Petitioner did not plead sufficient facts to establish prejudice, and, consequently, the ACCA's decision was reasonable.

Petitioner does not specifically allege the relevance of any videotapes he faults counsel for failing to examine.  He merely alleges that, had counsel reviewed videotapes of the crime scene and various undescribed security videotapes, it "would have bolstered Mr. Hodges's version of events, and undermined the State's version."  Pet. ¶ 206.  How, specifically?  The petition is silent.  If a crime scene or security video substantially bolsters Petitioner's story while undermining the State's theory, and counsel prejudicially failed to examine such video, then it is reasonable to expect a petition to explain the particulars of this momentous circumstance.  With no such explanation to be found in the state and federal petitions, the ACCA's decision concluding that Petitioner failed to plead facts establishing prejudice is reasonable.

Similarly, Petitioner does not plead sufficient facts supporting his claim that he was prejudiced by counsel's failure to investigate the accuracy of time stamps on Walmart receipts.  He merely alleges, without support, that "time stamps were often incorrect[.]"  Pet. ¶ 207.  There are no specific allegations about inaccurate Walmart time stamps in general, or inaccurate time stamps at the relevant Walmart location, in particular.  Even if Petitioner's allegation is taken as true, however, the Walmart time stamp was consequential as an evidentiary matter only insofar as it helped to establish a timeline of Petitioner's movements on January 4.

Petitioner conceded that he bought the ski mask at Walmart on January 4, but insisted that he bought it about two hours earlier in the evening.  The receipt was consistent, however, with the testimony of several witnesses that described Petitioner being out and about around the time the ski mask was purchased.  For instance, Eady and Maddox both testified that Petitioner left Eady's apartment in the 10:00 to 10:30 p.m. range and did not return for several hours.  Ware testified that it was after 10:00 p.m. when Petitioner and Murph visited her home.  Thus, sufficient evidence corroborated the prosecution's timeline, even without the receipt.  While Petitioner argues that, had counsel somehow shown that time stamps are often incorrect, it "would have rehabilitated Mr. Hodges's credibility," he does not allege how, or why, Petitioner's credibility would have been so

136

rehabilitated considering the testimony of the other witnesses described above. And, in any event, there are no allegations supporting a contention that, even if the jury viewed Petitioner as credible on the time of his Walmart visit, it necessarily would have found him more credible on the more pertinent aspects of his story about what happened to Beth Seaton.  Thus, the ACCA reasonably dismissed this claim.

### E.   Trial Counsel Failed to Object to Erroneous Rulings and Improper Rulings by the Trial Court (Claim I.F).

The petition identifies six instances in which, it is alleged, counsel ineffectively failed to object to erroneous and improper rulings by the trial court. This opinion will examine each instance in turn.

#### 1.   Failure to object to the trial court's interruption of closing argument.

During defense counsel's closing argument, while explaining the reasons jurors should question Murph's testimony, counsel's argument stumbled into improper rhetoric.  Counsel stated, "I am glad it's not my job to stand up here and ask you to kill somebody and I am glad it's not my job to attempt to enrage you and make you get angry."  Tr. 1135–36.  The State objected.  Judge Harper sustained and advised the jury to disregard counsel's statement "about kill somebody."  Tr. 1136.  Counsel persisted in his line of argument:  "I find it

offensive that the State of Alabama wants to present a horror show up here in order to get someone electrocuted." *Id*.  The State objected again, and Judge Harper again sustained the objection.  *Id*.  Counsel then pivoted to arguing that the State had introduced certain evidence in an attempt inflame jurors' passions:

> They brought a carefully produced and directed videotape up here. That videotape did not show one thing that had not already been proven by another witness.  That videotape was terrible.  And it had one purpose.  That was to make you angry.  To inflame compassion, revenge, and it was a terrible thing to watch.

*Id*.  The State objected again, but this time Judge Harper ruled that counsel's statement was within the bounds of permissible argument and overruled the objection.  Tr. 1136–37.  Counsel then proceeded with his argument that jurors should not be "manipulated based on your passions" and encouraged them to view the evidence dispassionately.  Tr. 1137.

It is in this context that Judge Harper "interrupted" closing argument.  After trial counsel suggested to the jury that the prosecution had produced a video full of "close-ups" to "fan" the flames of emotion and revenge in jurors, Judge Harper asked to speak with the attorneys at sidebar.  Tr. 1137.  In that discussion, Judge Harper stated that, "[b]ased on this *Fletcher* case, I am – I am going to charge on intoxication and manslaughter.  I wanted you to know that during the course – before you finish your argument.  I am going to do it out of an abundance of

caution, and I will explain it when the jury goes out." Tr. 1137.  Defense counsel clarified that the trial court would instruct the jury on manslaughter, thanked the court, and continued with closing argument.  Tr. 1137–38.  Later in closing argument, armed with knowledge that the trial court would instruct the jury on manslaughter, counsel informed the jury that it would hear about the lesser-included offense of manslaughter in relation to evidence about Petitioner's drinking and smoking marijuana that evening.  Tr. 1142.

### a.   Petitioner's allegations

Petitioner alleges that Judge Harper's interruption "fragmented the defense's closing arguments and may have left jurors with the impression that the trial court was reprimanding trial counsel."  Pet. ¶ 210.  He alleges that the "failure to object to this interruption denied Mr. Hodges a fair trial."  *Id.*

### b.   The state court's merits adjudication

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.7(d), finding that, because Petitioner's challenge to the trial court's interruption had been rejected on direct appeal, his claim of ineffective assistance failed to raise a material issue of fact or law that would entitle him to relief.  Doc. 21-55 at 171–72. The ACCA affirmed dismissal of the claim, concluding that Petitioner's allegations

139

were deficient on both the deficient performance and prejudice prongs of *Strickland*. 147 So. 3d at 941–42.

        c.   *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner's allegation of prejudice is too attenuated to support his claim. He alleges only that Judge Harper's interruption "may have left jurors with the impression that the trial court was reprimanding trial counsel." Pet. ¶ 210. But, as the full context of the interruption set forth above demonstrates, immediately before the interruption Judge Harper overruled *the State's* objection to defense counsel's argument. There would have been no reason for the jury to conclude that the trial court was reprimanding defense counsel for continuing to present argument that it had just allowed over the State's objection. The jury more reasonably could have concluded that Judge Harper was reprimanding prosecutors for frivolously objecting to counsel's argument.

In any event, even if jurors could have reasonably speculated that the trial court was reprimanding defense counsel during the interruption, it does not follow that there is a reasonable probability that Petitioner would not have been convicted of murder had counsel objected to the trial court's interruption. To begin with, the

interruption permitted counsel to tailor his closing argument to accommodate the jury charge counsel had been advised would be forthcoming.  There would have been no reason for counsel to "object" to an interruption that allowed counsel to argue that the jury would have the opportunity to return a manslaughter conviction. It is more probable that Petitioner would have suffered prejudice had there been no interruption and the jury was charged on manslaughter without affording the defense the opportunity to address the charge in its closing.

More importantly, attorneys are often reprimanded at trials, sometimes in front of the jury.  For example, the prosecution was reprimanded at Petitioner's trial for, *inter alia*, walking between defense counsel and Kitty Porter during her cross-examination, and then "standing between the juror[s] and the witness."  Tr. 984.   The trial court was forced to instruct the prosecutor to have a seat at counsel's table.  *Id*.  Point is, reprimands happen; most of the time all concerned— the judge, attorneys, and jurors—move on.   Even a forceful, explicit, and "unnecessary and improper" reprimand is not sufficient to pronounce a trial unfair where the context surrounding the reprimand negates the risk of prejudice.  *See, e.g., United States v. Harriston*, 329 F.3d 779, 790–91 (11th Cir. 2003).  It follows here that counsel's failure to object to Judge Harper's interruption, or to otherwise clarify before the jury that no reprimand had occurred, was not ineffective.  The

context surrounding the interruption here suggests the jury would not have construed the interruption as a reprimand and that, even if it could have, nothing alleged in the petition supports Petitioner's claim the jury would have been unduly influenced by such reprimand. Accordingly, Petitioner did not sufficiently allege prejudice to support his claim of ineffective assistance.

### 2. Failure to object to the trial court's prejudicial suggestion to the State that it had failed to link Petitioner to a crucial piece of evidence.

At trial, Opelika Police Detective Clint Davis testified about accompanying Murph to a location on Society Hill Road, where Murph led him to items of clothing that he had hidden after Seaton's murder. Tr. 820–27. Davis testified about his recovery of a pair of "black men's pants" along with several other items of clothing. Tr. 826. Subsequent testimony would show that blood was identified "mainly around the crotch area of the pants." Tr. 862. A blood stain was cut out of the pants and submitted for DNA testing. *Id*. The State's DNA analyst testified that the blood extracted from the pants "matched the DNA profile of Elizabeth Seaton." Tr. 912.

Counsel immediately objected after this testimony, arguing that the "pants have not been identified." *Id*. In particular, he objected to the prosecutor's use of a chart during her examination of the analyst because the chart described the pants

as "pants from Hodges." *Id*.  At sidebar, Judge Harper asked the prosecutor if she would "tie that up with him." Tr. 913.  The prosecutor indicated that she would tie it up "with Marlo Murph and also Clint Davis; these are the pants that were found on Society Hill Road that Marlo Murph took him out there and identified as Hodges." *Id*.  Judge Harper determined that, because the State had not yet identified the pants as belonging to Petitioner, the prosecutor would obscure the chart's description of the pants as belonging to Petitioner.  Judge Harper then gave a curative instruction to the jury:

> All right.  Now ladies and gentlemen, there has been no evidence at this point that state's Exhibit Number 76, these pants, are the pants of the Defendant.  So I am going to direct that you disregard that testimony at this point.  I am directing the State to cover up that reference that's on this chart.

*Id*.  The DNA analyst then repeated his testimony that the blood sample extracted from the pants matched the DNA profile of Seaton.  Tr. 913–14.

During Murph's direct testimony, he explained that, after the murder, traveling in Seaton's van, he and Petitioner eventually returned to the church parking lot where Petitioner had left his car.  There, Petitioner removed the clothes he had been wearing and collected Seaton's clothes from the van.  Tr. 1025.  The clothes were in a bag.  *Id*.  They left the church in Petitioner's car and, after driving a bit, Petitioner pulled over so that Murph could hide the clothes on the side of the

road.  *Id*.  Murph then later described accompanying Detective Davis to Society Hill Road to assist in the recovery of the clothing items that he had discarded there.  Tr. 1030.  Murph confirmed that Petitioner's clothes, the clothes that he had assisted Davis in recovering along Society Hill Road, including his pants, were bloody.  Tr. 1031.

On redirect examination, the prosecutor asked Murph who first approached him about robbing the Golden Corral.  Tr. 1040.  After Murph confirmed that it was Petitioner, the following exchange occurred:

> THE COURT: The lawyers step up here for just a minute.
> MR. ABBETT: Your Honor, I would offer --
> THE COURT: Hold on -- hold on a minute and just step up here.
>     (Whereupon, a bench discussion was had outside the hearing of the jury)
> THE COURT: Are you going ahead with your testimony to tie up those pants as being those of the Defendant that had blood on them?
> MR. ABBETT: I thought I did.
> THE COURT: How?  Not yet you haven't.
> MR. ABBETT: All right.

Tr. 1041.  The prosecutor then asked Murph whether "the pants—the clothing that you took police out to find, the pants there, were they the pants of this Defendant right here, Melvin Hodges?"  *Id*.  Murph answered affirmatively.  He also testified that the pants to which he led Detective Davis were the "only pair of pants in that bundle of clothing."  *Id*.  The prosecutor then directed Murph's attention to the pants that had been entered into evidence and asked Murph if they were the same

144

pants Petitioner wore during the robbery and murder of Seaton.  Tr. 1041–42.
Murph confirmed that they were.  Tr. 1042.

The prosecutor then moved to enter its DNA chart that had previously been
disputed during the testimony of the DNA analyst.  Tr. 1042.  Defense counsel
objected, arguing as follows:

> [H]e has not identified these pants as far as putting any of his own
> personal identification on them.  It's been a year and a half since he
> has seen those pants, and the District Attorney holds them up after he
> has been offered a deal for his life and he said yes, sir.  I mean, he
> didn't even look at them.  You can hold up any pair of black pants and
> he can say yes.  I don't think he had an identification that he can
> specify these as being the pants.

*Id*.  Judge Harper then instructed the prosecutor to hold the pants up again "and
show them to the Defendant [sic]."  *Id*.  Murph then again confirmed that the pants
in evidence were the same pants that Petitioner had worn and that he had discarded
along Society Hill Road.  Tr. 1042–43.  The prosecutor moved again to enter the
DNA chart into evidence, to which trial counsel objected.  Tr. 1043.  Judge Harper
overruled the objection.  The prosecution concluded its redirect examination.  Trial
counsel did not conduct recross examination.

### a.  *Petitioner's allegations*

Petitioner alleges that Judge Harper's intervention during Murph's redirect
testimony "was wholly unjustified, and demonstrated the judge's bias."  Pet. ¶ 211.

145

He alleges that counsel's "failure to object to the court's prompting was demonstrably ineffective, and that ineffectiveness further manifested itself when trial counsel failed to cross-examine Mr. Murph *at all* regarding the basis for his recollection about the pants." *Id*. (emphasis in original). He alleges simply that these failures prejudiced him, "denying him effective representation and a fair trial." *Id*.

b. *The state court's merits adjudication*

The Rule 32 court dismissed this claim pursuant to Rule 32.7(d) "because the underlying issues were raised on direct appeal and held to be without merit." Doc. 21-55 at 184–85. The ACCA affirmed, concluding as follows:

> This claim was due to be dismissed because Hodges failed to plead any specific facts to support the claim. He did not indicate what grounds counsel should have raised if they had objected or that any objection would have been sustained, and he failed to allege that if counsel had objected the result of the proceeding probably would have been different. Because Hodges made only bare allegations in the petition, he failed to satisfy the specificity and pleading requirements of Rule 32.3 and Rule 32.6(b); therefore, the claim was properly dismissed.

147 So. 3d at 957.

c. *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

146

The ACCA reasonably applied *Strickland* because Petitioner did not plead facts establishing that there is a reasonable probability that he would not have been convicted of murder had counsel objected to the trial court's intervention. Petitioner did not plead what was likely to have happened had counsel objected. He did not allege that the prosecution would have somehow been precluded from asking Murph to identify the pants in evidence as belonging to Hodges.  More to the point, he did not plead any allegations establishing that he was prejudiced because, considering all the circumstances surrounding the identification and admission of the subject pants, the jury could reasonably infer that the pants in evidence were the pants Murph attributed to Petitioner with or without his explicit identification of them.

Murph testified that Petitioner's pants were the only pair of pants in the bundle of clothes he discarded along Society Hill Road.  Tr. 1041.  Detective Davis identified the pants he and Murph recovered along Society Hill Road.  Those pants were determined to be stained with Seaton's blood.  The pants were located along with Petitioner's work shirt, which also had blood on it.  Tr. 859.  Witnesses, including Ware, Holstick, and Maddox, testified about observing Petitioner in his Golden Corral work uniform late on the night of the murder, long after his shift was completed that day.  This combined testimony permitted the reasonable

147

inference that the pants presented in court were the pants worn by Petitioner during the murder.  This is especially so considering that, for the same reasons identified by counsel, Murph's identification was questionable because he had not seen those pants in over a year and a half.  Murph's prior testimony describing the events surrounding the murder, coupled with the DNA evidence and witnesses' testimonies about the clothes Petitioner was wearing, was simply more convincing on the identification of the pants than was his in-court identification.  The ACCA's decision affirming the dismissal of this claim was reasonable.

### 3. Failure to object to the trial court's prejudicial instruction to Petitioner.

During Petitioner's cross examination, the following exchange occurred:

Q      Are these your shoes or are they Marlo Murph's shoes?
A      Them are -- them are Steve's shoes.   You know that Mr. Abbett.
Q      All right.
        MR. RAY: Just answer the question.
        THE COURT: Don't make statements like that again. Do you understand? You answer the questions.
        THE WITNESS: Your Honor, can I say something?
        THE COURT: No, sir. You answer questions that are asked only. Do you understand?
        MR. RAY: Answer the Judge, Melvin.
        THE COURT: Do you understand me?
        THE WITNESS: Yes, sir.

Tr. 1085.  Although Petitioner's claim concerns counsel's failure to object to this exchange, a subsequent exchange provides additional context for the claim.  Later

148

in cross examination, Petitioner was again admonished by Judge Harper.  After

Petitioner refused to concede, before finally admitting, that police had taken his

ring and watch from him, the prosecutor asked whether Petitioner heard the

testimony about the presence of blood on the watch and ring.  Tr. 1089–90.  The

following exchange occurred:

> A      Yes, sir, I heard that.  Can I -- can I elaborate on that?
> THE COURT:  No, sir.  You answer the questions that are asked.
> THE WITNESS:  Your Honor – Your Honor, this –
> MR. RAY:  I will ask you a question, Melvin, about it.  I get to ask you some more questions.  Do you understand?
> THE WITNESS:  Yes, sir.
> MR. RAY:  I will ask you about it.  Just answer Mr. Abbett's questions right now.
> THE WITNESS:  I don't know whose trial this is.
> THE COURT:  Hang on just a second.  Ladies and gentlemen, step back to the jury room for a minute.
> (Whereupon, a recess was had.)
> (Whereupon, jury not present.)
> THE COURT:  Let me explain something to you, Mr. Hodges.  Turn around here and look at me.
> (Whereupon, witness complies.)
> THE COURT: You answer this man's questions when he is questioning you. Do you understand that?  When he gets through asking you questions, then your lawyer can ask you questions to clarify things that he thinks might need clarifying. That's the way we operate.  Do you understand that?
> THE WITNESS:  No, sir.
> THE COURT;  You don't?
> THE WITNESS: No, sir.
> THE COURT: What do you not understand about that?
> THE WITNESS: I don't understand this whole trial, sir.

THE COURT:   Well, you just be quiet and you answer questions that are asked you -- of you.  Do you understand that?

THE WITNESS: No, sir.

THE COURT: Well, you had better because that's the way we are going to operate.  Now, when this jury comes back, are you going to answer this man's questions?

THE WITNESS:  Yes, sir.

THE COURT:   And then are you going to answer your own lawyer's questions?

THE WITNESS:  Yes, sir.

THE COURT: All right.  Let's do it that way. Bring this jury back.

Tr. 1090–91.

### a.    *Petitioner's allegations*

Petitioner claims that, in the first exchange excerpted above, "the trial court took Mr. Hodges to task, treating him like a child in the middle of his own testimony, and repeatedly challenging not only his willingness to cooperate, but his intelligence as well."  Pet. ¶ 212.  He maintains that the earlier exchange "would necessarily have affected the jury's perception of Mr. Hodges's cooperativeness, his intelligence, and his truthfulness." *Id*.  Thus, he appears to assert that counsel's failure to object deprived him of the effective assistance of counsel.

### b.    *The state court's merits adjudication*

The ACCA affirmed the summary dismissal of this claim as both insufficiently specific and without merit:

150

This claim lacked any specific facts regarding prejudice allegedly suffered as a result of trial counsel's failure to object. Hodges alleged nothing to suggest that, if counsel had objected to the trial court's remarks, the result of the proceeding probably would have been different. Furthermore, we note that the claim was meritless on its face. The portion of the record quoted in the petition indicates that Hodges made an unsolicited comment to the prosecutor, then asked the court if he could make a statement. The trial court is vested with much discretion to control the proceedings in its courtroom and to ensure that proper decorum is maintained. *E.g.*, *Smith v. State*, 838 So. 2d 413, 451–52 (Ala. Crim. App. 2002). The trial court's instruction to a witness regarding answering questions and not making unsolicited statements was well within the trial court's discretion here. There being no valid basis for an objection by trial counsel, there could be no finding of deficient performance. *See, e.g.*, *Hamm v. State*, 913 So. 2d 460, 490 (Ala. Crim. App. 2002). Thus, this claim was properly dismissed.

147 So. 3d at 958.

> c.   *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner failed to plead any facts showing that, had counsel objected to the trial court's instruction to Petitioner, there is a reasonable probability that he would not have been convicted of murder. To begin with, Petitioner's allegation that Judge Harper "treated him like a child" and questioned his intelligence is unreasonable in light of the record. As the record excerpts provided above illustrate, Petitioner demonstrated a tendency to argue and make extemporaneous statements during his cross-

151

examination.[18]  Judge Harper sought to enforce procedural rules and decorum by reminding Petitioner that he was on the stand only to answer questions of the attorneys and then asking Petitioner to confirm his understanding of that instruction.   This  was  a  reasonable,  calibrated  response  to  Petitioner's argumentative response to the prosecutor's questioning.   When Petitioner later appeared obstinate by exclaiming that he did not know "whose trial this is" in the presence of the jury, Judge Harper again was measured and proportionate.  He sent the jury out before more forcefully instructing Petitioner on his obligation to answer the questions asked of him.

In all respects, Judge Harper reasonably sought to steer the proceedings in conformance with procedural rules and decorum, while limiting any show of force before the jury.   Judge Harper did not unreasonably infantilize Petitioner or question his intelligence or truthfulness, as Petitioner alleged, and there is no fact alleged in the petition showing that Petitioner could have been prejudiced by counsel's failure to object to Judge Harper's instruction.  Accordingly, the ACCA did not unreasonably conclude that this claim is without merit.

---

[18] Indeed, Petitioner had already been reprimanded by Judge Harper for an inappropriate outburst even before he took the stand.  During the State's examination of the victim's sister, Petitioner exclaimed, "I didn't kill your sister."  Tr. 623.  Judge Harper cleared the jury from the courtroom, instructed counsel to advise Petitioner about the seriousness of his actions, and informed Petitioner that he was not to do anything like that again.  Tr. 623–24.  Judge Harper plainly had cause to be highly attuned to policing Petitioner's conduct at trial.

### 4.   Failure to object to belated decision to charge on manslaughter and failure to request a continuance.

Judge Harper's interruption of counsel's closing argument to advise that he would charge the jury on manslaughter was addressed previously.   The record shows that this was not a spontaneous decision, as Judge Harper had previously grappled with the applicability of the charge.   At the charge conference following the close of evidence, counsel argued for a charge on the lesser-included offense of robbery in the first degree.   Tr. 1112–14.   Judge Harper rejected Petitioner's argument and further gave his rationale for declining to charge on manslaughter, among other lesser-included offenses:

> I do not see any facts that would warrant a charge on manslaughter. Manslaughter would be appropriate if there is evidence of intoxication, but this Defendant said absolutely nothing about having had had anything to drink on the night of this offense, and I do not believe that that would work to reduce this offense to manslaughter, and I will not charge on that.

Tr. 1114.  Following the interruption in which Judge Harper advised that he would charge the jury on manslaughter, he followed through with the manslaughter charge to the jury:

> A person commits the crime of manslaughter if he recklessly causes the death of another person, and to convict, the state must prove beyond a reasonable doubt that the Defendant [sic] is dead and that her death -- and that the Defendant recklessly caused that death by striking her with a vehicle. A person acts recklessly with respect to a result or to a circumstance when he is aware of and consciously

153

disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists.  The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

There is some evidence in this case of intoxication. A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication acts recklessly with respect thereto, voluntary intoxication means intoxication caused by substances that the person knowingly introduced into his body, the tendency of which is to cause intoxication, he knows or ought to know unless he -- unless he introduces them under circumstances that would afford a defense to a charge of crime.

Tr. 1160–61.

### a.    *Petitioner's allegations*

Petitioner alleges that Judge Harper's abrupt reversal on the manslaughter charge during counsel's closing argument was "untimely," and that counsel should have objected on that basis and requested a continuance so that counsel could prepare to adequately argue why the jury should convict only on manslaughter. Pet. ¶ 213.

### b.    *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim because the underlying issue, whether the court erred in its alleged untimely decision to instruct on manslaughter, was without merit.  Doc. 21-55 at 172–73.  Accordingly, the Rule 32 court concluded that Petitioner had failed to "raise a material issue of law or

fact that would entitle the petitioner to relief" and dismissed the claim pursuant to Rule 32.7(d). *Id*. at 173. The ACCA affirmed, concluding that Petitioner's claim was insufficiently pleaded:

> As to the claim that counsel should have objected to the court's delayed announcement that it would give the manslaughter instruction to the jury and should have requested a continuance, Hodges again failed to plead facts indicating what arguments counsel should have made, in light of the evidence and Hodges's theory of defense. He also failed to plead any facts alleging prejudice or indicating that, but for counsel's failures, he would have been convicted of manslaughter.
>
> Hodges made only bare allegations of error and conclusions that his right to a fair trial was denied. These claims were insufficiently pleaded and were, therefore, properly dismissed by the circuit court.

147 So. 3d at 957.

>       *c.    The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because, as the ACCA found, Petitioner did not allege sufficient facts to support either prong of his *Strickland* claim. Specifically, he does not allege that, had counsel objected to Judge Harper's "untimely" decision and requested a continuance, counsel could have persuasively argued that the jury should convict Petitioner of manslaughter. Considering the evidence that was introduced at trial and the theory of defense presented in Petitioner's testimony and counsel's closing argument, he does not

allege facts demonstrating that, had counsel objected and obtained a continuance, there is a reasonable probability that he would have been convicted of manslaughter.   Accordingly, Petitioner did not allege facts establishing the requisite prejudice, and the ACCA's decision affirming dismissal of this claim is reasonable.

### 5.   Failure to object to the trial court's failure to give a robbery instruction.

Defense counsel requested that the court charge the jury on the lesser-included offense of robbery in the first degree.   Counsel submitted a proposed jury charge, which the trial court refused.   Doc. 21-4 at 153–54.   At the charge conference, counsel argued for inclusion of the charge:

> THE COURT: I do not believe that there would be any other lesser included offenses [other than felony murder] that would be appropriate under the status of the evidence in this case.

> MR. RAY: If I may be heard on that briefly, Your Honor.

> THE COURT: Yes sir.

> MR. RAY: I believe the evidence was – was pretty clear from Mr. Murph that -- that Mr. Hodges was involved in the robbery.   And it was also clear from Mr. Hodges that he was involved in the robbery, and I think there is more than sufficient evidence to charge the jury on the lesser include offense of robbery in the first degree.

> THE COURT: Well, in the case of Tucker versus State, the annotations in the Code say this:

The Defendant indicted under Subsection A 2 was not entitled to have the jury charged on a lesser included offense of robbery because there was a killing in the course of and in furtherance of a robbery; it was clear that the Defendant was at least guilty of felony murder.

MR. RAY: The facts of that case can be distinguished from this one, Judge, in that there is evidence that Mr. -- Mr. Hodges was not present during the murder.  I think both of those offenses are appropriate.  There is evidence that he was not present at the scene and had nothing -- was not even involved in that murder whatsoever, and that leaves then the possibility that the jury if they found that to be the case could find him guilty of just robbery.

THE COURT:  I do not agree with that.  What does the State say about that?

MR. ABBETT: Your Honor, I say, when two or more persons engage in a common unlawful purpose, each is equally guilty for what may consequently and proximately result from such unlawful purpose, as the Court said.

THE COURT: Well, I understand that, but I am asking you, do you agree that robbery itself is not a lesser included offense under these facts?

MR. ABBETT: I agree.

THE COURT: Okay.

MR . RAY:  Judge, we are - -

THE COURT:  I am not going to charge on that, Mr. Ray.

Tr. 1112–14.

### a.    Petitioner's allegations

157

Petitioner alleges that "counsel did not object to the court's failure to instruct the jury on robbery" and that this failure "deprived Mr. Hodges of a fair trial by not permitting the jurors to find Mr. Hodges guilty solely of robbery." Pet. ¶ 215. By failing to give the requested instruction, he alleges, despite that the entirety of his testimony supported the defense that he was guilty only of robbery, the trial court "forced the jury to either find Mr. Hodges 'not guilty,' or to convict him of murder. This was no choice at all for the jury, which had, after all, heard Mr. Hodges admit to being involved in the planning of the robbery." Pet. ¶ 216. Because counsel failed to object to the trial court's decision to cabin the jurors with this choice, he alleges, counsel was ineffective.

### b.   *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim because the underlying issue, the trial court's failure to give the robbery charge, was found to be without merit on direct appeal. Doc. 21-55 at 173–74. Accordingly, the Rule 32 court concluded that dismissal pursuant to Rule 32.7(d) was appropriate because Petitioner "failed to raise a material issue of law or fact that would entitle the petitioner to relief." *Id*. at 174. The ACCA affirmed, concluding as follows:

> This claim was properly dismissed because it was not pleaded with sufficient specificity to satisfy the requirements of Rule 32.3 and Rule 32.6(b). We note, first, that Hodges's claim is misleading. He stated in the petition that a felony-murder conviction was

"unavailable" based on the facts and implied that a felony-murder instruction was not given to the jury. The record belies this allegation. The trial court instructed the jury on felony-murder. Because the trial court instructed the jury on a lesser-included offense and the jury found Hodges guilty of the greater offense of capital murder, Hodges could establish no prejudice as a result of counsel's failure to object to the jury charge. Even if a robbery instruction had been given to the jury, the jury clearly would have rejected it and convicted Hodges of capital murder because the jury had the option of convicting him of felony-murder for an unintended death during the commission of a robbery, and instead it convicted him of the greater offense of capital murder. Clearly, Hodges could not establish prejudice as a result of counsel's failure to object to the trial court's decision not to instruct the jury on robbery. Because Hodges failed to plead any facts to show prejudice as a result of trial counsel's actions, summary dismissal of this claim was proper.

147 So. 3d at 958–59 (citations omitted).

> c. *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because, as the ACCA concluded, Petitioner did not plead facts establishing that he was prejudiced by counsel's alleged failure to object to the failure to give the robbery instruction. This is so because, as the ACCA found, Judge Harper instructed the jury on the lesser-included offense of felony-murder. Indeed, as the ACCA found in denying the underlying claim of trial court error on direct appeal, the trial court gave an "instruction on felony murder that was supported by Hodges's rendition of the events that occurred on January 4, 1998." *Hodges*, 856 So. 2d at 925. Trial

counsel argued that the jury should convict Petitioner of felony murder based upon the evidence.  Tr. 1141–42.  Where the jury plainly had  the option to convict Petitioner of the lesser-included offense of felony murder, but nevertheless chose to convict him of capital murder, Petitioner's allegation that it is reasonably probable that he would not have been convicted of capital murder had counsel objected to the failure to give the robbery charge is without merit.  Accordingly, the ACCA's decision dismissing this claim was reasonable.

### 6.    Failure to object to the failure to define kidnapping.

Petitioner appears to allege that counsel was ineffective for failing to object to the trial court's failure to define kidnapping when it "charged the jury on the possible offenses of which it could convict Mr. Hodges."  Pet. ¶ 217.  Petitioner, however, was not charged with the crime of kidnapping, whether independent of capital murder or pursuant to Ala. Code § 13A-5-40(1), murder during a kidnapping in the first degree or an attempt thereof.  *See Hodges*, 856 So. 2d at 890 ("Hodges was not charged with murder committed during the course of a kidnapping[.]").  Hence, the trial court did not reference kidnapping in its guilt phase charge to the jury and there was no need to define that offense while charging the jury "on the possible offenses of which it could convict Mr. Hodges[.]"  *Id*.

It is possible that this claim of error relates to counsel's failure to object to the trial court's failure define kidnapping in its penalty phase instructions. During the penalty phase jury charge, the trial court identified three aggravating circumstances the jury could find only by unanimous agreement based upon proof beyond a reasonable doubt, including that the "offense was committed while the Defendant was engaged in or was an accomplice in kidnapping." Tr. 1247. The trial court did not define kidnapping, however, and counsel did not object to the failure to define kidnapping.

The jury returned a recommendation of life without parole and, accordingly, did not render a verdict about the existence of the kidnapping aggravating circumstance. In his amended sentencing order following remand from the ACCA, however, Judge Harper found that the kidnapping aggravating circumstance applied and rendered findings of fact to support that conclusion. Doc. 21-55 at 10. On direct appeal, the ACCA concluded that, considering the jury's life recommendation, any error in failing to define kidnapping to the jury was "at most harmless beyond a reasonable doubt." *Hodges*, 856 So. 2d at 929.

> ### a.    Petitioner's allegations

Petitioner's allegation respecting this claim, in its entirety, is as follows:

When the trial court charged the jury on the possible offenses of which it could convict Mr. Hodges, the trial court failed to define

kidnapping.  Trial counsel did not object to the trial court's failure to define kidnapping.  Had trial counsel objected, jurors would have been instructed on the definition of kidnapping.  Trial counsel's failure to object denied Mr. Hodges a fair trial by an adequately instructed jury.

Pet. ¶ 217.

### b.  The state court's merits adjudication

The Rule 32 court summarily dismissed this claim, concluding that, because Petitioner "was not charged with or convicted of any offense related to kidnapping[,]" he could not demonstrate deficient performance or prejudice due to counsel's failure to object to the failure to define kidnapping.  Doc. 21-55 at 174–75.  The ACCA affirmed, concluding that Petitioner failed to satisfy the pleading requirements of Rules 32.3 and 32.6(b) because he "clearly failed to plead sufficient facts supporting *both* prongs of the *Strickland* test."  147 So. 3d at 941–42 (emphasis in original).

### c.  The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.

The ACCA reasonably applied *Strickland* because it accurately concluded that Petitioner did not plead facts sufficient to establish prejudice.  Petitioner plainly was not prejudiced by the failure to define kidnapping in the guilt phase instructions, as he was not charged with that offense.  Likewise, he was not

prejudiced by the failure to define kidnapping in the penalty phase instructions because, as the ACCA concluded on direct appeal, the jury recommended that he receive a life sentence. There is no allegation substantiating any claim that Petitioner could have suffered prejudice, in the guilt or penalty phase of trial, due to counsel's failure to object to the court's failure to define kidnapping in jury instructions. Accordingly, the ACCA's decision was reasonable.

> **F.     Trial Counsel Were Ineffective for Failing to Object to Numerous Instances of Prosecutorial Misconduct at Trial (Claim I.G).**

Petitioner claims counsel was ineffective in failing to object to instances of prosecutorial misconduct. He identifies three such instances in the petition. The court will consider each instance in turn.

> **1.     Failure to object to the prosecution's intimidation of Kitty Porter.**

During the defense's cross examination of Kitty Porter, as counsel was eliciting her testimony about the circumstances under which she gave her police statement, Judge Harper admonished the prosecutor for walking between "the interrogator and the witness[.]" Tr. 984. When defense counsel resumed his questioning, the court interrupted to again admonish the prosecutor: "You are standing between the juror and the witness. Why don't you have a seat over here at counsel table?" *Id*. Defense counsel continued with his questioning of Porter

with no additional interruptions caused by the prosecutor.   Later, during the prosecutor's redirect examination of Porter, immediately after the jury was returned to the courtroom following a brief recess, Judge Harper again instructed the prosecutor not to "stand between this witness and this jury[.]"   Tr. 998. Defense counsel's brief recross examination proceeded without interruption.

### a.   Petitioner's allegations

Petitioner alleges that the prosecutor's "conduct intimidated Ms. Porter, prevented her from testifying fully and accurately, and impeded trial counsel's cross-examination of her.   Trial counsel's failure to object denied Mr. Hodges the effective assistance of counsel."   Pet. ¶ 218.

### b.   The state court's merits adjudication

The Rule 32 court summarily dismissed this claim because Petitioner "failed to specify how he was prejudiced by the prosecutor's allegedly improper actions. Hodges has not identified how cross-examination of Ms. Porter was impeded or how Ms. Porter was prevented from testifying truthfully or completely.   Hodges has not even identified the ways in which her testimony would have been different."   Doc. 21-55 at 134–35.   Accordingly, the Rule 32 court dismissed the claim as insufficiently pleaded pursuant to Rules 32.3 and 32.6(b).   *Id.*

164

The ACCA affirmed and expressly adopted the Rule 32 court's findings as

its own.  147 So. 3d at 955.  The ACCA added the following conclusion:

> Not only did Hodges fail to plead any specific facts indicating how he
> was prejudiced by counsel's failure to object, it appears that no
> objection was necessary because the trial court resolved any potential
> problem by instructing the prosecutor to sit down.  There being no
> reason for trial counsel to object, there could be no deficient
> performance.

*Id*.

        *c.*    *The ACCA reasonably applied Strickland and did not
base its decision upon an unreasonable determination of
the facts.*

The ACCA's conclusion that Petitioner failed to plead facts establishing

either deficient performance or prejudice was reasonable.  Petitioner pleaded no

specific facts supporting his contentions that Porter did not testify "fully and

accurately" because of the prosecutor's conduct or that trial counsel's cross

examination was "impeded" by such conduct.  Rather, the record reflects that

counsel continued with his cross examination with no additional interruptions or

similar antics by the prosecutor.  More importantly, as the ACCA concluded in

adopting the Rule 32 court's findings on the prejudice prong, Petitioner did not

allege that Porter would have testified differently had counsel objected to the

prosecutor's conduct.

Petitioner's merits brief in this court attempts to add the sort of specific factual allegations found lacking in the state court:

> The intimidation of Ms. Porter prejudiced Mr. Hodges because the jury was deprived of fully accurate testimony from the witness, and was deprived of the information that would have been revealed by a thorough cross-examination by trial counsel. . . . For example, trial counsel could have elicited testimony concerning Mr. Hodges's presence in the victim's van on several occasions prior to the murder and concerning Ms. Eady's unfamiliarity with the pants Mr. Murph claimed belonged to Mr. Hodges.

Doc. 31 at 55. But, as discussed previously, counsel did elicit Porter's testimony on cross-examination that Petitioner and Seaton visited her home a few days before the murder and that they arrived there in a van. Tr. 989. Petitioner has never alleged, and does not explain, any contention that Porter would have testified about additional instances of such conduct had counsel objected to the prosecutor's alleged intimidation. Furthermore, Petitioner offers nothing to explain how Porter might have testified about "Eady's unfamiliarity with the pants" but for the prosecutor's conduct. There is simply nothing in the record, in Petitioner's state or federal petitions, or in his merits brief in this court showing how he suffered prejudice due to counsel's failure to object to the prosecutor's actions. Accordingly, the ACCA's decision was reasonable.

### 2. Failure to object to misstatements of fact, evidence, and law.

The petition identifies four instances in which, it is alleged, counsel ineffectively failed to object to the prosecution's misstatements and mischaracterizations of the facts, evidence, and relevant law: a) counsel failed to object to the prosecution's assertion that human blood was found on Petitioner's watch and ring; b) counsel failed to object to the prosecution's repeated references to the State's DNA analyst as "Doctor," even though he did not possess any such credential; c) counsel failed to object to the prosecution's assertion that the cigarette butt containing Petitioner's saliva was located on the driver's side of Seaton's van; and d) counsel failed to object to the prosecution's argument in closing about "the law of accessories and complicity[.]"  Pet. ¶¶ 219–23.

### a.    Failure to object to mischaracterization of DNA evidence.

This opinion previously noted that blood was found on Petitioner's watch and ring, but that investigators could not determine that it was Seaton's blood, and did not even testify that it was identified as human blood, because "the amount of stain present was just insufficient to do anything further."  Tr. 857.  And, as also previously noted, Petitioner testified that the blood on his watch and ring must have been animal blood that was deposited while he was working with raw meats at Golden Corral.  Tr. 1106–07.

167

In the prosecution's initial guilt phase closing argument, the prosecutor remarked as follows:

> He was wearing this watch and ring that was later taken from him. You heard Detective Davis testify that when he arrested him, he took this from him; and it was sent off for testing; insufficient quantity to do a typing on it, but the DNA expert and the forensic scientist told you, one of the first elimination tests that they do on blood is to find out first if it's human blood.  Do you remember that?  The first thing we do is make sure it's human blood, not dog blood or deer blood or some other blood. And he said this -- these Exhibits, 63 and 64, this watch and ring, have the components of human blood.  Human blood. Not chicken blood.

Tr. 1125.  Then, in rebuttal closing, the prosecutor accused Petitioner of having "lied about the ring and the watch with chicken blood."  Tr. 1152.

### i.      *Petitioner's allegations*

Petitioner alleges that the prosecution misstated the evidence and that counsel's failure to object to the prosecution's argument deprived him of a fair trial because counsel "could have established that no one had testified that the blood found on Mr. Hodge's watch and ring was human blood[,]" and, instead, "allowed the prosecution to mislead jurors by suggesting that the victim's blood was on Mr. Hodges's hands[.]"  Pet. ¶ 220.

### ii.      *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.7(d) because the issue underlying counsel's alleged ineffectiveness, the prosecution's

168

alleged mischaracterization of the evidence regarding human blood on Petitioner's watch and ring, was found to be without merit on direct appeal.  Doc. 21-55 at 177–78.   The ACCA affirmed, concluding that Petitioner's claim was insufficiently pleaded:

> The claim lacked the full disclosure of the factual basis for the grounds of ineffective assistance of counsel.  Hodges made only a bare allegation that his right to a fair trial had been denied, and he pleaded no specific facts to show that, if trial counsel had objected, the objection would have been sustained; he also failed to plead any facts indicating that, even if the objection had been sustained, the result of the proceeding would have been different—that is, that the jury would not have found him guilty of capital murder. Therefore, the claim was properly dismissed.

147 So. 3d at 955.  The ACCA also found that the claim lacked merit, because, considering that the evidence showed that the clothes Petitioner was wearing were soaked in the victim's blood, prosecutors "could reasonably infer that the blood on Hodges's watch and ring was human."  *Id.*   Because attorneys are permitted to argue reasonable inferences from the evidence in closing arguments, "trial counsel would have had no basis for an objection."  *Id.*  This circumstance, along with the trial court's instruction that attorney argument is not evidence, rendered the claim meritless.  *Id.*

> iii.   *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA's conclusion that this claim lacked merit is a reasonable application of *Strickland*.  To be sure, it appears the prosecution improperly characterized its DNA analyst's testimony as indicating that human blood, as opposed to general components of blood, was located on the watch and ring. While, as the ACCA found, the prosecution was permitted to argue the inference that the blood was human based on the totality of the evidence, the prosecution was not permitted to misstate or mischaracterize the testimony that was admitted on that subject.

The question, though, is whether counsel's failure to object could have prejudiced Petitioner.  Fairminded jurists can agree with the ACCA's conclusion that Petitioner did not suffer prejudice.  This is so because evidence about whether Seaton's blood, or even human blood, was located on Petitioner's watch and ring was not integral to his conviction.  The testimonies of Murph and Porter, along with all the circumstantial evidence about Petitioner's movements that evening and what he was wearing, combined with the forensic evidence showing that the clothes he was wearing were covered in Seaton's blood, provide a robust basis for his conviction.  This fact, along with the trial court's instruction that the arguments of the prosecutors are not evidence, is sufficient to reasonably conclude that it is not reasonably probable that Petitioner would have been acquitted had his counsel

170

objected to the prosecution's mischaracterization of witness testimony about human blood on his watch and ring.

> **b.    Failure to object to repeated inaccurate references to witness credentials.**

Prosecutors relied upon Angelo Della Manna to testify about the results of DNA testing on various items of evidence at trial.  Della Manna testified that he is a "forensic scientist" in the "DNA unit" of the Alabama Department of Forensic Sciences Crime Laboratory.  Tr. 899.  Asked by the prosecution to describe his educational background, he testified that he received a Bachelor of Science degree in chemistry and a master's degree in forensic science.  Tr. 900.  He also described "extensive in-house training" in his field and professional training and development he completed at the FBI Academy, as well as his membership in several pertinent professional associations.  Tr. 900–01.  He did not, however, testify that he had completed a doctorate program at any university.

Nevertheless, there were several instances during trial in which the prosecution referred to him as "Doctor Della Manna."  Most of these instances occurred when, prior to Della Manna's testimony, and while establishing the chain of custody of certain items of evidence that Della Manna had obtained for testing, the prosecution asked witness Michael Hitchcock to confirm that he had sent and received items to and from "Dr. Della Manna."  *See, e.g.*, Tr. 842, 846, 849, 851,

856, and 864.   Although Hitchcock did not refer to Della Manna as "Doctor," referring to him instead by name or "Mister," he did not correct the prosecutor's erroneous descriptor and defense counsel did not object.

### i.     Petitioner's allegations

Petitioner claims that the cited references to Della Manna as "Doctor" "improperly bolstered" the testimony of Della Manna, who provided key testimony about the presence of Petitioner's DNA on the cigarette butt found in Seaton's van. Pet. ¶ 221.   He alleges that, "[i]f the effect of such improper bolstering were eliminated through proper objection, the jury would have likely had further doubts regarding Mr. Hodges's participation in the crime."  *Id*.

### ii.     The state court's merits adjudication

The ACCA affirmed the summary dismissal of this claim pursuant to Rules 32.3 and 32.6(b), concluding that Petitioner failed to "plead sufficient facts to establish *both* prongs of the *Strickland* test."  147 So. 3d at 940, 942 (emphasis in original).

### iii.     The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.

The ACCA reasonably applied *Strickland* because there is no fact pleaded in this subclaim establishing that Petitioner could have suffered prejudice.   The

incidents of alleged "improper bolstering" of Della Manna's testimony occurred with another witness prior to Della Manna's testimony.  Petitioner points to no such instance of "improper bolstering" during or after Della Manna's testimony, including in the prosecution's closing arguments.  Hence, any "improper bolstering" of Della Manna by referring to him as "Doctor" was surely negated when Della Manna himself testified about his educational background.  Moreover, Petitioner does not allege how a proper and timely objection to any "improper bolstering"—*i.e.*, assuring that the jury understood that Della Manna had only a master's degree and extensive professional training in his field—could have caused the jury to have "further doubts regarding Mr. Hodges's participation in the crime."  Pet. ¶ 221.  The ACCA reasonably determined that Petitioner failed to adequately plead this claim of ineffective assistance.

### c. Failure to object to improper characterization of evidence about the location of the cigarette butt.

At trial, Richard Roper, a forensic crime scene investigator, identified two cigarette butts he collected from Beth Seaton's van.  He identified State's Exhibit 42 as having been collected from "near the passenger's side door post and floor of the van."  Tr. 701.  State's Exhibit 43, he testified, was another cigarette butt "collected from the driver's side floor."  *Id*.  As the chain of custody of these items was further developed, Detective Davis simply identified both items as cigarette

butts recovered from the van.  Tr. 828.  Next, another State's witness, Hitchcock, identified Exhibit 42 as "a cigarette butt from foot near passenger's side door post on van," while Exhibit 43 was the cigarette butt recovered "from the driver's side floor of van."  Tr. 848.  Hitchcock turned over both items to Della Manna for DNA testing.  Tr. 848–49.

As Della Manna testified about the results of his DNA testing, the prosecution devised a chart listing all the items about which he was testifying, with exhibit numbers, to "aid the jury in keeping up with" Della Manna's testimony. Tr. 909.  The prosecutor identified State's Exhibit 42 as the "cigarette butt from the driver's side of the van."  Tr. 909.  Della Manna then testified—without reference to any exhibit number—that he "recovered DNA from the saliva present on the cigarette butt that was recovered from the driver's side floor" and that the DNA profile matched that of Petitioner.  Tr. 909–10.  The prosecutor then identified Exhibit 43 as "the other cigarette butt from the passenger's side of the van."  Tr. 910.  Della Manna testified—again, without reference to any exhibit number—that he tested DNA from the "saliva on the cigarette butt from the passenger's side of the vehicle," and that the DNA profile from that cigarette butt matched that of Murph.  Tr. 910.  Then, when the prosecutor was delivering her initial closing remarks, she stated, consistently with Della Manna's testimony, that Murph's DNA

174

was found on the passenger side cigarette butt, while Petitioner's DNA was found on the driver's side cigarette butt.  Tr. 1124.

The point of this review is to illustrate that, after Roper's initial testimony distinguishing the locations where he found the two cigarette butts, the prosecutor appears to have mixed up the exhibit numbers for the two cigarette butts while leading Della Manna through his testimony about the DNA testing he performed.

### i.      *Petitioner's allegations*

Petitioner claims that the prosecution "improperly alleged that the evidence demonstrated that the DNA on the cigarette butt found on the driver's side door was Mr. Hodges's."  Pet. ¶ 222.  He alleges that, because the testimony about the location of the cigarette butts was "thoroughly confused," counsel should have objected, and that the "failure to object was prejudicial."  *Id.*

### ii.      *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim as lacking merit pursuant to Rule 32.7(d).  Doc. 21-55 at 166.  In reaching this conclusion, the Rule 32 court observed that "[w]hether a witness or prosecutor misspoke regarding location of the butt or its proper exhibit number, the fact remains that his DNA was found in the van used to murder the victim."  *Id.*  The ACCA affirmed, concluding that Petitioner's claim was due to be dismissed pursuant to Rules 32.3 and 32.6(b)

because Petitioner did not plead sufficient facts to establish deficient performance or prejudice.  147 So. 3d at 940, 942.

> iii.  *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner did not plead any facts demonstrating that he was prejudiced by counsel's failure to object to the alleged "improper" argument of the prosecutor.  To begin with, it appears that, at most, the prosecutor simply transposed the exhibit numbers while questioning Della Manna about the testing he performed.  Della Manna was clear in his testimony that the cigarette butt that was marked and presented to him as having been recovered from the driver's side of the van was the one that tested positive for Petitioner's DNA.  Hence, the prosecutor was justified in reiterating that claim in her summation.  And, as the Rule 32 court found, the more crucial point in all of this was that Petitioner's DNA was found inside the van that was used to murder Seaton.  Finally, Petitioner cannot show prejudice from any failure to object because he attempted to explain the presence of his DNA in Seaton's van by testifying that he often drove her van.  In other words, in effect, he admitted to leaving behind a cigarette butt with his DNA, but offered testimony explaining

why that fact did not implicate him in Seaton's murder.  The ACCA's conclusion that Petitioner did not plead any facts demonstrating prejudice was reasonable.

### d.     Failure to object to misstatements of law.

In the prosecution's initial closing argument, the prosecutor broached the topic of accomplice or accessory liability.  Specifically, she argued that one "is legally accountable for the offense of another, if, with the intent to promote or assist in the commission of the offense, he, one, procures, induces, or causes the person to commit the offense."  Tr. 1118.  She then argued that, because Petitioner admitted to planning the robbery, the jury need not "bother yourself as to whether or not he is legally responsible for the result because he had already told you that he was the planner."  *Id*.  Counsel objected, arguing that the prosecutor misstated the law and that there was "nothing in evidence whatsoever from any source" showing that Petitioner "planned anybody to be killed."  *Id*.  Judge Harper overruled the objection.   The prosecutor continued, arguing that one who "procures, induces, or causes the other person to commit the offense, or if he aides and abets that person," "then he is legally liable for the acts of the other person, as the other person is also accountable for his acts."  *Id*.  The prosecutor even gave as an example of such aiding and abetting "collect[ing] the instruments that are going to be used—in this case a gun[.]"  *Id*.  Counsel objected again, arguing that the

177

prosecutor again misstated the law.  Tr. 1119–20.  Judge Harper again overruled the objection.  Tr. 1120.

In rebuttal closing, the prosecutor argued that, under the law of accomplice liability, Petitioner was guilty of first-degree robbery even if he did not go into the Golden Corral with Murph and Seaton because he planned the robbery and recruited Murph to execute his plan.  Tr. 1145–46.  He then argued that, under the law of felony murder, because both Murph and Petitioner "engaged in the robbery, each of them is equally guilty of the murder."  Tr. 1146.  The prosecutor then discussed the elements the State had to prove to support its capital murder charge, with no further discussion of accomplice or accessory law.  Tr. 1147.  In the course of this argument, the prosecution argued reasons why Petitioner's testimony that he did not participate in the murder should be disbelieved.

### i.    *Petitioner's allegations*

Petitioner cites the prosecution's rebuttal closing argument and claims that counsel ineffectively failed to "object to misstatements of the law of capital murder that were made by the prosecution in closing."  Pet. ¶ 223.  Specifically, he appears to allege that counsel should have objected to the prosecutor's "fail[ure] to inform the jury . . . that the capital murder statute prohibits an individual from being found guilty of capital murder if that individual in fact did not conduct the killing."  *Id*.

He reasons that, because Petitioner testified that he did not kill Seaton, "the failure to object to this misstatement of the law was ineffective assistance and prejudicial to Mr. Hodges's case" because "a jury following the prosecution's claims might still have convicted Mr. Hodges of capital murder." *Id*.  He further alleges that counsel's failure to object was "exacerbated" by counsel's "failure to demand, and the trial court's failure to give, a jury instruction that informed the jury that it could not convict Mr. Hodges of capital murder if he did not personally commit the act of killing." *Id*.

### ii.     *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.7(d), concluding that Petitioner failed to state a material issue of law which would entitle him to relief.   Doc. 21-55 at 166–68.   The Rule 32 court also found that Petitioner's assertion about accomplice law in Alabama was "blatantly incorrect" because it omitted that Alabama law provides that a defendant may be convicted of capital murder if he is "complicit" in the murder.  *Id*. at 167.  The Rule 32 court then reviewed the instruction on capital murder that was provided at Petitioner's trial and concluded that the charge was "thorough and accurate."  *Id*. at 167–68. Separately, the Rule 32 court found that the prosecution's argument challenged by

Petitioner was, at a minimum, an argument that Petitioner could be convicted of capital murder under Alabama's law on complicity. *Id*. at 179.

The ACCA affirmed. 147 So. 3d at 955–56. Specifically, the ACCA reproduced the Rule 32 court's reasoning in dismissing the claim and concluded that "the circuit court correctly dismissed the claim on the ground that it failed to raise a material issue of law or fact that would entitle Hodges to relief." *Id*. at 956.

> iii.   *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland*. To begin with, Petitioner's claim appears to be concerned less with any "misstatement" of the law than with counsel's failure to object to the prosecution's failure to "inform" the jury "that the capital murder statute prohibits an individual from being found guilty of capital murder if that individual in fact did not conduct the killing." Pet. ¶ 223. But, of course, the prosecution was under no obligation to explain any specific facet of the law—that is the function of the court's jury instructions—and counsel was not empowered to dictate the content of the prosecution's closing argument by objecting to a perceived failure to provide a fulsome explanation of the operation of Alabama's capital murder statute.

180

In any event, Petitioner's claim does not allege any specific positive statement in the prosecution's rebuttal closing argument to which counsel should have objected, and the argument, as summarized above, only mentions accessory or complicity liability in connection with the prosecution's contention that Petitioner was guilty of first-degree robbery even if he did not enter Golden Corral to commit the robbery, because he planned the robbery, recruited Murph to execute the plan, and obtained the gun that Murph used during the robbery. The petition does not explain why counsel should have objected to this argument. Nor does Petitioner address the ACCA's finding that his claim is itself "blatantly incorrect" because it does not recognize that one can be convicted of capital murder in Alabama if he is complicit in the murder. 147 So. 3d at 956. Accordingly, the ACCA's decision denying this claim of ineffectiveness was reasonable.

### 3.    Failure to object to prejudicial statements.

The final instance of alleged prosecutorial misconduct for which Petitioner faults his counsel for failing to object occurred during the prosecution's rebuttal closing when the prosecutor referred to Petitioner as a liar. A substantial portion of the prosecution's rebuttal closing consisted of the prosecutor's questioning the veracity of aspects of Petitioner's testimony at trial. For example, the prosecutor asked the jury to consider, *inter alia*, whether it was "probable" that Holstick or

Murph, rather than Petitioner (driving Trina Eady's car), could have caused Seaton to stop her car after leaving Golden Corral, or whether it was probable that, in Petitioner's version, Seaton would have opened the locked door at Golden Corral for Murph, even if Murph had on a Golden Corral shirt, when she could have viewed Murph on camera or through the glass doors.  Tr. 1148–49.  The prosecutor referred to Petitioner's testimony positing these circumstances as "a lie" because Petitioner was "trying to take that shirt off of him and that nametag off of him and put it on somebody else."  Tr. 1149.  The prosecutor further asserted that, "[m]ore than anyone else in this case this Defendant had a motive to lie."  Tr. 1150.  The prosecution then addressed the defense's attack on the credibility of Marlo Murph and explained why, after comparing the testimonies of Murph and Petitioner, the jury should believe Murph's testimony.  Tr. 1151–52.  Finally, as the prosecutor was winding down his rebuttal closing, he stated as follows:   Ladies and gentlemen, this Defendant has shown no remorse.  He is a liar and he insults your intelligence."  Tr. 1152.

### a.    Petitioner's allegations

Petitioner alleges that the prosecutor's characterization of him as a "liar" who was insulting jurors' intelligence was "not tied to any facts of the case and served no purpose other than to inflame the jurors."  Pet. ¶ 224.  He therefore

182

alleges that counsel's failure to object to the prosecutor's remarks deprived him of a fair trial.  *Id*.

> b.      *The state court's merits adjudication*

The Rule 32 court summarily dismissed this ineffectiveness claim pursuant to Rule 32.7(d) because the underlying issue, the propriety of the prosecution's characterization of Petitioner as a "liar" was addressed on direct appeal when the ACCA held that "the State's argument that Hodges was a 'liar' was a legitimate inference from the evidence presented at trial."  Doc. 21-55 at 168.  The ACCA affirmed the summary dismissal of this claim pursuant to Rules 32.3 and 32.6(b) because  Petitioner  failed  to  plead  sufficient  facts  establishing  deficient performance or prejudice with respect to this claim.  147 So. 3d at 941–42.

> c.      *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because there are no specific facts alleged in the petition supporting Petitioner's contention that he suffered deficient performance or prejudice due to counsel's failure to object.  On the first prong, Petitioner alleged no facts showing that counsel should have objected because the prosecution's characterization of him as a liar was not based on the evidence admitted at trial.  Again, Petitioner's own testimony expressly accused essentially

all the State's key witnesses of being liars and therefore placed his credibility *vis a vis* those witnesses—namely, Holstick, Porter, and Murph—at issue.   Petitioner has not pleaded any facts or law establishing that the prosecution was not permitted to answer his defense on the terms he presented.

More importantly, Petitioner did not allege any fact showing that it is reasonably probable that he would not have been convicted of capital murder had counsel objected to the characterization of him as a liar.   Petitioner does not allege what would have happened had counsel objected.   The ACCA reasonably could have concluded that, at most, a curative instruction would have been issued, but that nothing in the prosecution's argument was so inflammatory that it is reasonably probable that counsel's failure to object resulted in Petitioner's conviction.   Hence, the ACCA's conclusion that Petitioner did not allege sufficient facts to establish prejudice was reasonable.

### G.   Trial Counsel Failed to Conduct an Adequate Voir Dire (Claim I.H).

Petitioner next claims that counsel was ineffective in failing to conduct an adequate voir dire of the jury venire at his trial.   He identifies five failings of counsel in support of his claim: 1) counsel failed to ask adequate questions to reveal potential juror biases; 2) counsel failed to object to the improper removal of potential jurors; 3) counsel failed to challenge for cause jurors who displayed bias

but were excluded peremptorily; 4) counsel failed to remove biased jurors; and 5) counsel failed to adequately rehabilitate jurors who were dismissed for cause. This order will address each of these alleged failures in turn.

### 1. Counsel failed to ask adequate questions in voir dire.

Counsel submitted lengthy proposed voir dire questions prior to trial. Counsel proposed more than three hundred separately numbered questions, many of those with additional sub-questions. Doc. 21-4 at 72–109. Prior to voir dire, Judge Harper reviewed and ruled upon each of the defense's proposed voir dire questions. Tr. 289–96. Notations on the proposed voir dire questions included in the record appear to indicate which questions were permitted and refused by the trial court.

During voir dire, Judge Harper asked the entire venire a series of qualifying questions before permitting the attorneys to ask additional questions. Although the defense did not ask all the voir dire questions that Judge Harper had approved, the defense asked a number of questions on various topics, including, *inter alia*, whether potential jurors knew members of the victim's family, whether potential jurors knew certain law enforcement personnel involved in the case, and whether potential jurors knew the prosecutor or his staff or supported his campaign for district attorney. Tr. 381–402.

185

a.     *Petitioner's allegations*

Petitioner alleges that counsel "inexplicably" failed to ask at least nine of his proposed voir dire questions that were allowed by the trial court.  Specifically, Petitioner alleges counsel ineffectively failed to ask potential jurors whether they knew the victim's husband (Pet. ¶ 226); whether jurors would judge the credibility of all witnesses equally, without regard to their race (Pet. ¶ 227); whether jurors would "'make sure that racial prejudice plays no part in the jury's deliberations?'" (*Id.*); whether the race of the victim (white) and the defendant (black) "'could make it difficult for you to keep an open mind totally free of any bias or prejudice while considering the evidence to be presented in this case?" (*Id.*); whether "potential jurors knew anyone working in Lee County probation, parole, police, or correctional departments" (Pet. ¶ 228); whether potential jurors might harbor bias because they, or their friends or family, were victims of violent crime (*Id.*); whether potential jurors or their family members had been accused of a violent crime (*Id.*); and, whether potential jurors "had taken any courses in psychology or psychiatry (*Id.*).  Petitioner claims that, had counsel asked all these questions, counsel could have "elicited information to enable trial counsel to intelligently exercise both for-cause and peremptory challenges[,]" and that counsel's

186

"inexplicable" "failure to ask any of them constitutes ineffective assistance of counsel." Pet. ¶ 229.

### b.    The state court's merits adjudication

The Rule 32 court summarily dismissed this claim as insufficiently pleaded pursuant to Rules 32.3 and 32.6(b).  Doc. 21-55 at 129.  Specifically, the Rule 32 court found as follows:  "Hodges does not plead any facts demonstrating that he was prejudiced by counsel's failure to ask certain questions to reveal jury bias. Hodges does not identify a single juror who would have answered any of the questions in such a way as to indicate bias."  *Id*.  The ACCA affirmed the Rule 32 court's summary dismissal, concluding that Petitioner failed to plead sufficient facts alleging both deficient performance and prejudice under *Strickland*.  147 So. 3d at 937, 942.

### base    c.    The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.

The ACCA reasonably applied *Strickland* because Petitioner's claim that he was prejudiced by counsel's failure to ask certain questions during voir dire is conclusory and lacking in sufficient specifics to support his claim.  Petitioner alleges only that, had counsel asked the additional questions identified in the petition, counsel "would have elicited information to enable trial counsel to

187

intelligently exercise both for-cause and peremptory challenges." Pet. ¶ 229. But Petitioner does not allege how any potential juror would have answered any of the questions specified in the petition. For instance, he does not allege that any potential juror knew Floyd Seaton or Lee County law enforcement personnel, or that any juror would have admitted to being unable to perform their duties without reference to the race of the defendant, victim, and witnesses. It is therefore unclear how counsel might have "elicited information" concerning for-cause and peremptory challenges.

Furthermore, counsel might have decided not to ask certain questions, and Petitioner cannot show prejudice due to the failure to ask them, because Judge Harper asked questions of the venire that were similar to some of the questions the petition faults counsel for failing to ask. For instance, Judge Harper advised potential jurors that the defendant "is a black man and the alleged victim Elizabeth Seaton is a white woman" and asked whether those facts might "prejudice you against the Defendant or affect your ability to render a fair and impartial verdict based solely on the evidence in this case?" Tr. 343. No jurors responded to that question. Having seen and assessed the venire's lack of response to Judge Harper's question, counsel might reasonably have decided that he need not inquire about whether jurors would assess witness credibility without regard to race,

whether jurors would prevent racial prejudice from affecting deliberations, or whether jurors could keep an open mind about the evidence notwithstanding any racial dynamics in the trial.

Similarly, Judge Harper also asked potential jurors whether they or any of their family members had ever been victims of a crime of violence.  Tr. 360.  After reviewing the circumstances with each juror who indicated that the question applied to them, Judge Harper asked whether the potential jurors would be able to judge the evidence impartially despite the potential juror's experience with violent crime.  Tr. 364.  No potential juror indicated any such difficulty with impartially serving as a juror.  Accordingly, counsel reasonably could have determined that he need not question the potential jurors along those lines, and Petitioner has not alleged any facts supporting his claim that he was prejudiced by counsel's failure to ask additional questions on that subject.

In short, the trial court asked questions and heard responses concerning most of the topics Petitioner faults his counsel for failing to inquire into with potential jurors.  There are no facts alleged in the petition establishing that any potential juror would have provided additional information that would have aided counsel in exercising for-cause challenges and peremptory strikes.  The ACCA's conclusion

that Petitioner did not plead sufficient facts to establish a claim of ineffective assistance was reasonable.

### 2.   Trial counsel failed to object to improper removal of potential jurors from the venire.

Petitioner identifies two potential jurors whose "improper removal" should have been opposed by counsel: Lois Doleman and Gwendolyn Wilson.  During the trial court's qualifying questioning of the venire, Judge Harper asked whether any potential jurors "have any religious or moral reasons that would prevent you from sitting in judgment of your fellow man?"  Tr. 307–08.  Lois Doleman raised her hand in response.  Judge Harper advised that he would hear from Doleman on the matter later.  Tr. 308.  Gwendolyn Wilson also raised her hand and was noted as having done so by the trial court.  Tr. 308.

After completing the initial qualifying questioning, the trial court solicited "general requests for excuses" from potential jurors.  Tr. 309.  Judge Harper then heard individually at the bench from each potential juror seeking to be excused from service.   Doleman approached the bench, and the following exchange occurred:

> THE COURT: Tell me your name.
> POTENTIAL JUROR:  Lois D. Doleman.
> THE COURT: Doleman.  Okay, Ms. Doleman.  What did you want to tell me?

> POTENTIAL JUROR: I am one of Jehova's Witnesses, and I wouldn't want to sit on a trial like that.
>
> THE COURT: What?
>
> POTENTIAL JUROR: I am one of Jehovah's Witnesses.
>
> THE COURT: You are?
>
> POTENTIAL JUROR: Uh-huh. And also, Your Honor, my family just finished up with a murder trial over in Columbus, - -
>
> THE COURT: Uh-huh.
>
> POTENTIAL JUROR: - - and I would like to not be in the judicial limelight anymore.
>
> THE COURT: Okay. I am going to excuse you because of those views, and we appreciate you coming. Number 17, Ms. Doleman, will be excused. You may go.

Tr. 313–14. Later, outside the presence of the jury, Judge Harper related to counsel the reasons that he excused potential jurors in the "general excuses" round of questioning. Regarding Ms. Doleman, Judge Harper stated that she "is a Jehova's Witness. Those people do not believe in sitting in judgment. And I have had them hang up juries before. She is excused for that reason." Tr. 325.

Prospective juror Gwendolyn Wilson also requested to be excused, prompting the following exchange:

> THE COURT: Okay, Ms. Wilson. What did you need to tell me?
>
> POTENTIAL JUROR: Well, what I have is more of a moral issue as an imperfect person, I am just uncomfortable sitting in judgment of

other people, whether it be a matter of trying to deliberate on how much money they need to receive or on a murder trial.  And I just feel a moral obligation to let that be known to the court.

THE COURT: Okay. Now, if you end up in court up here sometime with a suit, what are you -- how are you going to get your case resolved if everybody felt like you?

POTENTIAL JUROR:  Well, I -- well, I understand what you are saying. I have never had to be in that situation so far, but like I said, I just feel a moral obligation to let that be known.  You can -- I just wanted to do that.

THE COURT:  Okay.  I am going to excuse you from jury duty right now, and I will let you turn your badge in, and we appreciate you coming.

POTENTIAL JUROR:  Okay.

Tr. 315–16.  Judge Harper later gave his reason for excusing Wilson, reiterating her claim "that she has a moral problem sitting in judgment of anyone in any kind of case.  So I have excused her because of that."  Tr. 325.

### a.   Petitioner's allegations

Regarding the removal of Doleman, Petitioner alleges simply that counsel's failure to object "constituted ineffective assistance" because it was "the trial court, and not Ms. Doleman, who asserted that Ms. Doleman did not believe in sitting in judgment."  Pet. ¶ 231.  As for the removal of Wilson, Petitioner alleges that counsel's failure to object constituted ineffective assistance because "Ms. Wilson's

192

comments were not sufficient to support a finding that she was unable to sit in judgment of others."  Pet. ¶ 233.

> b.     *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.7(d) because the issue underlying counsel's alleged ineffectiveness, whether the trial court improperly removed Doleman and Wilson, was found to be without merit on direct appeal.  Doc. 21-55 at 154.  The ACCA affirmed, concluding as follows:

> Noticeably absent from Hodges's claims are any specific facts regarding what additional questions the trial court should have asked [Doleman] and any allegation at all that Hodges suffered any prejudice as a result of trial counsel's failure to object to the trial court's decisions to excuse these veniremembers.  Hodges was required to plead specific facts indicating that there is a reasonable probability that, but for counsel's acts or omissions, the result of the proceeding would have been different.  Because Hodges failed to provide a clear and specific statement of the grounds for relief, summary dismissal was proper.

147 So. 3d at 947 (citation omitted).  In addition, the ACCA further concluded that "summary dismissal of this claim was proper because it was meritless on its face." *Id*.  In support, the ACCA reasoned that, even where the trial court has ruled erroneously on a challenge for cause, no relief is warranted absent a showing that such erroneous ruling "'prevented the jury from being impartial.'"  *Id*. (quoting *Evans v. State*, 794 So. 2d 411, 414 (Ala. 2000)).  Because Petitioner did not allege that the trial court's removal of Doleman or Wilson deprived him of a fair trial

before an impartial jury, he could not show prejudice flowing from counsel's failure to object to their removal.

|       | c. | The ACCA reasonably applied Strickland and did not |
|-------|-----|-----|
| base  |    | its decision upon an unreasonable determination of the facts. |

The ACCA reasonably applied *Strickland.* To begin with, Petitioner's allegation that "[i]t was the trial court, and not Ms. Doleman, who asserted that Ms. Doleman did not believe in sitting in judgment" (Pet. ¶231), is not supported by the record. As indicated above, both Doleman and Wilson responded to Judge Harper's question asking whether they had a moral or religious objection to sitting in judgment. Tr. 308. In fact, Doleman and Wilson were the *only* potential jurors to respond to that question. Then, after Judge Harper heard further responses from them, Doleman and Wilson were the only potential jurors excused on that basis.

In any event, as the ACCA found, while Petitioner faults counsel for failing to object to the removal of Doleman and Wilson, he does not allege facts showing that he was denied a fair trial by an impartial jury because of their removal. He does not even allege facts showing that counsel could not have favored the removal of Doleman and Wilson for other reasons, such as their demeanor, biographical information, or their responses to juror questionnaires, if any. Put simply, there are no facts alleged supporting a contention that Doleman and Wilson would have

194

been selected to sit on Petitioner's jury, or that they would have voted to acquit him.   Accordingly, Petitioner failed to allege any facts supporting his claim of prejudice.

### 3.   Trial counsel failed to challenge for cause veniremembers who displayed bias but were struck peremptorily.

Petitioner identifies three veniremembers whom, he alleges, displayed bias in their responses to questioning yet were not challenged for cause by counsel: Charles Teel, Anthony Moody, and Catherine Prestridge.   Teel was among the many jurors who indicated that he had heard of the case prior to trial.   Tr. 339. Teel also indicated that he knew the District Attorney, Nick Abbett, and an Assistant District Attorney, Walter Northcutt.   Tr. 346–47.   He did not indicate that his acquaintance with those individuals would affect his ability to impartially serve as a juror.   Under questioning by defense counsel, Teel also indicated that he knew Lee County Sheriff's Department Investigator Van Jackson, one of the State's potential witnesses.   Tr. 387.   He further indicated that he "contributed [to] or supported" the District Attorney's recent campaign for office.   Tr. 389.

Later, during individual voir dire, Teel affirmed that he could put aside what he had heard about the case prior to trial and base his verdict on the evidence admitted in court.   Tr. 522.   Defense counsel asked Teel if he made a "political contribution" to the District Attorney's campaign, to which Teel responded that he

had only put up signs in his yard supporting the District Attorney's campaign.  *Id*.
He affirmed, however, that his support for the District Attorney would have no
"bearing on [his] ability to be fair and impartial," and that he had no "close
association" with the District Attorney.  Tr. 522–23.  Teel then clarified that the
District Attorney had prosecuted a case in which he, Teel, was involved, but that
this fact would not affect his ability to be a fair juror.  Tr. 523.

In response to the trial court's question asking whether potential jurors or
their families had been the victims of crime, Anthony Moody stated that his father
had been murdered in Savannah, Georgia.  Tr. 363.  During individual voir dire,
defense counsel raised Moody's prior statement about his father's murder.  Tr. 493.
Judge Harper asked Moody whether he could put aside his father's murder and
base his "verdict in this case on the evidence" admitted in court.  Tr. 494.  Moody
answered simply that "[i]t's already been decided."  Tr. 494.  Judge Harper
responded, "huh," and Moody again stated "[i]t's already been decided."  Tr. 494.
Judge Harper then clarified, "[t]here is no question in your mind about that?"  Tr.
494.  Moody responded, "No, sir."  Tr. 494.

Catherine Prestridge responded to the District Attorney's inquiry whether
any potential jurors "had a family member, close friend, or associate be a victim
of" robbery, kidnapping, or assault.  Tr. 381.  She also indicated that she had

previously contributed to or supported the District Attorney's political campaign. Tr. 400.   During individual voir dire, she clarified that her support consisted of placing a campaign sign in her yard.   Tr. 509.   She further stated that, notwithstanding her prior support for the District Attorney, she would be able to be fair and impartial as a juror.  Tr. 509.

### a.    *Petitioner's allegations*

Petitioner alleges that counsel's failure to ask more questions of these potential jurors in order to explore "the sources of their bias" "resulted in the unnecessary expenditure of three of Mr. Hodges's peremptory strikes and prejudiced him in his ability to select a fair and proper jury."  Pet. ¶ 234; *id*. at ¶ 240.

### b.    *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.7(d) because the issue underlying counsel's alleged ineffectiveness—whether Teel, Moody, and Prestridge "were properly allowed to remain in the venire"—was found to be without merit on direct appeal.  Doc. 21-55 at 155.  The Rule 32 court further found that, because counsel used peremptory challenges to remove these potential jurors, "any error in leaving them in the venire would be harmless."  *Id*. Hence, Petitioner could not show prejudice.  The ACCA affirmed, concluding that

Petitioner's ineffectiveness claims respecting these potential jurors were properly dismissed pursuant to Rules 32.3 and 32.6(d) because he failed to plead sufficient facts to support both prongs of *Strickland*.  147 So. 3d at 937–38, 942.

> c.   *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner did not allege any facts establishing how he was prejudiced by counsel's failure to challenge Teel, Moody, or Prestridge for cause.  While he faults counsel for failing to "request follow-up questioning of those jurors on the sources of their bias[,]" Pet. ¶ 234, he does not allege what any such follow-up questioning would have revealed.[19]  Considering the ACCA's determination on direct appeal that there was no cause to remove any of these jurors based on their statements during voir dire, *see* 856 So. 2d at 906–10, it was incumbent upon Petitioner to allege why additional questioning would have revealed the basis for a for-cause challenge that was not established in the questioning of those jurors.  Petitioner offers only

---

[19] And, to be clear, counsel *did* request leave to conduct additional voir dire "of the whole panel," and specifically referenced Teel twice in justifying his request.  Tr. 535–36, 541. Counsel argued that the court's questioning of jurors about pretrial publicity, their experiences with law enforcement, and racial attitudes was not sufficiently thorough to reveal bias.  Counsel also argued that the trial court's refusal of most of his proposed voir dire questions precluded him from learning sufficient information to assess bias in the potential jurors.  Tr. 537–41.  On the deficient performance prong of Petitioner's claim, the petition is silent about what more counsel should have done.

speculation, however, that these jurors would have revealed additional information about the "source of their bias" that would have rendered them subject to a for-cause challenge.   Nor does Petitioner allege any facts supporting his claim of prejudice considering that he indeed peremptorily challenged Teel, Prestridge, and Moody, thereby preventing these allegedly biased jurors from serving on his jury. Instead, he alleges only that the "unnecessary expenditure" of three peremptory challenges on these potential jurors "prejudiced him in his ability to select a fair and proper jury," Pet. ¶ 234, but he provides no factual allegation explaining how he was so prejudiced.   The ACCA's conclusion that this claim was insufficiently pleaded was reasonable.[20]

### 4.    Trial counsel failed to remove biased jurors.

Petitioner next identifies five potential jurors whom counsel should have challenged for cause or removed peremptorily based on their biases, but who, instead, counsel permitted to serve on the jury that convicted Petitioner.   John Sanders stated in voir dire that his brother works for the Tallapoosa Sheriff's

---

[20] This subclaim also alleges that counsel "failed adequately to challenge the bias of potential jurors who had read media reports on the case." Pet. ¶ 239.  Petitioner provides no specific allegations about which potential jurors counsel ineffectively failed to challenge as biased based on pretrial media exposure.  This court will not construct Petitioner's claim for him.  Moreover, other parts of the petition challenge counsel's failure to remove biased jurors. *See* Pet. ¶¶ 241–45.  Accordingly, to the extent Petitioner intended to allege any additional claim concerning counsel's failure to remove biased jurors which counsel subsequently struck peremptorily, it is summarily dismissed.

Department and that his uncle was murdered in Lee County.  Tr. 358, 363.  He also was among the many potential jurors who heard of the case through media reports prior to trial.  Tr. 338.  During individual voir dire, he confirmed that he could put aside what he had learned about the case from media reports and that he had no fixed opinion about the guilt or innocence of the defendant.  Tr. 511–12.  He was not questioned by the trial court or the attorneys about any bias relating to his brother's employment or the murder of his uncle.

Geraldine Nobbley also indicated that she had heard of the case in media reports prior to trial.  Tr. 338.  She further indicated that she knew Margaret Mayfield, one of the District Attorney's assistants, Tr. 346, as well as State's witness Mike Kinser, the Golden Corral general manager who testified about Golden Corral security procedures and the amount of money taken in the robbery. Tr. 381.  During individual voir dire, Nobbley explained that she worked at a bank branch inside a Winn Dixie that was near the Golden Corral and that, because the bank worked with Golden Corral, she heard about the murder "through word of mouth at that time."  Tr. 502–03.  She did not know Beth Seaton, however, and she affirmed that she would not let her prior knowledge of the case affect her ability to be fair and impartial.  Tr. 503.  She was asked no further questions about any bias related to her acquaintance with Ms. Mayfield or Mr. Kinser.

Barbara Webb indicated that her daughter works for "the office of Professional Standards in Columbus," and that her son-in-law is a Phenix City police officer.  Tr. 359.  She also indicated that her son was stabbed by a girlfriend in Columbus.  Tr. 364.

William Burks indicated that he had heard about the case from media reports.  Tr. 335.  During individual voir dire, he confirmed that he had heard about it on television, in the newspaper, and "peoples talking."  Tr. 426.  The only thing he remembered hearing about it was speculation about "why did he do it, you know, and things like that."  Tr. 426.  He affirmed that he would be able to sit as a fair and impartial juror notwithstanding what he had heard about the case.  Tr. 426.

Elizabeth Jones also responded to the trial court's question about potential jurors who had heard of the case.  Tr. 337.  During individual voir dire, Jones revealed that she learned about the case from television and newspaper accounts. Tr. 477.  She stated that she remembered "a great deal" of what she had learned because she shared the same name as the victim.  Tr. 478.  She appeared to express feelings of empathy for the victim and her family:  "And just to be – the victim. Yes.  And just to be friendly and outgoing, I thought of myself, and – and the family, a picture of the children—the children and the family at a grave site."  Tr. 478.  Despite these feelings, Jones explained that she could be fair and impartial:

"I have to make those kinds of impartial judgments all the time, you know, in – in line of teaching and working with children and making decisions about what they should do, so no, I could set that aside."  Tr. 478.

### a.  Petitioner's allegations

Petitioner alleges that, with respect to each of these jurors, counsel was ineffective in failing to make a for-cause or peremptory challenge.  Pet. ¶ 241.

### b.  The state court's merits adjudication

The Rule 32 court summarily dismissed Petitioner's claim with respect to jurors Sanders, Webb, and Jones because the issue underlying counsel's failure to challenge those jurors, whether those jurors demonstrated bias sufficient to warrant removal from the jury, was found to be without merit on direct appeal.  Doc. 21-55 at 156.  The ACCA affirmed the summary dismissal of the entirety of Petitioner's claim, all jurors, pursuant to Rules 32.3 and 32.6((b) because Petitioner failed to plead sufficient facts to establish deficient performance or prejudice under *Strickland*.  147 So. 3d at 938–39, 942.

### c.  The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.

The ACCA reasonably applied *Strickland* because, for the same reasons given with respect to Petitioner's claim that counsel failed to adequately challenge

for cause certain jurors whom counsel later struck peremptorily, Petitioner did not plead sufficient facts to establish deficient performance or prejudice with respect to this claim. To begin with, as noted previously, counsel did, in fact, request leave to conduct further voir dire of the entire panel and objected strenuously to being unable to ask potential jurors many of the defense's proposed voir dire questions that were intended to probe potential sources of bias. Tr. 535–44. The trial court denied counsel such leave. To the extent that the claim here is counsel's alleged failure to conduct an adequate voir dire, the petition does not allege what more counsel should have done.

To the extent Petitioner's claim alleges that these jurors should have been challenged for cause based on their voir dire responses, as the ACCA found, he does not allege sufficient facts to support his claim. None of the jurors identified in this subclaim revealed information that would have supported a for-cause challenge. To the extent they were subjected to individual voir dire, all jurors expressed that they would be able to put aside what they had previously heard about the case and serve fairly and impartially on the jury. Likewise, as the ACCA concluded on direct appeal, the mere circumstance that a juror might have known someone in the District Attorney's office, or in local law enforcement, or had a

family member who was a victim of violent crime, does not support a for-cause challenge to such juror.

What Petitioner really appears to be complaining about here is how counsel allocated his limited peremptory challenges, *i.e.*, that counsel should have exercised peremptory challenges against Sanders, Nobbley, Webb, Burks, and Jones rather than five other potential jurors whom counsel did strike. Petitioner does not allege, however, that reasonable counsel would have had no reason to favor Sanders, Nobbley, Webb, Burks, or Jones over one of the potential jurors that counsel did peremptorily strike, and he does not allege, specifically, which potential jurors counsel should not have struck in the place of Sanders, Nobbley, Webb, Burks, and Jones.[21] Nor does he allege that it is reasonably probable that he would not have been convicted had one of those proposed jurors, rather than

---

[21] Upon review of the defense's peremptory strikes, there are no obvious candidates. The defense struck the following potential jurors: Robert Alexander, whose son was a police officer in Opelika (Tr. 354); Eldra Andrews, who knew the victim's sister (Tr. 380, 420–22); Fay Coleman, whom counsel challenged for cause, but was denied, because of her exposure to the newspaper on the morning of the trial (Tr. 437); Barrett Heartsill, whose step-grandmother was a victim of robbery and rape only three years prior (Tr. 451–52); Robert Hughes, who knew an Opelika police detective (Tr. 386); Timothy Johnson, who knew an Opelika police lieutenant (Tr. 386); Anthony Moody, whose father, as discussed previously, was murdered (Tr. 363); Michael Mulkey, whose house was burglarized twice (Tr. 363); Anthony Myers, who indicated that he knew the victim's father and bought produce from him, and that he had a daughter who "probably went to school" with the victim (Tr. 383, 497–98); Catherine Prestridge, who, as discussed previously, supported the District Attorney's political campaign (Tr. 509); and Charles Teel, who, as discussed previously, also supported the District Attorney's political campaign and had some previous involvement in a case prosecuted by the District Attorney (Tr. 522–23).

Sanders, Nobbley, Webb, Burks, or Jones, served on his jury.   In short, as the ACCA concluded, Petitioner did not plead sufficient facts to establish deficient performance or prejudice stemming from counsel's failure to remove purportedly "biased" jurors from the venire.   Accordingly, the ACCA's decision was reasonable.

### 5.   Counsel failed to adequately rehabilitate jurors who were dismissed for cause.

During voir dire, the trial court asked the entire panel whether any potential juror was opposed to capital punishment.   Tr. 340.   Seven potential jurors (Butz, Infantino, Ives, Crystal Johnson, McLeod, Minger, and Burns) responded to the court's question.   Tr. 340–41.   Of these potential jurors, Infantino, Ives, and McLeod were not excused based upon their capital punishment beliefs and, consequently, were peremptorily struck by the State.   In individual voir dire, Butz, Minger, Johnson, and Burns were excused for cause.   Butz was excused because of her medical condition rather than her beliefs about capital punishment.   Tr. 432–33.   Minger, Burns, and Johnson all gave unequivocal answers indicating that they would not vote for the death penalty no matter the circumstance.   Tr. 428, 474, 492.   Consequently, they were excused for cause by the trial court.

*a.     Petitioner's allegations*

Petitioner claims, without reference to any specific potential juror, that "[s]everal potential jurors were removed by the trial court for cause based on the court's conclusion that those jurors could not follow the law and, if appropriate, find the defendant guilty, or to sentence him to death[.]" Pet. ¶ 247. He maintains, again without reference to any specific potential juror, that "[m]ost of those jurors, however, would, in fact have indicated a willingness to convict a defendant or sentence him to death in at least some circumstances." *Id.* He therefore alleges that counsel's failure to "press these [unidentified] jurors for circumstances in which they might, in fact, be willing to follow the law, or failing to press the court to make relevant inquiries on this issue" rendered counsel ineffective since it "deprived the jury of what would likely have been the most effective advocates of a sentence of life without parole." *Id.*

> b.   *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim pursuant to Rules 32.3 and 32.6(b) due to Petitioner's failure "to identify the jurors he alleges could have been rehabilitated by trial counsel." Doc. 21-55 at 130. The ACCA affirmed the summary dismissal pursuant to Rules 32.3 and 32.6(b), concluding that Petitioner failed to allege sufficient facts to support his claim under both prongs of *Strickland.* 147 So. 3d at 939, 942.

206

c. *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner did not allege how counsel might have "rehabilitated" the three potential jurors who were excused due to their opposition to the death penalty, or how he was prejudiced by counsel's failure to attempt rehabilitation. Petitioner's allegation that "most" of the potential jurors so excluded would have "indicated a willingness" to sentence Petitioner to death notwithstanding their statements during voir dire is completely unsupported. Petitioner's speculative and conclusory allegations in this regard are insufficient to support a claim under *Strickland*. Accordingly, the ACCA's conclusion was reasonable.

## H.  Trial Counsel Failed to Object to the Introduction of Victim-Impact Evidence in the Guilt Phase (Claim I.I)

Petitioner alleges that counsel ineffectively failed to object to the introduction of impermissible victim impact evidence in the guilt phase of his trial. At trial, Beth Seaton's sister, Melody Campbell, testified about her interactions with Seaton in the hours before her murder. She testified that, after church, she, her daughter, and granddaughter went to Golden Corral for lunch, as they often did when Seaton was working on Sundays. Tr. 621. While they were at the restaurant, Seaton's husband and daughter came to the restaurant. Tr. 622. Campbell testified

207

that Seaton's daughter wanted to attend Sunday evening service with Campbell and her family, so she agreed to keep Seaton's daughter, take her to evening service, and keep her until Seaton could pick her up after work. *Id*. Campbell did not speak with Seaton again, although Seaton's daughter spoke with her on the phone at some point and, still later, Seaton called Campbell's home and spoke with Campbell's father between 10:30 and 11:00 p.m. that evening. *Id*. A subsequent witness, a co-worker at Golden Corral, testified that he and Seaton left the restaurant at the same time, and that, as they were leaving, he carried some food scraps to Seaton's van that she intended to feed to her dog. Tr. 627.

### 1.   *Petitioner's allegations*

Petitioner claims that the above testimony about Seaton's family visiting her at the restaurant, her daughter's plan to go to church, Seaton's call to her sister's house just prior to the robbery, and Seaton's collecting scraps for her dog constitutes impermissible victim-impact evidence. Pet. ¶ 249. He alleges such evidence was introduced only to inflame jurors' passions, and that the failure to object to such testimony deprived him of the effective assistance of counsel. Pet. ¶ 250.

### 2.   *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.7(d) because the issue underlying counsel's alleged ineffectiveness, the introduction of purported impermissible victim-impact evidence, was found to be without merit on direct appeal.  Doc. 21-55 at 158.  The ACCA affirmed summary dismissal of the claim, concluding that Petitioner did not plead sufficient facts to support his claim pursuant to Rules 32.3 and 32.6(b).  147 So. 3d at 949.  Specifically, the ACCA concluded as follows:

> Although he alleged facts regarding the specific arguments and testimony he claimed were improper, he failed to allege any facts indicting [sic] how trial counsel's failure to object to the argument and testimony prejudiced him or indicating that, but for counsel's failure to object, he would not have been convicted of capital murder. Therefore, summary dismissal of this claim was proper.

*Id*.  The ACCA further found that the claim lacked merit because Campbell's testimony "was not offered as victim-impact evidence, but was offered to show the victim's activities on the day of the murder and when she was last in contact with the family, and it went toward establishing when the crime was committed."  *Id*. Hence, counsel had no basis to object to the testimony as impermissible victim-impact evidence.  *Id*.

> 3. *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

209

The ACCA reasonably applied *Strickland* because both bases it offered for summarily dismissing this claim are reasonable.  The ACCA reasonably concluded that Petitioner failed to allege sufficient facts establishing how he could have been prejudiced by Campbell's testimony about the family meet-up at Golden Corral, her plan to take Seaton's daughter to church, or Seaton's call to her house later that evening.  The ACCA reasonably determined that Petitioner had alleged no fact indicating how there is a reasonably probability he would not have been convicted had counsel objected to such testimony.

Furthermore, the ACCA reasonably concluded that counsel was not ineffective in failing to object because the cited testimony was not victim-impact evidence at all, but was, instead, simply testimony establishing a timeline of relevant events.  Campbell's testimony provided evidence about where Seaton intended to go, and why, when she left work and, in recounting Seaton's call to her home around 10:30 p.m., provided a corroborating point on the timeline of Seaton's movements.  The testimony therefore was relevant to the overall *res gestae* of the crime and had nothing do with the traditional function of victim-impact evidence, which, historically, is offered to show "each victim's uniqueness as an individual human being, whatever the jury might think the loss to the community resulting from his death might be." *Payne v. Tennessee*, 501 U.S. 808,

210

823 (1991) (quotation omitted) (emphasis removed).   The ACCA reasonably determined that counsel had no basis to object to the cited testimony and, consequently, Petitioner cannot establish ineffective assistance of counsel.

**I.     Trial Counsel Failed to Present and Effectively Argue a Motion for Acquittal (Claim I.J).**

After the conclusion of Marlo Murph's testimony, Judge Harper asked the prosecutor if he intended to rest.  Tr. 1044.  After the prosecutor indicated that he would rest, Judge Harper asked defense counsel, "Have you got some motions?"  *Id*.  Counsel responded in the affirmative.  *Id*.  Counsel requested that the court hear his motions the following morning so that counsel could confer with Petitioner about testifying in his defense.  Judge Harper agreed, stating, "I will come back in and rule on any motions that want to be made."  Tr. 1047.

The next morning, the prosecutor again signaled his intent to rest.  *Id*.  At Judge Harper's prompt, defense counsel then stated as follows:  "Yes, Your Honor. If we may, we would like to first of all move for a dismissal on the basis that, number one, the -- the State has failed to prove that it was Mr. Hodges that killed the Defendant [sic] as opposed to Mr. Murph."  Tr. 1047.  Judge Harper denied the motion.  Tr. 1048.  After the defense then moved to exclude Murph's testimony on the basis that it lacked sufficient corroborating evidence, Judge Harper reviewed the evidence he found sufficiently corroborative of Murph's testimony to warrant

its admission and therefore denied the motion.  Tr. 1048–49.  Judge Harper then asked if the defense had any more motions, to which counsel responded in the negative.  Tr. 1049.  Judge Harper then remarked as follows:

> All right.  Now, I am going to consider that the defense has filed a motion for a judgment of acquittal in accordance with the rules of criminal procedure, and I am going to consider that as a motion that has been filed since this is a capital case and that motion will also be denied.

Tr. 1049–50.

### 1.    *Petitioner's allegations*

Petitioner alleges that counsel "failed to move for a judgment of acquittal" and that the "Court had to do it for him."  Pet. ¶ 251.  He claims that, because there was "sparse evidence linking Mr. Hodges to the crime scene" and the State was forced to rely nearly exclusively on Murph's testimony, counsel was required to "develop a coherent argument for acquittal[.]"  *Id*.  He then claims that an "effectively-argued motion for acquittal might reasonably have led to the granting of such a motion, or, in the alternative, to sufficient residual uncertainty about Mr. Hodges's liability that the trial court (like the jury) would have hesitated to sentence Mr. Hodges to death."  *Id*.

### 2.    *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.7(d) because the issue underlying counsel's alleged ineffectiveness, whether Petitioner

212

was entitled to a judgment of acquittal, was found to be without merit on direct appeal.  Doc. 21-55 at 169.  The ACCA affirmed the summary dismissal of the claim pursuant to Rules 32.3 and 32.6(b) because Petitioner failed to plead sufficient facts to establish deficient performance or prejudice under *Strickland*. 147 So. 3d at 941–42.

> 3. *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because it reasonably determined that Petitioner did not plead sufficient facts to establish deficient performance or prejudice.  To begin with, Petitioner's claim that counsel did not present a motion for judgment of acquittal, and that the trial court "had to do it for him," misreads the record.  As shown above, at the close of the State's case, counsel moved for "dismissal," arguing that the State had failed to present sufficient evidence showing that it was he, rather than Murph, who killed Seaton.  Tr. 1047.  Counsel therefore moved for the functional equivalent of a motion for judgment of acquittal, in which the movant argues, after the close of the State's case, that "the evidence is insufficient to support a finding of guilty beyond a reasonable doubt." Ala. R. Crim. P. 20.1.  Thus, Judge Harper did not have to move for acquittal "for" defense counsel.  He simply construed the defense's "motion to dismiss" as the motion for judgment of acquittal contemplated by the procedural rules.

213

To the extent Petitioner's claim concerns counsel's alleged failure to adequately prepare and present his motion, the record makes clear why his allegations of prejudice are insufficient. In response to defense counsel's motion for exclusion of Murph's testimony, Judge Harper summarized the trial evidence implicating Petitioner and corroborating Murph's account:

> There was DNA evidence of the -- on a cigarette butt in the victim's van; there is DNA evidence of the Defendant; secondly, the Defendant's nametag was found at the scene where the body was located. There is testimony that he had it on his person earlier in the evening. Third, the defendant was found in -- or was in possession of a large sum of money immediately after the time of this robbery, and a portion of it was left at a girlfriend's home. Fourth, the pistol that apparently was used in this offense had been given to the defendant by another man immediate[ly] prior to this incident. Fourth (sic), the defendant's pants were located with evidence of the victim's blood on them. Next, the testimony of the co-defendant is that the defendant planned it. Next, the defendant's aunt testified that the Defendant told her he and another person had killed the victim.

Tr. 1048–49. While Petitioner's testimony attempted to explain away some of these circumstances, such testimony came only after the trial court summarized the above inculpatory evidence. As Judge Harper's rendition of the evidence makes clear, he would not have granted a motion for judgment of acquittal at that point in time, no matter how strenuously counsel argued the motion.

Thus, in light of the trial court's ruling about the sufficiency of the evidence presented by the State, Petitioner did not allege, and cannot plausibly allege, that it

is reasonably probable that he would not have been convicted of murder had counsel more thoroughly prepared and presented a motion for acquittal. Likewise, Petitioner's claim that the points raised in an adequate motion for acquittal would have caused the trial court to harbor residual doubt about Petitioner's guilt, such that the trial court would not have overridden the jury's sentencing recommendation, is not supported by any factual allegation in the petition. The ACCA reasonably dismissed this claim.

### J. Counsel Failed to Move for a Change of Venue, Despite the Lack of Jurisdiction in Lee County and Highly Prejudicial Media Coverage (Claim I.K).

#### *1. Petitioner's allegations*

Petitioner claims that counsel were ineffective in failing to move for a change of venue for at least two reasons: extensive pretrial coverage of the case in the media poisoned the jury pool in Lee County and jurisdiction did not lie in Lee County since the evidence showed Seaton was murdered in Macon County. Pet. ¶¶ 253, 255. He alleges as follows regarding prejudice:

> A change of venue was constitutionally required. The media had convicted Mr. Hodges in the press long before the trial even began, and, as a number of potential jurors noted, the jury pool had seen those media reports long before trial began. The resulting bias would necessarily affect the jury's ability to remain impartial in this case. In addition, a change of venue to Macon County would likely have resulted in a different outcome in the case. Juries and judges of that county have been far less likely to sentence defendants to death in

recent years, demonstrating a different approach to the weighing of aggravating and mitigating factors—an approach that would likely have resulted in a different outcome at trial.

Pet. ¶ 256.

### 2.   The state court's merits adjudication

The Rule 32 court summarily dismissed this claim as lacking merit pursuant to Rule 32.7(d) and as insufficiently pleaded pursuant to Rules 32.3 and 32.6(b). Doc. 21-55 at 128–29, 152–54.  On the merits, the Rule 32 court found the claim lacking because every juror "indicated that they could give a fair and impartial verdict based on the evidence presented at trial" and, on the "jurisdictional" issue, because the evidence showed that Seaton was robbed and abducted in Lee County before she was murdered in Macon County, Alabama law supported finding venue proper in either county.  *Id*. at 152–53.  On the insufficiency of the pleading, the Rule 32 court observed that Petitioner failed to "identify a single juror who was biased by pre-trial publicity."  *Id*. at 128.  Consequently, Petitioner failed to allege sufficient facts to establish prejudice.

The ACCA affirmed.  On the pretrial publicity component of this claim, the ACCA agreed that Petitioner failed to sufficiently plead his claim because he "did not list the name of a single juror who had heard of the crime and alleged only that 'some jurors' had prejudged his guilt based on the media coverage, and he did not

216

allege that those veniremembers served on his jury." 147 So. 3d at 946. The ACCA also found that Petitioner "did not provide any facts about the media coverage to indicate that it was biased or that it prejudiced him in any way." *Id*. "Hodges alleged only that widespread publicity had existed and that 'some' veniremembers prejudged him; those facts, even if true, were not sufficient to establish that he was entitled to relief. Therefore summary dismissal of this claim was proper." *Id*.

On the failure to move for a change of venue due to lack of jurisdiction, the ACCA agreed with the Rule 32 court that summary dismissal was warranted because the claim was "meritless on its face." 147 So. 3d at 946. The ACCA reasoned as follows:

> Hodges was convicted of murder during the course of a robbery, and the crime began with the robbery in Opelika, which is in Lee County. The fact that Hodges drove the victim to Macon County and killed her there did not warrant a change of venue. "When an offense is committed partly in one county and partly in another or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, venue is in either county." § 15–2–6, Ala. Code 1975. Because venue was proper in Lee County, a motion for a change of venue on this basis would not have been granted. In *Miller v. State*, 913 So. 2d 1148, 1162 (Ala. Crim. App. 2004), we stated that "defense counsel cannot be said to have rendered ineffective assistance by not seeking a change of venue where there was insufficient evidence to show that he was entitled to such a change." Therefore, summary dismissal of this claim was proper.

*Id.* (citation omitted).

217

### 3.  The ACCA reasonably applied *Strickland* and did not base its decision upon an unreasonable determination of the facts.

The ACCA reasonably applied *Strickland*.  To begin with, the ACCA reasonably found that Petitioner did not plead sufficient facts about the pretrial publicity in this case to support his claim that such publicity prejudiced his ability to obtain a fair trial in Lee County.  Although he claims that the murder "received a great deal of attention in Lee County media," he specifically alleges only that the local newspaper featured stories about the crime as "front page news" "over a dozen times in the months before the trial[.]"  Pet. ¶ 252.  There are no facts alleged showing that this amount of coverage saturated the community.  As for the character of such publicity, while Petitioner alleges that the "media convicted Mr. Hodges in the press long before the trial even began," Pet. ¶ 256, the petition is devoid of even one specific allegation about the inflammatory nature of any pretrial media reports.[22]

Finally, while Petitioner accurately alleged that many potential jurors claimed to have heard about the case before trial, he failed to allege that even one juror who served at his trial had prejudged his guilt or was otherwise biased against

---

[22] To the extent the pretrial publicity could have been inflammatory, Petitioner makes no allegation that any potential juror was affected by such publicity.  For example, some of the pretrial publicity in the months before Petitioner's trial reported on Petitioner's escape from the Lee County Jail and subsequent capture.  *See* Doc. 21-4 at 33; *id*. at 56–58.  Yet, Petitioner does not allege that any potential juror referenced or was otherwise influenced by this potentially damaging publicity.

him based on such reports. In short, as the ACCA found, Petitioner's allegations were insufficient to establish that he suffered actual or inherent prejudice due to any pretrial publicity. *See, e.g.*, *Heath v. Jones*, 941 F.2d 1126, 1134 (11th Cir. 1991). Accordingly, Petitioner failed to adequately support his claim that counsel's failure to move for a change of venue based on pretrial publicity deprived him of the effective assistance of counsel.

On the jurisdictional component of this claim, Petitioner has no substantive response to the ACCA's conclusion that Alabama law established that jurisdiction, and venue, was proper in Lee County. The Rule 32 petition unequivocally claimed that there was a "lack of jurisdiction in Lee County," Doc. 21-24 at 138, but, as the ACCA found, this is patently inaccurate. Petitioner's federal court merits brief appears to backtrack from his jurisdictional argument, insisting that "[t]he essence of Mr. Hodges's claim, however, is that excessive and adverse pretrial publicity had prejudiced the Lee County venire such that a change of venue was proper, and that had a change of venue been sought, the fact that the death occurred in Macon County would have supported a change of venue to Macon County." Doc. 31 at 61. It is no doubt true that, had the trial court determined that prejudicial pretrial publicity saturated Lee County, but not the adjacent Macon County, then perhaps a change of venue to Macon County would have been appropriate. But this is, of

course, a different argument than Petitioner's explicit claim in his Rule 32 petition that Lee County *lacked* jurisdiction.

What Petitioner is really alleging here is that counsel should have argued for a change of venue to Macon County because the robbery-murder culminated there and, as he alleges, he perceives that juries in Macon County would be less likely to recommend a death sentence, and judges would be less likely to impose a death sentence.  But neither of these circumstances would have required a change of venue to Macon County under Alabama law.[23]  Hence, as the ACCA found, counsel could not have been deficient for failing to move for a change of venue based on Lee County's purported lack of jurisdiction or even because of the perceived more favorable venue offered in Macon County.  Accordingly, the ACCA reasonably applied *Strickland* in concluding that this claim lacks  merit.

### K.  Trial Counsel Performed Ineffectively During Closing Argument (Claim I.L).

As discussed previously, during defense counsel's guilt phase closing argument, Judge Harper interrupted counsel to inform the attorneys that he would charge the jury on the lesser-included offense of manslaughter based on trial

---

[23] And, it bears observing, Petitioner's claim of prejudice is further diminished because, whatever he believes to be the tendencies of juries in Macon County, his Lee County jury recommended a life sentence.  Nor has he alleged that Judge Harper would not have presided over the trial in Macon County had he granted a motion for change of venue. Thus, Petitioner's claim of prejudice is foreclosed.

evidence of Petitioner's drinking and smoking marijuana earlier in the evening of Seaton's murder.  Tr. 1137.  This was a reversal of Judge Harper's earlier ruling that he would not charge on manslaughter.  Tr. 1114.  Judge Harper advised defense counsel that he was interrupting because he "wanted you to know that during the course – before you finish your argument."  Tr. 1137.  Defense counsel then referenced the anticipated manslaughter charge in his closing argument while preparing the jury to receive Judge Harper's instructions on lesser-included offenses.  Tr. 1142 ("He will explain to you about another lesser included offense, and that's manslaughter.  It will have something to do with intent and the drinking and the marijuana smoking that went on that you heard about.  You will hear those instructions.").   Notably, counsel specifically advocated that the jury should convict Petitioner of the lesser-included offense of felony murder based upon his testimony that, while he planned the robbery, he did not plan for Seaton to be killed and he did not actively participate in the robbery or murder.  Tr. 1141–42; *id*. at 1142 ("We are submitting to you that what the evidence shows in this case is that Melvin Hodges did not intentionally kill Ms. Seaton and was not there when it happened but that he was so involved that he is guilty of the lesser included offense of murder, felony murder.").

       *1.*    *Petitioner's allegations*

Petitioner alleges that "trial counsel failed to even attempt to persuade the jury to consider returning a verdict of guilty on voluntary manslaughter." Pet. ¶ 260. He claims, "trial counsel's confused and off-hand presentation of the manslaughter charge served only to convince the jury that the charge was not worthy of serious consideration. Trial counsel's failure to seriously advocate one of the lesser included offenses instructed by the judge deprived Mr. Hodges of a fair trial." Pet. ¶ 261.

### 2. The state court's merits adjudication

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.7(d), concluding that Petitioner could not show prejudice due to counsel's purported inadequate advocacy for a manslaughter conviction: "Because of the defense's theory at trial, any argument that Hodges should only be convicted of manslaughter would have been a direct contradiction of his defense theory at trial." Doc. 21-55 at 171. The ACCA affirmed summary dismissal because Petitioner's allegations were insufficient to establish deficient performance or prejudice:

> He did not allege exactly what arguments counsel should have made in light of the evidence presented at trial and in light of Hodges's theory of defense. Hodges also failed to plead any facts alleging prejudice, that is, indicating that, if counsel had made those arguments to the jury, the jury would have found him guilty of manslaughter.

147 So. 3d at 957.   Thus, the ACCA concluded, Petitioner "made only bare allegations of error and conclusions that his right to a fair trial was denied.   These claims [concerning counsel's failure to object to the trial court's interruption and failure to more forcefully argue for a manslaughter conviction] were insufficiently pleaded and were, therefore, properly dismissed by the circuit court."   *Id*.

        3.     *The ACCA reasonably applied Strickland and did not base*
                *its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner failed to plead sufficient facts showing that he could have been prejudiced, *i.e.*, that there is a reasonable probability that he would not have been convicted of capital murder had counsel presented adequate argument about the trial court's manslaughter charge. In short, the evidence supporting a manslaughter conviction was negligible.   None of the witnesses who testified about Petitioner's consumption of alcohol or marijuana, including Petitioner, or who testified about their interactions with him that evening testified that he was intoxicated to any appreciable degree, or that he appeared to be in a state in which he could not have formed or entertained the specific intent to commit murder.   *See Fletcher v. State*, 621 So. 2d 1010, 1019 (Ala. Crim. App. 1993).[24]   Rather, there was only general testimony that Petitioner,

---

[24] *Fletcher* was referenced by Judge Harper when he informed defense counsel that he would be charging the jury on manslaughter.   Tr. 1137.

Murph, Eady, and Maddox drank and smoked marijuana while playing cards in the hours between the end of Petitioner's Golden Corral shift and his and Murph's departure from Eady's apartment around 10:30 p.m.   There was no specific testimony about the amount of alcohol or marijuana consumed by Petitioner, and there was no testimony suggesting any significant intoxication, as evidenced by his actions or behavior, on his part.

As provided in *Fletcher*, trial courts in Alabama are to liberally give the manslaughter charge "where evidence of intoxication is presented in a prosecution for intentional murder."   621 So. 2d at 1019.   Hence, the mere fact that, out of an abundance of caution, Judge Harper discerned sufficient evidence in the record to warrant the charge does not establish prejudice due to counsel's failure to advocate for a manslaughter verdict.   Petitioner's failure to highlight specific evidence about the amount of intoxicating substances he consumed, or testimony about behaviors consistent with intoxication, precludes him from establishing prejudice with his allegations.   *See Hunt v. Comm'r, Ala. Dep't of Corr.*, 666 F.3d 708, 727 (11th Cir. 2012) (petitioner could not show prejudice due to counsel's failure to pursue an intoxication defense because such defense was "implausible" where trial testimony included only a "few vague references to alcohol, unspecified pills, and cocaine" and therefore did not "support the conclusion that Hunt's intoxication reached such

224

an extraordinary level" as to render him incapable of forming the requisite intent under Alabama law).

Furthermore, as the ACCA found, counsel's advocacy for a manslaughter conviction would have contradicted the defense's theory that Petitioner was guilty of the lesser-included offense of felony murder because he was not there and did not participate in the murder of Beth Seaton.  Petitioner testified adamantly that, while he planned the robbery, he did not want Seaton murdered and he did not participate in the murder.  Counsel sought to burnish Petitioner's credibility by highlighting Murph's credibility issues, challenging the circumstances of Kitty Porter's police statement incriminating Petitioner, and arguing that Petitioner's story aligned with some of the physical evidence.

Had counsel pivoted and asked the jury to find that Petitioner killed Beth Seaton but lacked sufficient intent to commit murder due to intoxication, it would have undermined Petitioner's testimony and the defense's theory that the case was a credibility contest between Murph and Petitioner.  Counsel no doubt believed that he lacked sufficient evidence of intoxication to abandon the defense's theory in pursuit of such a risky strategy.  *See Hunt*, 666 F.3d at 726–27 ("An intoxication defense would have required the jury to posit that Hunt caused Lane's death, and to consider his mental state at the time.  Hunt's attorneys were not required to raise

such a defense—even in a request for a jury instruction—when they had reasonably chosen to argue that Hunt did not cause Lane's death.").  Accordingly, the ACCA's conclusion that Petitioner did not sufficiently allege ineffective assistance was reasonable.

### L.    Trial Counsel Failed to Request an Inquiry into the Fact that Assistant District Attorney Thomas Rountree had Previously Represented Mr. Hodges (Claim I.M).

Thomas Rountree, one of the assistant district attorneys employed by the office prosecuting Petitioner, "represented Hodges for approximately two weeks in 1993 on a controlled-substances charge, until he moved to withdraw from the case." *Hodges*, 147 So. 3d at 947.

#### 1.    Petitioner's allegations

Petitioner alleges that, although he was aware of Rountree's prior representation, defense counsel "did nothing to ensure that any confidential information obtained by Mr. Rountree during the course of his representation would not be used against Mr. Hodges in this case." Pet. ¶ 263.  Because counsel failed to raise the issue with the trial court and failed to request that Rountree be prohibited from serving on the prosecution team, "Rountree and the prosecutor's office were free to share impressions and information in order to charge or prosecute the case against Mr. Hodges." *Id*.  "Had trial counsel objected,"

Petitioner continues, "the unique information gathered by Mr. Rountree about Mr. Hodges would not have been communicated to the prosecution in this case, which would have undermined the substantial advantage held by the prosecution and would likely have resulted in a different outcome at trial." *Id.*

### 2. *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim as insufficiently pleaded pursuant to Rules 32.3 and 32.6(b) because Petitioner "failed to state how he was prejudiced by trial counsel's failure to request an inquiry into the fact that . . . Rountree had previously represented petitioner on an unrelated matter."  Doc. 21-55 at 130.   Moreover, Petitioner "did not specifically state what 'unique information' Mr. Rountree possessed that would have prejudiced his defense."  *Id.*  The ACCA affirmed summary dismissal pursuant to Rules 32.3 and 32.6(b):

> The circuit court correctly determined that this claim was insufficiently pleaded because it failed to include the full factual basis of the claim.  Hodges failed to allege that Rountree did, in fact, share any information with other members of the prosecutor's office, and he failed to plead any specific facts regarding what "unique information" Rountree allegedly gathered that could have been shared with the prosecution in this case.  He also failed to allege any specific facts indicating the manner in which he was prejudiced by the possible communication of this unique information.

147 So. 3d at 948.

### 3. *The ACCA reasonably applied Strickland and did not base its decision upon an unreasonable determination of the facts.*

227

The ACCA reasonably applied *Strickland* because Petitioner failed to plead specific facts establishing deficient performance or prejudice.  Petitioner does not allege that he advised trial counsel of specific information of which Rountree was aware that should not be privy to prosecutors.  With no articulable reason to believe that Rountree's unrelated representation of Petitioner from several years prior could prove detrimental to Petitioner's murder trial, counsel had no reason to request an inquiry by the trial court.  More importantly, Petitioner wholly failed to allege what "unique" and "confidential information" Rountree disclosed to the prosecution team and how that information influenced his prosecution.  With no specific allegation that Rountree's purported "duplicitous posture" somehow influenced the outcome of his case, Petitioner failed to sufficiently allege prejudice.  Accordingly, the ACCA's decision was reasonable.

**M.    Trial Counsel Failed in Other Ways to Present a Constitutionally Sufficient Defense (Claim I.N).**

*1.    Petitioner's allegations*

Petitioner alleges simply that, beyond the myriad ineffective assistance claims alleged throughout the petition, his counsel was "constitutionally inadequate to the degree that he should have, but failed to, raise at trial or at any other time, the issues or objections set forth herein."  Pet. ¶ 264.  He claims that

this "failure" includes several errors related to counsel's performance during jury selection which, according to the ACCA, were not raised in a timely manner, "including the failure to request follow-up questions in voir dire, or to challenge potential jurors for cause, as well as the failure to object to exclusion of potential jurors for cause." *Id.*

### 2.    The state court's merits adjudication

The Rule 32 court summarily dismissed this claim as insufficiently pleaded pursuant to Rules 32.3 and 32.6(b).  Specifically, the court found that Petitioner "failed to allege any facts in support of this claim in his petition" because he failed to allege "any facts indicating this his [counsel's] performance was deficient or that he was prejudiced by these unidentified errors."  Doc. 21-55 at 137.  The ACCA affirmed summary dismissal on this basis.  147 So. 3d at 941–42.

### 3.    The ACCA reasonably applied *Strickland* and did not base its decision upon an unreasonable determination of the facts.

The ACCA reasonably applied *Strickland* because Petitioner did not allege sufficient facts to support his claim that counsel was ineffective in "other ways" that are not specified in the text of the claim.  It was not incumbent on the ACCA, or this court for that matter, to speculate about the "other ways" counsel might have provided ineffective assistance beyond the many claims set forth in the petition.  Petitioner was obligated, at a minimum, to clarify all the additional ways

he perceived counsel to have provided ineffective assistance.  Furthermore, to the extent Petitioner intended to allege that some of the "other ways" counsel was ineffective encompassed counsel's performance during jury selection, the ACCA addressed his claims that counsel was ineffective in failing to request follow-up questions in voir dire, failing to challenge potential jurors for cause, and failing to object to the exclusion of potential jurors for cause.  As set forth previously, the ACCA did not unreasonably apply *Strickland* in denying those claims.  Likewise, the ACCA's decision dismissing this claim was reasonable.

### N.   Trial Counsel's Representation was Cumulatively Inadequate (Claim I.O).

#### 1.   *Petitioner's allegations*

Petitioner alleges that, while each ineffective assistance subclaim he alleges "is in itself a sufficient basis upon which to conclude that trial counsel was inadequate, the accumulation of these errors also amounts to ineffective assistance of counsel that was highly prejudicial to Mr. Hodges at each phase of the proceeding."  Pet. ¶ 265.

#### 2.   *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim pursuant to Rule 32.7(d) "because it does not assert a specific claim of ineffective assistance of counsel as required by *Strickland*."  Doc. 21-55 at 175.  Although Petitioner raised the claim

in his brief in the ACCA, *see* Doc. 21-33 at 99–100, it does not appear the ACCA addressed this claim.[25]

> ### 3.   *Petitioner is not entitled to relief on any claim of cumulative error.*

Because the ACCA did not explain its decision denying this claim, or otherwise address the claim, this court "looks through" the ACCA's decision to the last reasoned state court decision addressing the claim, that of the Circuit Court in Rule 32 proceedings, and assumes that the ACCA adopted the Circuit Court's reasoning in disposing of the claim. *Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018). As reviewed above, the Rule 32 court summarily dismissed Petitioner's cumulative ineffectiveness claim because Petitioner failed to "identify specific acts or omissions on the part of trial counsel." Doc. 21-55 at 175. This is not entirely accurate, however, as Petitioner did identify numerous specific acts or omissions of counsel that he alleged to be deficient throughout his Rule 32 petition. The crux of his cumulative ineffectiveness claim was that "the accumulation of these errors also amounts to ineffective assistance of counsel that was highly prejudicial to Petitioner at each phase of the proceeding." Doc. 21-24 at 171. The Circuit

---

[25] This court has closely examined the state court record searching for the ACCA's disposition of this claim and found none. Respondent concedes that the ACCA "did not specifically address this claim of cumulative error[.]" Doc. 37 at 65. Respondent maintains, however, that the ACCA "implicitly denied relief on this claim when it affirmed Hodges's conviction and death sentence." *Id*.; Doc. 38 at 78 (remarking that the ACCA "did not disturb" the Rule 32 court's ruling on this claim).

Court's conclusion that Petitioner failed to comply with *Strickland* by alleging specific acts or omissions of counsel thus misreads, and fails to engage substantively with, Petitioner's claim.

The question for this court, however, is whether the state court unreasonably applied *Strickland* and, if so, whether Petitioner is entitled to relief on his cumulative ineffective assistance claim.  The Eleventh Circuit has several times been confronted with the question "whether a claim of ineffective assistance of counsel may be based on the 'cumulative effect' of multiple non-prejudicial errors by counsel when no individual error standing alone would warrant a finding of prejudice under *Strickland*."  *Borden v. Allen*, 646 F.3d 785, 823 (11th Cir. 2011). That court has repeatedly avoided resolving the question.  *See, e.g., id*. ("Because Borden has not sufficiently pled facts that would establish prejudice—cumulative or otherwise—we decline to elaborate further on the concept of 'cumulative effect' for fear of issuing an advisory opinion on a hypothetical issue."); *Hunt*, 666 F.3d at 731–32 ("Even if we were to determine that clearly established federal law mandates a cumulative-effect analysis of ineffective-assistance claims, Hunt would not be entitled to relief: he has not shown that in this case the cumulative effect of counsel's alleged errors amounted to ineffective assistance."); *Tarleton v. Sec'y, Fla. Dep't of Corr*., 5 F.4th 1278, 1292 (11th Cir. 2021) ("In this case, we need not

reach the issue of whether cumulative error is cognizable in habeas proceedings."). Given that well after the relevant state court decision in this case it remained unclear for the Eleventh Circuit whether this claim is even cognizable under clearly established federal law, this court is hard-pressed to conclude that the Circuit Court unreasonably applied *Strickland* in summarily dismissing the claim.

Nevertheless, even assuming that this claim is cognizable under clearly established federal law, and that the Circuit Court in this case unreasonably applied *Strickland* in failing to appreciate the cumulative nature of the claim, this court concludes that, even under *de novo* review, Petitioner's cumulative ineffective assistance claim is due to be denied. As set forth throughout this opinion, outside the context of his penalty phase ineffective assistance claim related to counsel's investigation and presentation of mitigating evidence, Petitioner mostly failed to plead sufficient factual allegations to support his claim of prejudice flowing from counsel's various alleged errors. Where there were sufficient factual allegations to glean a coherent theory of prejudice, there was simply insufficient probability that Petitioner indeed was prejudiced. Considered cumulatively, it remains that there is not a reasonable probability that Petitioner was prejudiced by counsel's alleged errors.

Petitioner's strongest and most detailed claims of ineffectiveness relate to counsel's alleged inadequate preparation for the penalty phase and deficient presentation of evidence during the penalty phase.   For the reasons stated previously, the ACCA did not unreasonably apply *Strickland* in concluding that these errors did not prejudice Petitioner.  For purposes of this claim, however, the prejudicial effect of these errors, if any, cannot be "accumulated" with the prejudicial effect of counsel's earlier alleged errors in the guilt phase of trial to challenge Petitioner's *conviction*.   That is, the cumulative effect of counsel's alleged errors in jury selection, failing to investigate Petitioner's culpability, failing to adequately cross-examine the State's witnesses, failing to object to erroneous rulings, failing to object to prosecutorial misconduct, *etc*., is *not* enhanced by counsel's subsequent alleged errors in the penalty phase.  The hay was in the barn, so to speak: the alleged prejudice from counsel's pretrial and guilt-phase errors—Petitioner's conviction—was complete by the time of counsel's alleged penalty-phase errors, and the latter errors do not "accumulate" with the earlier errors to remediate any prejudice Petitioner allegedly suffered before the penalty phase.

As for the cumulative effect of counsel's alleged guilt-phase errors, this court is not persuaded that Petitioner can show prejudice, cumulative or otherwise. For the reasons explained earlier in this opinion, it is not reasonably probable that

Petitioner would not have been convicted of capital murder had counsel not committed the various acts or omissions characterized by Petitioner as deficient. Counsel performed reasonably in challenging the evidence presented against Petitioner: he demonstrated Murph's credibility issues; he gamely attempted to show why Porter's testimony and earlier police statement might be the product of her fear and intimidation; he emphasized the lack of fingerprint evidence implicating Petitioner; and he presented Petitioner's testimony providing an alternative explanation for the physical evidence that did link him to the murder. None of counsel's alleged errors, if corrected, would have excised an essential pillar of the State's evidence, cast such evidence in a markedly less inculpatory light, or provided Petitioner with exculpatory evidence of a caliber sufficient to undermine confidence in the outcome of his trial. Petitioner has failed to show how counsel's alleged guilt-phase errors, even considered cumulatively, could have prejudiced the outcome of his trial.

Accordingly, for all the foregoing reasons, Petitioner's cumulative ineffective assistance claim is without merit and is denied.

### O.   Appellate Counsel was Constitutionally Inadequate (Claim I.P).

Among other claims on direct appeal, Petitioner argued that the trial court "erred when it admitted evidence without establishing a proper chain of custody."

Doc. 21-14 at 160.   Citing state court decisions, he argued that evidence is inadmissible at trial "when  there is a 'missing link' in the chain of people who handle an evidentiary item."   *Id*. at 160–61.   He then cited over twenty-five examples of trial exhibits admitted without establishing a proper chain of custody, including crucial items of evidence like the cigarette butt found to contain his saliva and items of clothing soaked in the victim's blood.  *Id*. at 161.  He asserted that, had these items been excluded, "the state's case would have been completely undermined."  *Id*.  He therefore claimed that his constitutional rights were violated by admission of such evidence.  *Id*.

The ACCA rejected Petitioner's claim concerning chain of custody issues on direct appeal, concluding that he failed to present "any argument as to why each item of evidence should have been excluded."  856 So. 2d at 918.  The ACCA further stated that it examined the record and found "no evidence that was unlawfully admitted at trial."  *Id*.  Finally, the ACCA explained that, under Alabama law, failure to establish chain of custody is not grounds for exclusion of evidence.  *Id*.  Instead, such evidence "'shall be submitted to the jury or court for whatever weight the jury or court may deem proper.  The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence.'"  *Id*. (quoting Ala. Code § 12-21-13).

236

1.     *Petitioner's allegations*

Petitioner claims that his direct appeal counsel, Floyd Likins, who was his second chair counsel at trial, "failed to provide the Court of Criminal Appeals with an adequate basis upon which to assess the claim that chain of custody problems should have undermined the weight that a jury would have given exhibits presented in the trial court."  Pet. ¶ 266.  Petitioner also alleges a sort of catch-all claim of appellate ineffectiveness: "Furthermore, to the degree that any of the issues presented in this petition are issues that could or should have been, but were not, adequately raised and presented on appeal, the failure to do so amounts to inadequate representation of appellate counsel."  Pet. ¶ 267.

2.     *The state court's merits adjudication*

The Rule 32 court summarily dismissed this claim as insufficiently pleaded pursuant to Rules 32.3 and 32.6(b).  Doc. 21-55 at 137.  The ACCA affirmed the summary dismissal of both components of this claim—any claim relating to appellate counsel's argument about chain of custody problems and the "catch-all" component—as insufficiently pleaded.  147 So. 3d at 941–42, 959–60.

3.     *The ACCA reasonably applied Strickland and did not base*
       *its decision upon an unreasonable determination of the facts.*

The ACCA reasonably applied *Strickland* because Petitioner failed to allege sufficient facts regarding appellate counsel's alleged deficient performance or how

237

he was prejudiced by such performance.  On the chain of custody component of his claim, Petitioner failed to allege any facts about specifically what items of evidence were admitted with improper chain of custody and what arguments appellate counsel should have made regarding those items.  He also did not allege specific facts showing that any such argument would have been likely to succeed, resulting in a reversal of his conviction.  This is especially telling considering the ACCA's conclusion that, after reviewing the record, it identified no improperly admitted evidence.  In other words, although Petitioner alleges that "Mr. Likins's failure to adequately describe the failures in the chain of evidence amounted to ineffective assistance of counsel," Pet. ¶ 266, he still does not "adequately describe" the chain of custody failures that Likins should have brought to the ACCA's attention and how he should have gone about doing so.  Thus, the ACCA's summary dismissal of this claim was reasonable.

The ACCA's summary dismissal of Petitioner's "catch-all" appellate ineffectiveness claim also was reasonable.  As the ACCA concluded, this claim "contained no factual allegations to support either the allegation of deficient performance or prejudice."  147 So. 3d at 960.  It is incumbent on Petitioner to identify those issues "that could have been, but were not, adequately raised and presented on appeal," Pet. ¶ 267, so that the state courts and this court may assess

238

whether appellate counsel performed deficiently and whether Petitioner suffered prejudice. Petitioner's failure to specifically identify any such issues, outside his claim about counsel's inadequate argument of chain of custody issues, defeats his claim. Accordingly, the ACCA's decision summarily dismissing his claim was reasonable.

## II.      Claim Two – Deprived of the Right to Present His Defense

Petitioner's second ground for relief challenges the trial court's denial of his pretrial motions for funds for expert and investigative assistance. Specifically, he alleges that the trial court's denial of his motions for funds to hire an investigator, a mitigation expert, and a neuropsychologist denied him due process of law as explicated in *Ake v. Oklahoma*, 470 U.S. 68 (1985). Respondent concedes that this claim was decided on the merits in the state courts and is properly before this court for review pursuant to § 2254(d). Doc. 37 at 77. Accordingly, discussion of the claim will proceed as follows: a) review of the clearly established federal law governing the claim; b) review of the state trial court proceedings and the ACCA's merits adjudication of the claim; and c) analysis pursuant to § 2254(d).

### A.      Clearly Established Federal Law

The parties agree that the Supreme Court's decision in *Ake* provides the clearly established federal law governing Petitioner's claim. Pet. ¶¶ 269, 279; Doc.

239

38 at 79–80.   In *Ake*, an indigent Oklahoma murder defendant's behavior at arraignment and in custody was sufficiently bizarre that the trial judge *sua sponte* ordered that the defendant, Ake, undergo a psychiatric examination to determine whether he required extended "mental observation."   470 U.S. at 70–71 (internal quotation marks omitted).   Based on the examining psychiatrist's report of Ake's delusional behavior and beliefs, and the examiner's diagnosis of Ake "as a probable paranoid schizophrenic," the trial court committed Ake to a state hospital for an assessment of his competency to stand trial.   *Id*. at 71.   A few weeks later, the "chief forensic psychiatrist" at the state hospital reported to the court "that Ake was not competent to stand trial."   *Id*.   The trial court held a competency hearing, found Ake to be incompetent to stand trial, and committed him to the state hospital.

"Six weeks later, the chief forensic psychiatrist informed the court that Ake had become competent to stand trial."   *Id*.   The state hospital achieved this result by administering the antipsychotic drug Thorazine to Ake three times a day.   The psychiatrist further opined that Ake would remain competent so long as he continued to receive the drug.   *Id*. at 71–72.   The State therefore resumed its prosecution.   *Id*. at 72.

Ake's attorney noticed his intent to raise an insanity defense and, accordingly, asked the trial court to arrange for a psychiatric evaluation of Ake's mental condition at the time of the offense or, alternatively, provide him with funds to obtain such an evaluation independently. 470 U.S. at 72. The trial court rejected the defense's request. Nevertheless, Ake proceeded with his insanity defense at trial. Ake's counsel questioned the psychiatrists who examined Ake at the state hospital, but those witnesses were unable to testify "about his mental state at the time of the offense because none had examined him on that point." *Id*. "*As a result, there was no expert testimony for either side on Ake's sanity at the time of the offense*." *Id*. (emphasis in original). The jury instructions on Ake's insanity defense established that Ake was to be presumed sane at the time of the offense, that he could not be found not guilty by reason of insanity without proof of his inability to "distinguish right from wrong at the time of the offense," and placed the burden on Ake to "present evidence sufficient to raise a reasonable doubt about his sanity," which would then shift the burden to the State to prove his sanity beyond a reasonable doubt. *Id*. at 72–73. Lacking salient evidence on Ake's insanity defense, the jury convicted Ake on all counts. *Id*. at 73.

In the penalty phase, the State relied upon the state hospital psychiatrists' testimonies to argue that Ake posed a risk of dangerous behavior in the future,

241

which was an aggravating circumstance under Oklahoma law.  470 U.S. at 73.

"Ake had no expert witness to rebut this testimony or to introduce on his behalf

evidence in mitigation of his punishment."  *Id*.  The jury sentenced Ake to death.

*Id*.

The Court's holding in *Ake* is succinct:  "We hold that when a defendant has

made a preliminary showing that his sanity at the time of the offense is likely to be

a significant factor at trial, the Constitution requires that a State provide access to a

psychiatrist's assistance on this issue if the defendant cannot otherwise afford

one."  470 U.S. at 74.  This requirement assures that "the defendant has a fair

opportunity to present his defense" and is "grounded in significant part on the

Fourteenth Amendment's due process guarantee of fundamental fairness."  *Id*. at

76.  The Court recognized the "value" that the provision of psychiatric assistance

can have in ensuring fundamental fairness: "[W]hen the State has made the

defendant's mental condition relevant to his criminal culpability and to the

punishment he might suffer, the assistance of a psychiatrist may well be crucial to

the defendant's ability to marshal his defense."  *Id*. at 80.

The Court observed that, ordinarily, a defense-oriented psychiatrist will

gather pertinent facts to share with the factfinder and/or sentencer, will "analyze

the information gathered and from it draw plausible conclusions about the

242

defendant's mental condition," and will "offer opinions about how the defendant's mental condition might have affected his behavior at the time in question." *Id*. They may also provide an essential foil to the prosecution's expert psychiatric witnesses because they "know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers." *Id*. The "value" of the defense-oriented psychiatrist's functions of "investigation, interpretation, and testimony" is that it enables lay jurors "to make a sensible and educated determination about the mental condition of the defendant at the time of the offense." *Id*. at 80–81.

The Court also recognized that expert assistance of this type is not needed in every case. "A defendant's mental condition is not necessarily at issue in every criminal proceeding, however, and it is unlikely that psychiatric assistance of the kind we have described would be of probable value in cases where it is not." 470 U.S. at 82. The "value" of such assistance, and the likely prejudice from failing to provide it, "is most predictably at its height when the defendant's mental condition is seriously in question." *Id*. Set against these principles, the Court reiterated, and qualified, its holding:

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate

243

examination and assist in evaluation, preparation, and presentation of the defense.  This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.  Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

*Id*. at 83.

The Court in *Ake* further concluded that the same considerations underlying this holding may require the provision of expert assistance in a capital sentencing proceeding, outside the context of an insanity defense.  Specifically, due process requires the provision of expert assistance in the penalty phase "when the State presents psychiatric evidence of the defendant's future dangerousness."  470 U.S. at 83.  In that scenario, where the State proffers expert psychiatric opinion as proof of an aggravating circumstance, "[w]ithout a psychiatrist's assistance, the defendant cannot offer a well-informed expert's opposing view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor."  *Id*. at 84.

Applying these principles to the facts in *Ake*, the Court determined that Ake's due process rights were violated.  The Court reasoned that several factors showed that Ake's "mental state at the time of the offense was a substantial factor in his defense, and that the trial court was on notice of that fact when the request

244

for a court-appointed psychiatrist was made[.]"  470 U.S. at 86.  These factors included the following: 1) "Ake's sole defense was that of insanity[;]" 2) Ake's bizarre behavior caused the trial court to *sua sponte* order a psychiatric competency evaluation; 3) the psychiatric examiner opined that Ake was incompetent to stand trial; 4) the subsequent finding that Ake was restored to competency depended on the continuing administration of antipsychotic medication; 5) the state hospital psychiatrists "described to the trial court the severity of Ake's mental illness less than six months after the offense in question, and suggested that this mental illness might have begun many years earlier[;]" and 6) Oklahoma's law on insanity defense placed the "initial burden of producing evidence on the defendant."  *Id*.  Accordingly, due process required that the trial court provide the defense with the requested expert psychiatric assistance in preparing Ake's insanity defense.

Likewise, regarding the penalty phase of Ake's capital trial, because a state psychiatrist testified in the guilt phase that "Ake posed a threat of continuing violence[,]" and such "testimony raised the issue of Ake's future dangerousness, which is an aggravating factor under Oklahoma's capital sentencing scheme[,]" Ake was entitled to expert psychiatric assistance to rebut the State's showing on that aggravating circumstance. *Id*. at 86–87.

## B.      State Court Proceedings

### 1.      Trial Court

In March 1998, just over two months after the murder of Beth Seaton, Petitioner filed an ex parte motion requesting authorization to spend up to $4,500.00 for investigative services and expenses. Doc. 21-13 at 32. The motion indicated that the investigator would be investigating for both the guilt and penalty phases of trial and that defense counsel could not provide effective assistance of counsel without the investigation described in the motion. Petitioner attached to the motion affidavits of practicing attorneys with capital defense experience who described the amount of investigation required to render effective assistance in capital cases. Petitioner also attached the affidavit of his attorney, Larry Ray, describing why he was unable to perform the adequate investigation necessary to prepare Petitioner's defense for trial.

About a month later, Petitioner filed a supplement to his motion, indicating that counsel had located "a social background/mitigation investigation specialist" that he wished to hire. Doc. 21-13 at 146. He explained that "it is imperative that defense counsel be provided with the means to obtain a social background and mitigation investigation for use at any penalty phase that may be required by trial

of this case[.]"  He requested that the trial court authorize up to $7,000.00 for the investigator and social background/mitigation specialist he wished to hire.

On July 10, 1998, the trial court held an ex parte hearing on Petitioner's motion requesting funds for investigative services.   At that hearing, counsel explained his need for investigative assistance:

> The professional investigation services that are required are for the pretrial phase of this trial of this case, the trial phase, the penalty phase before the jury, and the sentencing phase before the Judge.  The assistance is required specifically for the following purposes: investigative interviewing, evaluating, and probably more—most important to me is consulting with me on the implication of the investigation findings with case strategy which can effect consideration regarding responsibility for the offense, plea negotiations, the manner in which the defense team relates to the Defendant, decisions regarding whether or not the Defendant should testify, selection of witnesses for trial, alerting me of additional experts necessary to establish the presence of mental handicap, learning disorder, substance abuse or addiction, physical or sexual abuse, mental illness, and other conditions significant to the investigation; all of which involves an expertise far beyond in scope from what I possess, as I have never handled a case, anything like this capital murder case before.

> The experts would also assist in the phase of rebuttal of the State's evidence, testifying at trial as an expert, and in the presentencing litigation phase of the trial.

Tr. 73–74.  Because Judge Harper asked at the hearing about specific Alabama state court authority supporting Petitioner's ex parte request for funds, counsel that same day provided Judge Harper with a letter memorandum discussing Alabama

247

case law supporting his request for funds, as well as reiterating his need for investigative assistance and his lack of training or ability to perform the required investigation on his own. Doc. 21-13 at 152–54.

On August 27, 1998, the trial court entered an order denying Petitioner's ex parte request for investigative assistance. Doc. 21-2 at 90. Judge Harper ruled that Petitioner had failed to "show a reasonable probability that an expert would aid in his defense and that denial of an expert to assist at trial would result in a fundamentally unfair trial." *Id*.[26]

In January 1999, counsel filed his third ex parte motion, in which he again requested authorization for funds to hire a social background/mitigation expert. Doc. 21-13 at 168. The motion reiterated his earlier motion's averments regarding the need for a comprehensive mitigation investigation and counsel's inability to conduct such investigation. The motion further highlighted the potential mitigation evidence relating to Petitioner's childhood that counsel learned in his own investigation and stressed that additional professional investigation was needed to fully develop the mitigation evidence already discovered.

---

[26] In this same order, Judge Harper granted Petitioner's second ex parte motion for expert funds, in which Petitioner sought funds for a DNA expert. Specifically, Judge Harper authorized the expenditure of $800 "to retain a medical geneticist for independent DNA testing." Doc. 21-2 at 90. This is the full amount that counsel requested in the motion. Doc. 21-13 at 156.

In February 1999, Petitioner filed his fourth ex parte motion requesting authorization for funds, this time seeking funds to retain a neuropsychologist.  Doc. 21-13 at 177.  In that motion, he argued that "neuropsychological testing of the accused is critical to the jury's determination of Mr. Hodges' guilt, because it goes to his ability to form the requisite mens rea elements."  *Id*. at 178.  He also claimed that neuropsychological testing was critical to his proof of statutory mitigating circumstances at the penalty phase, including whether the offense was committed while he was under the influence of extreme mental or emotional disturbance, whether he acted under extreme duress or under the substantial domination of another, and whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.  *Id*. at 178–79.  In addition, he maintained that neuropsychological testing could reveal mental and psychological impairments that would be relevant to non-statutory mitigating evidence.  *Id*. at 179.  He asserted that, where neurological testing reveals neurological impairment, "neuropsychological testing is critical for determining the presence or absence of organic brain damage[.]"  *Id*. at 181.

To justify his request for neuropsychological assistance, he offered the same general narrative statement about mitigating evidence that he offered in support of his request for a social background/mitigation specialist.  Doc. 21-13 at 182–83.

He asserted that the "facts of this case indicate it was committed by a person who has a developmental history and traumatic life events." *Id*. at 183.  Furthermore, referencing his counsel's consultation with a neuropsychologist, he claimed there is a question of whether the person who murdered Beth Seaton "was insane, whether he acted with intention, and whether he acted under extreme emotional disturbance." *Id*. at 183.  Finally, Petitioner also asserted neuropsychological testing and evaluation was necessary to fully develop mitigating evidence. *Id*. at 183–84.

Petitioner couched his motion in the language of *Ake*, claiming that he had "demonstrated . . . that his mental health at the time of the offense will be a significant factor at trial." Doc. 21-13 at 185.  Thus, he argued, he required the assistance of a neuropsychologist "in evaluating, preparing, and presenting mental health evidence." *Id*.  He also attached to his motion the affidavit of Dr. Daniel H. Grant, a licensed psychologist and practicing neuropsychologist and forensic psychologist.  Dr. Grant opined that, based on his conversations with defense counsel about the facts of the crime and Petitioner's background, Petitioner "may have significant mental difficulties and dysfunction that could have affected his behavior if he was involved with the crime as alleged.  A reliable determination of

250

the etiology and severity of Mr. Hodges' mental state is crucial to a proper diagnosis of his mental status and functioning." *Id*. at 194.

Dr. Grant therefore proposed to, *inter alia*, "determine if there is a genetic basis for psychiatric impairments" by completing a "social-medical history" of Petitioner and his family; obtain a "social history assessment[;]" review medical, school, and institutional records and interview Petitioner's family; "conduct a psychiatric evaluation and physical and neurological examination" of Petitioner; "prescribe the appropriate psychological testing to determine the existence of any disabilities and, if they exist, to document them;" "express an opinion . . . as to any causal connection between any impairments, or environmental/genetic predispositions, and the criminal behavior with which [Petitioner] is charged;" "assist counsel in understanding and presenting evidence of Mr. Hodges mental impairments to the jury, both at the guilt-innocence phase and as to mitigation factors at the penalty phase of trial;" and testify about his findings at both phases of Petitioner's trial. Doc. 21-13 at 195–96.

At a motion hearing on February 12, 1999, the court and the parties discussed Petitioner's third and fourth ex parte motions. Judge Harper appeared to be unfamiliar with the content of the motions. Defense counsel asserted Petitioner's right to be heard on his ex parte motions "in camera." Tr. 186. Judge

251

Harper expressed reservations about setting a "precedent" of continually allowing ex parte hearings.  *Id*.  After locating the motions, Judge Harper promised to look them over.  Tr. 188.  About two weeks later, with no ex parte hearing provided, Judge Harper summarily denied Petitioner's third and fourth ex parte motions for expert and investigative assistance, ruling that "[i]t does not appear to the Court that the content of these application[s] is appropriate for ex parte relief."  Doc. 21-3 at 37.  Judge Harper further remarked that, "[i]f the Defendant wishes to submit a motion to require a mental examination of the Defendant, such motion may be submitted and the Court will act on it promptly."  *Id*.

### 2.    Appeal

On direct appeal, Petitioner challenged the trial court's denial of his ex parte motions for the assistance of a criminal investigator, a mitigation specialist, and a neuropsychological expert, arguing that the trial court violated his due process rights pursuant to *Ake*.  Doc. 21-14 at 42–66.  In his brief, Petitioner meticulously laid out the circumstances of each of his requests for expert assistance in the trial court, including detailing the affidavits and other evidence he provided in support of his motions.  Based upon this showing, he asserted that the trial court erred in concluding that he had failed to satisfy the necessary showing under state and/or federal law to obtain the requested assistance and maintained that such error

prejudiced his ability to present a defense and, therefore, deprived him of due process.

The ACCA affirmed the trial court's denial of Petitioner's ex parte motions. The ACCA described Petitioner's motions as essentially perfunctory:

> The record reflects that Hodges's motion for funds to hire an investigator stated that he needed the investigator because one of the attorneys was a solo practitioner and he had never handled a capital case. Attached to the motion was a copy of a practitioner's manual on how to represent a capital defendant. The motion was a general motion requesting that he be given funds because all capital defendants should be given funds for an investigator.

> The motion for funds to hire a mitigation expert was similar to the motion for an investigator. It was a general request that Hodges be allowed funds for an expert to investigate mitigation evidence. It detailed some of Hodges's background. However, this evidence was introduced at the penalty phase through Hodges's mother's testimony.

> Last, Hodges requested a neuropsychologist. In the motion he attached the affidavit of a psychologist who stated Hodges might have a mental disorder caused by his traumatic childhood. However, there was never any pretrial motion that Hodges be mentally evaluated. Rule 11, Ala. R. Crim. P. Hodges's mental condition was never made an issue at trial.

856 So. 2d at 914–15 (footnote and record citations omitted). Given this finding, the ACCA concluded that Petitioner "failed to show that his trial was fundamentally unfair because of the failure of the trial court to approve funds for experts. Therefore, the trial court correctly held that Hodges failed to meet his

burden of showing that he was entitled to state funds." *Id*. at 915 (citing *Dobyne v. State*, 672 So. 2d 1354, 1357–59 (Ala. 1995)).

### C.      Analysis

This court is charged with determining whether the ACCA's adjudication of Petitioner's *Ake* claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly established Federal law" "refers to the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state court decision." *Williams*, 529 U.S. at 412.

As recited above, *Ake*'s explicit holding is, ostensibly, narrow. The Court in *Ake* twice enunciated its holding, both as a preface and as a conclusion to its analysis about the requirements of due process. The prefatory statement of the holding is as follows: "We hold that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." 470 U.S. at 74. The latter statement reiterates the former's preconditions while also explicating the specific functions of the state-provided psychiatrist:

254

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id*. at 83. Neither statement of the holding in *Ake* appears to embrace the provision of non-psychiatric assistance, like investigators and mitigation specialists, or even the provision of expert psychiatric or psychological assistance for purposes other than "evaluating, preparing and presenting" a defense based on the defendant's "sanity at the time of the offense[.]" *Id*. Petitioner has not alerted this court to any Supreme Court case extending *Ake*'s explicit holding into these areas.

Nevertheless, Petitioner contends that the ACCA unreasonably adjudicated his *Ake* claim because "many courts, including the Supreme Court of Alabama and other federal courts, recognize that *Ake* applies beyond the narrow factual scenario presented in that case, including to the provision of nonpsychiatric experts, such as investigators." Doc. 42 at 37. Even if this is so, however, this court is charged with assessing whether the ACCA reasonably applied the *holdings* of Supreme Court cases. The ACCA is not bound by any *dicta* in *Ake* or any other Supreme Court opinion suggesting that due process might confer a constitutional entitlement greater than that set forth in the holding of *Ake*. Nor is the ACCA bound by any federal appellate court's interpretation of the reach of *Ake*'s holding, including that

255

of the Eleventh Circuit Court of Appeals.[27]   Nor is it relevant to this court's application of § 2254(d)(1) that the Alabama Supreme Court itself has interpreted *Ake* to encompass non-psychiatric forms of expert assistance.   The ultimate question—the only question under AEDPA—remains whether the ACCA unreasonably applied the holding of *Ake* in disposing of this claim.

Considering all of the above, this inquiry is easily resolved regarding the denial of funds to retain an investigator and a mitigation specialist/investigator.   No part of the holding in *Ake* requires the provision of such assistance and, as recognized by the Eleventh Circuit, no other Supreme Court holding requires as much, at least as of the date of the ACCA's decision in this case.   Accordingly, the ACCA did not unreasonably apply *Ake*, or any other "clearly established Federal law," in concluding that Petitioner was not entitled to the assistance of an investigator and/or a mitigation specialist/investigator.

The question is murkier when considering the state court's denial of Petitioner's motion for funds to obtain a neuropsychologist.   Granted that a

---

[27] To be sure, although the Eleventh Circuit has sometimes analyzed *Ake* claims under the assumption that *Ake* applies with greater breadth than is suggested in its holding, *see, e.g.*, *Conklin v. Schofield*, 366 F.3d 1191, 1206–07 (11th Cir. 2004), as of the date of the ACCA's decision in this case, the Eleventh Circuit still had not extended *Ake* to non-psychiatric experts.   *See Grayson v. Thompson*, 257 F.3d 1194, 1231 (11th Cir. 2001) (quoting *Baxter v. Thomas*, 45 F.3d 1501, 1511 n.24 (11th Cir. 1995)) ("'Neither the Supreme Court, nor this court, has held that the Constitution requires a state to provide an indigent defendant with nonpsychiatric experts.'").   Implicit in this observation, of course, is that *Ake*'s holding on its own does not extend to nonpsychiatric assistance.

neuropsychologist may provide the sort of expert "psychiatric" assistance that *Ake* recognizes as necessary for fundamental fairness in certain instances, the question is reduced to whether the ACCA's conclusion that Petitioner's due process rights were not violated by the trial court's denial of such funds involved an unreasonable application of *Ake* or was based upon an unreasonable factual determination. Ultimately, this court cannot resolve either question in Petitioner's favor.

To begin with, there was no showing, or even a plausible contention, in Petitioner's motion to the trial court that his "sanity at the time of the offense" would be a "significant factor" at his trial. *Ake*, 470 U.S. at 83. Petitioner argued in his motion that "neuropsychological testing of the accused is critical to the jury's determination of Mr. Hodges' guilt, because it goes to his ability to form the requisite *mens rea* elements." Doc. 21-13 at 178. He asserted the same justification regarding the penalty phase, *i.e.*, that neuropsychological testing was needed to ascertain whether he could form the requisite intent to support the aggravating circumstances that he murdered Seaton "while committing or attempting to commit robbery and while abducting or attempting to abduct" her. *Id*.

Moving away from these asserted "*mens rea*" justifications, Petitioner also argued that neuropsychological testing was "critical to the jury's determination" of

at least three statutory mitigating circumstances: whether he acted under the influence of "extreme mental or emotional disturbance," "extreme duress," or "the substantial domination of another," or whether his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was "substantially impaired." *Id*. at 178–79. Lastly, he asserted that neuropsychological testing was needed to reveal other potential "mental and psychological impairments" that could be presented as relevant mitigating evidence. *Id*. at 179.

Focusing on Petitioner's "*mens rea*" justification, and supposing that, in Petitioner's presentation to the trial court, discerning whether he had the "ability to form the requisite *mens rea* elements" was the functional equivalent of discerning whether he was insane at the time of the offense, the ACCA's conclusion that he "failed to meet his burden of showing that he was entitled to state funds" is reasonable under *Ake* because he failed to show that his "sanity" would be a significant factor at his trial. 856 So. 2d at 915. Petitioner offered a lengthy, general recitation of the background evidence counsel had learned up to that point, including accounts of a few head injuries Petitioner sustained at various points in his life, his impoverished upbringing, his lack of a stable father figure, his teenage suicide attempt, and his history of substance abuse. Doc. 21-13 at 183. From these

258

facts, and based on a consultation with a neuropsychologist, Petitioner asserted that "these facts indicated a person who may have significant mental difficulties. There is the question of whether this person was insane, whether he acted with intention, and whether he acted under extreme emotional disturbance." *Id*. But the motion was devoid of any specific fact about the crime, or of Petitioner's background, showing that Petitioner might have been insane, within the meaning of Alabama law, at the time of the offense.[28]

The affidavit of the consulting neuropsychologist whom Petitioner hoped to hire did not appear to go as far as the motion in suggesting Petitioner's sanity at the time of the offense was genuinely at issue. Parroting the motion to which his affidavit was attached, the neuropsychologist opined that "[t]he facts of the case indicate that the crime was committed by a person who may have significant mental difficulties." Doc. 21-13 at 192. But the neuropsychologist *did not* include in his affidavit the motion's follow-up sentence asserting that there "is the question of whether this person was insane[.]" Likewise, the affidavit recited, essentially verbatim, the motion's description of Petitioner's background and asserted that "[t]hese facts indicate a person with a developmental history and traumatic life

---

[28] Alabama's insanity defense at the time of Petitioner's trial was an affirmative defense requiring that the defendant prove by clear and convincing evidence that, at the time of the alleged crime, "'the defendant, as a result of mental disease or defect, was unable to appreciate the nature and quality of his acts.'" *Dunaway v. State*, 746 So. 2d 1021, 1028 (Ala. Crim. App. 1998) (quoting Ala. Code § 13A-3-1(a)).

events." *Id*. at 194.   The neuropsychologist then presented the crux of his assessment of the available evidence:

> It is my professional opinion based on the limited information Mr. Hodges' legal counsel has been able to provide me that Mr. Hodges may have significant mental difficulties and disfunction that could have affected his behavior if he was involved with the crime as alleged. A reliable determination of the etiology and severity of Mr. Hodges' mental state is crucial to a proper diagnosis of his mental status and functioning.

*Id*. Notably absent from the psychologist's affidavit was any suggestion that Petitioner's sanity at the time of the offense, *i.e.*, his ability to appreciate the nature and quality of his acts, was in question or was likely to be a significant issue at trial.

In short, it appears that, understandably, Petitioner sought expert neuropsychological assistance for global purposes; counsel wanted to develop a comprehensive picture of Petitioner's mental health so that he could assess potential guilt and penalty phase defenses related to possible mental illnesses. Lacking any reason to question Petitioner's sanity at the time of the offense, however, counsel appears to have peppered his motion with a few key words and phrases from *Ake* in hopes of bringing his motion firmly within the ambit of *Ake*'s plain holding. But the motion and supporting affidavit did not substantiate any contention that Petitioner's sanity, as opposed to other possible mental

impairments, was at issue.[29]  Hence, on the question of whether Petitioner's motion sufficiently demonstrated that his *sanity* at the time of the offense was likely to be a significant factor at his trial, the ACCA reasonably concluded that Petitioner's motion did not suffice to meet his preliminary burden.

Other factors illustrate the reasonableness of the ACCA's conclusion.  *First*, unlike in *Ake*, there was no history of bizarre behavior or psychotic beliefs observed by the trial court, or otherwise reported to it, that would have made clear that Petitioner's sanity might be a significant factor at trial.

*Second*,  also unlike in *Ake*, there was no State-sponsored psychiatric evidence for Petitioner to rebut, whether in the guilt or penalty phase of his trial. This, of course, was one of the core reasons given for *Ake*'s holding.  *See Ake*, 470 U.S. at 82 (explaining that a key function of the independent psychiatric expert is "to assist in preparing the cross-examination of a State's psychiatric witnesses"); *id*. at 86 (finding that Ake was entitled to psychiatric assistance because of guilt phase testimony from the State's psychiatrist about Ake's future dangerousness). The State sponsored no psychiatric evidence about Petitioner's sanity or his future

---

[29] This apparent lack of indicia of Petitioner's insanity is hardly surprising given that Petitioner's Rule 32 psychological expert, Dr. Brodsky, testified that Petitioner's mental impairments "did not at all reach the threshold at which somebody should have presented a not guilty by reason of insanity plea, and at which a major issue could have been raised about mental state at the time of offense[.]"  Doc. 21-40 at 92–93.

dangerousness, and there was no analogous aggravating circumstance at issue in Petitioner's trial.

*Third*, as the ACCA found, "there was never any pretrial motion that Hodges be mentally evaluated." 856 So. 2d at 915. There was never any such motion despite that Petitioner twice entered what appear to be "placeholder" pleas of not guilty by reason of mental defect. *See* Tr. 21, 192. Rule 11.2(a)(2) of the Alabama Rules of Criminal Procedure establishes the procedure by which a defendant may seek either a competency examination or an "examination into the defendant's mental condition at the time of the offense" based upon such a plea. The trial court invoked this procedure when it denied Petitioner's motion: "If the Defendant wishes to submit a motion to require a mental examination of the Defendant, such motion may be submitted and the Court will act on it promptly." Doc. 21-3 at 37. With the trial court therefore inviting counsel to file a "motion to require a mental examination of the Defendant" if he believed the circumstances warranted doing so, Petitioner's failure to file such a motion strongly suggests that his "mental condition at the time of the offense"—meaning, specifically, his sanity at the time of the offense—was never likely to be a significant factor at his trial.[30]

---

[30] Notably, for all the many allegations of ineffective assistance lodged against Petitioner's counsel, Petitioner *does not* allege that counsel ineffectively failed to file a pretrial motion to require an examination of his mental condition at the time of the offense. This is understandable, considering that the Rule 32 testimony of Dr. Brodsky,

So, if Petitioner's *Ake* claim did not satisfy the explicit elements of *Ake*'s express holding because he did not demonstrate to the trial court that his sanity at the time of the offense would be a significant factor at his trial, are there any remaining grounds to support a claim for relief under that decision?  Petitioner says yes, arguing that *Ake* is not "limited to circumstances in which sanity or future dangerousness are at issue."  Doc. 42 at 36.  He maintains that, "[w]hen *Ake* is interpreted properly, as applying beyond the competency context, it is clear that the trial court's denial of funds for a neuropsychologist and the appellate court's affirmation were unreasonable and had a substantial and injurious effect on the jury."  *Id*. at 38.  But he runs up against the same obstacle that defeats his claim that *Ake* applied to his requests for nonpsychiatric investigative assistance: he cites no "clearly established Federal law"—meaning a Supreme Court holding—interpreting *Ake*'s holding in that manner.  Although he cites the decisions of various federal appellate courts in support of this argument, as previously discussed, those decisions are not binding on Alabama's state courts and are not

---

discussed *supra*, conclusively shows that Petitioner cannot show prejudice from counsel's failure to file such a motion.

determinative on the question whether the ACCA unreasonably applied *Ake*'s holding.[31]

The strongest support for Petitioner's position may be found in a Supreme Court decision issued after briefing in this case was completed. In that decision, *McWilliams v. Dunn*, 582 U.S. 183 (2017), the Supreme Court revisited and applied *Ake* in a case which, as here, required AEDPA review of a decision of the Alabama Court of Criminal Appeals. McWilliams was charged with rape and murder. *Id*. at 188. The trial court "granted counsel's pretrial motion for a psychiatric evaluation of McWilliams' sanity, including aspects of his mental condition relevant to mitigating circumstances to be considered in a capital case in the sentencing stage." *Id*. (internal quotations omitted). As a result, three

---

[31] Furthermore, the only federal appellate decision binding on this court to which he cites is not on all fours. Petitioner cites *Blanco v. Sec'y, Fla. Dep't of Corr*., 688 F.3d 1211 (11th Cir. 2012), in support of his contention that *Ake* applies outside the sanity and future dangerousness contexts. *See* Doc. 42 at 36. In that case, a Florida trial court appointed several experts, including a neuropsychologist and a psychiatrist, to assist the defense with proving the applicability of mitigating circumstances in a capital sentencing proceeding. The issue before the Eleventh Circuit in *Blanco* was simply whether the trial court complied with *Ake* when it declined to appoint Blanco's preferred psychiatric expert and whether the appointed expert's alleged deficient performance could constitute error under *Ake*. 688 F.3d at 1227–28.

*Blanco* does not speak to the precise circumstances under which *Ake* requires the appointment of a psychiatric or psychological expert to assist in the development of mitigating evidence unconnected to sanity at the time of the offense or future dangerousness. Furthermore, *Blanco* does not address the specific circumstances that caused the Florida trial court to ascertain that Blanco's mental condition at the time of the offense would be a significant factor in the penalty-phase proceeding. It is thus difficult to draw from *Blanco* durable support for Petitioner's arguments in this case.

psychiatrists formed a "Lunacy Commission" and "examined McWilliams at a state hospital[.]" *Id*. All three members "concluded that McWilliams was competent to stand trial and that he had not been suffering from mental illness at the time of the alleged offense[,]" with one of the psychiatrists writing in the Commission's report that he believed McWilliams "grossly exaggerate[ed] his psychological symptoms to mimic mental illness." *Id*.

After McWilliams was convicted of murder, both McWilliams and his mother testified in the penalty phase about McWilliams's multiple serious head injuries as a child. 582 U.S. at 189. In addition, McWilliams testified about his "history of psychiatric and psychological evaluations" and read "from the prearrest report of one psychologist[] who concluded that McWilliams had a 'blatantly psychotic thought disorder' and needed inpatient treatment." *Id*. To rebut McWilliams's evidence of psychosis, the prosecution "called two of the mental health professionals who had signed the Lunacy Commission's report." *Id*. One psychiatrist "testified that he had found no evidence of psychosis," while the other testified about McWilliams's exaggeration or faking of his psychological symptoms during Lunacy Commission testing. *Id*. The jury recommended that McWilliams be sentenced to death. *Id*.

Prior to the judicial sentencing hearing, McWilliams moved for "an order requiring the State of Alabama to do complete neurological and neuropsychological testing on the Defendant in order to have the test results available for his sentencing hearing." 582 U.S. at 190 (internal quotations omitted). The trial court apparently granted this motion because "Dr. John Goff, a neuropsychologist employed by the State's Department of Mental Health, examined McWilliams." *Id*. Dr. Goff issued his report two days prior to the sentencing hearing. *Id*. Dr. Goff noted that, while McWilliams "was 'obviously attempting to appear emotionally disturbed' and 'exaggerating his neuropsychological problems[,]'" "it was 'quite apparent that he ha[d] some genuine neuropsychological problems.'" *Id*. Specifically, the results of Dr. Goff's neuropsychological testing "were 'suggestive of a right hemisphere lesion' and 'compatible with the injuries [McWilliams] sa[id] he sustained as a child.'" *Id*. "The report added that McWilliams' 'obvious neuropsychological deficit' could be related to his "low frustration tolerance and impulsivity," and suggested a diagnosis of "organic personality syndrome." *Id*. In addition to Dr. Goff's report, the day before the sentencing hearing, the defense received prison records indicating McWilliams's ongoing treatment with "an assortment of psychotropic medications[.]" *Id*. at 191.

At the judicial sentencing hearing, the trial court rejected multiple requests by McWilliams's counsel for additional time and for expert assistance with interpreting and presenting the mental health evidence contained in the Lunacy Commission report, the prison records, and in Dr. Goff's report. 582 U.S. at 192–93. Instead, the trial court sentenced McWilliams to death. In the trial court's written sentencing order, the court "found three aggravating circumstances and no mitigating circumstances. It found that McWilliams 'was not and is not psychotic,' and that 'the preponderance of the evidence from these tests and reports show [McWilliams] to be feigning, faking, and manipulative.'" *Id*. at 193. Furthermore, the trial court concluded that, "even if McWilliams' mental health issues 'did rise to the level of a mitigating circumstance, the aggravating circumstances would far outweigh this as a mitigating circumstance.'" *Id*.

On direct appeal, the ACCA concluded that McWilliams's rights pursuant to *Ake* were not violated because he was provided with psychiatric assistance, namely, the evaluation and report of Dr. Goff and, ostensibly, the opportunity to call Dr. Goff at the judicial sentencing hearing and elicit testimony about Dr. Goff's findings. 582 U.S. at 194. Hence, the issue before the Supreme Court in *McWilliams* was only whether the ACCA's "determination that McWilliams got all the assistance to which *Ake* entitled him was 'contrary to, or involved an

267

unreasonable application of, clearly established law.'"  *Id*. at 195 (quoting §

2254(d)(1)).

The Supreme Court prefaced its analysis of this question by observing, "no

one denies that the conditions that trigger application of *Ake* are present" because,

in pertinent part, McWilliams's "'mental condition' was 'relevant to . . . the

punishment he might suffer,' . . . [and] that 'mental condition, *i.e.*, his 'sanity at the

time of the offense,' was 'seriously in question.'"  582 U.S. at 195 (quoting *Ake*,

470 U.S. at 70, 80)).  Ultimately, the Court ruled that the ACCA's conclusion that

*Ake* was satisfied was "plainly incorrect" because "*Ake* does not require just an

examination.  Rather, it requires the State to provide the defense with 'access to a

competent psychiatrist who will conduct an appropriate [1] *examination* and assist

in [2] *evaluation*, [3] *preparation*, and [4] *presentation* of the defense.'"  *Id*. at 198

(quoting *Ake*, 470 U.S. at 83) (emphasis in *McWilliams*).   While Dr. Goff's

evaluation and report may have satisfied the first of these core *Ake* functions, the

Court reasoned, he did not perform the remaining functions vital to the preparation

of McWilliams's defense.   *Id*.   Accordingly, the Court concluded, "[s]ince

Alabama's provision of mental health assistance fell so dramatically short of what

*Ake* requires, we must conclude that the Alabama court decision affirming

McWilliams' conviction and sentence was 'contrary to, or involved an

unreasonable application of, clearly established Federal law.'" *Id*. at 199 (quoting § 2254(d)(1)).

Inasmuch as, by its own terms, *McWilliams* marked a straightforward application of *Ake* to the facts in that case, the Court's "holding" in *McWilliams* was only that the ACCA unreasonably applied *Ake* in concluding that the trial court's provision of psychiatric assistance to McWilliams via Dr. Goff's examination sufficed under *Ake*. 582 U.S. at 186. The Court did not purport to expand or extend the express holding of *Ake*. Accordingly, any language in *McWilliams* suggesting a broader reach of *Ake* beyond its express holding is *dicta*.

That said, this court acknowledges that language in *McWilliams* arguably lends support to Petitioner's contention that *Ake* applies outside the contexts of "sanity" and "future dangerousness." In particular, the Court's observation that *Ake* was implicated because McWilliams's "mental condition was relevant to . . . the punishment he might suffer . . . [and] that mental condition, *i.e.*, his sanity at the time of the offense, was seriously in question," *id*. at 195 (internal quotations omitted), suggests a broader reach of *Ake* than the express terms of its holding. Assuming this remark is not merely a careless conflation of the general "mental condition" with the specific "mental condition" of legal insanity, then *McWilliams* marks the Court's first indication that *Ake* may reach beyond inquiries into sanity

and future dangerousness.  For, given the broad constitutional mandate to receive and consider relevant mitigating evidence, it is indisputable that myriad "mental conditions" other than a capital defendant's sanity might be relevant to the punishment the defendant will receive.

Ultimately, however, as the Court observed in *McWilliams*, this question—whether *Ake* applies beyond the sanity and future dangerousness contexts delineated or incorporated into its holding—was not before the Court in *McWilliams* because Alabama did not contest that point.  But that question is squarely before this court because Alabama does contest the point here.  *See* Doc. 38 at 82–83 ("Hodges makes valid points in his brief to this Court that mental health evidence can be very valuable and very critical during a capital murder trial.  To the extent the uses Hodges' [sic] advocates for this evidence go beyond countering 'future dangerousness' arguments and establishing lack of sanity at the time of the offense, his arguments seek to expand the holding of *Ake* beyond what is permitted under the AEDPA.") (citation omitted).  Considering that, certainly as of the time of the ACCA's decision here, the holding of *Ake* remained unadorned with any suggestion by the Supreme Court of a broader reach, this court is hard pressed to conclude that the ACCA unreasonably applied *Ake*, notwithstanding any *dicta* in *McWilliams*.

Nevertheless, even if *McWilliams* illustrates that *Ake*'s holding is broader than its express terms, and that this broader understanding of *Ake* was binding on the ACCA at the time it issued its decision in this case, it remains that the ACCA *reasonably*, even if incorrectly, applied *Ake* here because, unlike in *Ake* or *McWilliams*, Petitioner did not adequately demonstrate to the trial court that his "sanity" was "seriously in question" and would be a "significant factor" at his trial. In both *Ake* and *McWilliams*, the defendants triggered substantial and formal pretrial inquiries into their sanity at the time of their offenses by dint of bizarre behavior, pretrial motions requesting psychiatric examinations related to mental health defenses, or by raising an insanity defense.  Likewise, both defendants pointed to a history of diagnosed psychiatric disorders and other indicia of serious mental health issues in support of their requests for psychiatric assistance in order to show that their "sanity" was seriously in question: Ake was previously found incompetent to stand trial, was diagnosed as a probable paranoid schizophrenic, and was committed to the state mental hospital, while McWilliams referenced a psychologist's prior opinion about his "blatantly psychotic thought disorder" and his need for "inpatient treatment," his reliance on multiple "psychotropic" medications, and Dr. Goff's report that he suffered "genuine neuropsychological problems."

271

By contrast, Petitioner here did not present to the trial court with concerning behavior and, although he did enter what appears to have been "placeholder" pleas of not guilty by reason of mental defect or disease, he did not file a pretrial motion for an examination of his mental condition at the time of the crime, as the trial court invited him to do.  Similar actions no doubt provided the trial courts in *Ake* and *McWilliams* with substantial notice that that the "sanity" of those defendants was likely to be a significant factor in those defendants' trial proceedings, especially when considered in conjunction with those defendants' considerable psychiatric histories.  *See Hightower v. Schofield*, 365 F.3d 1008, 1015–1023 (11th Cir. 2004) (finding no *Ake* error where the trial court declined to appoint or fund a psychiatrist specializing in "family violence" because, *inter alia*, the defendant never indicated any intent to rely on an insanity defense, there was no suggestion of incompetency, and the defendant exhibited "normal" behavior throughout pretrial proceedings).

Petitioner here merely described a few general, largely anecdotal circumstances—he suffered a couple "substantial blows" to his head when he was young, his mother did not receive prenatal care and was poorly nourished while pregnant with him, he grew up poor and lacked stability, he and some family members abused alcohol, *etc.*—and posited that these circumstances were

272

suggestive of "developmental history and traumatic life events."  Doc. 21-13 at 182–83.  That may be true, insofar as it goes, but it cannot be said that the trial court here was confronted with the caliber of preliminary showing, in form or substance, that triggered the due process protections described in *Ake* and *McWilliams*.

As this court previously observed, Petitioner's interest in obtaining neuropsychological assistance here was likely general.  Counsel wanted to obtain a neuropsychological profile of Petitioner so that he could assess the potential for any guilt phase defenses and, more pertinently, ascertain what penalty phase defenses and arguments might be available based on Petitioner's mental health.  It is no doubt good practice, and probably good policy, for all capital defendants to undergo the sort of psychological screening that Petitioner described in his motion to the trial court.  The trial court's denial of the motion, and the ACCA's disposition of this claim, was not charitable to this potentially important function.

But it remains that *Ake*'s holding does not provide a general right to expert psychiatric assistance and, accordingly, does not require that every capital defendant receive such assistance.  *Ake*, 470 U.S. at 82 ("A defendant's mental condition is not necessarily relevant in every criminal proceeding, however, and it is unlikely that psychiatric assistance of the kind we have described would be of

273

probable value in cases where it is not.").  *See also Hightower*, 365 F.3d at 1015 (remarking, "the right to psychiatric assistance is not automatic," and observing that the "right hinges upon the sufficiency of the defendant's preliminary showing to the trial court that there is a substantial basis for the defense that the expert will assist in presenting") (internal quotations and citation omitted).

Read together, *Ake* and *McWilliams* appear to require that, minimally, a defendant seeking relief pursuant to *Ake* must present the trial court with a robust showing of the need for psychiatric assistance corresponding to specific trial-related purposes, including presenting an insanity defense, rebutting the State's evidence about the defendant's psychological condition, defending against the State's proof of specific aggravating factors at sentencing, and perhaps even developing and presenting mitigating evidence about mental health.  But the Supreme Court has never held that a general contention that a defendant's history is suggestive of the possibility of some mental health impairment needing further exploration is sufficient to invoke the due process protections described in *Ake*.  As set forth above, that was the extent of Petitioner's showing in the state courts. Thus, fairminded jurists can agree with the ACCA's conclusion that Petitioner failed to adequately demonstrate to the trial court that his "sanity," however that term is interpreted, would be a *significant* factor at his trial.  Accordingly, the

274

ACCA did not unreasonably apply *Ake* and Petitioner is not entitled to relief on this claim.

## III.   Claim Three – Alabama's Death Penalty Scheme is Unconstitutional

Petitioner next alleges that his "death sentence was imposed in violation of federal constitutional law."  Pet. ¶ 280.  He provides nine separate bases in support of this claim.  The court will address each in turn.

### A.   Alabama's Judicial Override is Unconstitutional.

Petitioner first argues that the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), renders his sentence unconstitutional, because, in his view, that decision establishes that "[j]ury sentencing in capital cases is required by the Sixth and Eighth Amendments to the United States Constitution."  Pet. ¶ 281.  A brief review of *Ring* provides necessary context for discussion of Petitioner's claim.   In *Ring*, the Supreme Court invalidated Arizona's capital sentencing scheme, in which, "following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty."  536 U.S. at 588.  Ring was convicted of felony murder for his part in a robbery that resulted in the murder of an armored car driver.  *Id*. at 589.  "Under Arizona law, Ring could not be sentenced to death . . . unless further findings were

made." *Id*. at 592. Arizona law placed the responsibility for making those findings on the trial judge, *i.e*., the trial judge alone was to hear evidence and make findings about the existence of aggravating and mitigating circumstances and determine whether any mitigating circumstances were "sufficiently substantial to call for leniency." *Id*. at 593 (quotation and citation omitted).

Based upon evidence introduced only in the penalty phase, the trial judge concluded that Ring was the gunman and that he "was a major participant in the robbery." 536 U.S. at 594. The judge then found the existence of two statutory aggravating factors: "that Ring committed the offense in expectation of receiving something of 'pecuniary value,'" and that the murder "was committed in an especially heinous, cruel or depraved manner." *Id*. at 594–95 (quotations and citations omitted). Finding only one mitigating circumstance that "did not call for leniency,'" the trial judge sentenced Ring to death. *Id*. at 595.

The question before the Court in *Ring* was, where Arizona law required the finding of at least one aggravating circumstance beyond a reasonable doubt before a death sentence could be imposed, "whether that aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee . . . requires that the aggravating factor determination be entrusted to the jury." 536 U.S. at 597 (footnotes omitted). Based upon the Court's then-

276

recent decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Court determined that Ring's Sixth Amendment rights were violated: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id*. at 602.   In short, because "Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury." *Id*. at 609 (quoting *Apprendi*, 530 U.S. at 494).   Because Arizona law empowered the trial judge alone "to find an aggravating circumstance necessary for imposition of the death penalty," Arizona's scheme violated the Sixth Amendment. *Id*.

### 1.   *Petitioner's allegations*

Petitioner alleges that *Ring* demonstrates that Alabama's practice of judicial override was unconstitutional.[32]   Specifically, he asserts that, as in *Ring*, the jury at his trial did not find the existence of any aggravating circumstances and that, instead, also as in *Ring*, it was the trial judge who made the necessary factual findings about aggravating circumstances to support his death sentence.   Pet. ¶ 282. Petitioner highlights two ways in which judicial override runs afoul of the Sixth Amendment, both generally and as applied in his case:

---

[32] In 2017, the Alabama legislature abolished judicial override. *See* Ala. Code § 13A-5-47(a).   The legislature did not make the abolition of judicial override retroactive.

First, while the jury's verdict of guilt for capital murder may have theoretically established a 'statutory maximum' sentence of death, a death sentence could still not have been awarded in Alabama in this case absent additional factual findings, including not only findings regarding the existence of an aggravating factor, but findings regarding the presence or absence of mitigating factors, and a finding that the aggravating factors outweighed the mitigating factors.  Under *Apprendi* and *Ring* . . . those sentencing-stage determinations *must* be made by a jury.  They were not, and Mr. Hodges's sentence is therefore impermissible.

Second, because the jury recommended life imprisonment without possibility of parole, we know that a jury of Mr. Hodges's peers reached at least two factual conclusions that were contrary to that found by the judge: The jury must have concluded that there were mitigating factors, and it must have concluded that mitigating factors outweighed the aggravating factors.  The judge's decisions to the contrary were impermissible not merely because they were made by a judge, rather than a jury, but they were doubly-impermissible because they were made *despite* the jury's precisely opposite factual findings.  As a result, Mr. Hodges's sentence is impermissible, and should be reversed.

Pet. ¶¶ 285–86 (emphasis in original).  Petitioner claims that the "Alabama courts' denial of relief on these claims was an unreasonable application of clearly established Supreme Court precedent."  Pet. ¶ 288.

### 2.   *The state court's merits adjudication*

The Supreme Court issued its decision in *Ring* in 2002, after the ACCA had affirmed Petitioner's conviction and sentence on return to remand in late 2001. The ASC granted certiorari review on two issues, including whether Alabama's judicial override "violates the Due Process Clause and the Equal Protection Clause

of the Fourteenth Amendment, in light of" the Supreme Court's decisions in *Apprendi* and *Ring*. *Ex parte Hodges*, 856 So. 2d at 938. Relying on its decision in *Ex parte Waldrop*, 859 So. 2d 1181 (Ala. 2002), the ASC rejected Petitioner's claim that *Apprendi* and *Ring* invalidate Alabama's judicial override or otherwise demonstrate constitutional error in his sentence.

The ASC first recited *Waldrop*'s conclusion that, "'[b]ecause the jury convicted Waldrop of two counts of murder during a robbery in the first degree, . . . the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery,'" was necessarily found by the jury beyond a reasonable doubt. *Hodges*, 856 So. 2d at 943 (quoting *Waldrop*, 859 So. 2d at 1188). Furthermore, since Alabama law requires only one aggravating circumstance to impose a death sentence, "'the jury, and not the trial judge, determined the existence of the aggravating circumstance necessary for imposition of the death penalty.'" *Id.* (quoting *Waldrop*, 859 So. 2d at 1188, and *Ring*, 536 U.S. at 609). Hence, where Petitioner was convicted of "murder made capital because it was committed during a first-degree robbery," *Ring* and *Apprendi* did not invalidate his death sentence because "the jury, not the trial court, determined the existence of at least one aggravating circumstance that exposed Hodges" to the death penalty. *Id.*

279

Again relying upon *Waldrop*, the ASC next rejected Petitioner's claim "that the process of deciding whether the aggravating circumstances outweigh the mitigating circumstances is a factual finding that must be made by the jury and not the trial court."  856 So. 2d at 943.  The ASC repeated *Waldrop*'s conclusion that "'the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, *Ring* and *Apprendi* do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.'"  *Id*. (quoting *Waldrop*, 859 So. 2d at 1190).

Finally, the ASC recited *Waldrop*'s conclusion that, where the jury's verdict establishes the existence of one aggravating circumstance, *Ring* and *Apprendi* do not preclude the trial court from making findings of fact about the existence of other aggravating circumstances.  856 So. 2d at 944.  Specifically, in *Waldrop*, the trial court found Alabama's heinous, atrocious, or cruel ("HAC") aggravating circumstance supported by the evidence, notwithstanding that the jury did not render any finding of fact on the existence of that aggravating circumstance.  *Id*. (citing *Waldrop*, 859 So. 2d at 1190).  But because the jury's verdict exposed Waldrop to a death sentence, "'[t]he trial court's subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that has application

only in weighing the mitigating circumstances and the aggravating circumstances, a process that we held earlier is not an 'element of the offense.'" *Id*. (quoting *Waldrop*, 859 So. 2d at 1190). Because the trial court in Petitioner's case likewise found the HAC aggravating circumstance only after the jury's verdict established the robbery-murder aggravating circumstance, Petitioner's Sixth Amendment rights were not violated. *Id*.

> 3. *The ASC did not unreasonably apply clearly established federal law.*

Petitioner's claim that *Ring* and *Apprendi* invalidate his sentence because of the judicial "factfinding" that occurred when the trial court overrode the jury's life recommendation is foreclosed by Eleventh Circuit precedent. In *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1197–98 (11th Cir. 2013), the Eleventh Circuit observed that, as happened here, where the jury has convicted a defendant of capital murder during a robbery, the jury's guilt-phase verdict "necessarily includes" a finding that the statutory aggravating circumstance that "'the capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit . . . robbery'" "is present." *Id*. (quoting Ala. Code § 13A-5-49(4)). The Eleventh Circuit concluded that "[n]othing in *Ring*—or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict." *Id*. at 1198. Because, in

that scenario, the jury's guilt-phase verdict includes the fact-finding necessary to impose a death sentence, the Sixth Amendment is not violated.  *Id.*

The Eleventh Circuit in *Lee* also rejected Petitioner's claim that *Ring* forbids the trial court from "finding" that aggravating circumstances outweigh mitigating circumstances because the Supreme Court expressly disavowed any such holding in *Ring*:

> Furthermore, *Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances. As the *Ring* Court also made clear, it was not deciding whether the Sixth Amendment: (1) required the jury to make findings as to mitigating circumstances; (2) required the jury to make the ultimate determination as to whether to impose the death penalty; or (3) forbade the state court from reweighing aggravating and mitigating circumstances.

*Id.* (citing *Ring*, 536 U.S. at 597 n.4).  Ultimately, the Eleventh Circuit concluded, *Ring*'s holding is "narrow: the Sixth Amendment's guarantee of jury trial requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury."  *Id.*  Because the jury in *Lee* convicted Lee of capital robbery-murder, the jury found sufficient facts to impose a death sentence on Lee.

The same is true here.  Petitioner was convicted of capital murder occurring during a robbery.  Hence, the jury's verdict implicitly included a finding that the robbery-murder aggravating circumstance was present.  Furthermore, as discussed

in *Lee*, nothing in *Ring* precluded the trial court from weighing the aggravating and mitigating circumstances and concluding, contrary to the jury's recommendation, that the aggravating circumstances outweighed the mitigating circumstances.[33]

Petitioner ignores *Lee* in his briefing.  *See* Doc. 31 at 73–77; Doc. 42 at 42–46.  This court can only conclude that Petitioner's failure to address this on-point Circuit precedent stems from the fact that it is indistinguishable and dispositive of his claim.  *Lee* makes clear that the ASC did not unreasonably apply *Ring*, *Apprendi*, or any other clearly established federal law in affirming Petitioner's conviction and sentence despite the trial court's employment of judicial override.[34]  Accordingly, Petitioner is not entitled to relief on this claim.

_____

[33] Likewise, because the jury's verdict implicitly established the existence of at least one aggravating circumstance, nothing in *Ring* precluded the trial court from making findings of fact about the existence of other aggravating circumstances, including the HAC aggravating circumstance that was applied by the trial court.  *See Waldrop v. Comm'r, Ala. Dep't of Corr.*, 711 F. App'x 900, 924 (11th Cir. 2017) ("The only distinction between this case and *Lee* is that here the trial court found an additional aggravating factor (that the crime was heinous, atrocious, and cruel) not found by the jury.  But *Ring* concerned death eligibility.  Once Mr. Waldrop was convicted, the jury had already found the only aggravating circumstance necessary for imposition of the death penalty.  The trial court's finding of an additional aggravating circumstance did not increase the maximum penalty to which Mr. Waldrop was exposed, and therefore falls outside the clearly established holding in *Ring*.") (quotations and citation omitted).

[34] In addition, the Supreme Court's decision in *Hurst v. Florida*, 577 U.S. 92 (2016), in which it invalidated Florida's advisory capital sentencing scheme pursuant to *Ring/Apprendi*, does not provide Petitioner with cause for relief.  *First*, the Eleventh Circuit has concluded that *Hurst* "announced a new rule of constitutional law that is not retroactive on collateral review."  *Miller v. Comm'r, Alabama Dep't of Corr.*, 826 F. App'x 743, 749 (11th Cir. 2020) (citing *Knight v. Florida Dep't of Corr.*, 936 F.3d 1335–

## B.   Alabama Affords Insufficient Weight to a Jury's Life Recommendation.

### 1.   Petitioner's allegations

Petitioner alleges that *Ring* "and the relevant constitutional provisions require, at the very least, that trial courts give more weight to the jury's sentencing recommendation than have been given under Alabama law, including in Mr. Hodges's case." Pet. ¶ 289.  In essence, he asserts that, where the jury has made a non-unanimous life recommendation, *Ring* demonstrates that it is "inappropriate for the trial court to give any weight at all to the votes of those jurors who in fact recommended death." Pet. ¶ 291.  Instead, he posits, *Ring* requires that "the trial court should have treated the jury's recommendation of life imprisonment as the functional equivalent of a unanimous recommendation," which, under Alabama law, would be entitled to "great weight." *Id.*

### 2.   The state court's adjudication

Petitioner first raised this claim in Rule 32 proceedings.  The Rule 32 court found the claim procedurally barred pursuant to Rule 32.2(a)(5) because it could have been, but was not, raised on direct appeal.  Doc. 21-55 at 113.  The ACCA

---

37 (11th Cir. 2019)).  *Second*, the Eleventh Circuit has also concluded that, in the specific circumstances applicable here, *i.e.*, where there is no *Ring* error because the jury in fact found the necessary facts to expose the defendant to a death sentence, *Hurst* does not demonstrate any error in Alabama's capital sentencing scheme.  *Id*.  *See also Waldrop*, 711 F. App'x at 924.

affirmed the Rule 32 court's dismissal pursuant to Rule 32.2(a)(5). *Hodges*, 147 So. 3d at 933.

### 3.   *Respondent's procedural defense*

Respondent contends that this claim is procedurally defaulted because it was not raised on direct appeal and the ACCA found the claim barred in Rule 32 proceedings pursuant to an adequate and independent state law ground. Doc. 30 at 23–25; Doc. 38 at 85–89.

### 4.   *This claim is procedurally defaulted.*

Alabama's procedural rule barring post-conviction litigation of claims that could have been, but were not, raised on appeal has been recognized as an independent and adequate ground to support the procedural default of a habeas claim in federal court. *See Mason v. Allen*, 605 F.3d 1114, 1121 (11th Cir. 2010); *Holladay v. Haley*, 209 F.3d 1243, 1254 n.9 (11th Cir. 2000). Petitioner does not appear to contest the basis for the state court's application of the procedural rule to this claim. Instead, he asserts simply that his "procedural default is excused by cause and prejudice." Doc. 42 at 46. Specifically, he asserts that the ineffective assistance of his appellate counsel establishes "cause" for his default of this claim, and that he was prejudiced by counsel's failure to raise this claim on direct appeal. Doc. 31 at 21–22.

Petitioner's argument is unavailing.  To begin with, as reviewed above, although Petitioner alleged that he received the ineffective assistance of appellate counsel, he did not specifically allege that his appellate counsel deficiently failed to present this claim's argument about *Ring*.  *See* Pet. ¶¶ 266–68.  Instead, he specifically referenced only appellate counsel's allegedly deficient argument about chain of custody issues, as well as a general, catch-all contention challenging appellate counsel's failure to adequately raise and argue "any of the issues presented in this petition . . . that could have been, but were not, adequately raised and presented on appeal[.]"  Pet. ¶ 267.  General pleading of this sort is not encouraged and is an insufficient basis to establish deficient performance for purposes of showing "cause" for the procedural default of this claim.

More importantly, Petitioner cannot show the requisite prejudice to excuse his default.  As the Eleventh Circuit stated in *Lee*, the "holding of *Ring* is narrow[.]"  *Lee*, 726 F.3d at 1198.  Provided the jury has rendered a verdict establishing the presence of at least one aggravating circumstance, *Ring*'s holding does not preclude the trial court from making findings of fact about the existence of aggravating and mitigating circumstances and weighing such evidence to arrive at a sentence.  *Id*.  It follows that *Ring*'s holding in no way establishes the weight that must be accorded to a jury's recommendation of a life sentence or otherwise

286

demonstrates that Alabama law affords insufficient weight to a nonunanimous life recommendation.  Accordingly, Petitioner cannot show the requisite prejudice due to his counsel's failure to raise this claim on direct appeal and, as such, the claim is procedurally defaulted in federal habeas review.

C. **In Light of the Judicial Override Process, Jury Instructions  are Either Unconstitutional or they Make a Mockery of the Jury's Sentencing Role in Capital Trials.**

1. *Petitioner's allegations*

Petitioner alleges that, because the jury at his trial was instructed that "its decision in the sentencing phase was merely a 'recommendation,'" he was deprived of his "right to a jury that is sufficiently aware of the importance of its role (to the degree that there is one) in the sentencing process."  Pet. ¶ 293 (citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985)).  He asserts that, because jurors "in the sentencing process may not be relieved of an awareness of the magnitude of responsibility at issue[,]" and *Ring requires* that jurors "play" some kind of role greater than merely rendering a recommendation at sentencing, the jury was unconstitutionally instructed at his trial.  *Id.*

Petitioner also alleges that "contrary" jury instructions advising that jurors "would set the punishment at hand" constituted "lies," "which makes a mockery of

the jury's participation in the sentencing process." Pet. ¶ 294. He describes the

constitutional violation as follows:

> To require a defendant to participate in a process that promises one thing to a jury, but does so knowing that those statements are false, undermines the very premise of the jury system and presumption of truthfulness on which the criminal system is based. To permit sentencing to proceed under these circumstances violates the defendant's constitutional rights under the federal constitution, including the due process and equal protection clauses, and the clauses barring cruel and unusual punishment.

*Id.*

### 2. *The state court's adjudication*

Petitioner first raised this claim in his Rule 32 proceedings. The Rule 32

court found the claim procedurally barred pursuant to Rule 32.2(a)(5) because it

could have been, but was not, raised on direct appeal. Doc. 21-55 at 113. The

ACCA affirmed the Rule 32 court's dismissal pursuant to Rule 32.2(a)(5).

*Hodges*, 147 So. 3d at 933.

### 3. *Respondent's procedural defense*

Respondent contends that this claim is procedurally defaulted because it was

not raised on direct appeal and the ACCA found the claim barred in Rule 32

proceedings pursuant to an adequate and independent state law ground. Doc. 30 at

23–25; Doc. 38 at 89–90.

### 4. *This claim is procedurally defaulted.*

288

As previously discussed, Alabama's procedural rule barring post-conviction litigation of claims that could have been, but were not, raised on appeal has been recognized as an independent and adequate ground to support the procedural default of a habeas claim in federal court. *Mason*, 605 F.3d at 1121; *Holladay*, 209 F.3d at 1254 n.9. Petitioner does not appear to contest the basis for the state court's application of the procedural rule to this claim. Instead, he once again asserts that his "procedural default is excused by cause and prejudice." Doc. 42 at 47. He argues, as before, that the ineffective assistance of his appellate counsel establishes "cause" for his default of this claim, and that he was prejudiced by counsel's failure to raise this claim on direct appeal. Doc. 31 at 21–22.

For the reasons previously discussed, Petitioner's argument is, again, unavailing. Petitioner did not specifically allege that his appellate counsel deficiently failed to present this argument under *Ring*, and his general, catch-all assertion of ineffective assistance of appellate counsel is insufficient to establish the requisite "cause" for his procedural default. Furthermore, Petitioner again cannot show the requisite prejudice to excuse his default. *Ring*'s holding plainly has nothing to say about whether an advisory jury is properly apprised of its role in sentencing when it is told, as here, that its sentencing verdict will serve as a recommendation to the trial court. More importantly, the essential inquiry is

whether the jury instructions "improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994).  Because the jury was properly advised that its sentencing-phase verdict would be a recommendation to the trial court for sentencing (Tr. 1251–53), it cannot be argued that judicial override rendered the penalty phase jury instructions inaccurate, misleading, or a "mockery."

Petitioner's reply brief makes clear that, rather than a challenge to the accuracy or propriety of the penalty phase instructions, this claim is concerned with *Waldrop*'s "judicial reconstruction" of Alabama's capital sentencing scheme:

> The jury was never told that, by convicting Hodges of intentional murder during a robbery in the first degree, it would render Hodges eligible for death.  To the contrary, the trial court instructed the jury not to consider the penalty that Hodges might face when deciding his guilt or innocence.  The jury had no way to know that, by convicting Hodges of the charges that it did, under Alabama's view of the law, the jury was giving up any further substantive role in the determination of whether Hodges would live or die. . . .  The jury's decision to sentence Hodges to life demonstrates that, had the jury been aware of the full consequences of its guilty verdict (*i.e.*, that Hodges would be eligible for a death sentence that the jury would have no way of preventing), it would likely have decided differently, because it did not believe that Hodges should be put to death.  The judge deprived the jury of the full knowledge of the import of its decision, and in doing so violated Hodges' clearly established constitutional rights.

Doc. 42 at 47.  This argument, that the jury should have been advised that its guilt-phase verdict could expose Petitioner to a death sentence that it could not

290

"prevent," is distinct from the petition's articulated challenge that "[t]o the degree that jurors are told that their sentencing decision is merely a recommendation, rather than a decision that actually implements the sentence, their recommendation is illegitimate under *Caldwell*[.]"   Pet. ¶ 293.   Petitioner may not amend his petition by presenting a new or different claim in his briefing.   In any event, as set forth above, *Lee* makes clear that nothing in *Ring* precludes what happened here and, likewise, nothing in *Ring* or *Caldwell* dictates that the jury was not properly apprised of its advisory role in the sentencing process.   Accordingly, Petitioner cannot show prejudice to excuse his procedural default of this claim.

### D.   Judicial Override is Unconstitutional Because it Provides for Standardless Imposition of a Death Sentence.

#### 1.   Petitioner's allegations

Petitioner alleges that judicial override in Alabama is unconstitutional because Alabama law provides "essentially no direction regarding the overturning of a jury's verdict," and thereby "invites arbitrariness."   Pet. ¶ 295.   This "arbitrariness is a violation of the due process, equal protection, and cruel unusual punishment clauses of the federal constitution."   *Id*.   Petitioner also maintains that, because "the vast majority of cases involving judicial override are cases in which, as here, the trial judge overrides a jury recommendation for life," the "consistent bias in favor of the death penalty strongly suggests that trial judges improperly

give too little weight to the mitigating circumstances considered by most juries, and that, in all likelihood, the same thing occurred here."  Pet. ¶ 296.  As for meeting his burden under AEDPA, he concludes, "[t]he Alabama courts' denial of relief on this claim was an unreasonable application of the clearly established Supreme Court precedent under the Eighth Amendment[.]"  Pet. ¶ 297.

## 2.   *The state court's merits adjudication*

On direct appeal, Petitioner argued that the Alabama statute permitting judicial override "provides no standards for a trial court and is facially unconstitutional."  *Hodges*, 856 So. 2d at 933.  Specifically, taking note of the Supreme Court's decision in *Harris v. Alabama*, 513 U.S. 504 (1995), in which the Court held that Alabama's judicial override practice did not violate the Eighth Amendment, Petitioner argued on appeal that "standardless override violates the Equal Protection Clause of the Fourteenth Amendment[.]"  Doc. 21-14 at 80.  He maintained that, because "the jury's verdict is an indispensable part of the sentencing process, trial courts should not have unbridled discretion to determine the weight, if any, the jury's recommendation for life without parole receives."  *Id.* at 81.  This practice of "standardless overrides permits the trial courts of this State to impose the death penalty arbitrarily and unevenly to different defendants," thereby violating equal protection.  *Id.*  Finally, he also claimed that "standardless

imposition of a death sentence" violated his rights under the Eighth Amendment. *Id*.

The ACCA rejected Petitioner's challenge. Relying upon the ASC's decision in *Ex parte Taylor*, 808 So. 2d 1215 (Ala. 2001), the ACCA concluded that Alabama's "'capital sentencing procedure ensures that the trial judge is given adequate information and sufficient guidance in deciding whether to support or to reject a jury's recommendation.'" 856 So. 2d at 934 (quoting *Taylor*, 808 So. 2d at 1218)). Furthermore, the ACCA concluded, because Alabama law requires the trial judge to "'make specific written findings regarding the existence or nonexistence of each aggravating circumstance and each mitigating circumstance offered by the parties[,]'" and further requires the trial judge to "'consider a jury's recommendation of life imprisonment without parole,'" the "'trial judge must state specific reasons for giving the jury's recommendation the consideration he gave it.'" *Id*. (quoting *Taylor*, 808 So. 2d at 1219). Collectively, these requirements ensure that "Alabama's capital-sentencing procedure does not result in the imposition of the death sentence in an arbitrary and capricious fashion." *Id.* (quoting *Taylor*, 808 So. 2d at 1219).

3.    *Respondent's procedural defense*

293

Respondent contends that this claim is procedurally defaulted.  Doc. 38 at 90.  While Respondent appears to assert that the claim was found procedurally barred in the Rule 32 proceedings pursuant to Rule 32.2(a)(5), because it could have been, but was not raised on appeal, *see id.*, Petitioner correctly notes that the claim was not adjudicated as procedurally barred on that basis.  Doc. 42 at 48.  Instead, the Rule 32 court adjudicated the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (4), because it could have been raised at trial, but was not, and because it *was* raised and addressed on appeal.  Doc. 21-55 at 113.  The ACCA affirmed the procedural bar, as to postconviction proceedings, pursuant to Rule 32.2(a)(4), finding that the claim was raised and addressed on appeal.  *Hodges*, 147 So. 3d at 931.  Accordingly, because, according to the ACCA, this claim was raised and addressed on the merits in Petitioner's direct appeal, the claim is not procedurally defaulted and, rather, the ACCA's decision on direct appeal is subject to review under § 2254(d).

4. *The ACCA did not unreasonably apply clearly established federal law.*

Discerning the precise contours of Petitioner's claim is difficult.  The petition first posits that Alabama's "standardless" override results in arbitrary death sentences and, therefore, violates "the due process, equal protection, and cruel and unusual punishment clauses of the federal constitution."  Pet. ¶ 295.  The

294

only "clearly established Federal law" cited in support of this claim in the petition, however, is *Furman v. Georgia*, 408 U.S. 238 (1972), which is cited for the proposition that the Constitution prohibits the "arbitrary and capricious" imposition of a death sentence.  Pet. ¶ 297.  In addition, as previously noted, this subclaim concludes with Petitioner's contention that the state court unreasonably applied "clearly established Supreme Court precedent under the Eighth Amendment[.]" Pet. ¶ 297.  From the petition, one can only presume that the "clearly established" Eighth Amendment "law" unreasonably applied by the ACCA must have been *Furman*.

Petitioner's merits brief appears to focus more on an alleged Fourteenth Amendment equal protection violation, arguing first that "unequal treatment" is repugnant to the constitutional mandate of "reliability and consistency" in capital sentencing; that "clearly defined standards" guiding judicial sentencing are needed to "ensure uniformity and consistency and to protect the sanctity of the jury's sentencing role;" and that "Alabama's judicial override lacks the required uniformity and invites the impermissible arbitrariness and inequality."  Doc. 31 at 81–82.  He submits that the fact that he was sentenced to death despite the jury's life recommendation, while others who received life recommendations were not sentenced to death, reflects "disparate treatment" that "is a significant consequence

of the fact that Alabama's override system has no consistent standard to guide trial courts in their consideration of jury life verdicts." *Id*. at 82. He argues that, because the trial court disagreed with the jury's life recommendation and was empowered to "substitute[] its opinion in place of the" jury without even having to "explain what type of weight should be afforded its determination," his death sentence was imposed with no constitutional standard. *Id*. at 83. "This standardless imposition of a death sentence," he contends, "is an independent constitutional violation that is contrary to, and involves an unreasonable application of, clearly established United States Supreme Court precedent." *Id*.

Specific and pertinent references in the brief to the "clearly established" Supreme Court precedent alleged to have been violated are lacking. *Furman* is cited in the brief, again for the contention that "arbitrary and unequal application of the death penalty" is unconstitutional. Doc. 31 at 82. *Schneider v. Rusk*, 377 U.S. 163, 168 (1964), *Shapiro v. Thompson*, 394 U.S. 618, 641–42 (1969), and *Edelman v. Jordan*, 415 U.S. 651, 670 (1974), are cited for the general proposition that the Fourteenth Amendment equal protection clause forbids "unequal treatment" that "is 'so unjustifiable as to be violative of due process.'" Doc. 31 at 81–82. And *Bush v. Gore*, 531 U.S. 98, 103 (2000) (per curiam), is cited for its conclusion that "inconsistent application of state law violates [the] Equal Protection Clause." *Id*.

at 82.  None of these cited cases deal with the question before the ACCA—whether an allegedly "standardless" capital sentencing scheme violates equal protection.

Faced with a claim that vacillates between due process and equal protection arguments and features only vague references to the clearly established federal law supposed to have been violated by the state court under any theory of relief, this court must parse the constituent parts of the claim and consider whether the ACCA's decision unreasonably applied Supreme Court precedent.  To the extent Petitioner challenges his sentence or Alabama's capital sentencing scheme under the Eighth Amendment, alleging that his sentence was arbitrarily imposed because the trial judge lacked adequate "direction regarding the overturning of a jury's verdict," Pet. ¶ 295, the Supreme Court has previously held that the Eighth Amendment does not require a sentencing judge to "ascribe any particular weight to the verdict of an advisory jury."  *Harris*, 513 U.S. at 509, 514–15.  The ACCA thus did not unreasonably apply clearly established federal law in concluding that Alabama's judicial override does not violate the Eighth Amendment.

Likewise, to the extent Petitioner here challenges judicial override under the Fourteenth Amendment's Due Process Clause, precedent forecloses his claim.  As noted by the ACCA on appeal, the trial court considered and professed to give "great deference to the verdict and sentence recommendation of this jury," but,

297

based upon its written findings about the "callousness" of Petitioner's actions, "and comparing his acts with similar cases," determined that the jury's recommended punishment "should not be followed."  856 So. 2d at 932–33 (internal quotations omitted).  The ACCA determined that the trial court adequately considered the jury's recommendation and articulated its reasons for overriding the recommendation.  *Id*. at 933.  The ACCA's decision here relied upon *Taylor*, in which the ASC specifically found the Supreme Court's *Harris* holding "applicable" to the Fourteenth Amendment challenge posed in that case.  856 So. 2d at 934.  The ACCA did not unreasonably apply clearly established federal law in dispensing with any Fourteenth Amendment due process claim.  *See Madison v. Comm'r, Ala. Dep't of Corr*., 677 F.3d 1333, 1336 (11th Cir. 2012) (citing *Harris*, 513 U.S. 504) (rejecting claim that "Alabama's judicial override scheme violates . . . the Due Process Clause of the Fourteenth Amendment" where "the trial judge stated that it gave the jury recommendation 'significant weight' and 'all due and proper consideration'").

Turning to the equal protection component of Petitioner's claim, Petitioner fails to alert the court to any clearly established federal law demonstrating that the ACCA erred in rejecting his claim.  Considering the ACCA's conclusion that the trial court adequately stated its reasons for overriding the jury's verdict, and that

those reasons were supported by the evidence, he fails to establish any contention that he suffered "unequal treatment" "so unjustifiable as to be violative of due process."   Doc. 31 at 82 (internal quotations omitted).   Likewise unavailing is his assertion in his brief that his death sentence illustrates "inequality" because some defendants were sentenced to life in prison in accordance with a jury's life recommendation while the trial court disregarded his jury's life recommendation. More likely, the "disparate treatment" about which Petitioner complains is the result of individualized sentencing based upon "disparate" facts and the sentencer's assessment of aggravating and mitigating evidence in the respective cases Petitioner cites.[35]   *See, e.g., Harris*, 513 U.S. at 515 ("The disparate treatment of

---

[35] The cases Petitioner cites as illustrating "disparate treatment" violative of his equal protection rights, *see* Doc. 31 at 82 n.27, do not advance his claim.   In *Ex parte Carroll*, 852 So. 2d 833 (Ala. 2002), the ASC determined that, given the jury's life recommendation (10-2), the defendant's age at the time of the offense (17), the plea for mercy from the victim's family, and the presence of only one aggravating circumstance (the robbery-murder aggravator), there was "overwhelming support of a sentence of life imprisonment[.]"   *Id*. at 837.   Unlike here, the trial court in *Carroll* plainly did not conclude that Alabama's powerful HAC aggravator applied, and the uniquely compelling mitigating evidence of Carroll's age (Carroll was a minor who, today, would be ineligible to receive a death sentence) and the victim's family's wishes further distinguish *Carroll* from this case.   The remainder of the cases Petitioner cites—*Berryhill v. State*, 726 So. 2d 297, 299 (Ala. Crim. App. 1998), *Burrell v. State*, 689 So. 2d 992, 994 (Ala. Crim. App. 1996), and *Crumpton v. State*, 677 So. 2d 814, 814–15 (Ala. Crim. App. 1995)—as also illustrative of "disparate treatment" reveal nothing about the presence of aggravating circumstances, if any, in those cases, or the strength and character of the mitigating evidence that precipitated those juries' life recommendations and the respective trial judges' decisions to sentence accordingly.   Those are simply cases where a life sentence followed a jury's life recommendation.   The mere fact that a different outcome was

jury verdicts simply reflects the fact that, in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances in each case.").   It does not follow that, just because Petitioner received a death sentence while others were sentenced in accordance with the jury's recommendation, Alabama's override system is so unconstitutionally "standardless" that it allows for unequal treatment "so unjustifiable as to be violative of due process."   Doc. 31 at 82 (internal quotations and citations omitted).   Petitioner fails to cite any clearly established federal law unreasonably applied by the ACCA in rejecting his claim.   Accordingly, he is not entitled to relief.

### E.    The Trial Court Improperly Discounted Mitigating Evidence.

As discussed previously, the defense presented one witness during the penalty-phase proceeding before the jury, Petitioner's mother, Cora Cobb.   Cobb testified at length about Petitioner's background, including his birth in the Georgia turpentine camp, the family's poverty, struggles with domestic abuse, Petitioner's head injuries as a child, and the transience the family experienced as Cobb moved back and forth between Georgia and Alabama in search of a stable home. Approximately seven transcript pages into Cobb's testimony, as Cobb was

---

reached in those cases, without more, does not illustrate constitutionally infirm unequal treatment.

testifying about the abuse she suffered from Petitioner's father and her decision to leave for Alabama with their children, the trial court appeared to notice that one or more jurors were in need of a break and declared a short recess.  Tr. 1196.  With the jury out of the courtroom, Judge Harper called the attorneys for a bench discussion:

> THE COURT: I haven't heard any objections but I think this kind of testimony is far beyond than [sic] normally that is acceptable for mitigating testimony in a case of this kind that you think it relates to this defendant; this is as to the mother.
>
> MR. RAY: Well, we -- we are fixing to get away from that.  What we -- where she is getting at right now, she is fixing to move, and then we are going to talk about the stepfathers and the numerous moves that relate to this defendant.
>
> THE COURT: Okay.
>
> MR. RAY: Of course, he --
>
> THE COURT: Now, the -- the whole --
>
> MR. RAY: Sir?
>
> THE COURT: All of this other is really not relevant.
>
> MR. RAY: She is getting off of it, but you know, obviously, the turpentine business is not what we are talking about.
>
> THE COURT: All right. Okay.

Tr. 1196–97.  After this discussion, the jury returned to the courtroom and Cobb's testimony continued.  Almost immediately, the prosecutor objected on relevance grounds to Cobb's testimony about where she went when she left Petitioner's

father at the turpentine camp in Georgia.  Tr. 1198.  Judge Harper sustained the objection.

Defense counsel pressed on, and Cobb proceeded to testify about moving her children to Loachapoka, and then to Auburn, to live with Pastor Eddie Maddox.  Tr. 1199.  Counsel then asked Cobb about her moves in Auburn, inquiring how long she lived at each address in Auburn.  Tr. 1199–2000.  When counsel asked Cobb where she went after moving out of the second home she occupied in Auburn, which was one street over from the first home, this exchange followed:

> MR. ABBETT: Your Honor, again, I object --
>
> THE COURT: Mr. Ray, we need to get something that --
>
> MR. ABBETT: -- on the grounds of relevant --
>
> THE COURT: -- is relevant to this phase of the trial.  And I don't believe this is.
>
> MR. RAY: Judge I – if I may present some authority that the instability of the family life is certainly relevant to mitigation.  I have authority on that, I will be glad to submit it.
>
> THE COURT:  Well, the fact that you have moved from one place to the other I don't believe has any relevancy to that?
>
> MR. RAY:  Yes, sir, it does, and I -- I mean, it's --
>
> THE COURT:  Mr. Ray, please don't argue with me.
>
> MR. RAY:  I am not arguing with you, Judge.  I am just giving you --
>
> THE COURT: Come up.
>
> MR. RAY: -- my opinions.
>
> THE COURT: Come up here.

302

(Whereupon, a bench discussion was had outside the hearing of the jury.)

THE COURT:  If you are wanting to show something -- treat us to some part of his life that you think it is significant, we will listen to it. The fact that you moved here, moved there, is something else.  I don't believe it does.

MR. RAY:  May I ask to be heard on the record if I may, Your Honor?

THE COURT:  You are on the record.

MR. RAY:  Okay. Well, I don't -- I would like to get my statutes up here, if I may talk about what our authority is.

THE COURT: Hold on just a minute.

(Whereupon, the bench discussion was concluded.)

THE COURT: Ladies and gentlemen, let me get you step back in the jury room for just a minute.

(Whereupon, a recess was had for the jury and they are not present.)

THE COURT:  I point out to you, Mr. Ray, that under the code mitigating circumstances are: Shall include any aspect of a defendant's character or record or any of the circumstances that the defendants [sic] offers as a basis for a sentence of life imprisonment without parole.  Any other relevant mitigating circumstance which the Defendant offers as a basis for a sentence of life in prison without parole.  Now, certainly things that have affected this defendant are relevant.  But you are taking a narrative of this lady and her travels without any reference to what effect, if any, it has on this defendant; and it doesn't seem to me that that's relevant.

MR. RAY:  Your Honor, the --

THE COURT:  I am going to give you a lot of leeway, you understand that, but I don't think we ought to be wasting a juror's time on things that don't seem to have much relevance at all.

MR. RAY:  The last thing I want to do is waste their time, Judge, but you know, this is --

THE COURT:  And I don't need any statements like that out of you. You are not wasting my time.  It's the juror's time.

MR. RAY:  I didn't say -- I said their time.

THE COURT:  Okay.

MR. RAY:  I didn't say your time.  I understand.  But you know, this is a serious situation and -- and I would refer the court to the Supreme court case of Eddings versus Oklahoma, also McGauther versus California, which say that the family's instability, lack of a father, and that sort of thing is a mitigating circumstance, as well as the rules in -- in the code of Alabama about the evidence that is relevant to a sentencing phase.  Which says that anything pertaining to the – the defendant would be relevant.  And I would like to refer you to those code sections that talk about relevance of -- in the sentencing phase.

THE COURT:  I know those code sections, but you are asking this lady if she moved from one place and then she moved two blocks over.  And this sort of thing.

MR. RAY: Yes, sir.

THE COURT:  That -- that doesn't seem to me to have any relevance at all.

MR. RAY:  Well, as I said --

THE COURT:  Are you going to get to something else very shortly?

MR. RAY: There is going to be some history of moving around, Judge, and the stepfathers that come in and the stepfathers that are alcoholics. and the stepfathers -

THE COURT:  Okay.  Well, why don't we get to that.

MR. RAY: Okay.  But --

THE COURT:  Bring the jury on back.

Tr. 1200–04.

Following this discussion, counsel continued with his examination of Cobb,

eliciting her testimony about Maddox's abuse and Cobb's decision to leave

Maddox.   When the defense asked Cobb to describe a photograph depicting Petitioner as a child, the prosecution again objected on relevance grounds, but Judge Harper overruled the objection.   Tr. 1207–08.   Counsel then continued to elicit several additional transcript pages of Cobb's testimony about Petitioner's background—*i.e.*, the family's experience with Echols, Petitioner's academic performance, compliments Petitioner received from his elementary school teachers, Petitioner's effort to reconnect with his father, *etc.*—with no additional objections by the prosecution to such background information, and no questioning of the relevance of such information by the trial court.

### 1.   Petitioner's allegations

Petitioner alleges that the trial court erred in describing his mitigation evidence as irrelevant and impermissibly interfered with counsel's effort to present mitigating evidence.   Pet. ¶ 299.   He asserts that, although counsel continued to present evidence after the interruptions excerpted above, "there was no demonstration that all the relevant evidence on this issue was presented[.]"   *Id*.   He further alleges that the trial court's error was "even more substantial in light of the effect that they likely had on the jury, as well as what they reveal about the trial court's perception of what amounts to 'relevant' evidence in mitigation."   Pet. ¶ 300.   He contends that the trial court's interjection that Cobb's testimony was

305

irrelevant "certainly would have affected the jury's assessment of that evidence, as well as the jury's understanding of the instructions that followed shortly after that testimony." *Id*.

Petitioner also alleges that the trial court's interruption and objection to his evidence demonstrates the trial court's "misunderstanding of the law" and its "improperly narrow interpretation of what amounts to appropriate mitigation." Pet. ¶ 302. Petitioner further claims the trial court's amended sentencing order also demonstrated the trial court's misunderstanding of what constitutes relevant mitigating evidence because the trial court noted the presence of "verbal abuse" by one of Petitioner's stepfathers. Pet. ¶ 303. According to Petitioner, the trial court improperly dismissed the evidence of abuse because it was merely "verbal," and thereby "improperly limited the scope of its consideration of mitigating evidence." *Id*.

Petitioner concludes as follows:

> Because the trial court's interruption of the testimony offered by Mr. Hodges's mother limited the jury's consideration of relevant facts and informed the jury that they were in fact irrelevant, and because the trial court refused to consider evidence that was clearly relevant to mitigation in its own sentencing orders, the trial court's sentence was imposed unconstitutionally. To allow it to stand would amount to a miscarriage of justice, and it should therefore be vacated.

Pet. ¶ 304.

2. *Respondent's procedural defense*

Respondent acknowledges that Petitioner's claim that the trial court improperly characterized some of his mitigation evidence as irrelevant was reviewed on the merits in the state courts.  Doc. 38 at 91.  Respondent disputes, however, that Petitioner ever "presented a claim that not all evidence was presented because of the trial court's actions to the Alabama Supreme Court during post-conviction certiorari review[,]" and that, accordingly, such claim was not exhausted in the state courts and is procedurally barred in federal habeas.  *Id*. at 92–93.

Petitioner counters that his claim was reviewed by the ACCA on direct appeal and that there was no need for it to be reviewed again in post-conviction in order for it to be exhausted for federal habeas purposes.  Doc. 42 at 48–49.

As will be discussed below, Petitioner did raise on direct appeal a claim alleging error based upon the trial court's limitation of counsel's questioning of Cobb and the trial court's characterization of some of Cobb's testimony as irrelevant.  Notwithstanding the merits adjudication of his claim on direct appeal, Petitioner presented a claim in his amended Rule 32 petition that is substantially identical to the instant federal habeas claim.  *See* Doc. 21-27 at 170–73.  The Rule 32 court found this claim to be procedurally barred pursuant to Rule 32.2(a)(3) and

(4) because it could have been raised at trial, but was not, and because it was raised or addressed on direct appeal.   Doc. 21-55 at 114.   The ACCA affirmed the dismissal on this basis.  *Hodges*, 147 So. 3d at 932.

Petitioner asserts that this claim is exhausted and is properly before this court for review under the AEDPA because the state court adjudicated the merits of the claim in his direct appeal.   *See* Pet. ¶ 299; Doc. 42 at 49 (arguing the ACCA's decision unreasonably applied clearly established federal law and was based upon an unreasonable adjudication of the facts).   Accordingly, this court will review the state court's decision on direct appeal pursuant to § 2254(d).   The corollary to this conclusion, however, is that the articulation of the claim presented in the state court on direct appeal, rather than in Rule 32, is the operative presentation of the claim for federal habeas purposes.   In other words, although the instant claim is essentially a reproduction of the claim in his Rule 32 petition, it is the articulation of the claim on direct appeal that was fairly presented to the state courts and resulted in the merits decision that will be reviewed in this court.

### 3.   *The state court's merits adjudication*

On direct appeal, Petitioner argued that the trial court prevented him from presenting mitigation evidence in the penalty phase, including further testimony about Cobb's abuse at the hands of Petitioner's father, by signaling to the State that

it should be objecting to Cobb's testimony, sustaining the prosecution's "baseless" objections to Cobb's testimony, and by labeling some of her testimony irrelevant before the jury.  Doc. 21-14 at 37–42.

As discussed previously, on direct appeal, the ACCA initially remanded to the trial court with instructions to correct errors in the trial court's sentencing order, *i.e.*, to make sufficient findings of fact respecting the aggravating and mitigating circumstances.  In observing the trial court's failure "to make specific findings concerning the presence of any nonstatutory mitigating circumstances," the ACCA noted Petitioner's argument about the trial court's interruption of Cobb's testimony and remarked that it agreed with Petitioner's contention that Cobb's testimony "about the number of moves the family had made when Hodges was growing up" "was admissible to show the instability of Hodges's home environment."  856 So. 2d at 893 n.4.  Nevertheless, the ACCA concluded, "this evidence was introduced during her testimony; thus, there is no reversible error." *Id*.

After Petitioner's conviction and sentence were affirmed by the ACCA on return to remand, he argued that the ASC should grant certiorari review of his claim that the trial court erred in preventing him from presenting mitigation evidence to the jury.  Doc. 21-16 at 92–94.  In his brief in support of his certiorari

309

petition, he referenced the ACCA's finding that the evidence he sought to introduce was, indeed, relevant mitigating evidence, but disputed the ACCA's conclusion that the trial court's actions did not warrant reversal.  Doc. 21-17 at 74–75.  In particular, he asserted that "neither the court nor the jury heard about the physical living conditions Mr. Hodges' family endured and the number of times they moved from 1977-1987 due to the trial court's erroneous ruling."  *Id*. at 74.  He further argued that, given the trial court's erroneous ruling about the relevance of this testimony, "one must assume the trial court did not take it into account when sentencing Mr. Hodges to death[.]"  *Id*. at 75.  He maintained that, had the trial court not erred in limiting Petitioner's presentation of mitigating evidence, more jurors might have voted for a life sentence, which would have increased the weight owed to the jury's recommendation in the trial court's sentencing determination.  *Id*.

The ASC granted certiorari and reviewed Petitioner's claim "that the trial court improperly restricted the presentation of mitigating evidence on  his behalf by his mother during the penalty phase of his trial, and that the trial court improperly commented in the presence of the jury that certain of that evidence was irrelevant."  *Hodges*, 856 So. 2d at 945.  In its opinion, the ASC first reproduced the lengthy exchange from Petitioner's trial that is excerpted above, and which

310

concluded with the second bench discussion wherein counsel asserted the

relevance of Cobb's testimony.  The ASC then rendered the following findings:

> Thereafter, defense counsel had the opportunity to go into evidence concerning the instability of Hodges's family during his childhood. Although defense counsel did not specifically question the witness further about the frequency of the family's moves, he did ask general questions, without objection from the State, about various stepfathers who came and went from the home, from which the jury could have inferred that moves took place.  Obviously, the bench discussion persuaded the trial court to reconsider its view as to the relevance of testimony about the family's moves.  Nevertheless, defense counsel did not object to the trial court's previous remarks in the presence of the jury concerning the lack of relevance of evidence indicating that the family had moved from place to place and he did not request a curative instruction on that issue.
>   . . .
> The Court of Criminal Appeals pointed out that a difficult family history is a mitigating circumstance, but that the weight to be accorded that circumstance depends upon the facts of the case and the defendant's age.  We note that Hodges was 27 years old at the time this murder was committed.
> Hodges argues that even though he was eventually able to present most, if not all, of the mitigating evidence he wanted the jury to hear, the trial court erred in stating in the presence of the jury, while ruling on an objection during the testimony, that the evidence regarding the family's many moves was not relevant.  That error, Hodges argues, might have affected the number of jurors who voted for life imprisonment without the possibility of parole instead of death.  Had more jurors voted for life imprisonment, Hodges reasons, the trial court might have been more reluctant to override the jury's verdict.
>   . . .
> After reviewing the record, we conclude that Hodges was able to present to the jury the evidence regarding his difficult, unstable, and impoverished childhood.  The trial court initially sustained the prosecutor's objections as to the family's frequent moves and

311

commented in the presence of the jury that such evidence was not relevant. The evidence was, however, relevant. . . . Nevertheless, as the Court of Criminal Appeals correctly noted, the evidence of the Hodges family's frequent moves was ultimately admitted. The question before us, then, is whether the trial court's erroneous comments about the relevancy of the evidence require us to reverse Hodges's sentence and remand the case for a new sentencing hearing.

856 So. 2d at 946–47 (citations omitted).

Reviewing for plain error, the ASC concluded that Petitioner's claim did not warrant reversal:

Hodges contends that without the trial court's comment that evidence of the family's frequent moves was irrelevant, the jury might have returned a recommendation in favor of life imprisonment without the possibility of parole by a vote of greater than 8–4. As previously stated, the evidence regarding the frequent moves Hodges's family made when he was a child was relevant, and the trial court should not have commented in the presence of the jury on the relevancy of the evidence of the frequency of the moves. However, the assumption that had those comments not been made the jury might have returned a vote more favorable to Hodges and, thereafter, that the trial court might have declined to override the jury's recommendation, is too tenuous a foundation upon which to base plain error. After reviewing all of the evidence in this case, especially the manner in which the 27–year–old Hodges murdered the victim, we conclude that the trial court's comments concerning the lack of relevance of the evidence of the frequency of moves made in the midst of the testimony from Hodges's mother to which there was no objection, followed by a bench conference that led to permission to pursue this avenue of inquiry, do not rise to the level of "plain error." . . . Speculation as to what would have happened absent the unobjected-to remarks concerning the relevancy of the evidence of the frequency of the family's moves after which general testimony about the instability of Hodges's family life was permitted does not rise to the level of error that had or probably had adversely affected Hodges's substantial

312

rights so as to permit the conclusion that a miscarriage of justice occurred.

856 So. 2d at 948.

> 4. *The ASC did not unreasonably apply clearly established federal law and did not base its decision upon an unreasonable determination of the facts.*

The petition cites one Supreme Court case, *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), for the proposition that "a sentencer may not preclude or refuse to consider any relevant mitigating factor offered by the defendant."   Pet. ¶ 302. Presumably, then, this is the clearly established federal law Petitioner charges the state court with having unreasonably applied.[36]   Curiously, the petition references the ACCA's adjudication of this claim, Pet. ¶ 299, but ignores the ASC's much lengthier discussion of the claim, which, under AEDPA, is the operative state court decision for purposes of review in federal habeas corpus.   Petitioner's briefing follows suit, challenging only the ACCA's truncated discussion of this claim and ignoring the ASC's lengthy merits adjudication.   *See* Doc. 31 at 84–85; Doc. 42 at 48–49.

---

[36] Petitioner's reply brief confirms this conclusion, arguing that the "trial court's improperly narrow interpretation of what was relevant mitigating evidence, and comments regarding what he believed was irrelevant . . . violated *Eddings v. Oklahoma*[.]" Doc. 42 at 49.

In any event, this court is now charged with determining whether the ASC unreasonably applied *Eddings* or based its decision upon an unreasonable determination of the facts in light of the record before the ASC.  Applying the deference due the decision of the ASC, this court concludes that the ASC's decision withstands § 2254(d) scrutiny.

Analysis of the unreasonable application prong of § 2254(d) begins with review of the clearly established federal law the ASC is alleged to have unreasonably applied.  *Eddings* involved a sixteen-year-old offender who pleaded *nolo contendere* to a first-degree murder charge based upon his shooting of a law enforcement officer.  455 U.S. at 106.  At Eddings's sentencing hearing, the State argued that three statutory aggravating circumstances were present, including "that the murder was especially heinous, atrocious, or cruel, that the crime was committed for the purpose of avoiding or preventing a lawful arrest, and that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  *Id*. at 106–07.

"In mitigation, Eddings presented substantial evidence at the hearing of his troubled youth."  455 U.S. at 107.  This included evidence about Eddings's parents' lack of guidance and their inability to control his behavior, that Eddings was subject to "excessive physical punishment," "that Eddings was emotionally

disturbed in general and at the time of the crime, and that his mental and emotional development were at a level several years below his age." *Id*. at 107.  Mental health professionals also testified about Eddings's amenability to treatment for his mental conditions and described his potential to be rehabilitated, including to the point that he would not pose a danger to society. *Id*. at 107–08.

The Oklahoma trial court found that all three aggravating circumstances were present and that only Eddings's age was a mitigating factor in his punishment.  455 U.S. at 108.  The trial court appeared to believe that it was precluded by law from considering Eddings's background evidence as mitigating: "Nor can the Court in following the law, in my opinion, consider the fact of this young man's violent background." *Id*. at 109 (internal quotations omitted) (emphasis removed).  Based upon the trial court's findings respecting the aggravating and mitigating circumstances, the trial court sentenced Eddings to death.

The Supreme Court in *Eddings* applied its earlier holding in *Lockett v. Ohio*, 438 U.S. 586 (1978), which established that "'the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

less than death.'"  455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 604).  The Court emphasized that the Oklahoma trial court's fundamental misunderstanding of the law caused it not to even consider whether Eddings's compelling background evidence was mitigating.  *Id.* at 113 (finding, "it is clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that *as a matter of law* he was unable even to consider the evidence") (emphasis in *Eddings*).

The rule of *Eddings* is straightforward: "Just as the State may not by statute preclude the sentencer from considering any mitigating factor [as happened in *Lockett*], neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence."  *Id.* at 113–14 (emphasis in *Eddings*).  While the sentencer, and an appellate court on review, "may determine the weight to be given relevant mitigating evidence[,] . . . "they may not give it no weight by excluding such evidence from their consideration."  *Id.* at 114–15.

The trial court error Petitioner presented to the ASC on direct appeal differed from that confronted by the Supreme Court in *Eddings*.  Whereas Petitioner claimed the trial court prevented him from *presenting* mitigating evidence to the jury, *see* Doc. 21-17 at 74, *Eddings* involved no such alleged exclusion of evidence.  Rather, in *Eddings*, the defendant "presented substantial

316

evidence at the hearing of his troubled youth[,]" as well as copious evidence about his mental health issues, with no indication in the opinion that the trial court sought to impose any limitation on Eddings's presentation of evidence.  455 U.S. at 107–08.  The constitutional error in *Eddings*, instead, was that the trial court "found that *as a matter of law* he was unable even to consider the evidence."  *Id*. at 113 (emphasis in *Eddings*).

Nevertheless, *Eddings* and the constitutional principles that underlie that decision can be implicated by the trial court's exclusion of evidence.  *See Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (applying *Eddings* and holding that the trial court's exclusion of witness testimony about the defendant's "good adjustment" to incarceration "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of his punishment").  The constitutional rule animating this line of cases is, essentially, as follows: "[I]n capital cases, the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence."  *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987) (internal quotation marks omitted) (citing *Skipper*, 476 U.S. at 4).  The question, then, is whether the ASC unreasonably applied the line of cases establishing this rule or based its decision upon an unreasonable determination of the facts.

In essence, the ASC found that Petitioner was not deprived of his right to place relevant mitigating evidence before the sentencer, and that neither the jury, nor the ultimate "sentencer," was precluded from considering, or refused to consider, such evidence.  Instead, the ASC found, Petitioner "was able to present to the jury the evidence regarding his difficult, unstable, and impoverished childhood."  856 So. 2d at 947.  The ASC reasoned that, while the trial court inaccurately characterized some of Petitioner's evidence as "irrelevant," "the evidence of the Hodges family's frequent moves was ultimately admitted."  *Id*. This is so because defense counsel was able "to ask general questions, without objections from the State, about various stepfathers who came and went from the home, from which the jury could have inferred that moves took place."  *Id*. at 946. In the ASC's assessment, "the bench discussion persuaded the trial court to reconsider its view as to the relevance of testimony about the family's moves."  *Id*.

The ASC's findings and application of clearly established federal law were reasonable.  The record shows that, even after Judge Harper questioned the relevance of Cobb's testimony about the family's various moves around Auburn, he permitted counsel to continue questioning Cobb about hardships the family faced, including, in particular, Maddox's abuse and Echols's descent into drug addiction and mental illness.  Although there was no further specific testimony

about the family's moves, as the ASC found, Cobb's testimony about ongoing instability permitted the reasonable inference of additional moves as she described the family's cycling from Maddox to approximately two years living with no husband or father figure and then to Echols, to whom she was married when Petitioner first left home to find his father in 1987. *See* Tr. 1206–14.[37]  The trial court even overruled the prosecution's objection on relevance grounds to the defense's introduction of photographs depicting Petitioner as a child.  Tr. 1207–08. Thus, it cannot be said that the trial court prevented counsel from asking Cobb about the hardships the family faced.  More importantly, the trial court plainly did not exclude, or preclude the jury from considering, whole categories of non-statutory mitigating evidence, such as evidence about instability in Petitioner's life, as occurred in *Lockett*, *Eddings*, *Skipper*, and *Hitchcock*.

To the extent that Petitioner's claim is concerned that the trial court's remarks about the relevance of Cobb's testimony before the jury "affected the jury's assessment of that evidence, as well as the jury's understanding of the

---

[37] Indeed, if anything, Cobb's testimony suggested that the arrival of Echols marked a sustained period of stability in Petitioner's home life.  She testified that Echols "was a – a good person.  He really was.  A very good person.  The first maybe seven years of our relationship he was very good."  Tr. 1213.  While Echols's drug abuse and mental illness obviously presented problems for the family in later years, it is not clear that counsel had additional evidence of instability, insofar as it relates to moving around, to present for this seven-year period, much less that he believed he was precluded from presenting such evidence.

instructions that followed shortly after that testimony[,]" Pet. ¶ 300, the record again demonstrates that the ASC's decision was reasonable. As discussed above, notwithstanding Judge Harper's questioning the relevance of testimony about Cobb's moves from one house to another in Auburn, after the second bench discussion, counsel continued to question Cobb about abuse she suffered and hardships the family faced. The jury reasonably would have concluded that, because this evidence was admitted following the recess that was triggered when the question of relevance was brought up in court, all such evidence was relevant. And considering that much of this evidence was similar to the evidence that preceded the recess—Cobb testified both before and after the recess about abuse she suffered, abuse that Petitioner witnessed, *etc.*—the jury would have had no basis to conclude that Cobb's testimony about abuse, instability, and the like was irrelevant, or that the trial court believed it to be irrelevant but allowed it anyway.

Moreover, the trial court correctly charged the jury that it was permitted to "consider as a mitigating circumstance any aspect of the defendant's character and life and any of the circumstances of the capital felony which tend to indicate that the Defendant should not be sentenced to death." Tr. 1250. This charge plainly distinguishes *Lockett*, *Eddings*, and *Hitchock*, where the penalty phase juries and/or

sentencers believed or were instructed that they could not consider such evidence.[38]

Judge Harper also instructed the jury to base its verdict only on the evidence admitted:

> Your deliberation and verdict should be based upon the evidence you have seen and heard and the law that I have instructed you on.  There is no room for the influence of passion, prejudice, or any other arbitrary factor.  While it is your duty to follow the instructions which the Court has given you, no statement, question, ruling, remark, or other expression that I have made at any time throughout this trial either during the guilty phase or during the punishment phase hearing is intended to indicate any opinion of what the facts are or what the punishment should be.  It is your responsibility to determine the facts and fix punishment, and in doing so, you should not be influenced in any way by what you imagine to be my views on this subject.

Tr. 1251.   Accordingly, the evidence was received and the jury was properly charged on how to evaluate the evidence free of influence due to rulings and remarks by the trial court.   Thus, the ASC reasonably concluded that Judge Harper's remarks did not cause the jury to fail to consider Petitioner's mitigating evidence.

If the ASC reasonably concluded that the trial court did not exclude mitigating evidence, and did not preclude the jury from considering it, the remaining question is whether the trial court, as the ultimate "sentencer," impermissibly refused to consider such evidence.   Here, the trial court's amended

---

[38] In fact, the trial court specifically instructed the jury that it could not "refuse to consider any evidence in mitigation and thereby give it no weight."  Tr. 1258.

sentencing order makes clear that, minimally, Judge Harper did not believe, as a matter of law, that he was precluded from considering Petitioner's background evidence in mitigation.   Rather, considering Petitioner's age at the time of the offense, Judge Harper simply found it insufficiently compelling to provide substantial mitigating effect.   Judge Harper found as follows:

> Testimony was given by Defendant's mother as to a difficult family history during Defendant's childhood.   She testified that Defendant's father abused her.   However, she left Defendant's father when Defendant was two years old.   She remarried a man who was <u>verbally</u> abusive to the family but left him when Defendant was seven years old.   At the time of this offense, Defendant was 27 years old.   In the opinion of the Court, this testimony is entitled to little, if any, weight.

Doc. 21-55 at 12–13 (emphasis in original).   While Judge Harper's sentencing order omits any reference to the various moves described by Cobb, as well as the hardships the family endured with Echols, it is apparent that Judge Harper at least understood that such evidence was cognizable as mitigating evidence.   Thus, on the matter of the sentencer's *consideration* of the mitigating evidence, the trial court here is more closely aligned with what the Supreme Court described as the permissible "flip side" to what happened in *Eddings*: the trial court evaluated the

322

evidence in mitigation and found it "wanting as a matter of fact[.]"  455 U.S. at 113.[39]

In sum, the ASC reasonably concluded that Petitioner succeeded in admitting substantially all the mitigating evidence counsel sought to introduce during the penalty phase of his trial.  Although the trial court improperly questioned the relevance of some of this evidence, the trial court did not prevent Petitioner from presenting mitigating evidence, did not preclude the jury from considering such evidence, and did not fail to consider such evidence in sentencing Petitioner.  The ASC's decision did not unreasonably apply clearly established federal law and was not based upon an unreasonable determination of the facts in light of the record before that court.  Accordingly, Petitioner is not entitled to relief on this claim.

### 5.    *Any error was harmless.*

*Hitchcock* suggests that claims of *Eddings*-type error are subject to harmless error review.  *See* 481 U.S. at 399 (observing, "Respondent has made no attempt to

---

[39] In fairness to the trial court, the mere fact that a family moves from one house to another is not necessarily indicative of instability and is not inherently mitigating.  Cobb testified that, in one move, the family "finally got a house in Auburn" and, next, "moved to a bigger place which was on the next road over."  Tr. 1199–1200.  Without more context for these moves, the trial court reasonably might perceive them as evidence of stability or upward mobility, rather than instability, and therefore question their relevance, as did Judge Harper.  Tr. 1203.

argue" that error was harmless where the "advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances"). The Eleventh Circuit has long subjected claims of such error to harmless error review. *See Ferguson v. Sec'y for Dep't of Corr.*, 580 F.3d 1183, 1204 (11th Cir. 2009). Thus, the question is whether, pursuant to *Brecht*, the trial court error identified by the ASC had a substantial and injurious effect or influence on the jury's verdict. *Id.* (citing *Sims v. Singletary*, 155 F.3d 1297, 1315 (11th Cir. 1998)).

Ultimately, the trial court's actions could not have had a substantial and injurious effect on the jury's verdict or the trial court's sentencing decision. To begin with, as discussed previously, and as found by the ASC, notwithstanding Judge Harper's actions, he permitted Petitioner to put on the background evidence that counsel wished to introduce through Cobb. While Petitioner argued to the ASC that the trial court "prevented" Cobb from testifying about "the physical living conditions" experienced by Plaintiff from 1977–1987, as well as the "number of times they moved" during that period, he failed to describe what additional evidence counsel would have produced but for the trial court's actions. *See* Doc. 21-17 at 74. Likewise, Petitioner's motion for new trial, which first raised the trial court's "exclusion of mitigating evidence," also failed to describe

what additional testimony Cobb might have offered about "Mr. Hodges' history of numerous moves as a child from residence to residence and the resulting family instability."   Doc. 21-5 at 88–89.   Similarly, Petitioner does not allege in the instant federal petition what additional evidence counsel would have produced at the penalty phase hearing but for the trial court's actions.

In addition, Petitioner's contention that counsel was prevented from producing evidence about Petitioner's living conditions and number of moves during this time is undermined by the record.  As previously discussed, even after the trial court questioned the relevance of some aspects of Cobb's testimony, Cobb testified about Petitioner's exposure to Maddox's abuse and controlling behavior (Tr. 1206), the one-to-two-year period Cobb and her children lived "alone" following her split with Maddox (Tr. 1207), and the family's struggles with Echols's drug abuse and mental illness (Tr. 1213–14).  Petitioner's counsel, Mr. Ray, testified in his deposition that he "tried to put on everything that I had that I could use with Ms. Cobb as the witness."  Doc. 21-36 at 161.  While he felt his effort was frustrated by the trial court's rulings, he did not testify that he was *prevented* from putting on the evidence he wanted to introduce.

Apart from Mr. Ray's own testimony, two documents from Mr. Ray's file indicate that most, if not all, of the evidence of the family's moves was admitted.

Cobb prepared a chronology of important events and her relationships for Mr. Ray. *See* Doc. 21-37 at 41. The chronology indicates Cobb left Maddox in 1977, lived alone in 1978, and married Echols in 1980, with no description of additional moves around these life events. As described above, Cobb's trial testimony essentially tracks this document.

In addition, based upon his interviews with Petitioner and Cobb, Mr. Ray prepared a summary document about Petitioner's background. *See* Doc. 21-37 at 49–59. This document indicates that Cobb informed Mr. Ray that she "moved about six times during the time Melvin was growing up." Doc. 21-37 at 52. Given that Cobb testified about her move from the Georgia turpentine camp to Alabama (Tr. 1198), at least two moves around Auburn with Maddox (Tr. 1199–1200), her time living "alone" after leaving Maddox (Tr. 1206), and her meeting and marrying Echols (Tr. 1208–09), which, as the ASC found, permitted the reasonable inference of additional moves, substantially all six of the moves indicated by Cobb were covered by her testimony. There has been no showing that counsel was prepared to produce still more evidence about Petitioner's "physical living conditions" or the family's moves from 1977 to 1987, but that counsel was thwarted from doing so by the trial court's alleged improper restriction of mitigating evidence.

Finally, as also discussed previously, the trial court properly instructed the jury that it could "consider as a mitigating circumstance any aspect of the defendant's character and life" in its evaluation of the mitigating evidence.   Tr. 1250.   This instruction, coupled with the trial court's instruction that the jury must base its verdict on the evidence admitted, rather than its perception of the trial court's opinion about such evidence as revealed by the court's remarks and rulings, ensured that the jury understood its role in evaluating the evidence and was not improperly influenced by Judge Harper's questioning the relevance of some aspects of Cobb's testimony.

Because Petitioner succeeded in presenting substantially all the evidence he sought to introduce through Cobb, and because the trial court's instructions adequately cured any improper comment on the relevance of some of Cobb's testimony, Petitioner cannot show that Judge Harper's error had a substantial and injurious effect on the outcome of his trial and sentencing.

## F.   **Petitioner Should Not Have Been Sentenced to Death.**

### 1.   *Petitioner's allegations*

This subclaim purporting to challenge Alabama's death penalty scheme appears to be, instead, more of an amalgamation of several other claims.   The claim reads, in its entirety, as follows:

As noted throughout the above discussion, trial counsel failed to investigate and present, to either the jury or the trial court, substantial mitigation evidence. Of the limited mitigation evidence that was supported, both the trial court and the jury failed to consider relevant and important mitigation evidence. If the trial court had permitted trial counsel the funds necessary to investigate Mr. Hodges's case on mitigation, if trial counsel had pursued such evidence on his own, despite the significant substantial hardship that would have been imposed, if the trial court had allowed the presentation of a complete mitigation case instead of seeking to rush the process along to let the jury go home more quickly, and if the trial court had reached proper conclusions regarding the nonexistence of the Heinous, Atrocious, or Cruel aggravating factor (the "HAC aggravator"), then and only then would Mr. Hodges's penalty phase case have reached a conclusion based on a complete and effective presentation of the relevant facts at issue in determining whether a death sentence is appropriate in this case. Such a conclusion would have, and should have, found that the mitigating factors—both statutory and non-statutory—were substantial, and that the aggravating factors did not outweigh the mitigating factors. As a result, the only conclusion acceptable under the United States Constitution is that the appropriate sentence in this case should be no more than life imprisonment.

Pet. ¶ 305.

### 2. Respondent's procedural defense

Respondent argues that this subclaim is procedurally defaulted because it was first presented in Petitioner's Rule 32 petition and was dismissed by the Rule 32 court on adequate and independent procedural grounds, which was affirmed by the ACCA. *See* Doc. 37 at 82–83; Doc. 38 at 93–94. Petitioner does not appear to address Respondent's procedural defense. *See* Doc. 42 at 48–49.

3.        *The state court's adjudication*

Petitioner presented this subclaim, essentially verbatim, in his amended Rule 32 petition.   *See* Doc. 21-31 at 118.   The Rule 32 court found the claim procedurally barred pursuant to Rules 32.2(a)(3), because it could have been raised at trial, but was not, and 32.2(a)(4), because it was raised or addressed on direct appeal.  Doc. 21-55 at 114.  Petitioner argued on appeal to the ACCA that the Rule 32 court erred because, considering that the claim is based in large part on the mitigating evidence Petitioner presented in the Rule 32 petition, the claim "could not have been raised at trial, and it must be considered in this proceeding[.]"  Doc. 21-33 at 80–81.

It does not appear to the court that the ACCA addressed this claim on appeal of the Rule 32 court's dismissal of the claim.  *See Hodges*, 147 So. 3d at 930–33 (listing the claims which the Rule 32 court properly dismissed pursuant to Rules 32.2(a)(4) and (5) and omitting any reference to this claim).[40]  Thus, the only state court resolution of the claim appears to be the Rule 32 court's summary dismissal,

---

[40] The court has carefully reviewed the ACCA's decision searching for that court's resolution of this claim.  While Respondent asserts that the ACCA affirmed the Rule 32 court's dismissal of this claim, *see* Doc. 38 at 93, Respondent does not appear to cite the ACCA's opinion in support of this contention.  Instead, Respondent cites "Vol. 52, Tab # R-11, at 6."  *Id*.  This cannot be correct because the ACCA's decision affirming the Rule 32 court's summary dismissal of most of the Rule 32 petition is found in Volume 53 of the state court record.  If the ACCA actually addressed the Rule 32 court's dismissal of this claim, Respondent has not directed this court to the ACCA's resolution and this court has not located it independently.

which rested, in part, on its finding that this claim was raised or addressed on direct appeal.  For the reasons argued by Petitioner on appeal to the ACCA, however, it is impossible that this claim could have been raised at trial, or was raised or addressed on direct appeal, because the claim explicitly and substantially relies upon the allegation that "trial counsel failed to investigate and present . . . substantial mitigation evidence."  Pet. ¶ 305.  While some errors described in the claim, such as the failure to provide expert assistance and the applicability of the HAC aggravator, were addressed on appeal, the full claim, including its allegations of ineffective assistance, could not have been considered on direct appeal because some of its constituent parts were not, and could not have been, presented.

Considering that this claim could not have been raised at trial or on appeal, and that it was not addressed in its full scope on direct appeal, the court finds that it would be "manifestly unfair" to adjudicate the claim procedurally defaulted in federal habeas.  *Boyd*, 697 F.3d at 1336.  Accordingly, the claim is exhausted, is not procedurally defaulted, and is subject to de novo review in federal habeas corpus.

### 4.    *Petitioner is not entitled to relief.*

As set forth above, Petitioner's claim, in its entirety, appears to be an amalgamation of several disparate claims of error—ineffective assistance, failure

330

to provide expert assistance, exclusion of or failure to consider mitigating evidence, improper application of the HAC aggravator—to allege a sort of "cumulative" sentencing error claim.  The gist of the claim is simply Petitioner's contention that, if all the other errors Petitioner alleged had not occurred, he would not have been sentenced to death.  It therefore does not appear that this subclaim presents a new or distinct claim of constitutional error related to Petitioner' sentence or Alabama's capital sentencing system.

Furthermore, Petitioner's presentation of the claim indicates it is not a freestanding claim of constitutional error.  The petition cites no authority in support of the claim.  Petitioner's brief on the merits of this claim merely paraphrases the claim as pled in the petition, with no authority cited in support of the claim.  Doc. 31 at 86.  Petitioner's reply brief ignores the claim entirely, skipping from his *Eddings* claim to his claims challenging the HAC aggravating circumstance.  Doc. 42 at 48–49.

Because this claim consists only of several allegations of constitutional error that are separately raised in the petition, and which are separately addressed in this order, the court concludes that it is not a "claim" at all.  Petitioner has presented no authority tending to show that his claims of sentencing error may combine to create

a separate and distinct claim. Accordingly, this claim is without merit and is denied.

**G.     The HAC Aggravator is Vague and Overbroad.**

**H.     The HAC Aggravator Requires Specific, Written Findings Demonstrating the Factfinder's Comparison to Other Capital Cases.**

**I.     The Trial Court Improperly Relied Upon the HAC Aggravator.**

Petitioner presents three subclaims challenging Alabama's HAC aggravator, both generally and as applied to him. This opinion will address Petitioner's arguments jointly.

As noted previously, the trial court applied the statutory aggravating circumstance found in Ala. Code § 13A-5-49(8), *i.e.*, "[t]he "capital offense was especially heinous, atrocious, and cruel compared to other capital offenses." In support, the trial court provided the following findings of fact:

> The Court finds, from the evidence, as follows: The victim's nude body was found beside a rural road in Macon County. Medical and other testimony revealed that she had been beaten and choked after being abducted from the location of the robbery in her van. Blood matching her type was found inside the van and on clothing of the Defendant. The accomplice testified that she pleaded for her life as she was being driven around naked in the van. It is unclear as to how long she was being driven around naked and how long she was beaten and choked before finally being dumped on the side of the road. In the view of this Court, that was extraordinarily cruel and likely generated great fear and terror in her during her last hours on this earth. She was then dumped on the ground and run over repeatedly

with her own van.   Blood matching her type was found on the underside of the vehicle.

Doc. 21-55 at 10–11.   In the "Conclusion" section of the amended sentencing order, while explaining its reasons for overriding the jury's sentencing recommendation, the trial court provided additional summary findings:

> This was an especially cruel and torturous murder.  The victim, after being abducted at gunpoint by the two perpetrators, cooperated by giving access to the building and safe at the Golden Corral Restaurant.  They got the money they sought without resistance from the victim.
>
> It would have been humane for them to release the victim at that point.  Instead, they continued to hold her against her will.  She was driven around, naked, and beaten and choked as she pled for her life.  It would be reasonable to assume that she was conscious and terrified as the torture continued over an extended period of time.
>
> She was then dumped on the ground and run over repeatedly.  It is unclear whether she was still alive at the time this was done but that conclusion could be drawn, thus magnifying the terror and anguish inflicted on the victim by the Defendant.

Doc. 21-55 at 13–14.

### 1.   *Petitioner's allegations*

*First*, Petitioner alleges the HAC aggravator "provides an inadequate basis upon which to rest a sentence of death" because it "provides no guidance to juries or trial courts in determining which capital crimes are within the scope of the aggravator, and which are not."  Pet. ¶ 306.  Because it does not provide adequate

guidance, he asserts, it "fails to cabin the discretion of the factfinder at the sentencing stage of the hearing, instead expanding it to encompass nearly every capital crime." *Id*. Thus, he contends, it is "impermissible as applied" and violative of the "due process clause of the federal constitution" and "the prohibition in that document against cruel and unusual punishment." *Id*.

*Second*, Petitioner alleges that, because Alabama law permits application of the HAC aggravator only where the crime is "heinous, atrocious, and cruel compared to other capital offenses" and because Alabama law further requires the "trial court to make specific factual findings to support the existence of the aggravating factor," the trial court's written findings must "include a comparison of the facts of this crime to the facts of 'other capital offenses,' and must demonstrate that the aggravator can be properly applied in this case." Pet. ¶ 307. He alleges that the "trial court made no findings demonstrating any comparison between the facts of his case and other capital offenses." Pet. ¶ 308. Because the trial court did not perform the required comparison, and did not provide written findings demonstrating that comparison, he concludes, the aggravator was improperly applied, rendering his sentence unconstitutional. *Id*.

*Third*, Petitioner alleges that, irrespective of the constitutionality of the HAC aggravator, the facts of Beth Seaton's murder do not support its application in his

case.  In support of this claim, he alleges that there is insufficient proof that Seaton was conscious at the time she was repeatedly run over, Pet. ¶ 310, and that it was improper for the trial court to base the aggravator on its finding that Seaton was "stripped naked" where trial testimony demonstrated that Seaton removed her clothing while pleading for her life.   Pet. ¶ 311.   He also alleges, without elaboration, that "it is apparent that this offense in fact was not 'heinous, atrocious, or cruel' as compared to other capital offenses."  Pet. ¶ 312.

### 2.   *The state court's merits adjudication*

Respondent appears to concede that all of Petitioner's challenges to the HAC aggravator were exhausted and decided on their merits in the state courts.  *See* Doc. 38 at 94–98.  Although these claims were presented, essentially verbatim, in Petitioner's Rule 32 petition, *see* Doc. 21-31 at 110–13, both the Rule 32 court and the ACCA found them procedurally barred in postconviction pursuant to Rule 32.2(a)(4) because they were raised or addressed on direct appeal.  *See* Doc. 21-55 at 114; *Hodges*, 147 So. 3d at 931–32.  Accordingly, the ACCA's opinion on direct appeal is the operative state court decision for purposes of AEDPA review.

On direct appeal, the ACCA stated the following with respect to the trial court's findings in support of its application of the HAC aggravator:

> Hodges argues that the trial court erred in finding that the murder was especially heinous, atrocious, or cruel as compared to

other capital offenses.  The trial court failed to make any findings concerning this aggravating circumstance.  Before this Court can review the merits of this contention we must have the specific findings of fact that support the application of this aggravating circumstance.  . . .  We call the trial court's attention to *Ex parte Kyzer*, 399 So. 2d 330 (Ala. 1981).

By remanding this case for the trial court to make findings as to this issue, we do not wish to imply that the evidence was not sufficient to support a finding that this aggravating circumstance existed.  There appears to be adequate evidence in the record to support the consideration of this aggravating circumstance.  Evidence was presented that Hodges beat the victim with his fists and a pistol, choked her, and threw her on the side of a road where he then repeatedly ran over her with her own vehicle.  However, the trial court must make specific findings as to why it believes this aggravating circumstance was present in this case.

*Hodges*, 856 So. 2d at 891–92 (citations omitted).  On remand, Judge Harper issued his amended sentencing order, which included his specific findings regarding the HAC aggravator that are set forth above.

On return to remand, the ACCA recited Judge Harper's findings about the HAC aggravator and discussed Alabama law governing application of the aggravator.  According to the ACCA, several factors can support applying the aggravator, including "'whether the infliction on the victim of physical violence was beyond that necessary to cause death, whether a victim experienced appreciable suffering after a swift assault that ultimately resulted in death, [and] whether the victim suffered psychological torture.'"  *Hodges*, 856 So. 2d at 930

336

(quoting *Kyzer*, 399 So. 2d at 334).   The ACCA further discussed Alabama and federal appellate case law concluding that Alabama's HAC aggravator comports with the Eighth Amendment because it provides a "principled way to distinguish cases in which the death penalty is appropriate from those cases in which it is not.'"  *Id.* (quoting *Ex parte Clark*, 728 So. 2d 1126, 1137–38 (Ala. 1998)).   In essence, according to the ACCA, Alabama's HAC aggravator is sufficiently "narrow" for Eighth Amendment purposes because Alabama's courts have consistently limited its application to cases where the victim's death was "unnecessarily torturous."  *Id.* (citations and quotations omitted).

Applying these principles, the ACCA rejected Petitioner's challenge to the HAC aggravator:

> Here, the facts support the trial court's finding that the murder was especially heinous, atrocious, or cruel as compared to other capital murders.  *See Ex parte Hutcherson*, 727 So. 2d 861 (Ala. 1998) (murder especially heinous, atrocious, or cruel when victim was beaten to death), *cert. denied*, 527 U.S. 1024 (1999).  The evidence demonstrated that Seaton pleaded for her life for some time before she was beaten with fists and a pistol and was ultimately run over with her own vehicle.  Murph testified that she even took off her clothes and offered to have sex with Hodges and Murph if they would not kill her. The evidence further demonstrated that Seaton had been physically and psychologically tortured.   "The torture element of the circumstance may involve both physical and psychological torture." *Wilson v. State*, 777 So. 2d 856, 881 (Ala. Crim. App. 1999), *aff'd*, 777 So. 2d 935 (Ala. 2000), *cert. denied*, 531 U.S. 1097 (2001). There was sufficient evidence to show that Seaton's murder was

"especially heinous, atrocious, or cruel" as compared to other capital murders.

856 So. 2d at 931–32.

>        3.    *The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon an unreasonable determination of the facts.*

Petitioner cites one Supreme Court case in the petition in support of his claims challenging the HAC aggravator.  That case, *Furman*, is cited generally for the proposition that the Eighth Amendment forbids the arbitrary and capricious application of the death penalty.  Pet. ¶¶ 307, 313.  Petitioner's merits brief follows suit, citing *Furman* twice, again for the general proposition that the Constitution prohibits arbitrary application of the death penalty.  Doc. 31 at 87, 89.  The petition therefore confronts this court with the question whether the ACCA unreasonably applied *Furman* in rejecting Petitioner's challenges to the HAC aggravator.

The Court in *Furman* and its companion cases invalidated two death sentences imposed in Georgia's state courts and one in Texas.  408 U.S. at 239–40. The Court ruled that the death sentences were imposed in violation of the Eighth and Fourteenth Amendments.  *Id*.  Through five separate concurring opinions, each Justice in the majority explained his reasoning, with some arguing that capital punishment is unconstitutional in any circumstance while others concluded only that the relevant state sentencing statutes were unconstitutional.  *Id*. at 240–371.

338

Accordingly, as recognized four years later in *Gregg v. Georgia*, 428 U.S. 153, 170 n.15 (1976), "the holding of the Court [in *Furman*] may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]"  That position—*i.e.*, the holding of *Furman*, according to *Gregg*—is that, because "death is different in kind from any other punishment," "it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner."  *Id.* at 188; *see also id.* at 199 ("*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.").

In short, "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  428 U.S. at 189.  As discussed in *Gregg*, in order to minimize the risks discussed in *Furman*, Georgia, like many other states, "narrow[ed] the class of murderers subject to capital punishment" by establishing "statutory aggravating circumstances" that must be proven by the State in order to sentence a convicted murderer to death.  *Id.* at 196.

339

As pertinent here, one of the statutory aggravating circumstances adopted in Georgia "authorize[d] imposition of the death penalty if the murder was 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim[.]'" *Gregg*, 428 U.S. at 201. Gregg challenged that aggravator as "so broad that capital punishment could be imposed in any murder case." *Id*. The Court in *Gregg* determined that this circumstance was not unconstitutionally broad on its face, but that its constitutionality would depend upon whether the Supreme Court of Georgia adopted a properly narrowed construction of the statutory language in order minimize its application. *Id*.

Of further interest here, the Court in *Gregg* cited approvingly of Florida as providing an example of such a narrowing construction: "In the course of interpreting Florida's new capital-sentencing statute, the Supreme Court of Florida has ruled that the phrase 'especially heinous atrocious or cruel' means a 'conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" *Id*. at 201 n.52 (quoting *State v. Dixon*, 283 So. 2d 1, 9 (Fla. 1979)). Indeed, in *Proffitt v. Florida*, 428 U.S. 242, 255 (1976), issued the same day as *Gregg*, the Court concluded that the Supreme Court of Florida's construction of its statutory

HAC aggravating circumstance "provides adequate guidance to those charged with the duty of recommending or imposing sentences in capital cases."

As stated previously, Petitioner's claim before the ACCA was that Alabama's HAC aggravator fails in its constitutionally required narrowing function.  Specifically, he argued, on return to remand, that "[t]he trial court's instruction did not channel the jury's discretion adequately and the trial court arbitrarily found the existence of the aggravating circumstance without explanation."  Doc. 21-14 at 78.  In support, he asserted that the facts of his case did not satisfy the narrowing construction approved in *Proffitt* and that there "was insufficient evidence to support the aggravating circumstance."  *Id*. (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).  Thus, he concluded, "the trial court 'subverted the narrowing function of those words [meaning, presumably, "heinous, atrocious, or cruel"] by obscuring the boundaries of the class of cases to which they apply.'" *Id*. (quoting *Lindsey v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir. 1989)).

Petitioner's claim that the ACCA unreasonably applied clearly established federal law is without merit.  In *Lindsey*, which Petitioner cited in his briefing to the ACCA, the Eleventh Circuit held that Alabama's narrowing construction of the HAC aggravator, which was identical to the Florida construction of the same statutory language that was approved in *Proffitt*, "is not too indefinite to serve the

narrowing function mandated by the eighth amendment." 875 F.2d at 1514 (citing *Proffitt*, 428 U.S. at 255–56)). Furthermore, because the trial court in *Lindsey* "made the required finding" about the circumstances that rendered the murder "especially heinous, atrocious or cruel as compared to other capital offenses," and those findings—including that "the victim was bound, gagged, and assaulted with two weapons"—"did not undermine the narrowing function accomplished by" the Alabama Supreme Court's construction of the HAC aggravator, application of the aggravator did not violate Lindsey's rights under the Eighth and Fourteenth Amendments. *Id*. at 1515. Thus, to the extent Petitioner challenged the constitutionality of the aggravator, as made clear in *Proffitt* and *Lindsey*, the ACCA did not unreasonably apply *Furman* in affirming the constitutionality of Alabama's HAC aggravator.

Furthermore, to the extent Petitioner's claim in the ACCA concerned the trial court's purported failure to properly channel the jury's discretion in its consideration of the HAC aggravating circumstance, the ACCA reasonably rejected such claim. The trial court's charge to the jury defined the HAC aggravator consistently with the Alabama Supreme Court's decision in *Kyzer*, *see* Tr. 1256, which specifically adopted the narrowing construction approved in *Proffitt* and later approved in *Lindsey*. *See* 399 So. 2d at 334 (citing *Dixon*, 283

So. 2d at 1). The jury charge also explained, in detail, the limited circumstances under which the aggravator may be applied. Tr. 1256–58. Thus, the ACCA reasonably rejected any claim by Petitioner that the trial court did not properly define the aggravator or otherwise failed to "channel" the jury's consideration of the aggravator.

Likewise, the ACCA reasonably rejected Petitioner's contention that the trial court applied the HAC aggravator arbitrarily. To begin with, Petitioner's claim, on return to remand, that the trial court applied the aggravator without explanation is contradicted by the record, because, as described above, the trial court's amended sentencing order rendered specific findings about the applicability of the aggravator. In any event, the ACCA did not unreasonably apply *Furman* and its progeny in concluding that the HAC aggravator was properly applied against Petitioner. The ACCA, like the trial court before it, properly identified the facts of Seaton's murder that rendered the HAC aggravator, as narrowed by *Kyzer*, applicable. Those facts included that Seaton so feared for her life as she was being driven at gunpoint into Macon County that she offered to have sex with Petitioner and Murph in exchange for her life, that she was pulled naked from her van before being beaten, choked, and pistol whipped by her assailants, and then finally that she was repeatedly crushed by her own van and left for dead alongside the road.

343

*Hodges*, 856 So. 2d at 931.   The ACCA reasonably concluded that these facts established that Seaton suffered both physical and psychological torture, and that her death therefore was "unnecessarily torturous" within the meaning of Alabama's narrowing construction.   *Id.   See Bradley v. Nagle*, 212 F.3d 559, 570 (11th Cir. 2000) (applying *Lindsey* and affirming ACCA's independent finding that the HAC aggravator, as narrowed, applied).

Petitioner's argument in the instant petition that the trial court failed to make required "findings demonstrating any comparison between the facts of this case and other capital offenses[,]" Pet. ¶ 308, does not appear in his appellate brief on return to remand in the ACCA.   Nevertheless, to the extent any such claim may be inferred from his challenge to the HAC aggravator, the ACCA reasonably rejected it.   *First*, he cited no clearly established federal law, then or now, requiring such specific comparative fact finding.   *Second*, even if *Furman* or its progeny could be read to require such factfinding, and the trial court failed in its obligation to do so, the ACCA plainly compared the facts of Seaton's murder to another case in concluding that the aggravator applied.   *See Hodges*, 856 So. 2d at 931–32 (citing *Ex parte Hutcherson*, in which the aggravator was properly applied where the "victim was beaten to death").

Finally, although Petitioner argued to the ACCA that there was insufficient evidence to support the application of the aggravator, *see* Doc. 21-14 at 78, he did not support this argument with his current contentions that the trial court improperly applied the HAC aggravator because there was insufficient proof that Seaton was conscious when she was repeatedly run over or that she was "stripped naked" by Petitioner.   Pet. ¶ 310–11.   Nevertheless, the ACCA reasonably concluded that sufficient evidence supported application of the aggravator because the evidence showed that Seaton suffered physical and psychological torture. Petitioner cites no authority for his apparent position that, notwithstanding the beating, choking, and pistol whipping she suffered, Seaton could not have suffered physical torture if she was beaten to unconsciousness before being repeatedly run over.   Nor does he cite any authority for his apparent contention that Seaton's desperate act of stripping herself naked to offer sex to her captors in exchange for her life somehow renders the aggravator less supported than if she had been "stripped naked" by Petitioner.   As the ACCA concluded, Seaton's pleading for her life and removing her clothes amply established that she suffered psychological torture within the meaning of Alabama's narrowed construction of the HAC aggravator.   The ACCA's decision affirming the basis for application of the HAC aggravator was reasonable.

345

For all the foregoing reasons, the ACCA did not unreasonably apply clearly established federal law in affirming application of the HAC aggravator and did not base its decision upon any unreasonable determination of fact.   Accordingly, Petitioner is not entitled to relief on any aspect of his challenge of the ACCA's decision.

**IV.    Claim Four - Alabama's Use of the Death Penalty, and the Sentence of Death in this Case, is Unconstitutional.**

**A.    Evolving Standards of Decency Render the Death Penalty Unconstitutional.**

*1.    Petitioner's allegations*

Petitioner alleges that, because several states have "developed substantial concerns about the ability to implement the [death] penalty in a manner that is acceptably free from risk[,]" "evolving standards of decency have now reached the point that the continued implementation of the death penalty is unacceptable, and it is, therefore, unconstitutional."   Pet. ¶ 315.   He also alleges that, where "other nations around the world continue to bar the death penalty almost without exception," "international" standards must "shape and inform our common understanding of [w]hat amounts to an appropriate manner in which to treat fellow human beings."   Pet. ¶ 316.

*2.    The state court's adjudication*

346

Petitioner first raised this claim in his state postconviction proceedings.  The Rule 32 court found the claim procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial and on direct appeal. Doc. 21-55 at 114–15.  The ACCA affirmed dismissal pursuant to Rule 32.2(a)(5). *Hodges*, 147 So. 3d at 933.

### 3.    *Respondent's procedural defense*

Respondent asserts that this subclaim is procedurally defaulted because it was dismissed pursuant to adequate and independent state procedural rules when it was first presented by Petitioner in his Rule 32 proceedings in the state courts. Doc. 30 at 26–28.

### 4.    *This claim is procedurally defaulted.*

Petitioner does not dispute Respondent's contention that this claim is procedurally defaulted.  Rather, he relies on his broad assertion that the ineffective assistance of his appellate counsel provides "cause" for his default of this claim. Doc. 42 at 51.  Petitioner's argument is unavailing.  He has not shown, and cannot show, that appellate counsel was defective in failing to present this claim on appeal, and, because there is no Supreme Court authority establishing that "evolving standards of decency," whether considered domestically or internationally, forbid the practice of capital punishment in Alabama, he cannot

347

show prejudice due to such failure.  The state courts adjudicated this claim as procedurally barred pursuant to an adequate and independent state procedural rule. Accordingly, this claim is procedurally defaulted in federal habeas corpus.

### B. Alabama's Death Penalty is and will be Unconstitutional Until the State Adopts a Moratorium Permitting Review of its Process and Procedures.

#### 1. *Petitioner's allegations*

Petitioner alleges that "recent studies have exhaustively investigated the risks of error in capital cases[,]" and that several such studies have "concluded that the risk of error in Alabama's system is among the highest in the nation."  Pet. ¶ 317.  He further alleges that, "in order to address and minimize these risks," Alabama must implement a moratorium "to evaluate and revise the current system, because the federal rights of defendants to due process, and against cruel and unusual punishment, cannot be vindicated otherwise."  *Id.*

#### 2. *The state court's adjudication*

Petitioner first raised this claim in state postconviction proceedings.  The Rule 32 court found the claim procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial and on direct appeal. Doc. 21-55 at 114–15.  The ACCA affirmed dismissal pursuant to Rule 32.2(a)(5). *Hodges*, 147 So. 3d at 933.

### 3.    *Respondent's procedural defense*

Respondent asserts that this subclaim is procedurally defaulted because it was dismissed pursuant to adequate and independent state procedural rules when it was first presented by Petitioner in Rule 32 proceedings in the state courts. Doc. 30 at 26–28.

### 4.    *This claim is procedurally defaulted.*

Petitioner does not dispute Respondent's contention that this claim is procedurally defaulted. Rather, he relies on his broad assertion that the ineffective assistance of his appellate counsel provides "cause" for his default of this claim. Doc. 42 at 51. Petitioner's argument is unavailing. He has not shown, and cannot show, that appellate counsel was defective in failing to present this claim on appeal, and, because there is no Supreme Court authority establishing that Alabama cannot continue imposing death sentences without first establishing a moratorium so that it may review its sentencing processes and procedures, he cannot show prejudice due to such failure. The state courts adjudicated this claim as procedurally barred pursuant to an adequate and independent state procedural rule. Accordingly, this claim is procedurally defaulted in federal habeas corpus.

## C.    Lethal Injection is Unconstitutional.

### 1.    *Petitioner's allegations*

Petitioner alleges that "the actual imposition of death by lethal injection is cruel and unusual, making death by that method a violation of the federal constitution."  Pet. ¶ 318.  He further alleges that there is a substantial risk his lethal injection execution will not be properly carried out, "leading to horrifying consequences that make the process even less acceptable under relevant federal constitutional requirements."  *Id*.

### 2.   *The state court's adjudication*

Petitioner challenged the constitutionality of Alabama's use of lethal injection in his Rule 32 proceedings.  The Rule 32 court summarily dismissed the claim pursuant to Rule 32.7(d), finding that Petitioner failed to "raise a material issue of law or fact."  Doc. 21-55 at 193–94.  The ACCA, however, affirmed dismissal of the claim on the ground that it could have been, but was not, raised on direct appeal.  *Hodges*, 147 So. 3d at 933.

### 3.   *This claim is due to be dismissed.*

Respondent argues that this claim "was considered on the merits and denied as a matter of law" in the state court.  Doc. 38 at 101.  As set forth above, that contention is true, at least insofar as the Rule 32 court is concerned.  Since the ACCA was the last state court to address the claim in a reasoned opinion, however, it is the ACCA's adjudication of the claim that is operative for purposes of

AEDPA review.  The ACCA plainly found the claim procedurally barred pursuant to Rule 32.2(a)(5), because Petitioner could have, but did not, raise the claim on direct appeal.  This court is not persuaded that the ACCA's application of the state procedural bar was adequate for purposes of federal procedural default.[41]

Ultimately, this court need not resolve whether this claim is procedurally defaulted or whether it is subject to AEDPA or even *de novo* review.  This is so because, in alleging that "imposition of death by lethal injection is cruel and unusual," and further alleging a high likelihood of error if Alabama proceeds with lethal injection, Pet. ¶ 318, Petitioner's claim plainly challenges the method of his execution rather than the validity of his conviction or sentence.  As such, the claim is not cognizable in habeas corpus and, instead, must be presented in a civil action pursuant to 42 U.S.C. § 1983.  *See McNabb v. Comm'r, Ala. Dep't of Corr.*, 727 F.3d 1334, 1344 (11th Cir. 2013).  *See also Nance v. Ward*, 597 U.S. 159, 170 (2022) (holding that challenge to Georgia's use of lethal injection must be brought

---

[41] The ACCA issued its opinion affirming Petitioner's conviction and sentence on return to remand on October 26, 2001.  Petitioner filed his petition for writ of certiorari to the ASC in January 2002, and, after the ASC granted certiorari review of Petitioner's *Ring* claim and a sentencing error claim, Petitioner filed his final brief in the ASC on June 3, 2002.  *See* Doc. 21-18 at 75.  The Alabama statute establishing lethal injection as a method of execution in Alabama became effective on July 1, 2002.  *Lewis v. State*, 889 So. 2d 623, 688–89 (Ala. Crim. App. 2003).  Thus, although the ASC issued its opinion after Alabama adopted lethal injection, it would have been somewhat irregular for Petitioner to have challenged lethal injection on direct appeal.

via § 1983 even where Georgia law does not authorize an alternative method of execution).  Accordingly, this claim is due to be dismissed in this habeas action.

### D.     The Process Used by Alabama for Imposing Death by Lethal Injection is Unconstitutional.

#### 1.     Petitioner's allegations

Petitioner next challenges Alabama's "lack of adequate procedures" concerning lethal injection and "lack of a process through which interested individuals can participate in the development of those procedures."  Pet. ¶ 319. He alleges that "[c]urrent procedures do not place adequate checks on the process of execution by lethal injection, creating excessive risk of an impermissible, wanton infliction of pain or a lingering death."  *Id*.  He also alleges a violation of his due process rights because there is a "lack of acceptable process through which interested and qualified individuals may influence the development of these procedures."  Pet. ¶ 320.

#### 2.     The state court's adjudication

Petitioner presented his challenge to Alabama's process for imposing death by lethal injection in his Rule 32 proceedings.  The Rule 32 court summarily dismissed the claim pursuant to Rule 32.3 and Rule 32.6(b), finding that Petitioner "failed to allege any specific facts demonstrating that the State of Alabama's lethal injection procedures are unconstitutional."  Doc. 21-55 at 143.  The Rule 32 court

352

also dismissed the claim pursuant to Rule 32.7(d), finding that Petitioner failed to "raise a material issue of law or fact."  Doc. 21-55 at 194–95.  It does not appear that the ACCA addressed this specific claim in its decision affirming the denial of Petitioner's Rule 32 petition.[42]

> ### 3.      *This claim is due to be dismissed.*

In challenging the alleged "lack of adequate procedures" and "lack of a process through which interested individuals" may participate in the formulation of Alabama's lethal injection procedures, Pet. ¶¶ 319–20, Petitioner plainly is challenging the method of his execution or, at least, the manner by which the method of his execution is devised, rather than the validity of his conviction or sentence.  Thus, for the reasons already stated respecting his claim challenging lethal injection, his claim is not cognizable in habeas corpus and, instead, must be pursued via a civil action pursuant to § 1983. *McNabb*, 727 F.3d at 1344. Accordingly, this claim is due to be dismissed in this habeas action.

> ## E.      **The Death Penalty, as Applied in Alabama, is Racially Biased.**

> ### 1.      *Petitioner's allegations*

Petitioner alleges that statistical studies have shown that "[w]here, as here, a defendant is black and the victim white, the defendant is far more likely to receive

---

[42] Respondent concedes the claim was denied by the Rule 32 court but does not point to any adjudication by the ACCA.  Doc. 38 at 102.

a sentence of death than in any other circumstance." Pet. ¶ 321. He contends this fact "demonstrates beyond a reasonable doubt that, regardless of the ability of a defendant to demonstrate overt racial bias in the conduct of his trial, an unconscious bias is associated with the sentencing process in cases like these." Pet. ¶ 322. He alleges this "unconscious bias" "leads to the imposition of the death penalty because of reasons that have no legitimate bearing on punishment of the defendant." *Id*. While he acknowledges that his claim about racial bias in capital sentencing, as demonstrated in statistical analysis, was rejected in *McCleskey v. Kemp*, 481 U.S. 279 (1987), Petitioner nevertheless claims that statistical analysis following that decision makes it "appropriate to reconsider the rulings of *McCleskey* at a federal level" because "reanalysis demonstrates that the *McCleskey* analysis impermissibly allows built-in racial bias to create a racial gerrymander in capital murder cases" involving a black defendant and white victim. Pet. ¶ 323. Finally, he alleges that the state courts unreasonably applied *Furman* in rejecting his claim. Pet. ¶ 326.

### 2. The state court's adjudication

On direct appeal, citing *McCleskey*, Petitioner's brief in the ACCA argued that "[t]he death penalty was sought and imposed in this case because of the race and status of the victim." Doc. 21-14 at 160. He asserted that, had the victim been

"poor and black," he "would not have been sentenced to death." *Id*. He thus maintained that this "racially discriminatory pattern" violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *Id*. In its opinion affirming Petitioner's conviction and sentence, the ACCA rejected Petitioner's argument, finding that Petitioner "cite[d] no basis" for his assertion about a pattern of racial discrimination in sentencing. *Hodges*, 856 So. 2d at 929. The ACCA further concluded that, after its own review of the record, "[t]here is absolutely no evidence that Hodges's sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. *Id*. at 929–30 (citing § 13A-5-53(b)(1)).

Petitioner next presented the instant federal claim essentially verbatim in his Rule 32 petition. *See* Doc. 21-27 at 175–76. The Rule 32 court found the claim procedurally barred pursuant to Rule 32.2(a)(3), because it could have been but was not raised at trial, Rule 32.2(a)(4), because it was raised or addressed on appeal, and Rule 32.2(a)(5), because, presumably, parts of the claim first presented in the Rule 32 petition could have been, but were not, raised on appeal. Doc. 21-55 at 115. The ACCA affirmed dismissal of this claim on the basis that it was raised and addressed on direct appeal. *Hodges*, 147 So. 3d at 932 (citing *Hodges*, 856 So. 2d at 929–30).

### 3.   *Respondent's procedural defense*

Respondent concedes that Petitioner argued on direct appeal that his sentence was the product of racial bias.  Doc. 38 at 102.  Respondent maintains, however, that, to the extent Petitioner "attempted to expand on this claim and add factual support during post-conviction proceedings," the claim is procedurally defaulted because of the procedural bars applied by the state courts in Rule 32 proceedings.  *Id*.  Petitioner does not address Respondent's argument.  *See* Doc. 42 at 52–53.

Because the ACCA found that this claim, as presented to it in Petitioner's appeal of the denial of his Rule 32 petition, was previously addressed in Petitioner's direct appeal, this court does not conclude that the claim is procedurally defaulted.  Instead, the court reviews the ACCA's decision on direct appeal pursuant to AEDPA.

4.   *The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon an unreasonable determination of fact.*

The ACCA did not unreasonably apply *Furman*, or any other clearly established federal law, in rejecting Petitioner's claim.  This is apparent by the very terms of Petitioner's claim.  In arguing that post-*McCleskey* research cited in the petition warrants "reconsideration" of "the rulings in *McCleskey* at a federal level[,]" Pet. ¶ 323, Petitioner essentially concedes that his claim depends upon a

reversal of *McCleskey* and that, accordingly, the ACCA could not have unreasonably applied that decision or the authorities upon which it was based.

A review of *McCleskey* demonstrates that the ACCA's decision on direct appeal was consistent with that decision. In *McCleskey*, the habeas petitioner, McCleskey, presented a statistical study showing that, in Georgia, "black defendants . . . who kill white victims have the greatest likelihood of receiving the death penalty." 481 U.S. at 287. The Court rejected McCleskey's claims that this statistical disparity demonstrates that Georgia's capital punishment statute violates the Equal Protection Clause of the Fourteenth Amendment or the Eighth Amendment, as explicated in *Furman*. On the equal protection claim, the Court held that McCleskey's statistical showing was insufficient to meet his burden of showing that "decisionmakers in *his* case acted with discriminatory purpose." *Id*. at 292 (emphasis in original). On the Eighth Amendment claim, the Court recognized that, at most, the statistical study "indicates a discrepancy that appears to correlate with race[,]" but that such discrepancy "is a far cry from the major systemic defects identified in *Furman*." *Id*. at 312 (internal quotation and citation omitted). The Court held that, considering "the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants,"

McCleskey's statistical study "does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process." *Id*. at 313.

Petitioner's claim before the ACCA on direct appeal presented nothing beyond his unvarnished assertion that he would not have been sentenced to death had Seaton been poor and black. The ACCA plainly did not unreasonably apply clearly established federal law in rejecting such argument. Petitioner's claim in his Rule 32 proceedings attempted nothing more than a relitigation of *McCleskey* based upon vaguely described post-*McCleskey* "statistical analysis" that was consistent with the thesis of the research addressed in *McCleskey*. The ACCA plainly could not have unreasonably applied clearly established federal law in declining Petitioner's invitation to "reconsider the rulings in *McCleskey*" based upon this additional research. Accordingly, Petitioner is not entitled to relief on this claim.

## V.    Claim Five - Petitioner's Right to a Fair Trial by an Impartial Jury was Denied by Juror Misconduct in Violation of the Sixth and Fourteenth Amendments to the Constitution of the United States.

Petitioner alleges four instances of juror misconduct which, he claims, violated his constitutional rights. The court will address each in turn.

### A.    Jurors Engaged in Premature Deliberations.

#### *1.    Petitioner's allegations*

358

Petitioner alleges "jurors began discussing their views on the death penalty generally and about Mr. Hodges's case specifically as soon as they realized they were going to be the jurors on the case. This occurred before the trial began, as they were waiting to be brought into the courtroom. During the same conversation, they elected the jury foreman." Pet. ¶ 327. He further alleges that, during breaks in the trial, "jurors discussed all of the new evidence that they had heard. They wrote the new facts they had learned on a board, and all of the jurors commented on what they thought about the new information." Pet. ¶ 328. Finally, he alleges that one unidentified juror "discussed the case with his roommate on the day of the deliberations but outside the presence of the other jurors." Pet. ¶ 329. Based upon these allegations of premature deliberations, he alleges as follows:

> By beginning to form collective conclusions before all of the evidence had been presented in the case, the jury demonstrated its willingness to ignore the instructions of the judge and interfered with the ability of the jurors to consider all of the evidence impartially. The jurors' improper conduct denied Mr. Hodges a fair trial.

Pet. ¶ 330.

### 2. *The state court's adjudication*

Petitioner presented this claim in his Rule 32 petition. Doc. 21-27 at 124–25. The Rule 32 court found the claim procedurally barred pursuant to Rule 32.2(a)(3) and (a)(5) because it could have been, but was not, raised at trial and

could have been, but was not, raised on direct appeal. Doc. 21-55 at 111. The ACCA affirmed dismissal of the claim pursuant to Rule 32.2(a)(5), noting that Petitioner had failed to allege in his Rule 32 petition "that his allegations of juror misconduct could not have been raised at trial or on appeal." *Hodges*, 147 So. 3d at 932; *id*. at n.4. Petitioner then argued in the ASC that the ACCA had improperly concluded that he could have presented his juror misconduct claims on direct appeal. *See* Doc. 21-49 at 45–47. The ASC granted certiorari "for the limited purpose of determining whether" the ACCA's decision dismissing Petitioner's claim "alleging juror misconduct during the voir dire examination" conflicted with intervening ASC authority. *Hodges*, 147 So. 3d at 974. Although the ASC reversed and remanded on Petitioner's claim alleging juror misconduct during voir dire, the ASC did not address Petitioner's other juror misconduct claims. Thus, the ASC did not disturb the ACCA's application of Rule 32.2(a)(5) to bar Petitioner's claim that jurors improperly deliberated prematurely.

### 3.    *Respondent's procedural defense*

Respondent asserted in his answer that this claim of juror misconduct is procedurally defaulted because of the ACCA's application of the state procedural rule to bar the claim in Rule 32 proceedings. *See* Doc. 37 at 90. Curiously, however, Respondent did not address any of Petitioner's juror misconduct claims

in his brief on procedural default.   Then, in Respondent's brief on the merits, Respondent again asserted his procedural default defense, with additional argument that this claim is not exhausted because Petitioner did not reargue the claim in the ACCA after the ASC remanded for an evidentiary hearing on a separate juror misconduct claim.   Doc. 38 at 104.

Addressing Respondent's latter argument first, Respondent points to no authority supporting his contention that this claim is unexhausted, and hence defaulted, because Petitioner did not attempt to reargue this claim in the ACCA after the ACCA already found the claim procedurally barred and the ASC further declined to disturb that judgment.[43]   Petitioner presented this claim in one complete round of state court review.   That is all that is required for exhaustion purposes. Thus, this court concludes that, contrary to Respondent's contention, the claim is exhausted.

As to Respondent's primary basis for asserting procedural default—that the claim was found procedurally barred by the ACCA—this court is not convinced. Although the ASC did not disturb the ACCA's finding that this claim is

---

[43] Indeed, Respondent argued on remand to the Circuit Court that, because all juror misconduct claims excepting the specific claim remanded by the ASC had been "procedurally dismissed," it would be inappropriate for the Rule 32 court to entertain evidence in support of such claims.   Rule 32 Tr. 33–34.   Respondent will not now be heard to argue that Petitioner nevertheless should have re-presented all his "procedurally dismissed" juror misconduct claims in a second round of Rule 32 proceedings in order to exhaust them.

procedurally barred because it could have been but was not raised on direct appeal, it does not appear to this court that there is any principled basis to distinguish this claim from the reasoning employed by the ASC in rejecting that state procedural bar to another of Petitioner's juror misconduct claims.  The ASC concluded that Petitioner's claim that jurors provided false answers during voir dire was not procedurally barred because the state court record did not "indicate that Hodges knew or reasonably should have known of the jurors' alleged untruthfulness in time to raise the issue on direct appeal."  *Hodges*, 147 So. 3d at 976.  Likewise, Respondent here does not point to anything in the state court record indicating that Petitioner knew or reasonably should have known about jurors' alleged premature deliberations in time to raise the issue on appeal.  Accordingly, this court concludes that Respondent has failed to sustain his burden in proving the affirmative defense of procedural default as to this claim.

### 4.    *Petitioner is not entitled to relief.*

Despite that the ACCA did not render a judgment on the merits of this claim, Petitioner argues that "the Alabama Court unreasonably applied Supreme Court precedent" when it denied relief on this claim.  Doc. 31 at 94.  The only Supreme Court precedent cited by Petitioner in support of this argument is *Morgan v. Illinois*, 504 U.S. 719, 727 (1992), which is cited for the proposition that the Sixth

and Fourteenth Amendments "require that a jury 'stand impartial and indifferent.'"
Doc. 31 at 93.  That is indisputably true, insofar as it goes, but *Morgan* had nothing
to do with the issue presented in this claim.  *Morgan* concerned whether a trial
court conducting voir dire for a capital jury trial violated the defendant's
constitutional rights when it refused to query jurors whether, should they find the
defendant guilty of murder, they would "automatically vote to impose the death
penalty no matter what the facts are."  504 U.S. at 723 (quotation marks omitted).
The decision says nothing about a standard for determining whether and when a
jury's premature deliberations might deprive the defendant of the "impartial and
indifferent" jury guaranteed by the Constitution.  *See Gavin*, 40 F.4th at 1271
(distinguishing *Morgan* where habeas petitioner challenged jurors' alleged
premature penalty phase deliberations).  Petitioner has not cited any Supreme
Court decision holding that the Constitution demands that jurors refrain from
forming opinions about the evidence during the course of trial, or even discussing
their opinions based upon the evidence admitted in court.

Although the Supreme Court has not definitively announced a constitutional
standard governing claims of this sort, federal appellate courts, including our own,
have recognized that, at some point, "[a] jury's impartiality is endangered by
colloquy among jurors about the case prior to the beginning of formal

deliberations." *United States v. Dominguez*, 226 F.3d 1235, 1243 (11th Cir. 2000) (citing *United States v. Yonn*, 702 F.3d 1341, 1345 n.1 (11th Cir. 1983)). On the other hand, courts have also recognized the inevitability, despite instructions otherwise, that jurors will sometimes discuss aspects of the case amongst themselves before the close of evidence. *See Winebrenner v. United States*, 147 F.2d 322, 330 (8th Cir. 1945) (Woodrough, J., dissenting) ("No normal honest Americans ever worked together in a common inquiry for any length of time with their mouths sealed up like automatons or oysters."). This observation is especially relevant in capital cases, which tend to last several days or even weeks and sometimes involve sequestration of jurors.

In any event, where improper premature deliberations are alleged, without the influence of alleged extrinsic evidence,[44] courts have examined the record for some indication that the defendant was prejudiced by any premature deliberations. *See, e.g., United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974) (citations omitted) ("What is involved here is the premature discussion among the jurors themselves about the case. Assuming that there was juror misconduct, it is still true that not every incident of juror misconduct requires a new trial. The test is

---

[44] Although Petitioner alleges one unnamed juror discussed the case with his roommate "on the day of deliberations but outside the presence of the other jurors," Pet. ¶ 329, he does not allege that this juror sought or received extrinsic advice or opinion from his roommate, or that the roommate otherwise exposed him to extrinsic information about the case.

whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial."). *See also United States v. Siegelman*, 640 F.3d 1159, 1187 (11th Cir. 2011) (affirming district court's finding that premature jury deliberations, while constituting misconduct, were harmless, and did not warrant a new trial, because of the "totality of the circumstances, the strength of the government's case, the length of jury deliberations, and the court's instructions to the jury"). Importantly, it is not sufficient to merely allege that premature deliberations occurred. *Belmontes v. Brown*, 414 F.3d 1094, 1124–25 (9th Cir. 2005), reversed on other grounds, *Ayers v. Belmontes*, 549 U.S. 7 (2006). Rather, the petitioner "must allege facts which, if proved, would show that the premature deliberations prejudiced him to the extent that he did not receive a fair trial." *Id*.

Petitioner here alleges nothing more than that premature deliberations occurred. As recounted above, his allegations are set out in three separate paragraphs, in which he alleges as follows: jurors discussed their views about the death penalty and Petitioner's case "as soon as they realized they were going to be the jurors on the case"; during breaks jurors "discussed all of the new evidence they had heard," "wrote the new facts they had learned on a board," and shared comments "on what they thought about the new information"; and one juror "discussed the case with his roommate on the day of the deliberations but outside

the presence of the other jurors." Pet. ¶¶ 327–29. From these specific allegations, Petitioner leaps to the unsupported conclusion that jurors' premature discussions about evidence caused them "to form collective conclusions before all of the evidence had been presented in the case," which "demonstrated" jurors' "willingness to ignore the instructions of the judge and interfered with the ability of the jurors to consider all of the evidence impartially." Pet. ¶ 330.

But none of Petitioner's allegations permit the reasonable inference that *any* jurors formed a premature conclusion on the ultimate question before the jury, much less that there was any "collective conclusion," or that jurors' alleged premature discussions interfered with any juror's ability to consider the evidence impartially. In short, Petitioner alleged nothing more than that some premature discussions occurred, *i.e.*, that the jurors did not "work together . . . with their mouths sealed up like automatons or oysters." *Winebrenner*, 147 F.2d at 330. Although Petitioner therefore alleged juror misconduct, he did not allege facts supporting any claim of prejudice due to such misconduct. Thus, he did not allege misconduct of a constitutional dimension.

Furthermore, as in *Siegelman*, other aspects of the record demonstrate that any premature deliberations did not prejudice Petitioner. *First*, considering the strength of the State's case, it is not reasonably likely that jurors' premature

366

discussions about the evidence prejudiced the outcome of the guilt phase of trial. *Second*, considering that the jury returned a life recommendation after the penalty phase, Petitioner's allegation that there was a prejudicial "collective conclusion" related to that jury question, if any, is plainly rebutted.

Given all of the above, this court concludes that Petitioner has failed to adequately allege that his constitutional rights were violated due to the premature jury deliberations alleged in his petition.  Accordingly, Petitioner is not entitled to relief on this claim.

### B.   Alternate Juror Improperly Participated in Deliberations.

#### 1.   *Petitioner's allegations*

Petitioner alleges that, although he was dismissed at the close of evidence, alternate juror Edward Thompson "participated in the guilt phase deliberations of the case by voting with a paper ballot."  Pet. ¶ 331.  Petitioner submits that such participation "was an impermissible outside influence on the deliberation of the properly-selected jurors in the case."  *Id*.

#### 2.   *The state court's adjudication*

Petitioner raised this claim in his amended Rule 32 petition.  Doc. 21-27 at 125.  His claim in the state court differed, however, in two respects.  *First*, he alleged that Thompson "participated in the guilt *and* penalty phase deliberations of

the case." *Id*. (emphasis supplied).   *Second*, he omitted any reference to Thompson's having participated by voting with a paper ballot. *Id*.[45]

As discussed previously, the Rule 32 court dismissed Petitioner's jury misconduct claims, including the instant claim, pursuant to Rule 32.2(a)(3) and (a)(5), Doc. 21-55 at 111, and the ACCA affirmed dismissal of the claim pursuant to Rule 32.2(a)(5). *Hodges*, 147 So. 3d at 932. Although Petitioner then argued in the ASC that the ACCA had improperly concluded that he could have presented his juror misconduct claims on direct appeal, *see* Doc. 21-49 at 45–47, the ASC granted certiorari, and explicitly found the ACCA's application of Rule 32.2(a)(5) erroneous, with respect to one of Petitioner's other juror misconduct claims. Thus, the ASC did not disturb the ACCA's procedural adjudication of Petitioner's other jury misconduct claims, including the instant claim. *Hodges*, 147 So. 3d at 974.

### 3.   *Respondent's procedural defense*

As with the previous juror misconduct claim, Respondent asserts that this claim is procedurally defaulted because of the ACCA's application of the state procedural rule to bar the claim in Petitioner's Rule 32 proceedings. *See* Doc. 37 at 90; Doc. 38 at 104.

---

[45] As will be further discussed below, the discrepancy between Petitioner's state court and federal articulation of this claim stems from the fact that Thompson testified in the Rule 32 evidentiary hearing on remand from the ASC. The federal articulation of this claim reflects aspects of Thompson's testimony at the hearing.

368

As before, this court is not persuaded by Respondent's procedural default defense.  Once again, Respondent points to nothing in the record indicating that Petitioner knew or should have known about Thompson's alleged participation in deliberations in time to raise the issue on direct appeal.  Accordingly, for the reasons already stated, this court concludes that Respondent has failed to sustain his burden in proving the affirmative defense of procedural default as to this claim.

### 4.    *Petitioner is not entitled to relief.*

Petitioner cites no Supreme Court precedent establishing a standard for evaluating a claim that an alternate juror's improper participation in deliberations violated the constitutional rights of the defendant.  The only federal case Petitioner does cite, *United States v. Acevedo*, 141 F.3d 1421, 1423–24 (11th Cir. 1998), addressed whether the trial court's failure to discharge alternate jurors pursuant to Fed. R. Crim. P. 24(c), thereby allowing the alternate jurors to participate in deliberations, mandated "automatic mistrial" under the federal rules.  Nevertheless, in *United States v. Olano*, 507 U.S. 725, 737 (1993), which is cited in *Acevedo*, the Court assumed, *arguendo*, that an alternate juror's participation in jury deliberations could implicate constitutional protections.  The Court indicated the issue would properly be analyzed under its "'intrusion' jurisprudence," pursuant to which claims of improper influence upon the jury's deliberations are assessed for

actual or presumptive "prejudicial impact." *Id*. at 737–38.   Hence, as with the previous juror misconduct claim, Petitioner's claim ultimately asks whether the alleged misconduct prejudiced the jury's verdict.

Although no state court ever addressed this claim of juror misconduct on the merits, the state court record as to this issue is sufficiently developed that this court can easily conclude that Petitioner was not prejudiced.   This is so because the alternate juror alleged to have participated in jury deliberations, Thompson, was also one of the jurors whom Petitioner alleged improperly failed to disclose material information during voir dire.   Hence, Thompson's alleged misconduct in voir dire was the subject of the ASC's remand for an evidentiary hearing in the Rule 32 court.   Indeed, Thompson was the only juror who testified at the evidentiary hearing.   While the Rule 32 court on remand understood that the ASC "did not instruct this Court to explore whether [Thompson] engaged in any deliberation[,]" the Rule 32 court nevertheless rendered factual findings on the issue because Thompson "was extensively questioned about it, and his responses provided insight into his demeanor, memory and ability to recall certain events around the time of trial."  Doc. 21-56 at 131.

The Rule 32 court summarized Thompson's "extensive" testimony about his participation in jury deliberations as follows:

As to deliberations, when questioned by Hodges' attorneys, [Thompson] testified that he did not discuss his view of the evidence with other jurors in court. He did not recall discussing Hodges' guilt or innocence with other jurors before leaving the courthouse. He testified that he could tell during the trial the other jurors agreed with his subjective belief that Hodges was guilty by his perception of how the other jurors looked and/or acted. [Thompson] was asked whether he remembered deliberating with other jurors and he answered that he was shown the evidence and determined Hodges was guilty and felt the other jurors went along. [Thompson] testified he recalled being present when the jurors decided Hodges was guilty and that he was with the other jurors when it was determined he should be sentenced to life without parole. He did not recall being designated an alternate juror or being excused as an alternate.

When questioned by the State, [Thompson] recalled the judge calling him aside at the conclusion of the evidence. When asked why the judge did that, [Thompson] replied that the judge asked him about the trial. He recalled twelve jurors sat through the trial rather than fourteen, although he stated that if the record reflected there were fourteen and he was one of the jurors ultimately released, he would not disagree. [Thompson] testified that he sat with the other jurors and voted, although he could not recall who the foreperson was. [Thompson] did not remember there being a second portion of the trial, did not recall a penalty phase, and testified he did not vote in a penalty phase.

[Thompson] testified he had to leave the trial early because his wife was handicapped and he needed to care for her. He testified he was told he may be called back when released but was not called back. The record reflects that in fact, during jury selection [Thompson] expressed reservations about serving as a juror based on his wife's physical problems. It appears that due to faulty recollection, [Thompson] placed this discussion with the judge at the conclusion of the trial rather than the outset. [Thompson] testified that he recalled the jury deliberating for four or five days or more. On follow-up questioning he allowed that it may have been the entire trial, not jury deliberation, that lasted four or five days.

> [Thompson] is 70 years old.  It appears that since before this 1999 trial he has had to care for his wife, who has cerebral palsy.  He testified that he himself suffers from cancer and had some sort of procedure to treat it approximately two years ago.  He further testified that he has heart problems, is diabetic, and at the time of the May 16, 2012 hearing took five or six different medicines.  He and his wife live in separate apartments at Ease House, an assisted living facility.

Doc. 21-56 at 132–33.  Based upon its observations of Thompson's testimony, the

Rule 32 court rendered the following findings:

> In observing [Thompson] this Court found him to have difficulty hearing and answering questions.  In discussing his participation in the trial it appeared to the Court that [Thompson] may not have appreciated the distinction between serving on the jury and actually engaging in the jury deliberation.  In fact, his recollection of his participation on the jury contradicts the record with regard to his being revealed as an alternate juror; his being excused prior to the commencement of guilt phase deliberation; and the number of jurors who rendered a verdict as to both guilt and the recommended penalty (12 as opposed to 14).

Doc. 21-56 at 133.

The Rule 32 court's summary of Thompson's testimony, and its conclusions

therefrom, are persuasive.[46]    On the whole, Thompson's testimony was

inconsistent, and, on the specific question underlying this claim, unreliable.  It was,

as the Rule 32 court found, the product of an elderly gentleman with obvious

medical issues and stressful living circumstances offering confused testimony

---

[46] The Rule 32 court's "determination" of "factual issues" is presumed correct and may be rebutted only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

about events from nearly thirteen years prior.  Thompson appeared to not hear or understand some of the questions asked of him, and he appeared to confuse or misunderstand the concepts and premises behind many of those questions.  As an example, at one point Thompson denied that he "discuss[ed] and decid[ed] with the other jurors whether or not Mr. Hodges was guilty or innocent[.]"  Rule 32 Tr. 53–54.  Then, when he was asked if he remembered "deliberating with the other jurors to decide whether Mr. Hodges was guilty of the charges or was not guilty of the charges[,]" he responded, "We said he was guilty."  Rule 32 Tr. 54.  He also appeared to suggest that, while he had voted that Petitioner was guilty, he was not present for the verdict because he was needed at home to care for his wife.  Rule 32 Tr. 68.

Thompson's testimony about his participation in the penalty phase was similarly muddled.  While he denied having participated in penalty phase deliberations, Rule 32 Tr. 68, he also testified, "We gave him life without parole."  Rule 32 Tr. 55.  Elsewhere, he acknowledged going home before the other jurors, but appeared to believe that he was excused by the trial court so that he could care for his wife.  Rule 32 Tr. 69.  Thompson even said that the trial court told him when he was released that he might be "called back," but that he never was.  Rule

32 Tr. 70.[47]  Later, Thompson characterized the trial court's instructions to the jury as asking "us how we were going to plead."  Rule 32 Tr. 75.

In short, Thompson's testimony about his improper participation in jury deliberations is unreliable.  As the Rule 32 court found, Thompson appeared to conflate jury service with jury deliberation, and he appeared to not understand that he was an alternate juror or the reason why he was dismissed after the close of evidence.  Because Thompson's testimony on the specific question of his improper participation in jury deliberations is unreliable, Petitioner cannot show that any such participation actually occurred, much less that it somehow prejudiced the outcome of his trial under the governing federal constitutional principles.  Accordingly, this claim of juror misconduct is due to be denied.

## C.    Jurors Improperly Relied Upon Outside Knowledge and Beliefs.

### 1.    *Petitioner's allegations*

Petitioner alleges, without elaboration, that "[t]hroughout the penalty phase deliberations, the jury improperly speculated, on the basis of outside knowledge of the jurors rather than any information provided by the court, that Mr. Hodges might become eligible for release from prison even if the jury recommended that he be sentenced to Life Without Parole."  Pet. ¶ 332.  He further alleges that such

---

[47] This was the trial court's usual admonition to potential jurors that were excused during voir dire.  It is unclear to what Thompson was referring when he testified the trial court told him he might be called back.

"outside information" improperly influenced the "decisions of at least the four jurors who voted for the death penalty," resulting in a violation of his rights to an impartial jury, due process, and to "confront those presenting evidence against him[.]" *Id.*

### 2.   *The state court's adjudication*

Petitioner raised this claim in his amended Rule 32 petition.  Doc. 21-27 at 125.  As discussed previously, the Rule 32 court dismissed Petitioner's jury misconduct claims, including the instant claim, pursuant to Rule 32.2(a)(3) and (a)(5), Doc. 21-55 at 111.  The Rule 32 court also dismissed the claim pursuant to Rule 32.7(d), finding that Petitioner had "failed to state a claim upon which relief may be granted."  *Id.* at 175–76.  In support, the Rule 32 court found that, to the extent any juror expressed a belief "that the defendant might one-day be released if sentenced to Life Without Parole," such opinion was "nothing more than a personal belief and does not constitute extraneous information."  *Id.* at 176.  Furthermore, the Rule 32 court observed, because "a jury's verdict may not be impeached by the testimony of jurors as to matters which transpired during the deliberations[,]" Petitioner "cannot impeach the sentencing recommendation of the jury by divulging the conversations of the jury."  *Id.*

The ACCA affirmed dismissal of the claim pursuant to Rule 32.2(a)(5). *Hodges*, 147 So. 3d at 932.  Although Petitioner then argued in the ASC that the ACCA had improperly concluded that he could have presented his juror misconduct claims on direct appeal, *see* Doc. 21-49 at 45–47, the ASC granted certiorari, and explicitly found the ACCA's application of Rule 32.2(a)(5) erroneous, with respect to only one of Petitioner's juror misconduct claims.  Thus, the ASC did not disturb the ACCA's procedural adjudication of the remaining jury misconduct claims, including the instant claim.  *Hodges*, 147 So. 3d at 974.

### 3.   *Respondent's procedural defense*

As with the previous juror misconduct claims, Respondent asserts that this claim is procedurally defaulted because of the ACCA's application of the state procedural rule to bar the claim in Rule 32 proceedings.  *See* Doc. 37 at 90; Doc. 38 at 106–07.

As before, this court is not persuaded by Respondent's procedural default defense.  Once again, Respondent points to nothing in the record indicating that Petitioner knew or should have known about jurors' alleged reliance on "outside knowledge" in deliberations in time to raise the issue on direct appeal.  Accordingly, for the reasons already stated, this court concludes that Respondent

has failed to sustain his burden in proving the affirmative defense of procedural default as to this claim.

### 4.   *Petitioner is not entitled to relief.*

Because the last state court to address this claim, the ACCA, found that it is procedurally barred, this court is not bound to apply AEDPA deference to the lower state court's alternative merits adjudication of this claim.   Nevertheless, this court finds the Rule 32 court's merits adjudication persuasive and, accordingly, denies this claim for the same reasons articulated by the Rule 32 court.   Petitioner alleges nothing more than that one or more jurors speculated during the penalty phase that Petitioner might become eligible for release even if he received a life without parole sentence.   There is no specific allegation of how many jurors harbored this belief, what was the source of the belief, or the extent to which this belief was discussed among the jurors. Nor is there any specific allegation that any of the four jurors who voted to impose a death sentence were in any way influenced by such speculation.   Petitioner plainly does not allege that any juror sought out and received extrinsic evidence or opinion about whether he might one day be eligible for release notwithstanding a life without parole sentence.   *See Ward v. Hall*, 592 F.3d 1144, 1179–81 (11th Cir. 2010) (finding actual prejudice and a constitutional violation where jurors who were concerned defendant would

be released on parole if sentenced to life imprisonment queried the bailiff about whether defendant could be sentenced to life without the possibility of parole and sentenced defendant to death after bailiff answered in the negative). In short, there is no allegation of any "extrinsic" influence on the jury, much less that any outside influence actually prejudiced the outcome of the penalty phase of his trial.

The lone cases cited by Petitioner in support of his claim of a constitutional violation are plainly inapposite. In *Marshall v. United States*, 360 U.S. 310, 312 (1959), a prosecution for "unlawfully dispensing" drugs "without a prescription from a licensed physician," jurors were exposed to prejudicial newspaper articles describing the defendant's previous convictions for practicing medicine without a license. As already stated, there is no comparable extrinsic evidence at issue here. *Patterson v. People of the State of Colorado ex rel. Attorney General*, 205 U.S. 454, 459 (1907), also cited by Petitioner, involved a state contempt proceeding over "the publication of certain articles and a cartoon" that criticized "the motives and conduct of the supreme court of Colorado[.]" The Court expressed a concern that such publications might tend to influence a jury, which could be damaging in a judicial system where "conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Id*. at 462. The Court said nothing of import in

378

distinguishing between jurors' exposure to extrinsic information, like a newspaper cartoon, and jurors' speculation, based upon their independent opinions or beliefs, about the meaning of the terms over which they are deliberating.

In sum, Petitioner only alleges that, during the jury's penalty phase deliberations, one or more jurors might have speculated, based upon some unparticularized personal belief or opinion, about the meaning of the court's instructions relating to a sentence of life without the possibility of parole.  He has not alleged that any juror improperly performed independent legal research about the sentencing options before the jury, or that any juror otherwise sought advice or opinion on the matter from some extrinsic source.  Furthermore, he has not even alleged, with specifics, that any of the four jurors who voted to impose a death sentence were at all aware of, or influenced by, the speculation he describes. Petitioner therefore has not alleged *any* extrinsic or extraneous "outside" influence on the jury.  Instead, he appears to challenge jurors' mental processes and deliberations in reaching their penalty phase verdict, an inquiry that is generally impermissible under Alabama and federal law.  *See, e.g., Marshall v. State*, 182 So. 2d 573, 617–18 (Ala. Crim. App. 2014); *Siegelman*, 640 F.3d at 1185–87. Accordingly, he has failed to allege any constitutional violation and this claim is due to be denied.

**D.     Alternate Juror Failed to Disclose Material Information During Voir Dire.**

*1.     Petitioner's allegations*

Petitioner alleges that alternate juror Thompson "failed to respond to the question of whether any of the jurors knew the victim.  In fact, Mr. Thompson not only knew the victim, he considered her a friend."  Pet. ¶ 338.  He maintains that Thompson's failure to disclose this information during voir dire "disabled trial counsel from making further inquiries that would have led to and supported a challenge for cause as well as providing the basis for exercising a peremptory challenge."  *Id*.  He asserts that Thompson's "presence on the jury denied Mr. Hodges his right to a fair and impartial jury."  *Id*.  He also alleges that the error he describes was "particularly substantial" in light of Thompson's claim to have participated in deliberations, resulting "in manifest prejudice in both the guilt and sentencing phases."  *Id*.

*2.     The state court's merits adjudication*

As previously discussed, this claim of juror misconduct was the subject of the ASC's remand for an evidentiary hearing during the Rule 32 proceedings.  The Rule 32 court held an evidentiary hearing at which Thompson and Petitioner's trial attorney, Larry Ray, testified.  The Rule 32 court thereafter issued a written

opinion denying Petitioner's claim.   The Rule 32 court first summarized

Thompson's testimony about his relationship with the victim:

> [Thompson] testified that at the time of the 1999 trial he lived near the Golden Corral restaurant where victim Seaton worked.  He testified that he and his handicapped wife occasionally ate there, and he also occasionally picked up take-out orders.  The Golden Corral is a buffet restaurant as opposed to one where waitresses wait on customers.

> [Thompson] testified that, prior to the trial commencing, he did not know Seaton's name.  He did not know her name during jury selection. After the jury was selected and the trial was underway, he realized that the victim identified as Beth Seaton had worked at Golden Corral.  [Thompson] testified Ms. Seaton probably wore a name tag but that he never paid attention to it.  [Thompson] testified that he was unsure of Seaton's job duties but thought that she might be the restaurant's owner because she sometimes worked at the cash register and would ask how his meal was.  [Thompson] testified he might have waved at her and may have spoken to her perhaps three times.   The conversations would, [Thompson] testified, consist of Seaton asking how his meal had been.  [Thompson] testified that his impression of Seaton was that he liked her.  He was not sure if he had seen Seaton at the restaurant during the last year before she was killed, but had seen her in the "few years" before her death.  As [Thompson] put it, he "knew Seaton to look at her."  [Thompson] testified that once he recognized Seaton, he did not tell anyone, including other jurors, that he knew of her.

Doc. 21-56 at 131–32.  The Rule 32 court also summarized Ray's testimony about

his strategy during voir dire:

> The gist of Mr. Ray's testimony is that he questioned jurors regarding their acquaintance with Ms. Seaton and members of Ms. Seaton's family.  Mr. Ray placed great emphasis, when exercising either peremptory strikes or strikes for cause, on potential jurors who

knew Ms. Seaton or any member of her family.  Mr. Ray testified that
if [Thompson] had disclosed he knew Seaton, he would have explored
the extent of that acquaintance and, if justified, made a challenge for
cause and/or exercised a peremptory strike earlier than he did
([Thompson] was Mr. Ray's final strike, making him the alternate).

Mr. Ray did not recall, and the record does not reflect, that any
jurors were questioned regarding whether they patronized or
frequented the Golden Corral restaurant.  Mr. Ray testified that, other
than perhaps it being mentioned in the indictment, he did not recall
the Golden Corral being mentioned during voir dire.  Mr. Ray testified
that he was not highly concerned whether possible jurors were
customers of the Golden Corral restaurant; his concern was whether
perspective [sic] jurors were acquainted [with] Ms. Seaton.  When
asked, Mr. Ray testified that if a perspective [sic] juror had been asked
and had stated he or she knew Ms. Seaton because he or she was a
restaurant customer, he would not have automatically exercised a
strike; rather, Mr. Ray would have asked follow-up questions to
attempt to learn the extent, if any, of the restaurant customer/juror's
familiarity with Ms. Seaton.

Doc. 21-56 at 133.

Based on the witnesses' testimonies, the Rule 32 court made the following

findings of fact and conclusions of law:

In this case it is difficult to ascertain the temporal remoteness
regarding [Thompson's] knowledge of Seaton's identity when asked
during voir dire if he knew her or her family.  He could only speculate
in terms of years as to when he may have last encountered Seaton
before trial.

The pertinent voir dire questions asked of [Thompson] were not
ambiguous.  There were no questions concerning the Golden Corral
restaurant, or making any connection between the restaurant and
Seaton; rather the questions simply asked whether perspective [sic]
jurors knew Ms. Seaton or her family.  The evidence indicates that

[Thompson] truthfully answered those questions to the best of his recollection. The fact that it was only after trial commenced that [Thompson] connected Seaton with the restaurant is an indicia of how insignificant was his relationship with Seaton.

To the extent [Thompson] answered any pertinent voir dire questions incorrectly, it appears to be obvious that any error was a result of inadvertence as opposed to willfulness. Hodges conceded as much in his post-hearing brief. Finally, as the Court has stated previously herein, any error on the part of [Thompson] is no doubt a result of a failure to recollect, rather than any disregard for truthful disclosure.

Finally, Mr. Ray's testimony makes it clear that, had [Thompson] realized during voir dire and mentioned that he recognized Ms. Seaton as a friendly Golden Corral employee there is no reason to believe that this information would have caused Mr. Ray to exercise his strikes, or strikes for cause, any differently than he did.

It appears from the evidence elicited at the hearing that, even taking into consideration [Thompson's] age and infirmatory [sic], and the time elapsed subsequent to the trial, that he had no relationship with Ms. Seaton. The evidence indicates he was simply a customer at a buffet restaurant and that he recognized Ms. Seaton as an employee he occasionally encountered. [Thompson] was cordial to Ms. Seaton and she was cordial to him. Any acquaintance or relationship ended there.

The evidence does not indicate that [Thompson] failed to answer, or that he evasively, dishonestly or untruthfully answered, voir dire questions concerning Ms. Seaton. Nor does it indicated [sic] that the effect of [Thompson's] answers was that Hodges was prejudiced such that he would be entitled to the relief he seeks. Accordingly, as to the issues this Court has considered on remand, it DENIES Mr. Hodges' petition.

Doc. 21-56 at 134–35.

On return to remand, the ACCA affirmed.  Doc. 21-56 at 137–48.  In doing so, the ACCA rejected Petitioner's arguments both that the Rule 32 court improperly applied a heightened standard of prejudice in evaluating his claim and that he did show the requisite prejudice to sustain his claim.  *Id*. at 146–48.  On the latter point, the ACCA opined that Petitioner's claim of prejudice was defeated because Thompson "was an alternate juror and did not sit in judgment of Hodges in this case, so Hodges could not—and did not—prove that he might have been prejudiced by [Thompson's] alleged misconduct."  *Id*. at 147 (emphasis removed).  The ACCA further found that the Rule 32 court's findings of fact and conclusions of law were supported by the record and were correct as a matter of law.  *Id*.  Finally, the ACCA concluded, because the Rule 32 court was "tasked with resolving factual issues and assessing the credibility of the witnesses, and because this Court gives great weight on appeal to those determinations and to the determination of whether there was possible prejudice," the ACCA found no abuse of the Rule 32 court's discretion in its denial of relief on this claim.  *Id*. at 148.

The ASC denied Petitioner's request for certiorari review of the ACCA's decision.  *See* Doc. 21-56 at 150.

> 3.    *The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon an unreasonable determination of the facts.*

384

Petitioner alleges his rights to due process and a fair and impartial jury under the Sixth, Eighth, and Fourteenth Amendments were violated by Thompson's failure "to respond to critical questions by the trial court, the district attorney, and trial counsel on voir dire[.]"  Pet. ¶ 336.  He argues that the constitutional principle set out in clearly established federal law upon which this claim relies is as follows: "When a juror fails to truthfully answer questions on voir dire, the defendant is deprived of his right to wisely exercise peremptory strikes.  Thus, it is a recognized ground for a new trial when a juror answers falsely or fails to disclose material information on voir dire."  *Id*. (citing *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).  He therefore concludes that the ACCA's decision rejecting his claim was "an unreasonable application of established Supreme Court precedent."  Pet. ¶ 337 (citing *Williams*, 529 U.S. at 398; *Morgan*, 504 U.S. at 727; and *McDonough Power Equip.*, 464 U.S. at 554).

To be clear, none of the Supreme Court decisions cited by Petitioner provide a framework for determining whether and when a juror's failure to truthfully answer voir dire questions results in the violation of a criminal defendant's constitutional rights.  In particular, *McDonough Power Equip.*, cited in the petition and in Petitioner's briefing as providing the rule that was violated here, was a federal products liability suit in which a party requested a new trial due to a juror's

failure to respond to a voir dire question.  464 U.S. at 550–552.  While the Court referenced a party's "right to an impartial jury," *id*. at 554, it issued no rulings about due process or the Sixth, Eighth, or Fourteenth Amendments.  The question was simply whether a new trial should have been granted in accordance with the relevant provisions of the Federal Rules of Civil Procedure.  *Id*. at 553–54.  The Court indisputably recognized the role of voir dire in protecting the right to an impartial jury, but it cannot be said that it established a constitutional standard that was binding on Alabama's appellate courts for purposes of the AEDPA.

Nevertheless, even assuming that *McDonough Power Equip.* was binding on the ACCA, or that the "fairness" principle discussed in that decision was binding on the ACCA via some other Supreme Court decision, it remains that the ACCA did not unreasonably apply that decision and did not base its decision upon an unreasonable determination of the facts.  This is so because the "holding" of *McDonough Power Equip.* requires that "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire[.]"  464 U.S. at 556.  In adopting the findings of the Rule 32 court, the ACCA reasonably concluded that Petitioner did not show that Thompson failed to answer honestly any material question put to him during voir dire.

Thompson's testimony at the evidentiary hearing established that, at the time he was asked whether he knew the victim, he simply did not recognize her.  He did not know Seaton by name and therefore had no reason to respond to the voir dire question at issue.   Furthermore, Thompson and the venire were not questioned about whether they frequented the Golden Corral.  Rule 32 Tr. 129–31.  Hence, it cannot be said that during voir dire Thompson dishonestly obscured even the chance that he might know Seaton.  Thompson only recognized Seaton as someone he had seen at the Golden Corral after trial commenced, as the jury began to receive evidence and photographs depicting the victim.  Thus, as the Rule 32 court found, "[t]o the extent [Thompson] answered any pertinent voir dire questions incorrectly, it appears to be obvious that any error was a result of inadvertence as opposed to willfulness."  Doc. 21-56 at 134.

*McDonough Power Equip.* itself suggests that "a juror's mistaken, though honest response to a question" will rarely provide a basis to "invalidate" a trial. 464 U.S. at 555.  It follows that a juror's honest omission of a response to a voir dire question ordinarily will not invalidate a trial.  This, in fact, is what happened in *McDonough Power Equip.*, in which a juror, whose son once suffered a broken leg due to an exploding tire, failed to respond to a voir dire question asking whether jurors or their immediate family members had sustained accidental

injuries resulting in "disability or prolonged pain and suffering." *Id*. at 550, 555. The juror "apparently believed that his son's broken leg . . . was not such an injury." *Id*. at 555. Likewise, here, the evidence in the state court showed that Thompson honestly, even if mistakenly, did not believe that he knew the victim when he was questioned during voir dire.

Additional factors illustrate that any error owing to Thompson's failure to respond to the voir dire question at issue does not warrant "invalidating" his trial. *First*, the issue of Thompson's potential bias was explored at the evidentiary hearing in the state court. The Rule 32 court reasonably concluded that Thompson had no real relationship with Seaton. Instead, "he was simply a customer at a buffet restaurant" who "recognized Ms. Seaton as an employee he occasionally encountered." Doc. 21-56 at 135. Hence, there has been no showing that Thompson's minimal acquaintance with Seaton would have supported a challenge for cause. *Second*, as to Petitioner's missed opportunity to exercise an earlier peremptory challenge against Thompson, there has been no showing that counsel indeed would have done so.[48]  *Third*, there has been no showing that Thompson's

---

[48] Recall that Thompson was the last of Petitioner's peremptory challenges, which is why he served as an alternate juror at trial. As the Rule 32 court found, Ray testified that he would not have "automatically exercised a strike" based on a juror's acquaintance with Seaton as a restaurant customer. Doc. 21-56 at 133. Instead, he would have attempted to "learn the extent, if any, of the restaurant customer/juror's familiarity with Seaton." *Id*. Given Thompson's objectively limited familiarity with Seaton, it is not clear that counsel

service as an alternate juror somehow prejudiced the jury or the outcome of Petitioner's trial.  Thompson testified that, once he recognized Seaton, he did not reveal his acquaintance with her to the other jurors.  And, as an alternate juror, Thompson did not render a vote to convict Petitioner.[49]

At most, an alternate juror, who did not vote to convict or sentence Petitioner, did not respond to a voir dire question to which he had no reason to respond at the time it was posed.  To the extent the alternate juror's subsequent recognition of the victim could somehow constitute "misconduct" on the part of the juror, the surrounding circumstances of Petitioner's trial plainly indicate that Petitioner was not prejudiced.  The ACCA reasonably rejected this claim.  Accordingly, this claim is due to be denied.

---

would have exercised one of his earlier peremptory challenges against Thompson.  *See* Rule 32 Tr. 119–20 (Ray testifying that he would have considered other factors, beyond a juror's mere acquaintance with Seaton via the Golden Corral, when determining whether to strike a juror); *id*. at 134–35.  Nor has Petitioner identified which of the jurors whom he peremptorily challenged prior to Thompson he would have allowed to serve in Thompson's place.

[49] Petitioner maintains that, because Thompson claimed to have participated in deliberations, prejudice is manifest.  Doc. 31 at 99.  But, as set forth previously, Thompson's testimony about his participation in deliberations was confused, inconsistent, and, ultimately, unreliable.  Petitioner's claim is not enhanced by Thompson's testimony about his participation in deliberations.

389

## VI.   Claim Six – Petitioner's Constitutional Right to an Impartial Jury was Violated.

Petitioner alleges several "constitutional flaws" affecting both the grand jury that indicted him and the petit jury that convicted him.  This court will consider each of his subclaims in turn.

### A.   The Selection of the Grand Jury Foreperson was Based Upon Improper Racial Characteristics.

In a pretrial motion, Petitioner moved to dismiss the indictment against him "because of the systemic underrepresentation of blacks in the selection of grand jury forepersons."  Doc. 21-2 at 171–76.  After a hearing, the trial court denied the motion.  Doc. 21-2 at 181.  Petitioner moved the trial court for rehearing of the motion.  Doc. 21-2 at 204–06.  At a motion hearing on February 12, 1999, counsel examined witnesses and presented argument on the motion for rehearing.  Tr. 151–71.  The trial court denied the motion for rehearing.  Tr. 171; Doc. 21-3 at 37.

In March 1999, Petitioner was re-indicted by a new Lee County grand jury.[50] Doc. 21-1 at 21–22.  Petitioner moved for disclosure of the procedure used to

---

[50] At the January 18, 1999, motions hearing, the parties argued about the proof necessary to sustain the defense's claim about discriminatory selection of the grand jury foreperson. As the defense argued that it should be afforded "funds to obtain a census" and "an expert to come and present census information," Judge Harper asked, "[w]ould you prefer that this case be sent to the Grand Jury in January with a black foreman to be indicted—to be considered for indictment?"  Tr. 143.  Defense counsel responded, "Judge, whatever is the fair thing to do.  What we are saying is that this indictment should be dismissed."  *Id*. The March re-indictment followed a few weeks later.

select that grand jury's foreperson, as well as information about the race of the grand jury foreperson and the racial composition of the grand jury.  Doc. 21-3 at 42–46.  The State filed a response to the motion indicating that the foreperson of the March 1999 grand jury was black.  Doc. 21-3 at 65–66.  In a May 1999 motions hearing, Petitioner argued that the State or the trial court should explain on the record how the grand jury foreperson was selected.  Tr. 203.  The trial court stated simply that the foreperson "was selected in accordance with the rules of criminal procedure which this court followed."  *Id*.  Petitioner pressed for more information about how the selection was made.  *Id*.  The trial court stated, "I looked down the list and selected one."  *Id*.  After the trial court ruled on the rest of Petitioner's motions, the State asked "to present evidence to make sure that the record was clear that the Grand Juries are randomly selected . . . and there have been no discrimination since I have been in the district attorney's office."  Tr. 208–09.  The prosecutor explained that, of the seventeen members of the grand jury, six, including the foreperson, were black.  Tr. 209.  The prosecutor then moved into the record a statistical analysis of the demographics of Lee County grand juries, photographs of grand juries over the years, and called an expert witness to testify about the statistical analysis he conducted.  Tr. 212–22.

    *1.*    *Petitioner's allegations*

Petitioner alleges that, in selecting a black grand jury foreperson in advance of the March 1999 re-indictment, the trial court "consciously chose the new grand jury foreman based on racial characteristics (i.e., the fact that the prospective foreman was African-American). Such race-based selection, even if for a benign purpose, amounts to an unconstitutionally impermissible reliance on race in the most serious of situations." Pet. ¶ 340. He thus alleges that his indictment was "impermissibly tainted, and should have been dismissed with prejudice." *Id*. He maintains that, regardless of the foreperson's "ministerial" role under Alabama law, during grand jury deliberations, "the foreman will necessarily receive more deference from the other jurors, and the foreperson's impermissible selection will therefore have an influence on the issuance of the indictment." Pet. ¶ 341.

### 2.    *The state court's merits adjudication*

On direct appeal, Petitioner argued that Lee County's method for selecting a grand jury foreperson was racially discriminatory in violation of his equal protection rights. Doc. 21-14 at 85.[51] He further argued that the selection of a black foreperson before the second indictment "was clearly an orchestrated attempt by the court to stifle Mr. Hodges' claim that the method of selecting grand jury forepersons in Lee County was not [sic] racially discriminatory." *Id*. at 87. He

---

[51] Petitioner's reply brief in the ACCA clarified that his claim concerned equal protection only, and that he "does not assert a due process claim." Doc. 21-15 at 139.

argued that, notwithstanding the selection of a black foreperson for the second indictment, the process was "invidiously discriminatory" because "the court selected the foreperson based on race and no other factor." *Id*. at 88.  In essence, he maintained that the trial court could not "remedy twenty-five years of discrimination by employing one act of reverse discrimination that was marked solely by an evaluation of race and no other criteria." *Id*. at 89.

The ACCA rejected Petitioner's argument.  The ACCA described the process by which Petitioner was indicted by a second grand jury with a black foreperson and held that, "[e]ven if there was evidence of discrimination in the selection of a grand jury foreperson, there are no grounds for invalidating the indictment because of the ministerial nature of the foreperson's role in the grand jury proceedings." *Hodges*, 856 So. 2d at 896–97 (citing *Pace v. State*, 714 So. 2d 332 (Ala. 1997)).  In support, the ACCA quoted from a prior ASC opinion contrasting the largely "ministerial" function of the grand jury foreperson in Alabama with that of the grand jury foreperson in Tennessee, which the United States Supreme Court addressed in *Rose v. Mitchell*, 443 U.S. 545 (1979).  The gist of these authorities established that, unlike in Tennessee, where the grand jury foreperson "had a substantive duty to assist the district attorney in the investigation of crimes" and thereby enjoyed a "virtual veto power over the indictment

process[,]" the duties of the grand jury foreperson in Alabama are limited to "merely reporting grand jury votes and signing the appropriate paperwork prepared by the court or the district attorney." *Hodges*, 856 So. 2d at 897) (quoting *Ex parte Drinkard*, 777 So. 2d 295, 305 (Ala. 2000) (quoting *Pace*, 714 So. 2d at 338) (internal quotation marks omitted).  The ACCA thus denied Petitioner's argument for two reasons:

> Hodges's claim that his equal protection rights were violated is moot because he was reindicted by a grand jury that had a black foreperson. Moreover, even if Lee County's method of selecting a grand jury foreperson is discriminatory, based on the holding in *Pace*, no constitutional rights of Hodges were violated, nor is the indictment due to be set aside.

856 So. 2d at 897.

> 3.   *The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon an unreasonable determination of the facts.*

Petitioner cites two Supreme Court decisions as applying the relevant clearly established federal law governing his claim which, he alleges, the ACCA unreasonably applied: *Rose* and *United States v. Hobby*, 468 U.S. 339 (1984).  Pet. ¶ 343.  Specifically, he argues that, despite the "ministerial" nature of the grand jury foreperson in Alabama, the foreperson's selection by the trial judge "causes the foreperson to be viewed as 'the surrogate of the judge,' which may 'distort the overall composition of the [jury] array or otherwise taint the operation of the

394

judicial process.'"   Doc. 31 at 100 (quoting *Hobby*, 468 U.S. at 348).   He concludes that "[r]eliance on race at any point in a capital trial and sentencing process amount[s] to structural error meriting reversal."   *Id.* (citing *Guice v. Fortenberry*, 661 F.2d 496 (5th Cir. 1981) (en banc)).

In *Rose*, two black habeas corpus petitioners challenged, on equal protection grounds, Tennessee's process for selecting grand jury forepersons.   443 U.S. at 547.   In an important footnote, the Court described several unique features of Tennessee's grand jury practice, including that, while twelve members of the grand jury are selected randomly from lists of qualified potential jurors, the foreperson "is appointed for a term of two years by the judge of the court having criminal jurisdiction in the county."   *Id.* at 548 n.2.   The appointing judge considers vague, subjective statutory criteria in appointing the foreperson, including whether the potential foreperson is "'a good and lawful man or woman.'"   *Id.* (quoting Tenn. Code Ann. § 40-1507 (Supp. 1978)).   The appointed foreperson is, essentially, the thirteenth voting member of the grand jury.   *Id.*   Beyond the exercise of equal voting power, however, the appointed foreperson "is charged with the duty of assisting the district attorney in investigating crime, may order the issuance of subpoenas for witnesses . . . [,] [and] must endorse every bill returned by the grand jury."   *Id.*   "The absence of the foreman's endorsement makes an indictment

'fatally defective.'" *Id.* (quoting *Bird v. State*, 103 Tenn. 343, 344, 52 S.W. 1076 (Tenn. 1899)).

The Court in *Rose* "assume[d] without deciding that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire." 443 U.S. at 551 n.4. The reason the Court did not resolve that question is because, even operating under that assumption, the habeas petitioners failed to establish even a prima facie case of discrimination. *Id.* at 573.

*Hobby*, by contrast, was a federal prosecution in which the defendant moved to dismiss the indictment due to alleged improper selection of grand jurors. 468 U.S. at 340–41. "In particular, he alleged that the grand jury selection plan excluded citizens from service . . . on account of race, color, economic status and occupation, in violation of . . . the Fifth and Sixth Amendments of the United States Constitution." *Id.* (citation and quotation marks omitted). In the district court, Hobby presented statistical evidence about the absence of black and female grand jury forepersons in the relevant judicial district over the seven-year period surrounding his indictment. *Id.* at 341. The Court acknowledged that "purposeful discrimination against Negroes or women in the selection of federal grand jury foremen is forbidden by the Fifth Amendment to the Constitution." *Id.* at 342.

396

The question before the Court, however, was "the appropriate remedy for such a violation." *Id*.

Analyzing the question under the Fifth Amendment's Due Process Clause, the Court distinguished "[d]iscrimination in the selection of grand jury foremen . . . from discrimination in the selection of the grand jury itself[,]" remarking that the former "does not in any sense threaten the interests of the defendant protected by the Due Process Clause." 468 U.S. at 344. This is so because the grand jury foreman, unlike the grand jury itself, "is not a creature of the Constitution." *Id*. Furthermore, the Court observed, "the responsibilities of a federal grand jury foreman are essentially clerical in nature" and "carry with them no special powers or duties that meaningfully affect the rights of the persons that the grand jury charges with a crime, beyond those possessed by every member of that body." *Id*. at 345. Hence, "[g]iven the ministerial nature of the position, discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness. Simply stated, the role of the foreman of a federal grand jury is not so significant to the administration of justice that discrimination in the appointment of that office impugns the fundamental fairness of the process itself so as to undermine the integrity of the indictment." *Id*.

The Court in *Hobby* also distinguished *Rose* because, as discussed above, *Rose* involved a challenge pursuant to the Equal Protection Clause rather than the Due Process Clause.   468 U.S. at 347.   The Court further explained why the Tennessee procedures at issue in *Rose* warranted scrutiny under the Equal Protection Clause in contrast to the federal procedures at issue in *Hobby*:

> Moreover, *Rose* must be read in light of the method used in Tennessee to select a grand jury and its foreman.   Under that system, 12 members of the grand jury were selected at random by the jury commissioners from a list of qualified potential jurors.   The foreman, however, was separately appointed by a judge from the general eligible population at large.   The foreman then served as "the thirteenth member of each grand jury organized during his term of office, having equal power and authority in all matters coming before the grand jury with the other members thereof."   The foreman selection process in *Rose* therefore determined not only who would serve as presiding officer, but also who would serve as the 13th voting member of the grand jury.   The result of discrimination in foreman selection under the Tennessee system was that 1 of the 13 grand jurors had been selected as a voting member in an impermissible fashion.   Under the federal system, by contrast, the foreman is chosen from among the members of the grand jury after they have been empaneled; the federal foreman, unlike the foreman in *Rose*, cannot be viewed as the surrogate of the judge. So long as the grand jury itself is properly constituted, there is no risk that the appointment of any one of its members as foreman will distort the overall composition of the array or otherwise taint the operation of the judicial process.

*Id*. at 347–48 (citations and internal quotation marks omitted).

Finally, apart from Tennessee's "peculiar" procedures, the Court contrasted the Tennessee grand jury foreperson's "investigative and administrative powers

398

and responsibilities," pursuant to which the foreperson "possessed virtual veto power over the indictment process," with the "ministerial powers of the federal counterpart, who performs strictly clerical tasks and whose signature on an indictment is a mere formality." *Id*. Ultimately, the Court concluded, these differences counseled against applying in the federal context *Rose*'s assumption that discrimination in selection of the grand jury foreperson "would require the setting aside of a subsequent conviction[.]" *Id*. at 349.

Petitioner has presented no authority demonstrating that the ACCA unreasonably applied clearly established federal law when it concluded that his equal protection claim was mooted due to his indictment by a grand jury with a black foreperson. He has not shown that he may assert an equal protection violation, and have his indictment and subsequent conviction invalidated, where the group he alleges has suffered discrimination[52]—eligible black grand jurors denied the opportunity to serve as grand jury foreperson—were not, in fact, denied the opportunity to serve in that role in his case. He cites no case in which a

---

[52] To prove his equal protection claim, Petitioner must establish, *inter alia*, "that the group against whom discrimination is asserted is a recognizable, distinct class, singled out for different treatment." *Guice*, 661 F.2d at 499 (citing *Castaneda v. Partida*, 430 U.S. 482, 494 (1977)). Petitioner is not here alleging a claim that whites (or any other distinct non-black group or class), who were denied the opportunity to serve as foreperson on the grand jury that indicted him due to alleged discriminatory motive, have suffered discrimination.

defendant succeeded in challenging the alleged discriminatory selection of a grand jury foreperson who *is* a member of the group or class that he alleges has been singled out for different treatment.  In the absence of such authority, this Court is bound to conclude that the ACCA's decision was reasonable.  Even if Petitioner had cited such authority, however, it remains that the ACCA did not unreasonably apply *Rose* or *Hobby*.  This is so for at least two reasons.

*First*, neither *Rose* nor *Hobby* holds that discrimination in the selection of a grand jury foreperson requires the setting aside of a subsequent conviction.  While *Rose* proceeded with its analysis under that assumption, the footnote articulating that assumption was not the holding of the case.  Accordingly, it is dicta.  *See, e.g., Ramseur v. Beyer*, 983 F.2d 1215, 1236 (3d Cir. 1992) (describing the relevant passage of *Rose* as dicta).[53]  Pursuant to AEDPA, dicta, even Supreme Court dicta, is not "clearly established Federal law" and, accordingly, is not binding on Alabama's state courts.

---

[53] Petitioner cites the pre-split Fifth Circuit's decision in *Guice* for its remark that *Rose* "held that racial discrimination in the selection of the grand jury and its foreman violates the fourteenth amendment and requires a federal court to grant habeas corpus, reversing a state criminal conviction."  661 F.2d at 498.  *See* Doc. 42 at 56.  But, as *Guice* went on to correctly observe in that same paragraph, "[t]he Court assumed, *without deciding*, that invidious discrimination in 'the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire.'"  *Id*. at 499 (quoting *Rose*, 443 U.S. at 553 n.4) (emphasis supplied).  In any event, even if the old Fifth Circuit believed that *Rose*'s assumption was somehow its holding, its interpretation of *Rose*'s holding is not clearly established federal law that is binding on Alabama's state courts.

*Second*, to the extent *Rose* nevertheless could have articulated binding "clearly established Federal law," then, for the reasons stated in *Hobby*, the ACCA did not unreasonably apply it.  As discussed above, *Hobby* explained why the "peculiar" Tennessee procedures and the uniquely powerful role of the grand jury foreperson in that State warranted scrutiny under the Equal Protection Clause.  In short, the subjective selection process for the grand jury foreperson in Tennessee presented an opportunity for the discriminatory placement of a "super grand juror"—not just a voting juror but one who exercised a "virtual veto power over the indictment process." *Hobby*, 468 U.S. at 348.  The ACCA, relying upon ASC authority, reasonably contrasted the "ministerial" functions of the grand jury foreperson in Alabama with those at issue in Tennessee.  As *Hobby* makes clear, that is a constitutionally significant distinction.

More important than a simple contrast of the relative responsibilities of the Alabama and Tennessee grand jury forepersons, however, is the fact that, as explained in *Hobby*, the Tennessee grand jury foreperson enjoyed equal voting power with the twelve grand jurors but, unlike those jurors, was not selected randomly from a list of eligible jurors.  In effect, then, Tennessee's procedures allowed for the discriminatory selection of the foreperson to "shape[] the composition of the grand jury itself." *Campbell v. Louisiana*, 523 U.S. 392, 397

(1998) (explaining that, in Louisiana, where "the judge selects the foreperson from the grand jury venire before the remaining members of the grand jury have been chosen by lot," a challenge to the selection of the grand jury foreperson is "one alleging discriminatory selection of grand jurors").  Petitioner makes no similar claim regarding the selection of the grand jury foreperson in his case or in Alabama generally.  Because Alabama's procedures did not allow the trial court to affect the composition of the grand jury through discriminatory selection, the ACCA reasonably distinguished Alabama's process from that at issue in *Rose*.

Before *Hobby*, in his concurring opinion in *United States v. Perez-Hernandez*, 672 F.2d 1380, 1389 (11th Cir. 1982), Judge Morgan elaborated on why the rule the Supreme Court assumed applicable in *Rose* is not a good fit in the federal system or in states with procedures unlike those of Tennessee:

> [B]efore a defendant may challenge his indictment because of discrimination in the judicial system, I believe that the discrimination must be related to a significant position or part in the administration of justice.  Thus, discrimination in the selection of grand and petit juries would allow subsequently convicted defendants to appeal their convictions.  I do not believe, however, that the position of federal grand jury foreman is significant or even remotely necessary to the proper administration of justice.  Federal grand jury foremen perform menial, insignificant tasks.  Their position does not give them the ability to independently affect the judicial system or the rights of a defendant; they have no more power than any other member of the grand jury panel.  Appellant, of course, argues that the mere title gives a foreman the ability to unfairly persuade and influence the other grand jury members, but I cannot believe that federal grand jury

402

members are innocent and naive lambs and the foreman their shepherd. Accordingly, I believe that discrimination in the selection of federal grand jury foremen, if proven, does not justify the quashing of subsequent indictments. . . .

My position is not inconsistent with *Rose v. Mitchell*. A grand jury foreman in the Tennessee state court system is chosen by a judge from the entire population for a two year term of office. He or she is then added to the randomly selected grand jury panel as the thirteenth member. Thus, discrimination in the selection of Tennessee grand jury foremen infiltrates discrimination into the selection of the entire grand jury panel. This is not the case in the federal system below where the grand jury panel was randomly and properly selected and only then a foreman was chosen from that group. Moreover, a Tennessee grand jury foreman is expected to assist the district attorney in investigating criminal activity and may order the issuance of subpoenas. The absence of the foreman's signature results in a fatally defective indictment. In contrast, the only similarity between a Tennessee and a federal grand jury foreman is the name of the position. Rule 6(c) of the Federal Rules of Criminal Procedure provides that a foreman administers oaths, signs indictments, and keeps various clerical records. The absence of the foreman's signature does not affect the validity of the indictment. Thus, this is a case of apples and oranges. The position of grand jury foreman in the Tennessee system is an independently significant role in the administration of justice in that state, while the same position in the federal system is not. Therefore, the assumption made by the Court in *Rose v. Mitchell* was correct for the facts of that case and the same assumption may have been correct for a challenge of the Louisiana system in *Guice v. Fortenberry*.[54] I believe, however, that the same assumption is not applicable to the federal system.

---

[54] As discussed above, the Supreme Court's subsequent decision in *Campbell* explains why the *Rose* rule "may have been correct" for the old Fifth Circuit in *Guice v. Fortenberry*: Louisiana's procedure, like Tennessee's, allowed the presiding judge to "shape[] the composition of the grand jury itself." 523 U.S. at 396. This fact rendered a challenge to the selection of the foreperson equivalent to "one alleging discriminatory selection of grand jurors." *Id*. at 397.

Ultimately, like Judge Morgan and the *Hobby* Court before it, the ACCA explained why the selection and function of the grand jury foreperson in Alabama is closer to that of the federal system at issue in *Hobby* than the Tennessee system at issue in *Rose*.  *Hodges*, 856 So. 2d at 896–97.  In short, where the grand jury is properly constituted, and Petitioner here does not claim otherwise, selection of the grand jury foreperson from within that body does not allow for the "infiltration" of discrimination into the voting body of the grand jury.  And, considering the largely "ministerial" functions of the Alabama grand jury foreperson, it also does not empower a discriminatorily selected foreperson to substantially affect the administration of justice.

To be sure, other authorities have rejected the contention that *Hobby* has any relevance in assessing an equal protection claim under *Rose*.  *See, e.g., Mosley v. Dretke*, 370 F.3d 467, 477–78 (5th Cir. 2004).  But, considering *Hobby* and Judge Morgan's concurrence and the absence of a plain holding in *Rose* requiring the setting aside of a conviction merely due to the discriminatory selection of a grand jury foreperson—no matter how he or she is selected and what are his or her responsibilities—such contrary authorities only show that fairminded jurists can agree with the ACCA's application of Supreme Court precedent.  Accordingly,

pursuant to the governing principles of the AEDPA, the ACCA did not unreasonably apply clearly established federal law in rejecting this claim.

**B.    The Trial Court Impermissibly Denied Counsel the Ability to Inquire into the Jury Venire.**

Petitioner filed a pretrial motion for funds to obtain copies of public records "relating to the age, race, and gender composition of the master jury list from Lee County[,]" for the purpose of allowing him to "challenge the composition of the grand jury that indicted him, the procedures used for the selection of the grand jury foreperson, and the composition of the petit jury that will hear his case[.]"  Doc. 21-2 at 263–64.  At a motion hearing in October 1998, counsel presented argument in support of the motion.  Tr. 108–13.  The trial court denied the motion.  Tr. 113.

### 1.    Petitioner's allegations

Petitioner alleges the trial court unconstitutionally deprived his right to "inquire into the racial composition of the jury venire in an effort to determine whether the venire was selected in a manner that fairly represents a cross-section of the community."  Pet. ¶ 345.  He asserts that Lee County's use of driver's licenses to comprise its jury list "introduces a variety of biases in the jury selection processes, and disproportionately excludes certain racial and economic classes from the venire."  *Id*.  He thus alleges that his rights to due process, a representative jury, and equal protection were violated.  *Id*.

405

2. *The state court's adjudication*

Petitioner raised this claim in his amended Rule 32 petition. *See* Doc. 21-27 at 151. The Rule 32 court found the claim procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on direct appeal. Doc. 21-55 at 113. The ACCA affirmed dismissal of the claim pursuant to Rule 32.2(a)(5) because it could have been, but was not, raised on direct appeal. *Hodges*, 147 So. 3d at 932.

3. *Respondent's procedural defense*

Respondent asserts that this claim is procedurally defaulted because the ACCA adjudicated the claim as procedurally barred pursuant to an adequate and independent state procedural rule. Doc. 37 at 92; Doc. 38 at 113.

4. *This claim is procedurally defaulted.*

Petitioner does not appear to contest Respondent's charge that this claim is procedurally defaulted. Instead, he argues that the ineffective assistance of appellate counsel provides cause for his default. Doc. 42 at 57–58. But, as discussed previously with his other procedurally defaulted claims, Petitioner has asserted only a catch-all, indistinct claim of ineffective assistance of appellate counsel. He provides no specific allegations about why his appellate counsel deficiently failed to raise this claim on direct appeal. More importantly, he

provides nothing in the petition or in his briefing substantiating any claim that he was prejudiced by appellate counsel's alleged deficient performance.  That is, as the Rule 32 court found when rejecting his claim that counsel was ineffective in failing to press this claim at trial or on appeal, *see* Doc. 21-55 at 141, he has failed to allege specific facts indicating how he was prejudiced by appellate counsel's alleged errors.  There are no specific facts alleged, in state or federal court, showing that the "racial composition of the jury venire" in Lee County was not in fact a fair representation of a cross-section of the community.  Pet. ¶ 345. Accordingly, Petitioner has not even alleged the requisite prejudice to excuse his procedural default of this claim.

### C.    The Trial Court Impermissibly Refused to Make Personal Service on Those Summoned to Participate in the Jury Venire.

Petitioner filed a pretrial motion requesting, *inter alia*, that the trial court order that "personal service be made upon any jurors who fail to respond to their summons mailed by the clerk[.]"  Doc. 21-2 at 162.  At a motion hearing in January 1999, counsel presented argument on the motion.  The trial court explained that, because Lee County issues so many driver's licenses to Auburn University students who then move away, "we normally have a lot of people that don't show up because they don't live here anymore."  Tr. 122.  Outside of that context, the trial court stated that Lee County has the "normal attrition" of potential

jurors who do not respond to summonses, and that, in his view, "we have a good cross-section of people that appear on our jury venire." Tr. 122–23. Thus, the trial court denied the motion. Tr. 123.

### 1. Petitioner's allegations

Petitioner alleges that "less than two-thirds of the jurors notified actually showed up to serve." Pet. ¶ 346. He asserts, without elaboration, that "jurors who refuse to answer summons are likely to be those who have a more substantial difficulty receiving regular communications from the postal service, those who have difficulty asking for or receiving permission from employers to attend the summons, and more transient individuals who may not be at the address listed on their driver's license." Pet. ¶ 347. Based upon this supposition, he alleges the trial court's refusal to make personal service on jurors "skewed the jury venire, disproportionately excluding certain racial and social classes, and deprived Mr. Hodges of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution." *Id.*

### 2. The state court's merits adjudication

Petitioner raised this claim on direct appeal. The ACCA denied the claim, concluding "[t]here is no law requiring that jurors be personally served with notification of any jury duty." *Hodges*, 856 So. 2d at 913–14. Petitioner presented

the claim again in his Rule 32 petition, both as a substantive claim and as a claim of ineffective assistance.  Doc. 21-27 at 151–152.  The Rule 32 court dismissed the substantive claim because it was raised and addressed on direct appeal.  Doc. 21-55 at 190.  The ACCA affirmed dismissal of the claim because it was raised and addressed on direct appeal.  *Hodges*, 147 So. 3d at 931.  Accordingly, this court reviews the ACCA's adjudication on direct appeal pursuant to AEDPA.

> 3.    *The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon an unreasonable determination of the facts.*

Neither the petition nor Petitioner's merits brief cite to any clearly established federal law that the ACCA could have unreasonably applied in denying this claim of error on direct appeal.  In his reply brief, responding to Respondent's argument that he had cited no clearly established federal law governing this claim, Petitioner cites *Peters v. Kiff*, 407 U.S. 493 (1972), for the general proposition that he was "entitled to a jury that is fair and representative of his community because a failure to do so 'cast[s] doubt on the integrity of the whole judicial process[.]'" Doc. 42 at 58 (quoting *Peters*, 407 U.S. at 502–03).

*Peters* concerned "a white defendant's challenge to the [systematic] exclusion of Negroes from jury service" in Muscogee County, Georgia.  407 U.S. at 496.  While the Court certainly recognized the due process right of a defendant

to a fair trial before a fair tribunal, the holding of *Peters* was simply that, "whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law." *Id.* at 504. The decision plainly says nothing about a court's obligation to make personal service of juror summonses, and in no sense can it be read to conclude that a trial court's failure to order personal service of juror summonses results in the "systematic exclusion" of any class of citizens from jury service.

Furthermore, even to the extent *Peters* articulates some generally applicable constitutional principle about "unconstitutional jury selection procedures" and their effect on the "integrity of the whole judicial process," 407 U.S. at 502–03, the premise underlying Petitioner's claim remains unsubstantiated. He provides no support for the petition's allegation that the trial court somehow "skewed the jury venire, disproportionately excluding certain racial and social classes[.]" Pet. ¶ 347. There are no specific allegations or argument, in state or federal court, showing that the prospective jurors who showed up for service, which he describes as approximately two-thirds of those summoned, did not represent a fair cross-section of the community. Accordingly, his claim is not anchored in fact or law. The ACCA reasonably rejected this claim.

410

### D.     The Trial Court Impermissibly Excluded a Juror from the Venire Based on Unconstitutional Biases Regarding Her Religion.

In the context of Petitioner's claim of ineffective assistance due to counsel's failure to object to the trial court's exclusion of prospective juror Lois Doleman, this opinion previously set out the relevant voir dire proceedings resulting in Doleman's excusal from the venire.  To review, Doleman responded to the trial court's question whether any veniremembers had a moral or religious reason for not wanting to sit in judgment of another person.  Then, in individual voir dire with the court, Doleman indicated that she is a Jehova's Witness and, accordingly, "wouldn't want to sit on a trial like that."  Tr. 313.  Judge Harper later advised the attorneys that Doleman "is a Jehova's Witness.  Those people do not believe in sitting in judgment.  And I have had them hang up juries before.  She is excused for that reason."  Tr. 325.

#### 1.     Petitioner's allegations

Petitioner alleges that the trial court "excluded Ms. Doleman without making any further inquiry into her ability to follow the court's instructions in this case, or into the effect that her religious affiliation had on her ability to function as a juror." Pet. ¶ 349.  Thus, he claims, Judge Harper excused Doleman "based solely on [her] religious affiliation."  *Id*.  He asserts the trial court's improper exclusion of Doleman "amounts to a fundamental and structural flaw in the jury selection

process" that violated the First, Fifth, Seventh, and Fourteenth Amendments of the Constitution in that it deprived him of "due process of law as well as the right to an impartial jury of his peers." *Id*.

### 2.    The state court's merits adjudication

On direct appeal, Petitioner argued that the trial court deprived him of a fair and impartial jury by, *inter alia*, failing to adequately voir dire "jurors who indicated a possible opposition to the death penalty."   Doc. 21-14 at 96 (capitalization altered).   With regard to Doleman, Petitioner argued that the trial court "made a decision about Ms. Doleman's impartiality based not upon the information given by the juror herself, but upon its own generalization about a particular religion and, more egregious still, the extent to which all Jehovah's Witnesses adhere to every tenet of their religion." *Id*. at 99.   He insisted that additional questioning of Doleman was needed to determine whether she would be unable to follow the law due to her religious convictions. *Id*.

Reviewing for plain error, and concluding that Petitioner mischaracterized the record relating to the challenge of Doleman, the ACCA rejected the claim:

> Hodges characterizes the discussion with this juror the following way: "When questioned by the trial court regarding her feelings on the death penalty . . . ."  We note that this juror was never questioned about her feelings about capital punishment.  Before any questions related to capital punishment could be asked, this juror indicated that she was religiously opposed to sitting in judgment of her fellow man.

412

> We held in *Smith v. State*, 797 So. 2d 503 (Ala. Crim. App. 2000),
> cert. denied, 797 So. 2d 549 (Ala. 2001), that a trial court does not err
> in excusing a juror for cause who indicates that he or she is religiously
> opposed to sitting in judgment of others. We further held that no
> questions should be asked of the juror concerning his or her religious
> beliefs. Juror [Doleman] was correctly struck for cause based on our
> holding in *Smith*.

*Hodges*, 856 So. 2d at 903.

In his Rule 32 petition, Petitioner challenged the Doleman excusal both substantively and as the product of the ineffective assistance of his trial counsel. Doc. 21-27 at 93, 152–53. As discussed previously, the Rule 32 court summarily dismissed the ineffective assistance claim because the underlying issue—the validity of the trial court's excusal of Doleman—was decided on direct appeal and because Petitioner did not plead any facts demonstrating deficient performance or prejudice. Doc. 21-55 at 142–43, 191. The Rule 32 court summarily dismissed the substantive claim pursuant to Rule 32.2(a)(3) and (4) because it could have been, but was not, raised at trial and because it was raised and addressed on direct appeal. Doc. 21-55 at 113, 191. The ACCA affirmed dismissal pursuant to Rule 32.2(a)(4) because the claim was addressed on direct appeal.

### 3.   *Respondent's procedural defense*

Respondent appears to argue that some part of this claim is unexhausted because, on direct appeal, "Hodges did not present the issue as the trial court's

unconstitutional excusal of a juror based on assumptions about her religion. Instead, Hodges alleged that the trial court erred in dismissing a juror who indicates possible opposition to the death penalty without providing for an attempt at rehabilitation." Doc. 38 at 114.

As set forth above, Petitioner plainly argued on direct appeal that the trial court impermissibly excused Doleman because of its assumptions about her religion. Furthermore, both the Rule 32 court and the ACCA concluded that Petitioner's claim in his Rule 32 petition, which is essentially identical to the instant federal claim, was raised and addressed on direct appeal. Hence, Respondent's contention that this claim is unexhausted and procedurally barred, in any part, is without merit. This court will review the ACCA's decision on direct appeal pursuant to AEDPA.

> 4. *The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon an unreasonable determination of the facts.*

The petition cites one Supreme Court decision, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 135 (1994), as providing the clearly established federal law governing this claim. Pet. ¶ 349. In *J.E.B.*, the Supreme Court applied the equal protection rule of *Batson v. Kentucky*, 476 U.S. 79 (1986), which prohibits the racially discriminatory exercise of peremptory challenges in criminal trials, in a

challenge to the exercise of discriminatory peremptory challenges based on gender. 511 U.S. at 129.  The Court held that "gender, like race, is an unconstitutional proxy for juror competence and impartiality."  *Id*.  Thus, *J.E.B.* clearly establishes that "the Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man."  *Id*. at 146.

Petitioner argues that *J.E.B.* establishes that "it is impermissible to exclude a juror based on a juror's religious affiliation by a peremptory challenge[,]" and that, accordingly, the trial court's exclusion of a juror for religious affiliation is similarly forbidden.  Doc. 31 at 103.  Respondent, on the other hand, argues that neither *J.E.B.* or any other Supreme Court decision "held that religious beliefs are to be accorded the same importance as race and gender in deciding due process and equal protection claims[.]"  Doc. 38 at 115.

As discussed above, the express holding of *J.E.B.* plainly does not encompass challenges based on religious beliefs.  While state and federal courts following *J.E.B.* around the time of the ACCA's decision here came down on both sides of the question whether the equal protection principles of *Batson* and *J.E.B.* must apply to jurors' religious beliefs, *see, e.g., United States v. Brown*, 352 F.3d

654, 666–67 (2d Cir. 2003) (surveying state and federal cases), for purposes of review under AEDPA, these authorities only demonstrate that the ACCA could not have unreasonably applied *J.E.B* because reasonable jurists can agree with the ACCA's decision.  *See, e.g., Cash v. Barnes*, 532 F. App'x 768, 769 (9th Cir. 2013) (affirming denial of habeas corpus relief under AEDPA "because the Supreme Court has not extended the protections articulated in *Batson* to religious affiliation or belief").  *See also Fisher v. Texas*, 169 F.3d 295, 305–06 (5th Cir. 1999) (concluding that, because no precedent "clearly dictates an extension of the *Batson* principle to religion[,]" it would violate non-retroactivity principles to apply such a rule in habeas review).  Because *J.E.B.* did not preclude the trial court from excusing a juror based upon that juror's religious beliefs, the ACCA did not unreasonably apply that decision or any other clearly established federal law when it rejected this claim.  Accordingly, Petitioner's claim is due to be denied.

### E.   The Trial Court Impermissibly Refused to Instruct the Jury That "Life Without Parole" Means "Life Without Parole."

Prior to its penalty phase deliberations, the trial court charged the jury that its two sentencing options, by law, would be "death by electrocution or life imprisonment without parole."  Tr. 1245.  After explaining the circumstances under which the jury may return a recommendation of death or life imprisonment without parole, the trial court reviewed the verdict forms which, again, provided

for the two options explained by the trial court: death or life imprisonment without parole.  Tr. 1252–53.  To close its instructions, the trial court charged the jury that it is "not required to find any mitigating circumstances in order to return a sentence of life without the possibility of parole[.]"  Tr. 1259–60.

During deliberations, the jury sent a question to the trial court asking Judge Harper to "[d]efine life without parole."  Tr. 1261.  Judge Harper was inclined to inform the jury that the terms are "self-defining" and have "no separate legal definition[.]"  Tr. 1261–62.  Defense counsel asked that Judge Harper "add in there without the possibility of parole, I guess is the proper language."  Tr. 1262.  Judge Harper agreed and asked the parties to approve his written response to the jury's question before returning it to the jury.  Tr. 1262–63.  The record indicates that the parties reviewed Judge Harper's response before it was returned to the jury.  Tr. 1263.

### 1. *Petitioner's allegations*

Petitioner alleges that Judge Harper's response to the jury's question "allowed" jurors to believe, and in fact some did believe, that "'life without parole' meant that there remained a possibility that Mr. Hodges could be released in the future."  Pet. ¶ 352.  He asserts that, "[i]n light of the court's failure to respond to the question from the jurors on this issue, up to four jurors voted for the death

penalty even though they may have voted for a 'true' life sentence with no possibility of parole." *Id*. Because Judge Harper allowed deliberations to continue under the "false premise" that Petitioner might one day be released, Petitioner alleges, his right to due process was violated. *Id*.

### 2. The state court's adjudication

Petitioner first raised this claim in his Rule 32 petition. *See* Doc. 21-27 at 153–54. The Rule 32 court found the claim procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on direct appeal. Doc. 21-55 at 113. The ACCA affirmed dismissal of the claim pursuant to Rule 32.2(a)(5) because it could have been, but was not, raised on direct appeal. *Hodges*, 147 So. 3d at 932.

### 3. Respondent's procedural defense

Respondent asserts that this claim is procedurally defaulted because the ACCA adjudicated the claim procedurally barred pursuant to an adequate and independent state procedural rule. Doc. 37 at 92; Doc. 38 at 116–17.

### 4. This claim is procedurally defaulted.

Petitioner does not appear to contest Respondent's charge that this claim is procedurally defaulted. Instead, he argues that the ineffective assistance of appellate counsel provides cause for his default. Doc. 42 at 62. But, as discussed

previously with his other procedurally defaulted claims, Petitioner has asserted only a catch-all, indistinct claim of ineffective assistance of appellate counsel. He provides no specific allegations about why his appellate counsel deficiently failed to raise this claim on direct appeal. More importantly, he provides nothing in the petition or in his briefing substantiating any claim that he was prejudiced by appellate counsel's alleged deficient performance. As reviewed above, the trial court instructed the jury that it is "not required to find any mitigating circumstances in order to return a sentence of life *without the possibility* of parole[.]" Tr. 1259–60. Then, in response to the jury's question asking that the trial court define life without parole, the record indicates the trial court approved of defense counsel's request to include the words "life without the possibility of parole" in its written response to the jury. Tr. 1262–63. Thus, Petitioner's assertion that the trial court "simply indicated that there was 'no legal definition of that term,'" *see* Doc. 31 at 104, appears refuted by the record.

In any event, Petitioner has offered only speculation that he was prejudiced by the trial court's response. He asserts, without any specific allegation, that the four jurors who recommended a death sentence may have been influenced by the "false premise" he alleges the trial court permitted them to consider. But there has never been any specific allegation, in the state court or here, that any of the four

419

jurors who recommended a death sentence did not understand their sentencing options and did not believe that Petitioner should be sentenced to death based upon their independent weighing of the aggravating and mitigating circumstances. Accordingly, Petitioner has not established the requisite prejudice to excuse his procedural default of this claim.

## VII.   Claim Seven – Petitioner was Denied Due Process and a Fair Trial by the Prosecution's Misconduct.

Petitioner alleges his constitutional rights were violated due to several incidents of alleged prosecutorial misconduct.   The court will examine each of his claims in turn.

### A.   The Prosecutor Failed to Disclose a Deal with Kitty Porter and that She was Pressured to Testify in a Manner that Implicated Petitioner.

#### 1.   *Petitioner's allegations*

Petitioner appears to allege that the prosecution struck a deal with Kitty Porter to obtain her testimony against Petitioner but that it never disclosed this deal to Petitioner's counsel.   Petitioner's allegations about this deal, however, are vague.  He describes a shift in Porter's statement to police, in that, while it initially was "consistent with Mr. Hodge's trial testimony on this point" (the "point" of consistency is not described in the petition), it evolved "into a statement that largely tracks Mr. Murph's version of events."   Pet. ¶ 355.   "Based upon

information and belief," Petitioner alleges, "that change in testimony was based on leading questions posed by the police to Ms. Porter, and the police's threats of prosecution." *Id*.  He further alleges, also "[b]ased on information and belief, the police placed Ms. Porter under additional threats of prosecution associated with her use and sale of drugs, as well as in association with her detention for bringing Mr. Hodges some cigarettes when he was in the county jail awaiting trial."  Pet. ¶ 356. He alleges these "additional threats were not revealed at any time."  *Id*.

From these allegations about threats to prosecute Porter, Petitioner appears to leap to the claim that the prosecution had a "deal" with Porter.  Pet. ¶ 358.  He maintains that "[s]ince trial counsel had no knowledge of the deal, trial counsel was not prepared to probe Ms. Porter regarding this deal, or to raise questions to the jury regarding her motivation and reliability."  Pet. ¶ 359.  He alleges the prosecution's failure to disclose the purported deal "was misconduct, and deprived Mr. Hodges of a fair trial."  *Id*.

### 2. *The state court's adjudication*

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition.  *See* Doc. 21-27 at 131–32.  The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on appeal.  Doc. 21-55 at 111.  The

ACCA affirmed dismissal of the claim pursuant to Rule 32.2(a)(5) because it could have been, but was not, raised on direct appeal. *Hodges*, 147 So. 3d at 932.

### 3. *Respondent's procedural defense*

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it as procedurally barred pursuant to an adequate and independent state procedural rule. Doc. 38 at 117–18.

### 4. *This claim is procedurally defaulted.*

Petitioner does not contest Respondent's assertion of procedural default. He argues, instead, that he "can show cause and prejudice for his procedural default in state court[.]" Doc. 31 at 24. In short, he contends that the prosecution's violation of *Brady v. Maryland*, 373 U.S. 83 (1963), provides him with cause and prejudice to excuse his default because, in his view, the prosecution suppressed "favorable" evidence of its "deal" with Porter, and he was prejudiced because he was not able to impeach Porter's testimony with evidence of her "deal." Doc. 31 at 24–27.

Petitioner has not plausibly alleged the requisite cause or prejudice to excuse his procedural default. To begin with, Petitioner's allegations of an illicit "deal" are lacking. He has only alleged, in state and federal court, and based only upon his unsupported "information and belief," that a "deal" existed. Without a single allegation of the basis for his belief in the existence of any "deal," this court is

unable to conclude that favorable evidence of a "deal" exists, or that the State suppressed such evidence.  It is telling in this respect that Petitioner does not separately allege a freestanding *Brady* claim in his petition and does not allege that the *Brady* "claim" he posits to excuse his procedural default is based upon any newly discovered evidence of a "deal."  Instead, it appears he simply infers the "deal," and the *Brady* "claim," from the state court record.[55]  With no specific allegation showing why he could not have presented his claim about a "deal" on appeal, this court cannot conclude that the State suppressed any favorable evidence, or that the ACCA unfairly applied the state procedural rule to bar this claim.

But, even if Petitioner's supposition about an undisclosed "deal" with Porter could establish "cause" for his default, it remains that he must show that he was prejudiced.  To establish prejudice under *Brady*, there must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995).  Petitioner cannot meet this burden on his present allegations.  In essence,

---

[55] Petitioner's claim that Porter was threatened with prosecution for her drug use or dealing is not apparently tethered to the trial court record.  But Petitioner reveals nothing about his "information and belief" that Porter was so threatened.  If there is anything more than Petitioner's speculation to support this claim, he has not offered it up.  *See, e.g., United States v. Jordan*, 316 F.3d 1215, 1252 n.81 (11th Cir. 2003) (observing, "mere speculation or allegations that the prosecution possesses exculpatory information" is insufficient to sustain a *Brady* claim).

the "deal" Petitioner describes was the police or prosecution's threat to bring

criminal charges against Porter if she did not provide police with a truthful

statement of what she knew about Petitioner's involvement in Seaton's murder.

This subject—the threat to charge or prosecute Porter if she did not provide a

truthful statement—was raised during the defense's cross-examination of Porter:

> Q    At any time before, during or after the policeman was writing
>      up that statement, did they tell you that you were a suspect in
>      this offense; the robbery?
> A    Not during the statement.  It was before the statement.  When I
>      was picked up I was told that I was an accessory and I had
>      something to do with it, and I am going to jail and what have
>      you.  I was told that before the statement.
> Q    Okay.  Did they tell you that if you didn't cooperate you would
>      be arrested?
> A    Well, they told me if I knew anything or if I -- if I knew
>      anything, if I had heard anything, if I had anything to do with it,
>      anybody that knew or heard anything was going with Melvin if
>      they didn't come up with it then.
> Q    And so they told you what they wanted you to say, didn't they?
> A    No. They told -- they -- I had a choice.
> Q    Uh-huh.
> A    Either I tell the truth or I go to jail.
> Q    So they wrote down the information and -- and you signed it?
> A    Yes.
>      . . .
> Q    So the law enforcement officers told you that if you didn't
>      cooperate that you would be going to jail with Melvin.  Is that
>      right?
> A    Basically, yes.

Tr. 988–89, 991.  No "deal" or "threat of prosecution" hinted at in the petition is

more explicit, or "material," than Porter's own testimony that she was told she was

an accessory to robbery or murder and that she was going to jail if she did not cooperate and tell the truth.  Considering the dearth of any information about an alleged "deal" or "threat" based on Porter's purported drug use or dealing, the best evidence about any "deals" or "threats" conveyed to Porter is her trial testimony.  This evidence was in the record and, to the extent it suggests that any improper undisclosed "deal" or "threat of prosecution" induced Porter's testimony, it plainly could have been raised on appeal to the ACCA.

More importantly, for present purposes, there is no "reasonable probability" that Petitioner would not have been convicted of capital murder if, in addition to showing Porter's fear of being prosecuted as an accessory to robbery and/or murder, the defense had also been able to show that Porter was threatened with being prosecuted for her purported drug use or dealing or for something to do with her bringing cigarettes to Petitioner at the jail.[56]  *Kyles*, 514 U.S. 436–37.  The defense succeeded in showing that Porter's testimony may have been the product of threats, fear, or self-interest.  The jury had the essential impeachment evidence before it; additional evidence that Porter feared being prosecuted over drug dealing

---

[56] The defense also explored this issue—what Petitioner vaguely alleges as a threat "in association with her detention for bringing Mr. Hodges some cigarettes" (Pet. ¶ 356)— with Porter in her cross-examination.  She testified that, on the day she brought the cigarettes to the jail, a law enforcement officer at the jail told her that she should not be bringing cigarettes to Petitioner because it is illegal, and that she would be arrested if she did it again.  Tr. 990–91.

or use or cigarette smuggling would not have "put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435. Accordingly, any undisclosed "deal" or additional "threat of prosecution" was not material for *Brady* purposes and, as such, does not provide prejudice to excuse Petitioner's default of this claim.

### B. The Prosecutor Permitted Perjured Testimony Regarding Police and Prosecutorial Pressure on Witnesses for the State.

#### 1. *Petitioner's allegations*

Petitioner alleges the prosecution impermissibly allowed its witnesses, Murph and Porter, to "testify, untruthfully, that they had not been pressured by the State to offer the testimony that they gave." Pet. ¶ 360. With regard to Murph, Petitioner alleges that Murph was subjected to "intensive police questioning and pressure" between his first and second police statements, and that this pressure was the reason Murph changed his story to implicate Petitioner in the second police statement. Pet. ¶ 361. As to Porter, he alleges that, "while Ms. Porter testified that her testimony was not the result of pressure, the police and prosecution knew full well that she had been pressured into cooperation in exchange for her testifying against Mr. Hodges." Pet. ¶ 362. He maintains that, in both instances, the prosecution allowed witness testimony disclaiming any such pressure to go

"uncorrected" or "without comment," thereby violating his due process and confrontation rights.  Pet. ¶¶ 360–62.

### 2.    The state court's adjudication

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition.  *See* Doc. 21-27 at 135–36.  The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on appeal.  Doc. 21-55 at 111.  The ACCA affirmed dismissal of the claim pursuant to Rule 32.2(a)(5) because it could have been, but was  not, raised on direct appeal.  *Hodges*, 147 So. 3d at 932.

### 3.    Respondent's procedural defense

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it procedurally barred pursuant to an adequate and independent state procedural rule.  Doc. 38 at 117–18.

### 4.    This claim is procedurally defaulted.

As presented in the state court and in the federal petition, this claim appears to rely entirely upon Petitioner's interpretation of the state court record, namely Murph's and Porter's police statements and their trial testimonies about their statements.  Petitioner infers that Murph and Porter perjured themselves, and that the prosecution impermissibly allowed such perjury, because, in his view, it is

implausible that their police statements and testimonies were not the product of police pressure.  Petitioner alleges nothing, however, showing that he could not have presented this claim of prosecutorial misconduct on direct appeal. Accordingly, the ACCA did not arbitrarily or unfairly apply the state procedural rule to adjudicate this claim procedurally barred.

To the extent Petitioner argues that ineffective assistance of his appellate counsel provides him with cause and prejudice to excuse his procedural default of this claim, his argument fails because he cannot demonstrate the requisite prejudice.  Starting with his allegation of Porter's purported perjury, as discussed above, Porter did testify that she felt pressured to provide a statement to police, *i.e.*, that she was going to jail as an accessory to robbery and/or murder unless she cooperated.  Because that fact is plainly in the record, Petitioner cannot show that there is a reasonable probability that he would have succeeded with this claim of prosecutorial misconduct on direct appeal.

As to the Murph component of  his claim, Petitioner appears to argue that the prosecution should have interrupted the defense's cross-examination of Murph to "correct" Murph's testimony about the circumstances of his police statements. While Murph prefaced his testimony on direct by confirming that he "reached an agreement with the State" to plead guilty to capital murder in exchange for a life

without parole sentence, Tr. 1017, his direct examination consisted primarily of his lengthy, almost unbroken narrative account of his and Petitioner's activities on the night of Seaton's murder, followed by a colloquy teasing out additional important details. Tr. 1018–30. He did not testify on direct about the circumstances of his police statements. It was only on cross-examination that Murph offered the purportedly perjured testimony about his "change of heart" during his interrogation.

In any event, as revealed in his cross-examination, it was evident to the jury that Murph gave several police statements, that he was interrogated for a lengthy period, and that, ultimately, his testimony was part of a plea agreement that would spare him the death penalty. On cross-examination, defense counsel elicited Murph's testimony that he was detained between his first and second police statements "for a lot more time because they knew—they knew I wasn't telling the truth. They interrogated me four or five hours. I might have—I gave three or four different statements before I came clean and—you know, before I came clean with them." Tr. 1036. Defense counsel also elicited Murph's testimony about the deal he received for his trial testimony:

> Q    Okay. Thank you. Not long after you signed that statement.
>      you were told that if you would testify in this trial, that you
>      wouldn't be electrocuted; that you could be sentenced to life

<blockquote>
without parole if you would come to court and testify like you have today.  Isn't that true?<br>
A     Yes.<br>
Q     And that's what you have done.  Is that right?<br>
A     Yes.
</blockquote>

Tr. 1040.  While Murph also testified that he was not offered any deal before he gave his police statements, and that he finally "came clean" essentially because of his conscience, it is evident that jurors could infer from his description of his interrogation that he was pressured to provide additional statements beyond his first statement, which police knew to be false based upon physical evidence they had collected.

Petitioner does not allege that Murph perjured his testimony that he did not have any deal and was not offered leniency in exchange for his second police statement.[57]  He alleges only that the prosecution failed to challenge or "correct" Murph's testimony, on cross-examination, that his "change of heart" was due to his conscience rather than police pressure.  But, as discussed above, jurors could infer that the situation was intense and that Murph felt pressured.  He was detained for

---

[57] Petitioner's reply brief appears to attempt to make this claim.  *See* Doc. 42 at 66 (describing as an "untruth" Murph's testimony that he signed his police statement "with no guarantee that he would receive leniency," which gave him "the appearance that he was simply a brave truth-teller, rather than someone desperate to cut a deal").  Petitioner may not amend his petition via his briefing.  The petition alleges only that prosecutors failed to reveal that the change in Murph's statements was caused by "intensive questioning and pressure."  Pet. ¶ 361.  There is no claim in the petition that Murph was offered a deal for life imprisonment before his second police statement.

several hours and interrogated about his role in a brutal murder to which police had linked him through physical evidence.  And, notwithstanding any reasonable inference of police pressure, Petitioner has provided nothing showing that Murph, seeing the writing on the wall, could not have had a "change of heart" because of his conscience or out of a self-motivated desire to cooperate, *i.e.*, to try to get out in front of what he knew was coming for him.  Police pressure or other inducements are not the only reasonable explanations for the "change of heart" about which Murph testified.

Because the trial record credibly establishes that both Murph and Porter were pressured to cooperate with police, Petitioner's claim that the prosecution permitted perjury by these witnesses is without merit.  Accordingly, there is no reasonable probability that the result of his appeal would have been different had appellate counsel presented the claim on direct appeal.  His procedural default of this claim is therefore not excused by the ineffective assistance of his appellate counsel.

### C. The Prosecutor Misstated Facts, Law, and Evidence.

#### 1. Misstatement of facts and law regarding Mr. Hodges's testimony and the requirements for capital murder.

##### a. Petitioner's allegations

Petitioner alleges the prosecution deliberately mischaracterized Alabama law in its closing argument by suggesting that, because Petitioner admitted to planning the robbery, he was responsible for the murder of Seaton.  Pet. ¶ 364.  Specifically, he alleges that, under Alabama law, he could not be convicted of capital murder unless he committed the murder or was complicit in the murder, and that the prosecutor's argument would have supported a conviction of only felony murder under Alabama law.  Pet. ¶ 365–66.  He maintains that, even if it had reasonable doubt about whether he participated in Seaton's murder, "a jury following the prosecution's claims might still have convicted Mr. Hodges of capital murder."  Pet. ¶ 366.

### b.   *The state court's adjudication*

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition.  *See* Doc. 21-27 at 139–40.  The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on appeal.  Doc. 21-55 at 111.  As discussed previously in this opinion, the Rule 32 court also dismissed Petitioner's claim that trial counsel was ineffective for failing to object to this alleged misconduct on the merits.  *Id*. at 166–67.  In doing so, the Rule 32 court found that both the prosecutor's argument, to the extent she was arguing that Petitioner was

guilty of capital murder on a theory of complicity, and the trial court's instructions on this subject were correct.  *Id.*   Finally, the Rule 32 court also dismissed the substantive claim of prosecutorial misconduct on the merits, reiterating its finding that the prosecutor was correctly arguing that Petitioner could be found guilty of capital murder on a theory of complicity.  *Id.* at 178–79. The ACCA affirmed dismissal of the substantive prosecutorial misconduct claim pursuant to Rule 32.2(a)(5) because it could have been, but was not, raised on direct appeal. *Hodges*, 147 So. 3d at 932.

*c.    Respondent's procedural defense*

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it as procedurally barred pursuant to an adequate and independent state procedural rule.  Doc. 38 at 121.

*d.    This claim is procedurally defaulted.*

Petitioner does not rebut or otherwise address Respondent's procedural defense as to this claim.  In the portion of his merits brief in which he argues that the procedural default of some of his prosecutorial misconduct claims is excused by cause and prejudice pursuant to *Brady*, he says nothing about his default of this record-based claim of prosecutorial misconduct.  *See* Doc. 31 at 23–27.

Accordingly, this court cannot conclude that the ACCA unfairly or arbitrarily applied the state procedural rule to bar this claim.

To the extent Petitioner argues that the ineffective assistance of his appellate counsel provides cause to excuse his procedural default, such argument fails. Considering the ACCA's conclusion that the prosecutor did not mischaracterize Alabama's law on complicity and that, in any event, the trial court properly charged the jury on Alabama law, Petitioner cannot show prejudice from his appellate counsel's failure to raise this claim on direct appeal. *See Hodges*, 147 So. 3d at 955–56. Accordingly, this claim is procedurally defaulted.

### 2. Misstatement of fact regarding the existence of "human blood" on Mr. Hodges's watch and ring.

#### a. *Petitioner's allegations*

Petitioner alleges the prosecution improperly characterized the evidence as showing that human blood was found on the watch and ring Petitioner was wearing at the time of his arrest, despite that the DNA specialist testified only that the components of blood were located on those items, but that there was insufficient material to do further testing of the components. Pet. ¶ 367–68.

#### b. *The state court's adjudication*

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition. *See* Doc. 21-27 at 137–38. The Rule 32 court summarily dismissed

434

the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on appeal.  Doc. 21-55 at 111.  The Rule 32 court also dismissed Petitioner's claims that his trial and appellate counsel were ineffective for failing to object to this alleged misconduct on the merits because the underlying issue, whether the trial court erroneously inferred that the blood on the watch and ring was human, was addressed on direct appeal.  *Id*. at 177–78.  The ACCA affirmed dismissal of the substantive prosecutorial misconduct claim pursuant to Rule 32.2(a)(5) because it could have been, but was not, raised on direct appeal.  *Hodges*, 147 So. 3d at 932.

c.    *Respondent's procedural defense*

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it as procedurally barred pursuant to an adequate and independent state procedural rule.  Doc. 38 at 124–25.

d.    *This claim is procedurally defaulted.*

Petitioner does not rebut or otherwise address Respondent's procedural defense as to this claim.  In the portion of his merits brief in which he argues that the procedural default of some of his prosecutorial misconduct claims is excused by cause and prejudice pursuant to *Brady*, he says nothing about his default of this record-based claim of prosecutorial misconduct.  *See* Doc. 31 at 23–27.

435

Accordingly, this court cannot conclude that the ACCA unfairly or arbitrarily applied the state procedural rule to bar this claim.

To the extent Petitioner argues that the ineffective assistance of his appellate counsel provides cause to excuse his procedural default, such argument fails. The ACCA concluded that Petitioner failed to plead any facts showing that the jury's verdict would have been different had counsel objected to the prosecution's alleged mischaracterization of the evidence. *Hodges*, 147 So. 3d at 955. As this opinion previously discussed, that conclusion was reasonable. It follows that Petitioner cannot demonstrate a reasonable probability of a different result had his appellate counsel raised this issue of prosecutorial misconduct on direct appeal. Accordingly, this claim is procedurally defaulted.

### 3. Misstatement of fact regarding the timing of the motel rental.

#### a. *Petitioner's allegations*

Petitioner alleges the prosecution "insinuated at closing that Mr. Hodges had reserved the room at the Golden Cherry Motel on January 4, 1998, and that he had therefore anticipated the need for the hotel room long before the robbery actually occurred." Pet. ¶ 369. He further alleges that the "prosecution knew, however, from the police reports regarding Ms. Patel, that she had told police the registration statements of those who check in after midnight are typically indicated as having

436

been entered the preceding day." *Id.* He alleges the prosecution committed misconduct in failing to elicit Patel's testimony of this fact during her examination and then arguing as it did in closing. *Id.*

> b.   *The state court's adjudication*

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition. *See* Doc. 21-27 at 138. The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on appeal. Doc. 21-55 at 111. On postconviction appeal, the ACCA affirmed dismissal pursuant to Rule 32.2(a)(5) because this claim could have been, but was not, raised on direct appeal. *Hodges*, 147 So. 3d at 932. As previously discussed, the ACCA also affirmed the dismissal of Petitioner's claim that his counsel ineffectively failed to adequately cross-examine Patel about the fact that motel registration slips were backdated for guests arriving after midnight. *Hodges*, 147 So. 3d at 953.

> c.   *Respondent's procedural defense*

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it as procedurally barred pursuant to an adequate and independent state procedural rule. Doc. 38 at 125.

> d.   *This claim is procedurally defaulted.*

437

Petitioner does not rebut or otherwise address Respondent's procedural defense as to this claim.  In the portion of his merits brief in which he argues that the procedural default of some of his prosecutorial misconduct claims is excused by cause and prejudice pursuant to *Brady*, he says nothing about his default of this record-based claim of prosecutorial misconduct.  *See* Doc. 31 at 23–27.  Accordingly, this court cannot conclude that the ACCA unfairly or arbitrarily applied the state procedural rule to bar this claim.

To the extent Petitioner argues that the ineffective assistance of his appellate counsel provides cause to excuse his procedural default, such argument fails.  As previously explained in this opinion, Petitioner's testimony about his role as the planner of the robbery supplied the prosecution with all it needed to argue that Petitioner thoroughly planned the robbery.  Any inference about the extent of Petitioner's planning that the prosecution may have "insinuated" based on the motel registration slip was secondary to Petitioner's own testimony.  Thus, Petitioner cannot demonstrate a reasonable probability of a different result had his appellate counsel raised this issue of prosecutorial misconduct on direct appeal.  Accordingly, this claim is procedurally defaulted.

### 4.    Misstatement of fact regarding the title of the DNA expert.

*a.    Petitioner's allegations*

438

Petitioner alleges the prosecution committed misconduct when it repeatedly referred to Angelo Della Manna, the State's DNA expert, as "Dr. Della Manna." Pet. ¶ 370.  He alleges the prosecution "improperly bolstered the testimony of Della Manna" and that, had the prosecution not done so, "the jury would likely have had further doubts regarding Mr. Hodges's participation in the crime."  *Id*.

*b.    The state court's adjudication*

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition.  *See* Doc. 21-27 at 138.  The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on appeal.  Doc. 21-55 at 111.  On postconviction appeal, the ACCA affirmed dismissal pursuant to Rule 32.2(a)(5) because this claim could have been, but was  not, raised on direct appeal.  *Hodges*, 147 So. 3d at 932.

*c.    Respondent's procedural defense*

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it as procedurally barred pursuant to an adequate and independent state procedural rule.  Doc. 38 at 126.

*d.    This claim is procedurally defaulted.*

Petitioner does not rebut or otherwise address Respondent's procedural defense as to this claim.  In the portion of his merits brief in which he argues that the procedural default of some of his prosecutorial misconduct claims is excused by cause and prejudice pursuant to *Brady*, he says nothing about his default of this record-based claim of prosecutorial misconduct.  *See* Doc. 31 at 23–27. Accordingly, this court cannot conclude that the ACCA unfairly or arbitrarily applied the state procedural rule to bar this claim.

To the extent Petitioner argues that the ineffective assistance of his appellate counsel provides cause to excuse his procedural default, such argument fails.  As this opinion previously explained, the prosecution's references to Della Manna as "Dr. Della Manna" preceded Della Manna's testimony, when the prosecution was establishing with another witness the chain of custody of items of evidence that were sent to Della Manna for testing.  Della Manna himself testified about his education and extensive training and experience in his field, with no claim that he possessed a doctorate.  There were no additional erroneous references to "Dr. Della Manna" after his testimony.  Thus, the jury was not left with the impression that Della Manna was a "doctor."  It is not reasonably probable that the jury would have had any doubt about Petitioner's guilt had the prosecution never erroneously referred to Della Manna as "Dr. Della Manna."  Thus, Petitioner cannot

440

demonstrate a reasonable probability of a different result had his appellate counsel raised this issue of prosecutorial misconduct on direct appeal.  Accordingly, this claim is procedurally defaulted.

### 5.   Misstatement of fact regarding the clothes worn by Murph on the night of the murder.

#### a.    *Petitioner's allegations*

Petitioner appears to allege that the prosecution "knew or should have known" that the testimonies of Murph and his girlfriend, Maddox, about the clothes Murph was wearing on the night of the murder were false because it was "contradicted by Mr. Murph's earlier statements to police[.]"  Pet. ¶ 371.  He complains that "[t]his contradiction was never identified by the prosecution (let alone defense counsel), and was quite prejudicial to Mr. Hodges's case (since the identity of clothes, and who wore what when, were critical facts in the case)."  *Id*. He also alleges, without elaboration, that the prosecution "committed misconduct by failing to investigate the physical condition of the clothes that Mr. Murph initially indicated he had worn on the night of the crime[.]"  Pet. ¶ 372.

#### b.    *The state court's adjudication*

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition.  *See* Doc. 21-27 at 138–39.  The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it

could have been, but was not, raised at trial or on appeal.  Doc. 21-55 at 111.  On postconviction appeal, the ACCA affirmed dismissal pursuant to Rule 32.2(a)(5) because this claim could have been, but was  not, raised on direct appeal.  *Hodges*, 147 So. 3d at 932.

<em>c.      Respondent's procedural defense</em>

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it as procedurally barred pursuant to an adequate and independent state procedural rule.  Doc. 38 at 126–27.

<em>d.      This claim is procedurally defaulted.</em>

Petitioner does not rebut or otherwise address Respondent's procedural defense as to this claim.  In the portion of his merits brief in which he argues that the procedural default of some of his prosecutorial misconduct claims is excused by cause and prejudice pursuant to *Brady*, he says nothing about his default of this record-based claim of prosecutorial misconduct.  *See* Doc. 31 at 23–27. Accordingly, this court cannot conclude that the ACCA unfairly or arbitrarily applied the state procedural rule to bar this claim.

To the extent Petitioner argues that the ineffective assistance of his appellate counsel provides cause to excuse his procedural default, such argument fails.  To begin with, Petitioner does not allege any positive misstatement of fact about

442

Murph's clothes that is attributable to the prosecution.  Instead, he simply alleges that prosecutors "knew or should have known" that Murph's trial testimony about his clothes was false because it was contradicted by something in his police statements.  Pet. ¶ 371.  He alleges nothing demonstrating that the prosecution did not believe that the trial testimony was true and the police statement was false, and he cites no authority requiring a prosecutor to impeach a witness's testimony merely because of a prior contrary police statement that is in the possession of the defense.   Accordingly, he has pleaded nothing showing that it is reasonably probable that the result of his appeal would have differed had appellate counsel raised this issue of prosecutorial misconduct.  This claim is procedurally defaulted.

### D.  The Prosecutor Impermissibly Offered the Jury his Own Personal Opinions of the Evidence and Assessed the Credibility of Petitioner in Closing Arguments.

#### 1.   Petitioner's allegations

Petitioner alleges the prosecutor improperly "expressed his personal opinions about the evidence" when, in closing arguments, prosecutors referred to Petitioner as a "liar" and argued that his testimony consisted of lies.  Pet. ¶ 373. He alleges the "expression of personal opinion in this case clearly undermined the jury's ability to reach the rational and individualized determination that is constitutionally mandated in capital cases."  Pet. ¶ 374.

2.       *The state court's merits adjudication*

Petitioner raised this claim on direct appeal.   Doc. 21-14 at 134–35.

Reviewing for plain error, the ACCA rejected his claim.   *Hodges*, 856 So. 2d at

921.   Specifically, the ACCA recognized prior authority establishing that the State

may refer to the character of the defendant, and even refer to the defendant as a

liar, where such characterization is supported by the record.   The ACCA then

concluded as follows:

> Clearly, this was a legitimate inference that could have been drawn
> from the evidence presented at trial.  Hodges testified that he was not
> present when Seaton was murdered.  However, Murph testified that
> Hodges drove the vehicle over Seaton.  Moreover, Hodges's name tag
> was found near Seaton's dead body.  There was also testimony that
> Hodges confessed to his aunt that he had robbed and killed Seaton.

*Id*.

3.       *The ACCA did not unreasonably apply clearly established*
         *federal law and did not base its decision upon an unreasonable*
         *determination of the facts.*

Petitioner cites two Supreme Court decisions as providing the clearly

established federal law governing this claim:  *United States v. Young*, 470 U.S. 1,

17–19 (1985), and *Berger v. United States*, 295 U.S. 78, 88 (1935).  Doc. 42 at 70–

71.

In *Young*, the Supreme Court found no plain error requiring reversal of a

conviction where the prosecutor several times in closing asserted his personal

beliefs about the strength of the evidence and the character of the defendant. *Young* was a mail fraud prosecution against the general manager of a petroleum company who was accused of defrauding one of his customers. 470 U.S. at 3. In the defense's closing, the defense accused the prosecution of unfairly prosecuting the defendant, withholding evidence, and casting a "false light" on the defendant's conduct. *Id*. at 4–5. The defense attorney even asserted that the prosecutors themselves did not believe that the defendant intended to defraud the customer. *Id*. at 5. In its rebuttal to the defense's argument, and with reference to specific charges made by the defense, the prosecutor in several instances specifically indicated his personal beliefs about the strength of the evidence. *Id*. at 5–6. The Court observed that both parties presented improper argument. *Id*. at 9–11. The question, according to the Court, however, was whether "the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale[.]'" *Id*. at 12–13. In other words, the prosecution's argument must be considered in the context of the trial. *Id*. at 14. Importantly, where the prosecution's improper comments do not suggest the influence of extra-record evidence and the evidence of guilt admitted at trial is "overwhelming," a finding of plain error is not warranted. *Id*. at 18–20.

*Berger* is an important Supreme Court decision for its seminal discussion about prosecutorial misconduct in general.  There, the Court observed that the prosecuting attorney committed several instances of misconduct, including the following:

> He was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner.

295 U.S. at 84.  In addition, the prosecutor's "argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury." *Id*. at 85.

Considering the deference an ordinary jury is likely to give the prosecutor, the Court in *Berger* summarized the dilemma posed by such pervasive misconduct:

> Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. The court below said that the case against Berger was not strong; and from a careful examination of the record we agree.  Indeed, the case against Berger, who was convicted only of conspiracy and not of any substantive offense as were the other defendants, we think may properly be characterized as weak—depending, as it did, upon the testimony of Katz, an accomplice with a long criminal record.

In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence.  If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached.  Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential.  A new trial must be awarded.

*Id*. at 88–89.

The ACCA did not unreasonably apply either decision.  As to *Berger*, the sheer scale and pervasiveness of the prosecutor's misconduct distinguishes that case from the case before the ACCA.  As well, unlike in *Berger*, the ACCA here was not presented with a weak case.  And, as to *Berger* and *Young*, Petitioner points to nothing suggesting that the prosecution's characterization of him as a liar was in any way based upon something that was not in the record.  It was instead a response to Petitioner's own testimony, in which Petitioner explicitly accused essentially all the State's witnesses—but especially key witnesses Holstick, Porter, and Murph—of lying.  Indeed, Petitioner's entire defense rested on convincing the jury that the State's witnesses were liars and that only he was truthful.  *Young* instructs that the context of the prosecution's improper remarks or argument is significant in the plain error analysis.  In the context of Petitioner's trial, the prosecutors were simply answering Petitioner's defense on the terms on which he

447

presented it.   The ACCA's conclusion that there was no plain error was a reasonable application of *Young*.

        *4.    Any error was harmless.*

Finally, even if prosecutors committed error under *Berger* and *Young*, and even if the ACCA unreasonably applied those decisions in finding no plain error, it remains that Petitioner must show that the improper remarks and opinions expressed by the prosecutors substantially and injuriously affected the jury's verdict at his trial.   *Brecht*, 507 U.S. at 623.   Considering the substantial testimonial and circumstantial evidence of Petitioner's guilt, the lack of any reasonable inference that the prosecution's remarks were based upon anything other than the evidence admitted in court, and the trial court's instructions advising that the argument of the attorneys is not evidence, Tr. 1163, 1168–69, Petitioner cannot meet this demanding standard.   Accordingly, any error was harmless.   *See Al-Amin v. Warden Georgia Dep't of Corr.*, 932 F.3d 1291, 1301–03 (11th Cir. 2019) (finding serious prosecutorial misconduct at the underlying state court trial but concluding that habeas petitioner was unable to satisfy *Brecht*).

    **E.    The Prosecutor Permitted a Prosecution Witness's False Testimony to Go Uncorrected.**

        *1.    Petitioner's allegations*

Petitioner alleges the prosecution "should have known" that Trina Eady's testimony, on cross-examination, that she did not know whether Petitioner had ever occupied Seaton's van was "incorrect and or perjured." Pet. ¶ 375. He maintains that Eady in fact did know that Petitioner sometimes drove Seaton's van, and that he even sometimes smoked in her van. Pet. ¶ 376–77. Had Eady testified to those facts, her testimony would have corroborated Petitioner's testimony. Although he does not specifically allege why or how the prosecution should have known that this testimony was incorrect or perjured, he nevertheless asserts the prosecution should have "intervened" when Eady testified as she did on cross-examination, and that the prosecution's failure to do so deprived him of a fair trial. Pet. ¶ 380.

### 2. *The state court's adjudication*

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition. *See* Doc. 21-27 at 134–35. The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on appeal. Doc. 21-55 at 111. The Rule 32 court also dismissed the claim as insufficiently pleaded because Petitioner did not "state why the State should have known that Ms. Eady's testimony was incorrect." *Id*. at 138. On postconviction appeal, the ACCA affirmed dismissal

pursuant to Rule 32.2(a)(5) because this claim could have been, but was  not, raised on direct appeal.  *Hodges*, 147 So. 3d at 932.

### 3.   *Respondent's procedural defense*

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it as procedurally barred pursuant to an adequate and independent state procedural rule.  Doc. 38 at 128.

### 4.   *This claim is procedurally defaulted.*

Petitioner does not rebut or otherwise address Respondent's procedural defense as to this claim.  In the portion of his merits brief in which he argues that the procedural default of some of his prosecutorial misconduct claims is excused by cause and prejudice pursuant to *Brady*, he says nothing about his default of this record-based claim of prosecutorial misconduct.  *See* Doc. 31 at 23–27.  Accordingly, this court cannot conclude that the ACCA unfairly or arbitrarily applied the state procedural rule to bar this claim.

To the extent Petitioner argues that the ineffective assistance of his appellate counsel provides cause to excuse his procedural default, such argument fails.  This is so for the fundamental reason that Petitioner has failed to state, in state or federal court, why the prosecution "should have known" that Eady's testimony was not correct and how it should have "intervened" in defense counsel's examination that

produced Eady's testimony.  Even after the Rule 32 court and Respondent in this court raised this basic failure, Petitioner still offers nothing to support this claim.  *See* Doc. 42 at 66.   With no fact ever alleged showing that the State somehow knew that testimony it did not elicit was false, any claim of prosecutorial misconduct Petitioner might have alleged on direct appeal would have been without merit.   Accordingly, Petitioner has pleaded nothing showing that it is reasonably probable that the result of his appeal would have differed had appellate counsel raised this issue of prosecutorial misconduct.  This claim is procedurally defaulted.

### F.    The Prosecutor Intimidated a Witness During Trial Counsel's Cross-Examination of Her.

#### 1.    *Petitioner's allegations*

Petitioner appears to allege that the prosecutor's actions during defense counsel's cross-examination of Porter—including walking toward Porter and, later, standing between Porter and the jury—were contrived to intimidate Porter and cause her to testify untruthfully on a crucial aspect of her testimony.  Pet. ¶ 379.

#### 2.    *The state court's adjudication*

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition.  *See* Doc. 21-27 at 135.  The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could

have been, but was not, raised at trial or on appeal.  Doc. 21-55 at 111.  On

postconviction appeal, the ACCA affirmed dismissal pursuant to Rule 32.2(a)(5)

because this claim could have been, but was  not, raised on direct appeal.  *Hodges*,

147 So. 3d at 932.

### 3.    *Respondent's procedural defense*

Respondent asserts this claim is procedurally defaulted because the ACCA

adjudicated it as procedurally barred pursuant to an adequate and independent state

procedural rule.  Doc. 38 at 129.

### 4.    *This claim is procedurally defaulted.*

Petitioner does not rebut or otherwise address Respondent's procedural

defense as to this claim.  In the portion of his merits brief in which he argues that

the procedural default of some of his prosecutorial misconduct claims is excused

by cause and prejudice pursuant to *Brady*, he says nothing about his default of this

record-based claim of prosecutorial misconduct.  *See* Doc. 31 at 23–27.

Accordingly, this court cannot conclude that the ACCA unfairly or arbitrarily

applied the state procedural rule to bar this claim.

To the extent Petitioner argues that the ineffective assistance of his appellate

counsel provides cause to excuse his procedural default, such argument fails.  As

noted previously in this opinion, the ACCA reasonably rejected Petitioner's claim

that his trial counsel was ineffective for failing to object to this instance of alleged prosecutorial misconduct. *See Hodges*, 147 So. 3d at 954–55. In essence, Petitioner has not sufficiently alleged facts showing that Porter was actually intimidated by the prosecutor's actions, such that she failed to provide truthful testimony. Thus, for the reasons set forth in the ACCA's opinion and in this order, Petitioner also cannot show that it is reasonably probable that the result of his appeal would have differed had appellate counsel raised this issue of prosecutorial misconduct. Accordingly, his procedural default is not excused by the ineffective assistance of his appellate counsel. This claim is procedurally defaulted.

### G. The State Failed to Provide Petitioner's Trial Counsel with Complete Copies of All Reports, Photographs, and Other Evidence and Information Generated that Was Relevant to this Case.

#### 1. Petitioner's allegations

Petitioner alleges, without elaboration, that the prosecution "failed to provide trial counsel with copies of all notes, reports, and other document[s], as well as photographs and other investigative materials that were generated by or on behalf" of the several state, county, and local law enforcement agencies that participated in investigating Seaton's murder, including, particularly, those agencies outside the jurisdiction of Lee County. Pet. ¶ 380. He further alleges that several police reports provided to counsel were redacted, and that the redacted

information was "potentially exculpatory, or would have revealed information that would have served to impeach witnesses for the State."  Pet. ¶ 381.  He asserts, based upon his "information and belief," that the evidence withheld by the State was favorable to him in that it was "exculpatory or would have served to impeach the State's witnesses, or both."  Pet. ¶ 382.

### 2.  The state court's adjudication

Petitioner raised this claim in his Rule 32 petition.  Doc. 21-27 at 133–34.  The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on appeal.  Doc. 21-55 at 111.  The Rule 32 court also dismissed the claim as insufficiently pleaded pursuant to Rule 32.6(b) because Petitioner failed to allege "what reports, documents, statements, evidence, etc., was withheld from the defense in violation of *Brady*" and did not "state what exculpatory information was contained in these reports."  Doc. 21-55 at 137–38.  On postconviction appeal, the ACCA affirmed dismissal pursuant to Rule 32.2(a)(5) because this claim could have been, but was  not, raised on direct appeal.  *Hodges*, 147 So. 3d at 932.

### 3.  Respondent's procedural defense

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it as procedurally barred pursuant to an adequate and independent state procedural rule.  Doc. 38 at 129–30.

### 4.    This claim is procedurally defaulted.

Petitioner does not rebut Respondent's argument that this claim is procedurally defaulted.  Instead, he appears to argue that, as this claim essentially alleges a *Brady* violation, he has demonstrated cause and prejudice to excuse his default of the claim.  *See* Doc. 31 at 27.  But the mere allegation of a *Brady* violation is insufficient to sustain such a claim, much less demonstrate cause and prejudice to overcome a procedural default.  As discussed previously concerning Petitioner's claim of an undisclosed "deal" for Porter's cooperation, "mere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'"  *Jordan*, 316 F.3d at n.81.

Here, Petitioner only alleges that the prosecution did not give him every note, copy, document, report, and photograph that was produced by every law enforcement agency involved in the Seaton murder investigation, and that some of the documents he received bear redactions.  Pet. ¶¶ 380–81.  Despite his claim to have "information and belief" about the materiality of these undisclosed or redacted documents, he does not describe with particularity any document that he

455

believes has been withheld.  He simply concludes that some of the undescribed redactions "were potentially exculpatory" and that, again based only on his undescribed "information and belief," the evidence withheld from him "would have been favorable" because it "was either exculpatory or would have served to impeach the State's witnesses, or both."  Pet. ¶¶ 381–82.  Ultimately, "a *Brady* claim fails when it is only speculative that the materials at issue would have led to exculpatory information."  *Wright v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1256, 1281 (11th Cir. 2014).  Because Petitioner provides nothing but speculative and cursory allegations in support of this claim, he has not demonstrated cause or prejudice to overcome his procedural default of the claim in state court.  Accordingly, this claim is procedurally defaulted.

### H.   The Prosecution Failed to Reveal Significant Inconsistencies in the Collection of Physical Evidence.

#### 1.   *Petitioner's allegations*

Petitioner alleges, without elaboration, that the "prosecution knew or should have known that certain pieces of physical evidence presented at trial were mishandled or, possibly, even planted, in that they may not have been present at the various crime scenes when those scenes where initially secured.  The prosecution failed to object or otherwise address the existence of this evidence at trial."  Pet. ¶ 384.

456

2.    *The state court's adjudication*

Petitioner first presented this claim of prosecutorial misconduct in his Rule 32 petition.  *See* Doc. 21-27 at 136.  The Rule 32 court summarily dismissed the claim as procedurally barred pursuant to Rule 32.2(a)(3) and (5) because it could have been, but was not, raised at trial or on appeal.  Doc. 21-55 at 111.  The Rule 32 court also summarily dismissed the claim as insufficiently pleaded, finding that Petitioner failed to identify any of the "significant inconsistencies in the collection of physical evidence" which the claim challenged.  Doc. 21-55 at 138–39.  On postconviction appeal, the ACCA affirmed dismissal pursuant to Rule 32.2(a)(5) because this claim could have been, but was  not, raised on direct appeal.  *Hodges*, 147 So. 3d at 932.

3.    *Respondent's procedural defense*

Respondent asserts this claim is procedurally defaulted because the ACCA adjudicated it as procedurally barred pursuant to an adequate and independent state procedural rule.  Doc. 38 at 130–31.

4.    *This claim is procedurally defaulted.*

Petitioner does not rebut or otherwise address Respondent's procedural defense as to this claim.  In the portion of his merits brief in which he argues that the procedural default of some of his prosecutorial misconduct claims is excused

457

by cause and prejudice pursuant to *Brady*, he says nothing about his default of this record-based claim of prosecutorial misconduct.   *See* Doc. 31 at 23–27.[58] Petitioner's reply brief says nothing at all about this claim or Respondent's assertion of procedural default.   Accordingly, this court cannot conclude that the ACCA unfairly or arbitrarily applied the state procedural rule to bar this claim.

To the extent Petitioner argues that the ineffective assistance of his appellate counsel provides cause to excuse his procedural default, such argument fails.   As found by the Rule 32 court, and reiterated by Respondent here, *see* Doc. 38 at 131, Petitioner has never revealed, in state or federal court, what, specifically, this claim is about.   Thus, there is no reasonable probability that the result of his appeal would have been different had appellate counsel complained to the ACCA that prosecutors failed to object or otherwise address "significant inconsistencies in the collection of physical evidence."   Nor would appellate counsel have found traction for the petition's unsupported allegations of evidence-planting on direct appeal. Accordingly, Petitioner's procedural default of this claim of prosecutorial misconduct is not excused by the ineffective assistance of his appellate counsel. This claim is procedurally defaulted.

---

[58] The brief does nothing more than repeat this claim's allegation that the prosecution knew or should have known about mishandling of evidence.   *See* Doc. 31 at 27.   There is no additional explanation of what items of evidence, specifically, were mishandled.   Nor is there any argument that *Brady* provides cause and prejudice for the default of this claim.

## VIII.  Claim Eight – Petitioner's Due Process Rights Under the Sixth and Fourteenth Amendments were Violated by the Trial Court's Bias.

### A.  *Petitioner's allegations*

Petitioner claims the trial court's bias against him deprived him of due process.  He alleges the trial court demonstrated its bias through the following remarks, actions, and rulings: a) the trial court revealed frustration with trial counsel's filing of pretrial motions and "repeatedly interfered with trial counsel's ability to effectively argue those motions and to follow up on their denial to the prejudice of Mr. Hodges"; b) the trial court unacceptably and prejudicially delayed ruling on important pretrial motions, which impaired counsel's ability to manage the case and prepare for trial; c) the trial court "made impermissible rulings that served to bolster the prosecution or undermine the defense, which "could hardly avoid biasing the jury" in favor of the State; d) the trial court unreasonably rushed the trial to completion, which pressured the defense to "limit the scope of [its] inquiries of the prosecution's witnesses . . . and interfered with Mr. Hodges's ability to make his case and, in the penalty phase, "interfered with Mr. Hodges's ability to present a complete case" in mitigation of his sentence; e) the trial court prompted the State to "tie up" the evidentiary link between Petitioner and the pants that Murph attributed to Petitioner; and f) the trial court was impermissibly biased in favor of the death penalty.  Pet. ¶¶ 388–98.

459

B.     *The state court's merits adjudication*

On direct appeal, Petitioner argued that the trial court erred in denying his pretrial motion for recusal due to bias.   In support, he cited several rulings, statements, and actions by the trial court that indicated bias, including when it: responded with "hostility" to the defense's pretrial motions; reprimanded Petitioner during his cross examination by the State; denied most of the defense's pretrial motions; prevented the defense from presenting mitigating evidence; applied an aggravating factor which the State did not request; prevented the defense from accessing physical evidence admitted at trial; agreed with the State's charge that the defense was attempting trial by ambush when the defense requested an ex parte hearing on its motion for funds to retain a neuropsychologist; denied the requested ex parte hearing; denied the defense's request for funds to develop its claim of jury discrimination; ridiculed the defense as "politically correct" for employing the term "foreperson" rather than "foreman"; prevented the defense from asking voir dire questions; struck "all but seven of his over 300 suggested voir dire questions; and overrode the jury's life recommendation.  Doc. 21-14 at 165–67.  Petitioner argued the trial court's bias denied him his right to a fair trial.  Doc. 21-14 at 167.

The ACCA first discussed state court authority holding that bias on the part of a judge will not be presumed and that the party seeking recusal has the burden

460

of producing evidence to support his claim of bias. *Hodges*, 856 So. 2d at 898 (citations omitted). The ACCA concluded, in view of this authority, that "Hodges failed to meet his burden of showing that the trial court was biased or prejudiced against him." *Id*. The ACCA explained that the trial court's adverse rulings against Petitioner were not alone sufficient to establish bias. *Id*. (citations omitted). Instead, "[t]he bias or prejudice necessary to disqualify a judge must stem from an extrajudicial source and must result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Id*. (citations and internal quotations omitted). The ACCA summarized its analysis as follows:

> We have reviewed the record and find no evidence of any bias on the part of the trial court. On occasion, the trial court did exhibit some impatience with the defense because of the approximately 70 motions that Hodges's lawyers filed on his behalf, but this impatience is insufficient evidence of bias. Moreover, the trial court detailed its reasons for overriding the jury's recommendation. There is no evidence that the trial court, without reason or as a result of bias, chose to sentence Hodges to death. The record contains no clear evidence of bias in this case. Therefore, the trial court did not abuse its discretion in denying the motion to recuse.

*Id*. at 898–99.

Petitioner then presented the instant claim of judicial bias, essentially verbatim, in his Rule 32 petition. Doc. 21-27 at 141–45. The Rule 32 court summarily dismissed the claim, in all its parts, as procedurally barred pursuant to

461

Rule 32.2(a)(2) and (4) because it was raised or addressed at trial and on appeal. Doc. 21-55 at 111–12.  The ACCA affirmed dismissal pursuant to Rule 32.2(a)(4) because the issue of the trial court's bias was raised and addressed on direct appeal. *Hodges*, 147 So. 3d at 930–31.  Accordingly, this court reviews the ACCA's decision on direct appeal pursuant to AEDPA.

C.   *The ACCA did not unreasonably apply clearly established federal law and did not base its decision upon an unreasonable determination of the facts.*

The petition cites two Supreme Court decisions as providing the clearly established federal law which the ACCA is alleged to have unreasonably applied: *In re Murchison*, 349 U.S. 133 (1955), and *Peters v. Kiff*, 407 U.S. 493 (1972). These decisions are cited for the general proposition that due process requires a fair trial before a fair and impartial tribunal.  Pet. ¶ 387.  In *Murchison*, the Supreme Court addressed a peculiar feature of Michigan law which authorized a state court judge to act as a "one-man grand jury" by "compel[ling] witnesses to appear before him to testify about suspected crimes."  349 U..S. at 133.  The question before the Court was whether due process permitted a judge who served as such a "one-man grand jury" to preside over a criminal contempt hearing arising out of the "one-man grand jury" also presided over by the judge.  *Id*. at 134.

The Court observed that it "would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations." *Id*. at 137.  The Court reasoned that a judge serving as a "one-man grand jury" is "a part of the accusatory process" and, therefore, "cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." *Id*.  The Court therefore held that "it was a violation of due process for the 'judge-grand jury' to try" the criminal contempt charges arising out of the "grand jury" proceeding.  *Id*. at 139.

*Peters*, as discussed previously, was a habeas matter in which the white habeas petitioner complained of the systemic exclusion of blacks "from the grand jury that indicted him and the petit jury that convicted him" in Muscogee County, Georgia.  407 U.S. at 494.  The Court held that the petitioner had standing to bring his equal protection and due process challenges to his conviction.  *Id*. at 504.  In reaching this holding, the Court referenced the due process right to a "competent and impartial tribunal[.]"  *Id*. at 501.  The decision says nothing about establishing the presence of judicial bias in violation of due process.

Outside of *Murchison*, Petitioner cites only two cases addressing whether a conviction should be vacated or reversed due to judicial bias.  Petitioner cites *United States v. Candelaria-Gonzalez*, 547 F.2d 291, 297 (5th Cir. 1977), in which

the old Fifth Circuit found that the trial judge below "made no effort to conceal his annoyance and impatience with defense counsel's performance" and that there was "slight, if any, justification in the record for the judge's sarcasm, his frequent interruptions and his antagonistic comments in the jury's presence." The appellate court viewed "as a serious impropriety the trial judge's failure to preserve an appearance of impartiality." *Id*. But the Fifth Circuit did not reverse the conviction due to the alleged judicial bias alone. Rather, it reversed because of "the conduct of the trial as a whole." *Id*. Specifically, where the trial court permitted a "grossly prejudicial cross-examination of the [defendants'] character witnesses," this manifest error, "considered in conjunction with the district judge's mistreatment of defense counsel, resulted in failure to accord a fair trial" to the defendants. *Id*. at 297–98.

Petitioner also cites *Quercia v. United States*, 298 U.S. 466, 471 (1933), in which the Supreme Court reversed a conviction due to the following charge by the trial court:

> And now I am going to tell you what I think of the defendant's testimony. You may have noticed, Mr. Foreman and gentlemen, that he wiped his hands during his testimony. It is rather a curious thing, but that is almost always an indication of lying. Why it should be so we don't know, but that is the fact. I think that every single word that man said, except when he agreed with the Government's testimony, was a lie.

> Now, that opinion is an opinion of evidence and is not binding on you, and if you don't agree with it, it is your duty to find him not guilty.

*Id*. at 468–69 (quotation marks omitted).   The Court explained why the trial judge's charge was grossly improper:

> In the instant case, the trial judge did not analyze the evidence; he added to it, and he based his instruction upon his own addition. Dealing with a mere mannerism of the accused in giving his testimony, the judge put his own experience, with all the weight that could be attached to it, in the scale against the accused.  He told the jury that 'wiping' one's hands while testifying was 'almost always an indication of lying.'  Why it should be so, he was unable to say, but it was 'the fact.'  He did not review the evidence to assist the jury in reaching the truth, but in a sweeping denunciation repudiated as a lie all that the accused had said in his own behalf which conflicted with the statements of the government's witnesses.  This was error and we cannot doubt that it was highly prejudicial.

*Id*. at 471–72.

The Eleventh Circuit has previously held that "'there is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due Process Clause or any other constitutional provision.'"  *Whisenhant v. Allen*, 556 F.3d 1198, 1209 (11th Cir. 2009) (quoting *Hendrix v. Sec'y, Fla. Dep't of Corr.*, 527 F.3d 1149, 1153 (11th Cir. 2008)). Examples of actual bias include cases "in which the judge has a pecuniary interest in the outcome or has been personally abused or criticized by the party before

him." *Id*. (citation omitted).  Thus, Petitioner must demonstrate actual bias on the part of Judge Harper to sustain his claim.

Petitioner falls short of demonstrating that the ACCA unreasonably applied clearly established federal law in failing to find actual bias on the part of Judge Harper.  To begin with, Petitioner plainly has not alleged that Judge Harper had any pecuniary interest in the outcome of his trial, or that Judge Harper might have been actually biased due to any "abuse" or "criticism" of him by Petitioner or his attorneys.  Furthermore, it is apparent that none of the cases Petitioner has cited demonstrate error under AEDPA.  *Murchison* is distinguishable because in that case the "judge based his judgment of contempt on his own personal knowledge and impressions of what had occurred in the grand jury room, including his opinions that the witness was insolent and defiant, even though the judge's opinions could not be cross-examined." *Whisenhant*, 556 F.3d at 1209 (citing *In re Murchison*, 349 U.S. at 138).  *Quercia* is plainly distinguishable because there the trial judge baldly advised the jury of his personal opinion that the defendant had lied based on nothing more than the court's supposition about the significance of the defendant's having wiped his hands while testifying.

*Candelaria-Gonzalez*, which is not clearly established federal law binding on the ACCA, is closest to the facts here but, ultimately, does not demonstrate

error in the ACCA's decision, much less that the ACCA unreasonably applied clearly established federal law or made unreasonable factual determinations. This is so because, although the ACCA here found that the trial court occasionally displayed impatience with the defense, in total, as will be set out more fully below, the trial court's actions here fell far short of establishing the "serious impropriety" observed by the Fifth Circuit in that case. And, more importantly, and as discussed throughout this opinion, unlike in *Candelaria-Gonzalez*, there is no single trial error so prejudicial in nature as to warrant ordering a new trial when considered in conjunction with the evidence of bias Petitioner has proffered.

Closer examination of the specific instances in which Petitioner alleges the trial court acted out of or otherwise revealed its bias against him demonstrate that he falls short of showing actual bias. Consider first his lead evidence of bias, the trial court's "frustration" with his pretrial motions. To be sure, as the ACCA found, the trial court did occasionally express impatience with Petitioner's filing of approximately seventy pretrial motions. But, viewing the record as a whole, it cannot be said that the trial court was uniformly, or even substantially, hostile or impatient with the defense's motions. In the context of the entire transcript, the trial court's expressions of such impatience or frustration were rare, brief, and mostly mild.

The transcript reveals several different motions hearings before Judge Harper.  The motion hearing before Judge Harper on April 14, 1998, involved eight motions.  Judge Harper heard defense counsel on each motion, granted several of them, and, in this court's view, expressed no obvious frustration with the defense.  *See* Tr. 34–55.  On June 4, 1998, Judge Harper heard another eight defense motions, granted some, and, again in this court's view, expressed no obvious impatience with the defense's motions.  Tr. 57–69.

At an ex parte hearing on July 10, 1998, there was some mild back and forth between Judge Harper and defense counsel about whether a law enforcement officer could properly attend the ex parte hearing.  Tr. 72–73.  Judge Harper explained that he would not "have a capital murder defendant in here without a law enforcement officer to – to guard him[,]" but did not otherwise express impatience. Another eight motions were heard on October 16, 1998.  Although there was some argument about whether the defense could examine the prosecutor on the question of the identities of grand jury forepersons over the years, Judge Harper granted some of the motions without expressing any obvious impatience with the defense's motions.  Tr. 84–115.

At the next motions hearing, on January 18, 1999, as counsel was arguing in support of his motion to conduct individual sequestered voir dire and to "permit

extensive voir dire of the issue of racial bias," Judge Harper expressed some

frustration with the prematurity and numerosity of the defense's motions:

> Here again, Mr. Ray, you can – you can flood me with these motions
> if you want to, but here again, I think you are premature on this; at
> such time as we have a hearing to determine what questions are going
> to be asked in voir dire, I will hear you out on what you want to ask.
> But here you are giving me these motions probably months in advance
> of trial, and I am not going to grant these motions right now until we
> get close to trial time and I see precisely what you want to ask.

Tr. 132.   Nevertheless, Judge Harper worked through the defense's motions,

granting some, and expressed nothing more than the mild impatience cited above.

Tr. 117–146.

At the next motions hearing on February 12, 1999, the trial court again heard

several motions.  At this hearing, defense counsel admitted that one of the motions,

his motion for individual voir dire of jurors on certain topics, was filed because he

had never been in a capital case and did not know the court's procedures.  Tr. 173–

74.  At one point, addressing Petitioner's motion for independent expert inspection

of all the State's forensic evidence, the trial court admonished the defense for

engaging in a "fishing expedition" because it did not express a sufficiently

particularized need for the inspection of any single piece of evidence.  Tr. 180–81.

The trial court left open the possibility of revisiting the issue, however, upon a

more particularized showing by the defense in the future.  *Id.*

Addressing another motion, in which the defense asked the trial court to give the State a firm deadline to indicate whether additional forensic reports would be provided, the trial court stated that the defense was "engaging in a whole lot of make-work because the District Attorney has indicated his willingness to cooperate with you in providing these things in a timely manner."  Tr. 182.  The trial court further stated, "filing these kinds of motions that are in effect make-work for the purpose of making some sort of record seems to me a useless gesture, but I am not going to tell you how to handle your case."  Tr. 183.  When defense counsel responded that he did not mean to burden the court and the State with "make-work," the trial court stated as follows:

> I understand that, but it seems to me from where I sit that you are -- you are filing a lot of motions that are either way premature or in effect useless because a lot of this stuff you are going to be getting when this case is set for trial.  Now, you are going to know far in advance when the trial date is finally selected and at that point then we can sit down and start talking about anything that you don't have that you need, and we will certainly make sure that you have ample time to get it.

Tr. 183.

At the next motions hearing, on May 13, 1999, about a month before trial, the defense presented several more motions.  The trial court worked through the motions without any obvious display of impatience.  Tr. 197–208.  When the State called an expert witness to testify about the racial make up of Lee County grand

470

juries historically, Judge Harper expressed his belief that the proceeding was "irrelevant" because Petitioner had been re-indicted by a grand jury with a black foreman.  Tr. 219.  When Judge Harper overruled the State's objection to one of defense counsel's questions, he again expressed his frustration with the proceeding: "Overruled.  I am going to let you just ask him questions—I am going to break in a minute and take up my civil docket and then we will come back and we can cross examine this gentleman all day long."  Tr. 220–21.

The next motions hearing was June 3, 1999, less than two weeks before trial.  As the court was working through the defense's motions, the court addressed the defense's motion "to exclude for cause all veniremen who would vote for the death penalty automatically[.]"  Tr. 233.  Judge Harper explained, "[t]hat would be done by the Court just as required by law.  You don't need a motion to that effect, Mr. Ray."  *Id*.  Defense counsel responded that he did not know if he needed to file such a motion and that he was not trying to "burden the court[.]"  *Id*.  Judge Harper briefly expressed obvious frustration:  "Well, you have burdened me with every . . . motion conceivably—conceivably known to man, but you go right ahead."  Tr.

233–34.  Nevertheless, Judge Harper worked through the remaining motions with no obvious expression of impatience.[59]

At the final pretrial motions hearing, on June 10, 1999, the defense argued its motion for recusal, which it filed the previous day, approximately five days before trial was to begin.  Defense counsel here argued that the trial court had taken an "adversarial" approach with the defense throughout the pretrial period as shown by the court's remarks and demeanor, its delay in ruling on some motions, and its denial of most of the defense's pretrial motions.  Tr. 259–60.  Judge Harper "respectfully denied" the motion for recusal, Tr. 260, and worked through the remainder of the defense's motions with no obvious expression of impatience.

In sum, the trial court occasionally expressed the sentiment that the defense had filed premature or unnecessary motions and had burdened the court with "make-work" in an effort to build a record.  In some instances, the defense conceded that it had filed pretrial motions out of an abundance of caution and due to its unfamiliarity with Judge Harper's procedures and capital litigation more generally.  Considering the dozens of motions brought before the trial court at

---

[59] Another of the defense motions addressed at the hearing, this one to "prohibit the state from using its peremptory challenges in a racial discriminatory fashion," was similarly described by Judge Harper as "anticipatory" in that such conduct, if any, would be addressed at the time it occurs, not by pretrial motion.  Tr. 246.  The defense again explained that it filed the motion because it was unfamiliar with the court's procedure. *Id*.

several motions hearings in almost a year and a half of pretrial proceedings, it is unsurprising that, in rare instances, Judge Harper occasionally appeared impatient. But, in the context of the entire pretrial record, Judge Harper's rare and brief expressions of mild frustration do not appreciably accrue to suggest actual bias on his part.   And, of course, all of these pretrial incidents occurred outside the presence of the jury, which further distinguishes Petitioner's argument from *Quercia* and *Candelaria-Gonzalez*.

The other indicia of bias cited by Petitioner do not substantially advance his claim.   He alleges the trial court's delay in ruling on some of his motions "seriously prejudiced trial counsel's ability to manage the case in a constitutionally effective manner, and impaired the defense's abilities to address the State's responses in a timely manner."   Pet. ¶ 391.   He also complains the trial court's rulings denying some of his motions "demonstrated a "cavalierness" regarding the process in this capital case which revealed an underlying bias against the established protections for capital defendants."   *Id.*   To be sure, it is conceivable that the trial court's delay in ruling on some of the defense's motions could have prejudiced the defense's investigation and preparation for trial.   To the extent the trial court's delay might constitute error distinct from the trial court's ultimate disposition of such motions, Petitioner was free to argue such error on appeal or in

postconviction.  But Petitioner has presented nothing showing that Judge Harper delayed ruling on his motions due to bias rather than oversight, judicial workload, or other error.  The same goes for the alleged "cavalierness" to the rights of capital defendants demonstrated by Judge Harper's rulings.  If Judge Harper erred in denying any pretrial motion, thereby depriving Petitioner of an important constitutional right, then Petitioner was free to present such argument on appeal or in postconviction proceedings, which he in fact did in many respects.  It does not follow that any error by Judge Harper is attributable to bias on his part.

Petitioner also alleges that several of the trial court's rulings during trial "served to bolster the prosecution or undermine the defense[,]" and that the "resulting favoritism showed the trial court's bias for the State's position" and must have biased the jury against Petitioner.  Pet. ¶ 392.  This opinion previously addressed these alleged instances of improper rulings in the context of Petitioner's claim that counsel was ineffective in failing to object to the trial court's erroneous rulings.  *See supra* pp. 137–63.  This opinion need not revisit those rulings here.  It is sufficient for present purposes to conclude that, with respect to each alleged instance of impermissible judicial ruling, Petitioner failed to demonstrate prejudicial error, much less that any ruling was the product of judicial bias against him.

Petitioner's complaint that the trial court demonstrated bias against him by rushing the trial to completion also fails.  Indeed, Petitioner's lead allegation here is that "[t]he trial court refused to permit *the prosecution* to take a break late in the first day, instead pressing the prosecution to present yet more testimony."  Pet. ¶ 393 (emphasis supplied).  While Petitioner alleges this ruling "pressured" the defense "to limit the scope of his inquiries of the prosecution's witnesses[,]" *id*., it is apparent by his own allegation that the trial court held the State to this same standard of expeditiousness.  The trial court's refusal to grant the State a break cannot be said to be motivated by bias against the defense.

Petitioner here also complains about the trial court's interruption of the defense's examination of Cora Cobb in the penalty phase as another example of the court's unreasonable fixation on rushing the trial.  The ramifications of the trial court's actions in this respect were addressed on direct appeal and in this opinion. Even if the trial court erred in its assessment of the relevance of Cobb's testimony, considering that the trial court obviously pressed the State to move things along as well, nothing in the petition suggests that the court's error was the product of actual bias against Petitioner.[60]

---

[60] And, as noted previously, Cobb's specific testimony about "finally" moving to a house in Auburn and then moving to a bigger house a couple roads over in Auburn is not necessarily evidence of instability or otherwise inherently mitigating.  Petitioner has never articulated why testimony about moving to a bigger house or a better neighborhood

Petitioner also claims the trial court revealed bias when it reminded the State that it needed to "tie up" the evidentiary link between Petitioner and the pants Murph assisted the State with recovering.  Pet. ¶ 396.  He cites *Quercia* in support. Of course, the error in *Quercia*, in which the trial court flatly told the jury its opinion that one of the defendants lied to the jury during his testimony, *see* 289 U.S. at 468–69, is plainly distinguishable.  This opinion previously explained the context surrounding the trial court's "intervention" respecting the pants.  In short, the trial court's question to the State about "tying up" that piece of evidence was the product of an earlier interaction in which the trial court granted the defense's request that the jury not be shown a chart identifying the subject pants as "pants from Hodges."  The trial court was assured then that the State would "tie that up" through witnesses other than the DNA expert for whose testimony the State was using the chart.

Ultimately, as this opinion previously explained, even if the trial court improperly reminded the State of the need to "tie that up," there was no prejudice because of the circumstantial evidence connecting Petitioner and the pants. Nothing in the record, however, suggests that the trial court's reminder stemmed from actual bias and a desire to help the State make its case rather than the court's

is necessarily evidence of instability.  Thus, Judge Harper might have reasonably questioned the relevance of that specific testimony in the penalty phase.

desire to address a dangling loose thread from earlier in trial.  In any event, even if the trial court's reminder is evidence of bias, it is only weakly so, and in no sense is it a "thumb on the scale" of the nature the Supreme Court confronted in *Quercia*.

Finally, the trial court's "initial rationale" for its override does not support a claim of actual bias.  To begin with, Petitioner perceives bias because the trial court described his criminal history as "not good."  Petitioner acknowledges he had two convictions for possession of cocaine, one of which earned him a ten-year prison sentence, but takes issue with the trial court's mention of his "driving offenses" as part of the predicate for his death sentence.  Pet. ¶¶ 397, 399.

Review of the transcript, however, shows that the reference to "driving offenses" was merely part of the trial court's chronological recitation of Petitioner's criminal history from the pre-sentence report which the trial court was reviewing at the hearing.  Tr. 1267.  The "driving offenses" were sandwiched between a 1988 first degree forgery offense in Georgia and a 1991 drug offense, followed by a 1993 drug offense, and an escape charge in 1994.  The trial court stated, both before and after reviewing these convictions, that, cumulatively, Petitioner's criminal record was "not good."  Tr. 1267–68.  The trial court went on to express its weighing of the aggravating and mitigating circumstances and its conclusion that a death sentence was warranted.  Tr. 1268.  The trial court's

characterization of Petitioner's "not good" criminal history was fair, even if it did not amount to an aggravating circumstance.  In no sense, however, can it be said that Petitioner was sentenced to death because of his "driving offenses."  The trial court's remarks do not indicate actual bias.[61]

In sum, because Petitioner failed to demonstrate actual bias on the part of Judge Harper, the ACCA properly rejected his claim that the trial court erred in denying his pretrial motion for recusal.  In this court, Petitioner has provided no clearly established federal law demonstrating that the ACCA unreasonably rejected his claim of bias.  Accordingly, this claim is due to be denied.

## IX.    Claim Nine – The Errors Alleged in the Petition So Infected Petitioner's Trial That, Taken as a Whole, the  Trial Amounted to a Miscarriage of Justice that Cannot be Constitutionally Supported

### A.    Petitioner's allegations

---

[61] Petitioner also appears to allege Judge Harper was biased against him because Judge Harper previously presided over Petitioner's 1993 trial for drug possession.  Pet. ¶ 399. He references Judge Harper's ten-year sentence for that conviction and claims "this prior personal experience with Mr. Hodges's criminal history likely biased the court against Mr. Hodges."  Pet. ¶ 399.  Petitioner cites no authority permitting a finding of judicial bias because of a judge's prior involvement with the defendant in a separate criminal matter.  In any event, the Supreme Court has stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" do not establish bias "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).  Petitioner alleges nothing arising out of his prior conviction before Judge Harper that would establish such "deep-seated favoritism or antagonism" on the part of Judge Harper.

478

In a single paragraph, Petitioner appears to allege a cumulative error claim encompassing all the petition's various claims of error:

> In combination, the errors listed above were so substantial that the entire process leading to the conviction and sentencing of Mr. Hodges amounted to a miscarriage of justice in violation of Mr. Hodges's constitutional rights.  The repeated violations of constitutional norms infected the impartiality and effectiveness of the pretrial process, the trial, and the post-trial proceedings.  The cumulative effect of these errors have violated Mr. Hodges's rights to due process and a fair trial in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  *See, e.g., Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992).  As such, Mr. Hodges's conviction and sentence amount to a miscarriage of justice, and cannot stand in the presence of these errors.

Pet. ¶ 401.

### B.    *State court proceedings*

Petitioner first presented this claim in his Rule 32 petition.  *See* Doc. 21-27 at 180–81.  It does not appear the claim was addressed by the Rule 32 court or on appeal of that court's judgment in the ACCA.[62]  Respondent does not assert that the claim is unexhausted or procedurally defaulted.  Instead, he argues the ACCA "implicitly denied relief on this claim when it affirmed Hodges's conviction and death sentence."  Doc. 37 at 100–01.  Respondent therefore submits that review of the ACCA's implicit decision is governed by AEDPA.

---

[62] Respondent concedes the ACCA "did not specifically address this claim[,]"  Doc. 37 at 100–01.  Respondent does not point to any adjudication of the claim in the lower court.

C.      *Petitioner is not entitled to relief.*

The petition cites a single Fifth Circuit decision, *Derden v. McNeel*, 978

F.2d 1453 (5th Cir. 1992), in support of this claim.  In that case, the Fifth Circuit

indeed held that "federal habeas corpus relief may only be granted for cumulative

errors in the conduct of a state court trial where (1) the individual errors involved

matters of constitutional dimension rather than mere violations of state law; (2) the

errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so

infected the entire trial that the resulting conviction violates due process.'"  *Id*. at

1454 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

The Fifth Circuit in *Derden* articulated at least four "minimum standards"

governing a claim of cumulative error.  *Id*. at 1458.  *First*, "any cumulative error

theory must refer only to errors" rather than merely "unfavorable rulings or events

in the effort to cumulate errors."  *Id*.  *Second*, the errors joining to cumulate "must

not have been procedurally defaulted from habeas corpus review."  *Id*.  *Third*,

"errors of state law, including evidentiary errors, are not cognizable in habeas

corpus as such[,]" and, consequently, "rise to constitutional dimension only if they

'so infused the trial with unfairness as to deny due process of law.'"  *Id*. (quoting

*Lisenba v. California*, 314 U.S. 219, 228 (1941)).  *Fourth*, "the federal court must

review the record as a whole to determine whether the errors more likely than not

480

caused a suspect verdict." *Id*. (citation omitted).  Applying these criteria, the Fifth Circuit in *Derden* examined each of the habeas petitioner's claims of trial error and found them lacking individually and cumulatively and, accordingly, denied relief on the cumulative error theory advanced by the petitioner.  *Id*. at 1459–61.

The Eleventh Circuit has explained that "we address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Morris v. Sec'y, Dep't of Corr*., 677 F.3d 1117, 1132 (11th Cir. 2012) (citation omitted).[63]

Here, this court need not decide whether this claim is cognizable in habeas corpus and, if so, whether it is to be reviewed under AEDPA because the ACCA "implicitly" rejected the claim.  This is so because, even assuming the claim is cognizable, and applying de novo review, Petitioner's claim fails on the very authority which he has cited.  Petitioner does nothing more than present a blanket assertion that all of his claims of error may cumulate to provide relief under this

---

[63] In *Morris*, the Eleventh Circuit declined to decide "whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law."  677 F.3d at 1132 n.3.  Even assuming such claims are cognizable under AEDPA, the Eleventh Circuit found, the habeas petitioner in *Morris* failed to show cumulative error.  *Id*.

theory.  He does not take the opportunity to highlight any particular claim or set of claims that, in his view, substantially advances his cumulative error claim.

As has been discussed throughout this opinion, many of Petitioner's claims of error do not, in fact, establish error.  Likewise, many of his claims of error, including, especially, many of his claims of prosecutorial misconduct, are procedurally defaulted and, accordingly, cannot accumulate in the analysis. *Derden*, 978 F.2d at 1458.  Finally, and most importantly, having reviewed the record as a whole, this court can reliably conclude that the errors alleged in the petition did not cause a "suspect verdict" or otherwise result in a "fundamentally unfair trial." *Id*.; *Morris*, 677 F.3d at 1132.

To be sure, Petitioner's trial was not perfect.  No trial is.  As set forth throughout this opinion, many of his claims of error are unable to surmount the considerable deference due the state courts under AEDPA, while some alleged errors were harmless under *Brecht*.  In a few instances, Petitioner has presented serious claims of error that, although this court finds them meritless under AEDPA, are deserving of encouragement to proceed further and, consequently, mandate issuance of a certificate of appealability.  But viewing the record as a whole, this court is not persuaded that Petitioner's claims of error, considered

cumulatively, render his trial fundamentally unfair.  Accordingly, this claim of error is due to be denied.[64]

## X.  Claim Ten – State and Federal Claims Reserved; Procedurally Defaulted Claims Amount to Ineffective Assistance of Counsel; Direct Claims Preserved

Claim Ten appears to assert several blanket "allegations" about Petitioner's "intent to rely on all relevant law," including state or federal law, that may be construed to support his claims; his assertion that he received the ineffective assistance of his trial and appellate counsel for any claim found procedurally barred because it was not presented at trial or on appeal; his assertion that, for every claim of ineffective assistance of counsel he alleges, the underlying error also violated his constitutional rights; his assertion that he has not "abandoned" claims raised on direct appeal but not raised in his federal petition; and his assertion that the "failure to raise any claims at this stage of the proceeding does

---

[64] Notably, across the petition and his briefing, Petitioner has not cited a single case in which a federal court has granted habeas relief on a cumulative error theory.  In fact, in the cases he cites, federal appellate courts have denied relief under that theory.  As already discussed, *Derden*, cited in his petition and his briefing, denies the petitioner's cumulative error claim.  *See* 978 F.2d at 1459-61.  Petitioner's merits brief presents no new cases in support of his claim.  *See* Doc. 31 at 107–08.  Petitioner's reply brief cites a few federal appellate decisions that indeed conduct cumulative error review but ultimately deny relief under that theory.  *See* Doc. 42 at 73. (citing *Lundy v. Campbell*, 888 F.2d 467, 481 (6th Cir. 1989), *Bell v. Duckworth*, 861 F.2d 168, 170 (7th Cir. 1988), and *Matlock v. Rose*, 731 F.2d 1236, 1244 (6th Cir. 1984)).  Petitioner has presented no argument why his cumulative error claim is stronger than that of the habeas petitioners in these cases.

not amount to a conscious decision to decline to raise those issues"  Pet. ¶¶ 402–06.

Claim Ten presents no independent claim of error and alleges no constitutional violation affecting Petitioner's conviction or sentence.  Accordingly, Claim Ten is not a habeas claim at all.  To the extent Petitioner nevertheless intended to allege any claim of error, it is denied.

## CERTIFICATE OF APPEALABILITY

In pertinent part, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides as follows:  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . .  If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

A certificate of appealability is necessary before a petitioner may pursue an appeal in a habeas corpus proceeding.  28 U.S.C. § 2253.  To mandate the issuance of a certificate of appealability, a petitioner must make a "substantial showing of the denial of a constitutional right."  § 2253(c)(2); *see also Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).  Generally, such a showing requires something more than absence of frivolity, and it is a higher standard than the good faith requirement of 28 U.S.C. § 1915(d).  *See Clements v. Wainwright*, 648 F.2d 979, 981 (5th Cir.

1981).   In short, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot*, 463 U.S. at 893 and n.4) (internal quotations omitted).   Based upon careful consideration, Petitioner has made a substantial showing of the denial of a constitutional right on the following issues:

a.      Claims I.B & I.C:   Whether Petitioner received the ineffective assistance of counsel due to his trial counsels' alleged failures to adequately conduct a mitigation investigation and present mitigating evidence at the penalty phase of his trial;

b.      Claim II:     Whether Petitioner was deprived of his due process right to present a defense under the Sixth and Fourteenth Amendments to the United States Constitution by the trial court's denial of his motion for funds to retain a neuropsychological expert; and

c.      Claim III.E: Whether the trial court violated Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution when it allegedly limited Petitioner's presentation of mitigating evidence during the penalty phase of his trial, characterized some of his mitigating evidence as

485

"irrelevant," and allegedly failed to consider such evidence in overriding the jury's recommended life sentence (*i.e.*, Petitioner's claim pursuant to *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)).

Accordingly, it is ORDERED that a Certificate of Appealability is granted as to the issues listed above.

## CONCLUSION

For the foregoing reasons, it is ORDERED that Petitioner Melvin Hodges's claims for habeas corpus relief, individually and cumulatively, are DENIED and his petition for writ of habeas corpus is DISMISSED.

An appropriate final judgment will follow.

DONE, on this the 4th day of September 2024.

_____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE